# EXHIBIT F

*To Be Argued By*:
JUDITH BACHMAN

New York County Clerk's Index No. 651089/10

# 𝕹𝖊𝖜 𝖄𝖔𝖗𝖐 𝕾𝖚𝖕𝖗𝖊𝖒𝖊 𝕮𝖔𝖚𝖗𝖙

## APPELLATE DIVISION—FIRST DEPARTMENT

ARIE GENGER and ORLY GENGER, in her individual capacity
and on behalf of THE ORLY GENGER 1993 TRUST,

*Plaintiffs-Respondents,*

—against—

SAGI GENGER, TPR INVESTMENT ASSOCIATES, INC., THE SAGI GENGER 1993
TRUST, ROCHELLE FANG, individually and as trustee of THE SAGI GENGER 1993
TRUST, GLENCLOVA INVESTMENT COMPANY, TR INVESTORS, LLC, NEW TR
EQUITY I, LLC, NEW TR EQUITY II, LLC, JULES TRUMP, EDDIE TRUMP and
MARK HIRSCH,

*Defendants-Respondents,*

DALIA GENGER,

*Defendant-Appellant.*

*(Caption continued on inside cover)*

## BRIEF FOR DEFENDANT-APPELLANT

JUDITH BACHMAN
LAW OFFICES OF JUDITH BACHMAN
254 S. Main Street, Suite 306
New City, New York 10956
(845) 639-3210
jlbesq_99@yahoo.com

*Attorneys for Dalia Genger*

REPRODUCED ON RECYCLED PAPER

SAGI GENGER, individually and as assignee of
THE SAGI GENGER 1993 TRUST, and TPR INVESTMENT ASSOCIATES, INC.,

*Cross-Claimants, Counterclaimants, and Third-Party Claimants-Respondents,*

—against—

ARIE GENGER, ORLY GENGER, GLENCLOVA INVESTMENT COMPANY, TR
INVESTORS, LLC, NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, JULES
TRUMP, EDDIE TRUMP, MARK HIRSCH, TRANS-RESOURCES, INC., WILLIAM
DOWD, and THE ORLY GENGER 1993 TRUST,

*Cross-Claim, Counterclaim and/or Third-Party Defendants-Respondents.*

**TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES ................................................ ii

QUESTION PRESENTED ................................................ 1

STATEMENT OF FACTS AND NATURE OF CASE ................... 1

ARGUMENT ........................................................... 4

    IT WAS ERROR FOR AN IAS COURT WITH INCOMPLETE
    INFORMATION AND NO BASIS TO DISMISS LIVE CLAIMS
    WITH PREJUDICE WHICH DISMISSAL CONTRADICTED
    A PRIOR ORDER AND A PENDING MOTION..................... 4

CONCLUSION ......................................................... 7

i

# TABLE OF AUTHORITIES

PAGE(S)

## Cases

James v. Bernhard,
    106 A.D.3d 435, 965 N.Y.S.2d 56 (1st Dep't 2013) ................. 3

Kaiser v. J & S Realty, Inc.,
    173 A.D.2d 920 (3d Dep't 1991)......................................... 5

People v. Evans,
    94 N.Y.2d 499 (2000) .................................................... 6

People v. Putziger,
    22 A.D.2d 821 (2d Dep't 1964) ........................................ 5

Samuels v. Consol. Edison Co. of N.Y.,
    96 A.D.3d 685 (1st Dep't 2012)........................................ 5

## QUESTION PRESENTED

1. When an IAS Court has incomplete information and no basis, may it issue
   an Order dismissing live claims with prejudice based on a one-paragraph
   letter which contradicts a prior order of the IAS Court as well as a pending
   motion? The IAS Court answered yes.

## STATEMENT OF FACTS AND NATURE OF CASE

In 2010, plaintiff Arie Genger and his daughter, co-plaintiff Orly Genger
("Orly") (collectively, "Plaintiffs"), commenced this action against, among other
defendants, those collectively known as the "Trump Group". (R. 134). Orly
brought her claims in this action both in her individual capacity and on behalf of
the Orly Genger 1993 Trust ("Orly Trust") (collectively, the "Orly Individual and
Orly Trust Claims"). (R. 134). Dalia Genger ("Dalia") is the trustee of the Orly
Trust. (R. 134). In 2013, the action was assigned to Justice Barbara Jaffe of the
Supreme Court, New York County (the "IAS Court").

On January 2, 2013, the IAS Court dismissed some, but not all, of the Orly
Individual and Orly Trust Claims against the Trump Group. The IAS Court found
that certain of those claims stated a viable cause of action, including ones for
aiding and abetting breach of fiduciary duty and unjust enrichment (collectively,
the "Remaining Claims"). That partial dismissal was set forth in an Amended
Decision and Order of the IAS Court ("January Order"). (R. 10).

1

The Trump Group filed a notice of appeal from the January Order but never perfected that appeal. Instead, in June 2013, the Trump Group entered into a settlement with Plaintiffs ("Settlement"). (R. 288). Plaintiffs refused to share the terms of the Settlement with Dalia or anyone else. (R. 288). Instead, they filed a proposed Second Amended Stipulation of Discontinuance with Prejudice in which each of the settling parties initialed and scratched out (from a prior Stipulation) the words "on behalf of" before the words "the Orly Genger 1993 Trust" and replaced them with the words "as beneficiary of" – thereby making clear that the parties were only discontinuing the claims that Orly had brought against the Trump Group individually and as a trust beneficiary, but not any of the claims she had brought on behalf of the Orly Trust. The IAS Court "so-ordered" the Stipulation. (R. 288).

Consistent with the Second Amended Stipulation of Discontinuance, for the next year, in multiple submissions, Orly's attorneys represented to the IAS Court that her Settlement with the Trump Group "only dismisses Orly's individual claims against the Trump Group, but does not resolve or dismiss any claims of the Orly Trust against the Trump Group". (R. 61). Orly's attorneys further represented that the Settlement (which they still declined to share) left Dalia Genger, as Trustee of the Orly Trust, free to "pick up the cudgel if she so [chose]" to prosecute the Remaining Claims. Id. (emphasis added). The Trump Group did not notify the Court that they took issue with Orly's characterizations.

2

With that representation, and following certain other rulings from the IAS

Court which further crystallized the issue, in August 2014, Dalia moved, in part, to

be substituted for Orly on behalf of the Orly Trust ("Substitution Motion") against

the Trump Group to "pick up the cudgel" and use that cudgel to prosecute some or

all of the Remaining Claims on behalf of the Orly Trust. (R. 52).[1]

Plaintiffs thereafter sought multiple extensions of their time to respond to the

Substitution Motion, the last of which Dalia's objected but the IAS Court granted

over that objection. Before they had even submitted any oppositions to the

Substitution Motion, Plaintiffs' submitted a one paragraph letter requesting that the

IAS Court enter a proposed order of dismissal and severance: (1) dismissing all of

Plaintiffs' claims (necessarily including the never-dismissed Remaining Claims)

and (2) severing the cross-claims, counterclaims and third-party claims of another

party (the "Letter"). (R. 48).

Upon receipt of the Letter, Dalia's counsel objected to the entry of the

proposed order of dismissal and severance because of Dalia's pending Substitution

Motion which sought, inter alia, to prosecute the Remaining Claims. (R. 51).

Without any meaningful, let alone complete, information in the form of papers,

motion, hearing, or argument, however, the IAS Court entered the Order of

---

[1]    Such substitution is appropriate, and indeed necessary, when a derivative
plaintiff, like Orly Genger, is no longer an appropriate representative plaintiff.
James v. Bernhard, 106 A.D.3d 435, 965 N.Y.S.2d 56 (1st Dep't 2013).

3

dismissal and severance dated November 3, 2014 and entered November 25, 2014

(Jaffe, J.) (the "Order") that purportedly dismissed the Remaining Claims. That

Order contradicted the IAS Court's own January Order leaving the Remaining

Claims and ignored the pending Substitution Motion seeking, inter alia, to

prosecute the Remaining Claims (R. 10).

Appellant, Dalia Genger , Trustee of the Orly Trust, now appeals that Order

because it purportedly dismisses the Remaining Claims in contravention of the

January Order and the Substitution Motion.

After entry of the Order and filing to the Notice of Appeal of it, the parties

completed briefing on the Substitution Motion. (R. 144 - 545). The Appellees

cited the Order as justification for the denial of the Substitution Motion claiming

that the IAS Court had dismissed the Remaining Claims. (R. 290). After

argument, the IAS Court held the Substitution Motion in abeyance until the

Surrogate's Court determined whether Dalia should remain as trustee. (R. 579).

## ARGUMENT

### IT WAS ERROR FOR AN IAS COURT
### WITH INCOMPLETE INFORMATION AND NO BASIS
### TO DISMISS LIVE CLAIMS WITH PREJUDICE
### WHICH DISMISSAL CONTRADICTED A PRIOR ORDER
### AND A PENDING MOTION

When an order, such as the one at bar, is issued without complete

information provided in the form of papers, motion, hearing or argument, it should

be reversed.  E.g., Samuels v. Consol. Edison Co. of N.Y., 96 A.D.3d 685 (1st

Dep't 2012).  Without the submission of complete information in support of an

application, a court cannot grant an order.  Kaiser v. J & S Realty, Inc., 173

A.D.2d 920 (3d Dep't 1991); People v. Putziger, 22 A.D.2d 821 (2d Dep't 1964).

Thus for instance in Kaiser v. J & S Realty, Inc., 173 A.D.2d 920 (3d Dep't

1991), the Third Department reversed an order issued on an oral motion because

the movant had failed to present affidavits or other competent evidence in support

of its factual assertions.  The court reasoned:

> Here, it appears that defendant made no
> evidentiary showing. In any event, the record on appeal,
> stipulated to by defendant, contains no affidavits, sworn
> testimony or other competent evidence in support of
> defendant's motion to vacate the default judgment. As
> such, Supreme Court's determination may not be
> sustained.

Likewise in People v. Putziger, 22 A.D.2d 821 (2d Dep't 1964), the Second

Department held that "it was error for the trial court to enter an order without a

hearing and without a judicial determination on the issues of fact and law raised by

the petition and return."

Here too, the Order must be reversed because "it was error for the [IAS

Court] to enter an [O]rder without a hearing and without a judicial determination

on the issues of fact and law raised . . . ."

5

The IAS Court entered the Order in response to the one-paragraph Letter. Plaintiffs submitted no papers, motion, affidavits, sworn testimony or other competent evidence justifying the request for the Order purportedly dismissing the Remaining Claims, nor were any of the other parties afforded the opportunity to oppose entry of the Order through their own submissions.

Among other things, the IAS Court had no information, papers, motion or hearing on the interplay between the requested Order and the January Order. Nor did the IAS Court have any information, papers, motion or hearing on the interplay between the requested Order and the Substitution Motion. In fact, the Substitution Motion had not been fully briefed, heard or decided, at the time the Order was entered. The IAS Court had woefully incomplete information before it – merely a one-paragraph Letter and nothing else – when it entered the Order.

Even assuming arguendo that the Court did have complete information about the Order, it was error to enter the Order dismissing the Remaining Claims. There was no basis to dismiss the Remaining Claims. That purported dismissal was in direct contravention of the January Order which determined the Remaining Claims to be viable, which ruling remained the law of the case. See, People v. Evans, 94 N.Y.2d 499, 503 (2000) (holding that law of the case doctrine "expresses the practice of courts generally to refuse to reopen what has been decided") (quoting Messenger v. Anderson, 225 U.S. 436, 444 (1912)). Additionally, the Order was

6

issued notwithstanding the pendency of the Substitution Motion which sought to

prosecute the Remaining Claims.

## CONCLUSION

Because the IAS Court had incomplete information and no basis to issue the

Order, the Order must be reversed.

Dated: November 6, 2015
        New City, New York

_____/s/_____

Judith Lisa Bachman, Esq.
Attorney for Appellant, Dalia Genger
254 South Main Street, Suite 306
New City, New York 10956
845-639-3210

## PRINTING SPECIFICATION STATEMENT

This computer generated brief was prepared using a proportionally spaced typeface.

    Name of typeface: Times New Roman

    Point size: 14 Points

    Line spacing: Double

The total number of words in the brief, inclusive of point headings and footnotes and exclusive of pages containing the table of contents, table of authorities, proof of service, printing specification statement, or any authorized addendum is 1,472.

FILED: NEW YORK COUNTY CLERK 12/15/2014 04:35 PM
NYSCEF DOC. NO. 1156

INDEX NO. 651089/2010

RECEIVED NYSCEF: 12/15/2014

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------x

ARIE GENGER and ORLY GENGER, in her :  
individual capacity and on behalf of
THE ORLY GENGER 1993 TRUST, :   Index No. 651089/2010
(Jaffe, B. JSC)

:  

        Plaintiffs, :  

:  

       -against- :  

SAGI GENGER, TPR INVESTMENT :  
ASSOCIATES, INC., DALIA GENGER, THE
SAGI GENGER 1993 TRUST, ROCHELLE :  
FANG, individually and as trustee of THE SAGI
GENGER 1993 TRUST, GLENCLOVA :  
INVESTMENT COMPANY, TR INVESTORS,
LLC, NEW TR EQUITY I, LLC, NEW TR :  
EQUITY II, LLC, JULES TRUMP, EDDIE
TRUMP AND MARK HIRSCH, :  

        Defendants.

-------------------------------------------------------------x

SAGI GENGER, individually and as assignee of :   PREARGUMENT STATEMENT
THE SAGI GENGER 1993 TRUST, and TPR
INVESTMENT ASSOCIATES, INC. :  

        Cross-Claimants, Counterclaimants, and :  
        Third-Party Claimants,

:  

       -against- :  

:  

ARIE GENGER, ORLY GENGER,
GLENCLOVA INVESTMENT COMPANY, :  
TR INVESTORS, LLC, NEW TR EQUITY I, LLC,
NEW TR EQUITY II, LLC, JULES TRUMP, :  
EDDIE TRUMP, MARK HIRSCH,
TRANS-RESOURCES, INC., WILLIAM :  
DOWD, and THE ORLY GENGER 1993 TRUST,

:  

        Cross-Claim, Counterclaim and/or :  
        Third-Party Defendants.

-------------------------------------------------------------x

| | |
|---|---|
| 1.  TITLE OF ACTION: | As set forth in caption. |
| 2.  FULL NAMES OF ORIGINAL PARTIES AND ANY CHANGE IN PARTIES | The original parties are as set forth in the caption above. |
| 3.  NAME OF COUNSEL FOR DEFENDANT- APPELLANT DALIA GENGER | Judith Bachman, Esq. 254 S. Main Street, Suite 306 New City, New York 10956 845-639-3210 |

4.  NAME OF COUNSEL FOR
    PLAINTIFF-RESPONDENTS

Yoav M. Griver, Esq.
Bryan D. Leinbach, Esq.
ZEICHNER ELLMAN & KRAUSE LLP
575 Lexington Avenue
New York, New York 10022
212-223-0400
Attorneys for Orly Genger

William Wachtel, Esq.
Elliot Silverman, Esq.
WACHTEL MASYR & MISSRY LLP
One Dag Hammarskjold Plaza
885 Second Avenue
New York, New York 10017
212-909-9595
Attorneys for Orly Genger

Lauren J. Wachtler, Esq.
Paul D. Montclare, Esq.
MITCHELL SILBERBERG & KNUPP LLP
12 East 49th Street
New York, New York 10017
212-509-3900
Attorney for Arie Genger

5.  NAME OF COUNSEL FOR
    DEFENDANT-RESPONDENTS

John Dellaportas
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060

212-309-6690
Attorneys for Defendants Sagi Genger,
The Sagi Genger 1993 Trust, and
TPR Investment Associates, Inc

Douglas Herrmann
William P. Frank
John Boyle
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Attorneys for Defendants Glenclova
Investment Co., TR Investors, LLC, New
TR Equity I, LLC, New TR Equity II, LLC,
Jules Trump, Eddie Trump, Mark Hirsch
and Trans-Resources, Inc.

Brian T. Stapleton
GOLDBERG SEGALLA
11 Martine Avenue, Suite 1700
White Plains, New York 10606
(914) 79805470
Attorneys for Third-Party Defendant William Dowd

Ira Tokayer, Esq.
The Chrysler Building
405 Lexington Avenue, 7th Floor
New York 10174
(212) 695-5250
Attorney for Rochelle Fang

6. COURT AND COUNTY
   FROM WHICH APPEAL
   IS TAKEN

SUPREME COURT, NEW YORK COUNTY
(Barbara Jaffe, J.S.C.)

7. THE NATURE AND OBJECT
   OF THE CAUSE OF ACTION:

By her pending motion Dalia Genger, as trustee,
sought an order substituting her as plaintiff on Orly
Genger's Trump Group claims and for an order

pursuant to CPLR 2701 directing that the Trump Group settlement fund be paid into Court.

The Plaintiffs sought an order dismissing certain claims including those for which Dalia Genger sought to be substituted while the motion for substitution was pending

Dalia Genger objected to the issuance of the order while the substitution motion was still pending

8. RESULT REACHED IN
   THE COURT BELOW:

The IAS Court issued the order requested by Plaintiffs' dismissing certain claims including those for which Dalia Genger sought to be substituted while the motion for substitution was pending

9. GROUNDS FOR
   SEEKING REVERSAL:

The Court erred in issuing the order requested by Plaintiffs' dismissing certain claims including those for which Dalia Genger sought to be substituted while the motion for substitution was pending

10. RELATED ACTIONS:

Orly Genger et al. v. Dalia Genger et al., Index No. 109749/2009. Pending

Orly Genger v. Sagi Genger, Index No. 100697/2008. Pending

In the Matter of the Application of Orly Genger, as a person interested, for the removal of Dalia Genger, as Trustee of the Orly Genger Trust, File No. 0017/2008 N.Y. Surr. Ct. (Anderson, N. Surrogate. Pending.

Dalia Genger, et al. v. TR Investors LLC, C.A. No. 6906-CS Del. Chan. Ct., Stayed

11. OTHER APPEALS:

None pending by Dalia Genger.

## ATTORNEY'S CERTIFICATION

The undersigned hereby certifies that, to the best of the undersigned's knowledge, information

and belief, formed after a reasonable inquiry under the circumstances, the Presentation of the

within PRE-ARGUMENT STATEMENT or the contentions contained herein is/are not frivolous

as defined in 22 NYCRR § 130-1.1

Dated:  December 15, 2014
       New City, New York

_____/s/_____
Judith Lisa Bachman, Esq.
Attorney for Dalia Genger
254 South Main Street, Suite 306
New City, New York 10956
845-639-3210

## SETTLEMENT AGREEMENT AND RELEASE

This settlement agreement and release (this "Agreement") is entered into as of

June 16, 2013, by and between Arie Genger and Orly Genger (in her individual capacity and in

her capacity as beneficiary of the Orly Genger 1993 Trust), Arnold Broser, David Broser, (in

their individual capacity and on behalf of all entities managed, owned or controlled in any way

by Arnold Broser or David Broser and which are in any way related to the subject matter hereof

("Broser Entities" and collectively with Arie Genger and Orly Genger in all capacities referenced

above, the "AG Group"), and TR Investors, LLC ("TR Investors"), Glenclova Investment Co.

("Glenclova"), New TR Equity I, LLC ("New TR I"), New TR Equity II, LLC ("New TR II" and,

together with TR Investors, Glenclova and New TR I, the "Trump Entities"), Trans-Resources,

LLC (the successor to Trans-Resources, Inc. and together with its predecessor entities referred to

herein as, "Trans-Resources"), Jules Trump, Eddie Trump and Mark Hirsch (collectively, with

the Trump Entities and Trans-Resources, the "Trump Group"). The members of the AG Group

and the Trump Group are each referred to herein individually as a "Party" and together as the

"Parties".

**WHEREAS**, in March 2001, TR Investors, Glenclova, Trans-Resources and TPR

Investment Associates, Inc. ("TPR") entered into a stockholders agreement with respect the

common stock of Trans-Resources (the "Stockholders Agreement");

1

WHEREAS, since August 2008, Arie Genger, Orly Genger, the Trump Group and others have been engaged in various litigations (described below) concerning the ownership and control of Trans-Resources; and

WHEREAS, the Parties wish to resolve all issues, disputes and disagreements between them, including but not limited to the issue of ownership of all Trans-Resources shares;

NOW, THEREFORE, in consideration of the promises and representations contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1.   **Recitals.**   The above recitals are incorporated into and made a part of this Agreement and are binding on all Parties hereto.

2.   **Initial Consideration from the Trump Group**.   Upon dismissal with prejudice of the claims, counterclaims, cross-claims, third-party claims, issues and matters as provided in Paragraph 4 below, the Trump Group shall promptly:

(a)   release all claims they may have to the (i) $7,428,994.00 plus interest held by Skadden, Arps, Slate, Meagher & Flom LLP as escrow agent (the "Skadden Escrow") and (ii) $10,314,005.00 plus interest held by with Pedowitz & Meister as escrow agent (the "P&M Escrow");

(b)   pay to Wachtel, Masyr & Missry, LLP as attorneys for the AG Group ("Wachtel") an amount in cash equal to $35,000,000.00 minus (i) the amount held in the Skadden Escrow, and (ii) the amount held in the P&M Escrow.

2

3.   **Further Consideration from the Trump Group.**   Trans-Resources on behalf of the Trump Group shall pay: (i) $7,500,000 to Wachtel on the third anniversary of the Effective Date (defined below), and (ii) $7,500,000 to Wachtel 364 days following the third anniversary of the Effective Date The payments provided under this paragraph shall be (a) subject to the terms and conditions herein and (b) evidenced by two (2) promissory notes that are substantially in the form attached as Exhibit A hereto (the "Notes").  Notwithstanding anything else herein, the maturity of the two $7,500,000 Notes shall be delayed beyond their due date until the earlier (the "Extended Maturity Date") of (A) such time as all pending claims, cross-claims and counter-claims brought by any of TPR, Sagi Genger, the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust (other than the Orly Trust Action (as defined below)), D&K Limited Partnership, D&K GP LLC, Rochelle Fang, and/or David Parnes (collectively, the "Sagi Group") against any member of the Trump Group have been dismissed with prejudice and the statute of limitations shall have run with respect to any other potential claims of the Sagi Group that might be the subject of the Indemnification provided for by Paragraph 5 below or (B) such time as each member of the Sagi Group shall have provided the Trump Group with a release of the Trump Group Released Parties (as defined below) and covenant not to sue in form and substance that is the same as the AG release and covenant not to sue contained in Paragraph 6(a) below (the "Sagi Group Release").

Subject to the foregoing, the Notes shall become immediately due and payable upon the occurrence of any transaction or series of transactions which shall result in the Trump Group owning or controlling neither (i) a majority of the voting stock of Trans-Resources or its successors or each of its two principal subsidiaries, Haifa Chemicals, Ltd. and Na-Churs Plant

3

Food Company or their successors, nor (ii) directly or indirectly, a majority of the assets currently owned by Trans-Resources and its subsidiaries; provided, however, that in such event, at the request of the Trump Group, the amounts then payable on the Notes shall be placed in escrow for the duration of their original term or until the Extended Maturity Date (if applicable) under the provisions of an escrow agreement on reasonable terms to be negotiated at such time in good faith between Trans-Resources, the payee and an escrow agent selected by their mutual consent, which shall provide for their release to the Trump Group in payment of Indemnification Amounts, AG Group Release Amounts and Discovery Costs (as such terms are defined below), if any, and payment to the payee of such amounts after reduction for Indemnification Amounts, AG Group Release Amounts and Discovery Costs, if any, upon their original maturity date or the Extended Maturity Date (if applicable).  If Trans-Resources is unable to pay the Notes as and when they mature, the Trump Group will be obligated to make payment thereon in an amount equal to the lesser of (x) the outstanding amounts not paid by the obligor thereunder and (y) any amount by which cash payments received by members of the Trump Group (other than Trans-Resources) from Trans-Resources and its subsidiaries since the Effective Date (whether in the form of dividends, distributions, compensation or otherwise) exceeds reasonable compensation for services rendered plus payments for goods, services and assets provided by such persons in amounts that would have been paid for such goods, services and assets in arms' length transactions with unaffiliated third parties; provided, however, that in neither case shall the Trump Group be obligated to pay any amount that exceeds the outstanding amounts not paid by Trans-Resources on the Notes (subject to any Indemnification Amounts, AG Group Release Amounts or Discovery Costs).

4

4.    **Dismissal of Claims with Prejudice**. Within two (2) business days of the Effective Date (defined below), the AG Group and the Trump Group shall take all actions necessary or desirable to: (i) effect the dismissal with prejudice of all claims, counterclaims, cross-claims, third-party claims, issues and matters between them, and to vacate all court orders which restrain, enjoin or in any way limit actions by any members of the Trump Group, in each pending action in which members of the AG Group and the Trump Group are parties (whether or not service of process with respect thereto has been effected), including, without limitation, each of the following pending actions (collectively, the "Litigation"): *Genger v. TR Investors, LLC*, No. 168, 2013 (Del.); *TR Investors, LLC v. Genger*, C.A. No. 6697-CS (Del. Ch.); *Trans-Resources, Inc. v. Genger*, C.A. No. 4391-CS (Del. Ch.) (with respect to Arie Genger only); *TR Investors, LLC, et al. v. Genger*, C.A. No. 3994-CS (Del. Ch.); *Glenclova Investment Co. v. Trans-Resources, Inc., at al.*, No. 08 Civ. 7140 (JFK) (S.D.N.Y.); *Arie Genger and Orly Genger v. Sagi Genger, et al.*, Index No. 651089/2010 (N.Y. Supr.); and (ii) have the New York State Supreme Court enter a definitive non-appealable order declaring that members of the Trump Group own all right, title and interest (beneficially, of record and otherwise) to the shares of Trans-Resources purportedly transferred by TPR in October 2004 to Arie Genger (the ("Arie Shares") and to the Orly Genger 1993 Trust (the "Orly Trust Shares"), with the understanding and agreement that should the request for the entry of such an order with respect to the "Orly Trust Shares" be denied or not entered in a reasonably timely fashion, then the AG Group and the Trump Group shall take all action necessary or desirable to have the New York State Supreme Court vacate all court orders which restrain, enjoin or in any way limit actions by the

5

parties to the pending action captioned *Dalia Genger, as Trustee of the Orly Genger 1993 Trust v. TR Investors, LLC, et al.,* C.A. No. 6906-CS (Del. Ch.) (the "Orly Trust Action"), to prosecute, defend, compromise, settle and otherwise deal with all claims, counterclaims, cross-claims, third-party claims, issues and matters asserted therein; provided, however, that nothing in this Agreement is intended to require or permit the dismissal of any claims, counterclaims, cross-claims, third-party claims, issues and matters, (i) in *Trans-Resources, Inc. v. Genger,* C.A. No. 4391-CS (Del. Ch.) (the "Breach of Fiduciary Duty Case"), as between the Trump Group and Avi Pelossof and/or William Dowd (subject to the exchange of general releases between the members of the Trump Group and William Dowd as contemplated below) and (b) against TPR, the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust, D&K Limited Partnership, D&K GP LLC, Sagi Genger or Dalia Genger. Any member of the AG Group including, without limitation, Orly Genger, who is called to testify in the Litigation or the Orly Trust Action, agrees to testify that he, she (in her individual capacity, ~~on behalf of the Orly Genger 1993 Trust,~~ and as beneficiary of the Orly Genger 1993 Trust) or it has waived all claims he, she (in her individual capacity, ~~on behalf of the Orly Genger 1993 Trust,~~ and as beneficiary of the Orly Genger 1993 Trust) or it had or may have to ownership (record, beneficial or otherwise) of any shares of Trans-Resources and that he, she (in her individual capacity, ~~on behalf of the Orly Genger 1993 Trust,~~ and as beneficiary of the Orly Genger 1993 Trust) or it is opposed to the Orly Genger 1993 Trust seeking any remedy of any kind against any member of the Trump Group. Notwithstanding the foregoing, upon receipt by the Trump Group of a general release in form and substance reasonably satisfactory to it, the Trump Group shall provide the same general

6

release to William Dowd and cause the dismissal of the Breach of Fiduciary Duty Case as between the Trump Group and him.

     5.    **Indemnification.**

     (a)    Upon closing of this Agreement, each of the members of the AG Group with the exception of Arnold Broser and David Broser and the Broser Entities, jointly and severally, agrees to indemnify and hold harmless (i) each of the members of the Trump Group, and their respective past and present affiliates and direct and indirect subsidiaries, and (ii) each of the past and present agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, predecessors, successors, heirs, executors, administrators and assigns of each person and entity referenced in clause (i), from all reasonable costs, expenses, attorneys' fees of counsel selected by the Trump Group (it being agreed that the Trump Group will cooperate with the AG Group in all reasonable respects to cause the amount of such costs, expenses and its attorneys' fees to be minimized), settlements and/or judgments (whether direct or related to joint and several liability) (the "Indemnification Amounts") incurred as a result of, in connection with, or relating in any way to any (x) claims, counterclaims, cross-claims or third-party claims raised or that could have been raised in the Litigation, and (y) claims that are pending, have been brought, or that may in the future be brought by or on behalf of any of TPR, the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust (other than those claims currently pending in the Orly Trust Action), D&K Limited Partnership, D&K GP LLC, Sagi Genger, David Parnes or Dalia Genger, regardless of whether they were or could have been raised in the Litigation or the Orly Trust Action, relating in any way, whether directly or indirectly, to (A) the Shareholders Agreement entered into by Trans-Resources

shareholders and Trans-Resources on March 30, 2001, (B) the transfer of interests in TPR or the

purported transfer of shares of Trans-Resources by TPR in October 2004, (C) any activities or

developments relating to or conducted by Trans-Resources or any of its direct or indirect

subsidiaries that occurred prior to September 26, 2008, (D) the acquisition by the Trump Group

of all interests (record, beneficial or otherwise) of the so called "Arie Shares", "Orly Trust

Shares" and the shares of Trans-Resources purportedly transferred by TPR in October 2004 to

the Sagi Genger 1993 Trust (the "Sagi Trust Shares") (including, without limitation, the

negotiations for the ownership or acquisition of such shares), (E) the control of Trans-Resources

or any of its direct or indirect subsidiaries by the Trump Group through its acquisition of the

aforementioned shares, (F) records and documents (including but not limited to electronic files)

in the possession, custody or control of Trans-Resources or any of its direct or indirect

subsidiaries, (G) misrepresentations made or improper acts conducted prior to September 26,

2008 by any officer or director of Trans-Resources, (H) this Agreement, (I) the business or

operations of Trans-Resources or any of its direct or indirect subsidiaries conducted prior to

September 26, 2008 arising from or in any way related to the conduct of any member of the AG

Group, Avi Pelossof or William Dowd, or (J) the conduct of any other individual to the extent

Arie Genger is aware, or should have been aware, thereof. Notwithstanding the foregoing, the

indemnity provided for above shall not apply to any claims which may be brought subsequent to

the Effective Date (and which are entirely unrelated to any claim brought prior to such date) by

any of Sagi Genger, the Sagi Genger 1993 Trust or TPR and which arise solely out of actions

taken or not taken by members of the Trump Group which actions or inactions no member of the

AG Group was aware of or should have been aware of; provided, however, that such claim was

8

not encouraged or solicited by any member of the AG Group and no member thereof cooperates in asserting, instituting or prosecuting such claim. Notwithstanding anything herein to the contrary, the undertaking of William Wachtel hereunder shall not exceed under any circumstance an amount greater than $5,000,000.

(b)    The Trump Group may request payment or reimbursement of the Indemnification Amounts at any time by providing a written statement or copy of an underlying invoice or expense documentation to any member of the AG Group at the addresses set forth in Paragraph 16 below, and the AG Group shall pay such indemnified expenses in full and in cash within five (5) business days of the date such request is made. The supporting documentation submitted with any payment or reimbursement request hereunder may be redacted as necessary to preserve attorney-client privilege, attorney work product, or confidential information the Trump Group may, in its reasonable determination, need to protect. The Trump Group will provide the AG Group with reasonable notice prior to making any motion or taking any appeal with respect to, or in, any past, present or future action or claim for which the Trump Group is seeking indemnification, and such notice will be accompanied by a non-binding estimate of the legal fees and costs associated with such motion or appeal. The Trump Group authorizes the AG Group and their respective counsel to discuss directly with the Trump Group's appointed counsel the amount and scope of any invoice for which the Trump Group is seeking indemnification. The AG Group in its sole discretion may settle any indemnified claim so long as there is no monetary contribution to be paid by the Trump Group, and the Trump Group is released, in form and substance reasonably satisfactory to it, from any liability relating to any such indemnified

9

claim. The Trump Group shall not enter into any settlement of any indemnified claim, or discussions with respect thereto, without the express written consent of the AG Group.

(c)   With respect to each Indemnification Amount, until such time as it has been paid over to the Trump Group, the members of the AG Group shall remain jointly and severally liable for such Indemnification Amount and, the Trump Group may at its option pursue all legal remedies available to it and/or withhold an amount equal to such unreimbursed Indemnification Amount from any payments by Trans-Resources to be made pursuant to the Notes.

6.   **Releases**.

(a)   **The AG Group Release.** Effective on the Effective Date, each of the members of the AG Group, for itself, himself or herself, and in all capacities, and on behalf of its (and its respective affiliates' and direct and indirect subsidiaries'), his or her respective agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and affiliates, and each of their respective predecessors, successors, heirs, executors, administrators and assigns, and any other persons or entities acting in concert with any of them including, without limitation, any member of the Sagi Group which he, she or it shall at any time directly or indirectly control or be deemed authorized to act on behalf of (individually, an "AG Group Releasing Party" and collectively, the "AG Group Releasing Parties"): (i) fully, finally, irrevocably and unconditionally waives, releases and discharges each of the members of the Trump Group and its (and its respective past and present affiliates' and direct and indirect subsidiaries'), his or her respective past and present agents

10

(including Skadden, Arps, Slate, Meagher & Flom LLP in any capacity, including as Escrow Agent for the Skadden Escrow or for any escrow in which it held, holds, or may hold, any dividends or distributions from Trans-Resources), representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and affiliates, and each of their respective predecessors, successors, heirs, executors, administrators and assigns (collectively, the "Trump Group Released Parties"), from any and all claims, counterclaims, demands, proceedings, actions, causes of action, orders, obligations, damages, debts, costs, expenses and other liabilities whatsoever and however arising, whether known or unknown, past, present or future, suspected or unsuspected, contingent or actual, both at law and in equity, including without limitation, claims for fraud or fraud in the inducement (collectively, "Claims"), which such AG Group Releasing Party now has, has ever had or may hereafter claim to have against any Trump Group Released Party or its, his or her assets, liabilities or operations from the beginning of the world through the Effective Date (individually, an "AG Group Released Claim" and collectively, the "AG Group Released Claims"); and (ii) agrees not to assert, institute or prosecute, or encourage, solicit or cooperate with any other person or entity in asserting, instituting or prosecuting, any proceeding against any of the Trump Group Released Parties in any jurisdiction (domestic or foreign, including, without limitation, the State of Israel) with respect to any AG Group Released Claim or any other Claim relating in any way, directly or indirectly, to Trans-Resources or any of its direct or indirect subsidiaries, the ownership or acquisition of Trans-Resources shares (including any dividends or distributions relating thereto or any escrow in which such dividends or distributions may currently be or in the past have been held), the Litigation, the Orly Trust Action, control of Trans-Resources or any of its direct or

11

indirect subsidiaries, the business or operations of Trans-Resources or any of its direct or indirect

subsidiaries, or arising out of this Agreement including, without limitation, the negotiation and

execution of this Agreement or the AG Group Releases provided hereunder; provided, however,

that this AG Group Release shall not apply to any Claims (x) seeking equitable relief to enforce

the terms of this Agreement or claims seeking payment of the Notes or any indemnification

payments required to be paid hereunder, (y) relating solely to events that transpired in their

entirety subsequent to the Effective Date and that could not, under any circumstances, have

possibly been pursued prior to the Effective Date whether or not then known, and (z) between

any of the AG Group Releasing Parties and TPR, and/or any other member of the Sagi Group.

If an AG Releasing Party brings an AG Group Released Claim or other Claim in

violation of the immediately preceding paragraph, the AG Group, jointly and severally, agrees to

indemnify the Trump Group for any and all settlements, judgments, costs and fees, including

legal fees and disbursements of counsel chosen by the Trump Group, incurred in working on,

preparing for or defending such claim ("AG Group Release Amounts"). With respect to each

AG Group Release Amount, until such time as such AG Group Release Amount has been paid

over to the Trump Group, the members of the AG Group shall remain jointly and severally liable

for such AG Group Release Amount, and the Trump Group may at its option pursue all legal

remedies available to it and/or withhold an amount equal to such unreimbursed AG Group

Release Amount from any payments to be made by Trans-Resources pursuant to the Notes. For

purposes of the removal of all doubt, it is the parties' intention that no claims shall be brought or

pursued by any member of the AG Group against any member of the Trump Group for any

12

reason whatsoever (other than claims permitted under clause (x), (y) and (z) of the immediately preceding paragraph).

        (b)    **The Trump Group Release.** Effective on the Effective Date, each of the members of the Trump Group, for itself or himself, and in all capacities, and on behalf of its (and its respective affiliates' and direct and indirect subsidiaries'), or his respective agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and affiliates, and each of their respective predecessors, successors, heirs, executors, administrators and assigns, and any other persons or entities acting in concert with any of them (individually, a "Trump Group Releasing Party" and collectively, the "Trump Group Releasing Parties"): (i) fully, finally, irrevocably and unconditionally waives, releases and discharges each of the members of the AG Group and its (and its respective past and present affiliates' and direct and indirect subsidiaries'), his or her respective past and present agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and affiliates, and each of their respective predecessors, successors, heirs, executors, administrators and assigns (collectively, the "AG Group Released Parties"), from any and all claims, counterclaims, demands, proceedings, actions, causes of action, orders, obligations, damages, debts, costs, expenses and other liabilities whatsoever and however arising, whether known or unknown, past, present or future, suspected or unsuspected, contingent or actual, both at law and in equity including, without limitation, claims for fraud or fraud in inducement, ("Claims"), which such Trump Group Releasing Party now has, has ever had or may hereafter claim to have against any AG Group Released Party or its, his or her assets, liabilities or operations from the beginning of the world through the Effective Date (individually,

a "Trump Group Released Claim" and collectively, the "Trump Group Released Claims"); and (ii)

agrees not to assert, institute or prosecute, or encourage, solicit or cooperate with any other

person or entity in asserting, instituting or prosecuting, any proceeding against any member of

the AG Group Released Parties with respect to any Trump Group Released Claim or any other

Claim relating in any way, directly or indirectly, to Trans-Resources or any of its direct or

indirect subsidiaries, the ownership or acquisition of Trans-Resources shares, control of Trans-

Resources or any of its direct or indirect subsidiaries, the business or operations of Trans-

Resources or any of its direct or indirect subsidiaries, or the negotiation and execution of this

Agreement or the Trump Group Releases provided hereunder; provided, however, that this

Trump Group Release shall not apply to any Claims (x) seeking equitable relief to enforce the

terms of this Agreement or claims seeking payment of any indemnification payments required to

be paid hereunder, (y) relating solely to events that transpired in their entirety subsequent to the

Effective Date and that could not, under any circumstances, have possibly been pursued prior to

the Effective Date whether or not then known, and (z) between any of the Trump Group

Releasing Parties and Avi Pelossof, William Dowd (unless and until the exchange of mutual

general releases between the Trump Group and William Dowd referred to above) and/or TPR.

If a Trump Group Releasing Party brings a Trump Group Released Claim or other Claim

in violation of the immediately preceding paragraph, the Trump Group, jointly and severally,

agrees to indemnify the AG Group for any and all settlements, judgments, costs and fees,

including legal fees and disbursements of counsel chosen by the AG Group, incurred in working

on, preparing for or defending such claim ("Trump Group Release Amounts").  With respect to

each Trump Group Release Amount, until such time as such Trump Group Release Amount has

14

been paid over to the AG Group, the members of the Trump Group shall remain jointly and

severally liable for such Trump Group Release Amount, and the AG Group may at its option

pursue all legal remedies available to it.  For purposes of the removal of all doubt, it is the parties

intention that no claims shall be brought or pursued by any member of the Trump Group against

any member of the AG Group for any reason whatsoever (other than claims permitted under

clause (x), (y) and (z) of the immediately preceding paragraph).

   7. **Discovery Obligations**.  Effective on the Effective Date (defined

below), to the extent that a member of the AG Group or the Orly Genger 1993 Trust seeks

discovery or testimony from any member of the Trump Group, or if any member of the Trump

Group is subpoenaed by any party to an action in which any member of the AG Group or the

Orly Genger 1993 Trust is a party, each of the members of the AG Group, jointly and severally,

agrees that to the extent indemnities of the Trump Group provided for elsewhere in this

Agreement do not apply, they shall indemnify the Trump Group for any and all costs and fees,

including reasonable legal fees and disbursements of counsel to be chosen by the Trump Group

(it being understood that for the purposes of this Discovery Obligation indemnity only, the

indemnification for legal fees shall be limited to $750 per hour of legal services), incurred in

working on, preparing for or defending such claim, it being agreed that the Trump Group will

cooperate with the AG Group in all reasonable respects to cause the amount of such costs and

fees, including its attorneys' fees and disbursements to be minimized ("Discovery Costs").  With

respect to each Discovery Cost, until such time as such Discovery Cost has been paid over to the

Trump Group, the members of the AG Group shall remain jointly and severally liable for such

Discovery Cost, and the Trump Group may at its option pursue all legal remedies available to it

15

and/or withhold an amount equal to such unreimbursed Discovery Cost from any payments to be made by Trans-Resources pursuant to the Notes.

### 8. Cooperation.

**(a)** Each member of the AG Group shall take all actions necessary or desirable, as promptly as practicable and as may be requested by the Trump Group from time to time including, without limitation, testifying in the Orly Trust Action, to (i) effectuate the release of the AG Group Released Claims and to prevent or preclude any other person or entity from asserting, instituting or prosecuting, or encouraging, soliciting or cooperating with any other person or entity in asserting, instituting or prosecuting, any proceeding or claims against any of the Trump Group Released Parties with respect to any AG Group Released Claim or any other Claim relating in any way, directly or indirectly, to Trans-Resources or any of its direct or indirect subsidiaries, the ownership or acquisition of Trans-Resources shares, the control of Trans-Resources or any of its direct or indirect subsidiaries, records and documents (including but not limited to electronic files) in the possession, custody or control of Trans-Resources or any of its direct or indirect subsidiaries or the business or operations of Trans-Resources or any of its direct or indirect subsidiaries brought by any party without regard to whether such party is a signatory hereto and (ii) cause the Orly Genger 1993 Trust to release any and all claims against the Trump Group Released Parties, including, without limitation, any claims pending in the Orly Trust Action.

**(b)** As a condition to any settlement that any member of the AG Group shall enter into with any member of the Sagi Group, the AG Group parties to such settlement shall cause each Sagi Group party to such settlement to (i) dismiss with prejudice all pending claims, cross-claims and counter claims against any of the Trump Group Released Parties (as defined below)

16

and to provide the Sagi Group Release, and (ii) if the Orly Genger 1993 Trust is a party to such

settlement, cause it to agree in writing to become an AG Group member for purposes of

providing the indemnity contained in Paragraph 5.  Likewise, as a condition to any agreement by

the AG Group to a replacement trustee for the Orly Genger 1993 Trust, the AG Group shall use

its best efforts to cause such trustee to agree in writing on behalf of the Orly Genger 1993 Trust

that it shall be a member of the AG Group for purposes of providing the indemnity contained in

Paragraph 5.

(c)    Each member of the AG Group covenants that for so long as the indemnity

contained in Paragraph 5 remains in effect, he, she or it shall not contribute or deposit any

amounts, or permit to be contributed or deposited any amounts (including, without limitation,

any payments made under Paragraphs 2 and 3), to or with the Orly Genger 1993 Trust or to any

other trust or entity that any of them directly or indirectly controls or is or was established at

their direction, or that is or was established or exists for any of their direct or indirect benefit,

unless such trust or entity has agreed in writing to being a member of the AG Group for purposes

of providing the indemnity contained in Paragraph 5.  The foregoing shall not restrict members

of the AG Group from investing in or with such entities provided that that such investment may

be liquidated, without restriction, by such member of the AG Group from time to time as may be

necessary to comply with the terms of the indemnity contained in Paragraph 5.

(d)    The AG Group covenants that, subject to any confidentiality orders of any court

or other restrictions imposed by law (i) with respect to any court filing made or received by it

concerning the Orly Genger 1993 Trust, it shall contemporaneously provide a copy thereof to the

Trump Group, and (ii) contemporaneously with its becoming aware of any changes or

17

contemplated material changes to the Orly Genger 1993 Trust including, without limitation, the

resignation of its trustee and/or the appointment of a replacement trustee, it shall provide written

notice thereof to the Trump Group.

9. **Confidentiality.** The Parties and their counsel shall not disclose the

terms of this Agreement, except if, upon written advice of counsel, it is required to do so by law.

Notwithstanding the foregoing, disclosure may be made by the Parties: (i) to their respective

accountants, financial advisors or attorneys (collectively, "Advisors") as required to obtain tax or

legal advice, it being agreed that each Party shall apprise its Advisors of the obligation to

maintain such confidentiality and that each Party shall be accountable for any breach of this

provision by its respective Advisors, and (ii) notwithstanding anything to the contrary in this

Agreement, the Parties may disclose the terms of this Agreement if necessary in any action to

enforce this Agreement or as may be required to respond to a valid subpoena, court order or

other legal process.  Each Party agrees that he, she or it will promptly give notice of any attempt

to compel disclosure of the terms of this Agreement to each of the other Parties, at least five (5)

days before compliance is required.

10.    **Third Party Beneficiaries.**  This Agreement shall have no third party

beneficiaries except for those persons and entities that are not Parties hereto but are covered by

the releases set forth in Paragraph 6 above, who may enforce those releases.

11.    **Binding Effect**

This Agreement shall be binding upon and inure to the benefit of each of the Parties hereto and

(where applicable) their respective current and former agents, representatives, officers, directors,

advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and

18

affiliates, and each of their respective predecessors, successors, heirs, executors, administrators

and assigns.

12.     **Representations and Warranties.**

(a)     Each Party represents that it, he or she is authorized to enter into

this Agreement and to grant the rights granted by it, him or her in this Agreement. Each Party

further represents that, to the extent any non-party consents are required for the performance of

any of its, his or her obligations under this Agreement (including, without limitation, with any

entity controlled by any Party, including any of its partners or equity holders), it, he or she has

obtained such consents.

(b)     Each Party has the benefit of the advice of counsel chosen and

employed by it, him or her concerning this Agreement.

(c)     Each Party is the sole owner and holder of the Claims it is releasing

under this Agreement, and represents that none of the Claims released herein have been assigned,

pledged, encumbered, or otherwise transferred in whole or in part, to any other person or entity.

(d)     Each member of the AG Group represents that he, she or it is

knowledgeable, sophisticated and experienced in business, financial and other matters relevant to

his, her or its entry into this Agreement and the transactions contemplated hereby, and has

engaged advisors, experienced in the matters contemplated by this Agreement. Each member of

the AG Group has undertaken such investigation and has been provided with and has evaluated

such documents and information as he, she or it has deemed necessary to enable him, her or it to

make an informed decision with respect to the execution, delivery and performance of this

Agreement and the transactions contemplated hereby. Each member of the AG Group is

19

consummating the transactions contemplated hereby without reliance upon any express or

implied representations or warranties of any nature, whether in writing, orally or otherwise, made

by or on behalf of or imputed to any of the Trump Group Released Parties, except as expressly

set forth in this Agreement, and no member of the AG Group shall make any Claim with respect

thereto. Each member of the AG Group acknowledges that he, she or it is taking full

responsibility for making his, her or its own evaluation of the adequacy and accuracy of all

documents or information that may have been furnished to him, her or it, and that no member of

the AG Group shall have any Claim against any of the Trump Group Released Parties with

respect thereto, including for Claims relating to the accuracy or completeness of the information

that may have been furnished to him her or it. Each member of the AG Group acknowledges and

understands that each member of the Trump Group Released Parties expressly disclaims any and

all liability that may be based on any of the documents and information that may have been

furnished to any member of the AG Group and all liability based on such documents or

information or errors therein or omissions therefrom. Accordingly, each member of the AG

Group acknowledges that none of the Trump Group Released Parties has made any

representation or warranty with respect to (i) any historical information, financial or otherwise,

including without limitation results of operations (or any component thereof), cash flows, or

financial condition (or any component thereof), of Trans-Resources and/or any of its subsidiaries,

(ii) any valuations or projections or estimates of future revenues, future results of operations (or

any component thereof), future cash flows or future financial condition (or any component

thereof) of Trans-Resources and/or any of its subsidiaries or the future business and operations of

Trans-Resources and/or any of its subsidiaries, (iii) any Claims any member of the AG Group

20

may have against any of the Trump Group Released Parties or (iv) any other information or

documents that may have been made available to any member of the AG Group or their

respective counsel, accountants or advisors with respect to any of the Trump Group Released

Parties any of their respective businesses, assets, liabilities or operations, except as expressly set

forth in this Agreement.  In addition to the foregoing, each member of the AG Group

acknowledges that his, her or its entry into this Agreement and the transactions contemplated

hereby is based solely on his, her or its respective assessment and valuation of all Claims that he,

she or it may have against any of the Trump Group Released Parties and the likelihood of

success of such Claims in a court of competent jurisdiction.  Each member of the AG Group

acknowledges that the consideration to be received by the AG Group pursuant to this Agreement

constitutes full and fair consideration for the release of all Claims contemplated hereunder.

(e)     Each member of the Trump Group represents that he, she or it is knowledgeable,

sophisticated and experienced in business, financial and other matters relevant to his, her or its

entry into this Agreement and the transactions contemplated hereby, and has engaged advisors,

experienced in the matters contemplated by this Agreement.  Each member of the Trump Group

has undertaken such investigation and has been provided with and has evaluated such documents

and information as he, she or it has deemed necessary to enable him, her or it to make an

informed decision with respect to the execution, delivery and performance of this Agreement and

the transactions contemplated hereby.  Each member of the Trump Group is consummating the

transactions contemplated hereby without reliance upon any express or implied representations

or warranties of any nature, whether in writing, orally or otherwise, made by or on behalf of or

imputed to any of the AG Group Released Parties, except as expressly set forth in this

21

Agreement, and no member of the Trump Group shall make any Claim with respect

thereto. Each member of the Trump Group acknowledges that he, she or it is taking full

responsibility for making his, her or its own evaluation of the adequacy and accuracy of all

information that may have been furnished to him, her or it, and that no member of the Trump

Group shall have any Claim against any of the AG Group Released Parties with respect thereto,

including for Claims relating to the accuracy or completeness of the information that may have

been furnished to him her or it. Each member of the Trump Group acknowledges and

understands that each member of the AG Group Released Parties expressly disclaims any and all

liability that may be based on any of the documents and information that may have been

furnished to any member of the Trump Group and all liability based on such documents or

information or errors therein or omissions therefrom. Accordingly, each member of the Trump

Group acknowledges that none of the AG Group Released Parties has made any representation or

warranty with respect to (i) any historical information, financial or otherwise, including without

limitation results of operations (or any component thereof), cash flows, or financial condition (or

any component thereof), of Trans-Resources and/or any of its subsidiaries, (ii) any valuations or

projections or estimates of future revenues, future results of operations (or any component

thereof), future cash flows or future financial condition (or any component thereof) of Trans-

Resources and/or any of its subsidiaries or the future business and operations of Trans-Resources

and/or any of its subsidiaries, (iii) any claims any member of the Trump Group may have against

any of the AG Group Released Parties or (iv) any other information or documents that may have

been made available to any member of the Trump Group or their respective counsel, accountants

or advisors with respect to any of the AG Group Released Parties any of their respective

22

businesses, assets, liabilities or operations, except as expressly set forth in this Agreement. In addition to the foregoing, each member of the Trump Group acknowledges that his, her or its entry into this Agreement and the transactions contemplated hereby is based solely on his, her or its respective assessment and valuation of all Claims that he, she or it may have against any of the AG Group Released Parties and the likelihood of success of such Claims in a court of competent jurisdiction. Each member of the Trump Group acknowledges that the consideration to be received by the Trump Group pursuant to this Agreement constitutes full and fair consideration for the release of all claims contemplated hereunder.

13.     **Attorneys' Fees.** The Parties agree to be responsible for their own attorneys' fees and costs incurred in connection with this Agreement and negotiations related to and preparation of this Agreement and not to seek from each other reimbursement of any such costs, expenses or attorneys' fees.

14.     **Governing Law.**

This Agreement, and all disputes arising under this Agreement or related thereto, shall be governed by, construed and interpreted in accordance with the laws of the State of Delaware, applicable to instruments made, delivered and performed entirely in such state, without regard to the choice of law provisions thereof.

15.     **Arbitration.** UNLESS THIS AGREEMENT SPECIFICALLY PROVIDES FOR ANOTHER TYPE OF DISPUTE RESOLUTION WITH RESPECT TO A PARTICULAR KIND OF DISPUTE, ANY AND ALL CONTROVERSIES AND CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE BREACH, TERMINATION OR VALIDITY THEREOF, SHALL BE EXCLUSIVELY SETTLED BY FINAL AND BINDING

23

being given a limited number of strikes, except for cause. Any arbitrator appointed by the AAA shall be a retired judge that presided over a state or federal court located in Delaware or a practicing attorney licensed in Delaware with no less than fifteen years of experience with large commercial cases. Any such arbitration proceedings shall be and remain confidential. The place of arbitration shall be in Manhattan, New York or elsewhere if otherwise agreed to.

(c)    Discovery will be limited to the request for and production of documents, directly related to the issues in dispute, limited depositions of limited duration, and interrogatories. Interrogatories will be allowed only as follows: a Party may request the other Party to identify by name, last known address and telephone number (i) all persons having knowledge of facts relevant to the dispute and a brief description of that person's knowledge, and (ii) any experts who may be called as an expert witness, the subject matter about which the expert is expected to testify, the mental impressions and opinions held by the expert and the facts known by the expert. All issues concerning discovery upon which the parties cannot agree will be submitted to the arbitrator for determination.

(d)    Each of the Parties agrees that it will use commercially reasonable efforts to join (and will allow the other party to join) any third party that the Parties have agreed is indispensable to the arbitration. If any such third party does not agree to be joined, the arbitration will proceed nonetheless.

(e)    The arbitrators are not empowered to award damages not permitted by the terms of this Agreement and if so permitted, then not in excess of compensatory damages, except with respect to indemnification obligations for punitive damages as provided hereunder, and

25

each Party irrevocably waives the right to recover punitive, exemplary or multiple damages with respect to any dispute other than with respect to indemnification obligations for such punitive damages as provided hereunder. The decision of, and award rendered by, the arbitrator will be final and binding on the Parties, will be in writing and will include the findings of fact and conclusions of law upon which it is based, if any.

(f)    The Parties specifically acknowledge that this Agreement evidences a transaction involving, affecting, affected by, and a part of, interstate commerce and that this agreement to arbitrate is governed by and enforceable under the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq.

(g)    Except to the extent that any of the indemnification provisions contained herein shall be applicable (i) the Parties shall each be responsible for their own costs and expenses (including legal fees and disbursements) incurred in any arbitration, and (ii) the AG Group on the one hand and the Trump Group on the other shall each be responsible for 50% of the fees and disbursements of the arbitrator and of any costs and expenses payable to the AAA.

(h)    With respect to the enforcement, modification or vacating of any arbitration award (it being reconfirmed hereby that the arbitration award shall itself be final and binding on the Parties), the Parties submit to the exclusive jurisdiction of one or the other of (i) the United Stated District Court of the Southern District of New York sitting in the Borough of Manhattan in the City of New York and (ii) the Commercial Division of the New York State Supreme Court sitting in the Borough of Manhattan in the City of New York.

16.    **Notice.** If any Party is required to give notice to any other Party under this Agreement, such notice shall be in writing and shall be deemed to have been duly given upon receipt of hand delivery, one business day following its being sent to the recipient via Federal Express or another

716412-WILSR01A - MSW

nationally recognized over-night courier, or by e-mail with confirmation of receipt to the

following individuals or to such other address or person as such Parties may from time to time

specify by written notice given in the manner provided above:

**If to the Trump Group:**

Mark S. Hirsch, Esq.

The Trump Group

41 Madison Avenue, Suite 4101

New York, NY 10010

Phone: (212) 838-1000

E-mail: mhirsch@trumpgroup.com

**With Copy to:**

Thomas J. Allingham II, Esq.

Anthony W. Clark, Esq.

Douglas D. Herrmann, Esq.

Skadden, Arps, Slate, Meagher & Flom LLP

One Rodney Square

P.O. Box 636

Wilmington, DE 19899

Phone: (302) 651-3000

E-mail: thomas.allingham@skadden.com

27

E-mail:  anthony.clark@skadden.com

E-mail:  douglas.herrmann@skadden.com

**If to Arie Genger:**

Arie Genger

104 West 40th Street, 19th Floor

New York, NY 10018

E-mail:  wachtel@wmllp.com

**With Copy to:**

Stephen P. Lamb, Esq.

Paul Weiss

500 Delaware Avenue, Suite 200

Wilmington, DE 19889

**If to Orly Genger:**

Orly Genger

104 West 40th Street, 19th Floor

New York, NY 10018

E-mail: wachtel@wmllp.com

**With Copy to:**

28

William Wachtel

Wachtel Masyr & Missry LLP

885 second ave.

New York, NY 10017

[]

**If to Arnold Broser or David Broser:**

David Broser

104 West 40th, 19th FloorNew York, NY 10018

E-mail: wachtel@wmll.com

**With Copy to:**

William Wachtel

Wachtel Masyr & Missry LLP

885 second ave.
New York, NY 10017

29

17.    **Entire Agreement.** This Agreement contains the entire agreement between the Parties

concerning the subject matter hereof. Neither this Agreement nor any of its terms or provisions

shall be binding on any Party until all the Parties hereto have signed. The Parties agree that all

drafts of this Agreement are strictly confidential and shall supplement and complement any

protection, which may attach to the exchange of confidential information in settlement

discussions, whether by common law or statute including, but not limited to, Federal Rule of

Evidence 408 and comparable state laws. Any and all prior discussions and agreements between

the Parties concerning the subject matter of this Agreement are merged into this Agreement

when signed. This Agreement may not be modified or amended, nor any of its provisions

waived, except by an instrument in writing signed by all Parties. No Party has made any

warranty or representation to the other Parties that is not set forth expressly herein. In entering

into this Agreement, no Party has relied on any statement or representation made by or on behalf

of any other Party, by or on behalf of any affiliate of such other Party, or by counsel for such

other Party that is not set forth expressly in this Agreement.

18.    **No Drafting Presumption.** This Agreement shall be interpreted or construed without

any presumption that the provisions hereof should be strictly construed against the drafter, it

being agreed that the Parties and their respective counsel and other agents have fully and equally

participated in the preparation, negotiation, review and approval of all provisions of this

Agreement.

19.    **No Admissions.** The Parties have executed this Agreement for the sole purpose of

settling and disposing of all Claims between them, and it is expressly understood and agreed that

no Party hereto admits any wrongdoing on its, his or her part by executing this Agreement.

30

20.     **Binding Effect.** It is the intention of the parties to extinguish all AG Group Released Claims and all Trump Group Released Claims and, consistent with such intention, each of the Parties hereby waives any and all rights, to the extent permitted by law, to assert that the Release provided by it in Paragraph 6 hereunder is unenforceable as to any claim whatsoever and for any reason including, without limitation, any and all rights under section 1542 of the California Civil Code, if applicable, or any other applicable similar law or principle of common law, which may have the effect of limiting the Releases herein.  Section 1542 of the California Civil Code provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

21.     **Headings.** The section headings contained in this Agreement are for reference purposes only and shall not in any way effect or control the meaning or interpretation of this Agreement.

22.     **Execution in Counterparts and by PDF e-mail.** This Agreement may be executed in multiple counterparts and by fax or PDF e-mail, each of which, when so executed and delivered, shall be an original, but such counterparts shall together constitute one and the same instrument and agreement.

23.     **Effective Date.** This Agreement shall be effective immediately upon execution and delivery by all Parties hereto (the "Effective Date").

31

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed as follows:

**TR Investors, LLC**                    **Arie Genger**

By: _____

Print: _____          Date: ____6/15/13____

Title: _____

Date: _____


**Glenclova Investment Co.**             **Orly Genger (in her individual capacity and**

**in her capacity as beneficiary of the**

By: _____          **Orly Genger 1993 Trust)**

Print: _____

Title: _____          Date: ____6/15/13____

Date: _____

32

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed as follows:

**TR Investors, LLC**                                    **Arie Genger**

By: _M̶a̶r̶k̶ ̶S̶.̶ ̶H̶i̶r̶s̶c̶h̶_____          _____

Print: MARK J. HIRICH                       Date: _____

Title: Executive VP/General Counsel

Date: June 16, 2013

**Glenclova Investment Co.**                    **Orly Genger (in her individual capacity and**

**in her capacity as beneficiary of the**

By: _M̶a̶r̶k̶ ̶S̶.̶ ̶H̶i̶r̶s̶c̶h̶_____          **Orly Genger 1993 Trust)**

Print: MARK S. HIRICH                       _____

Title: Executive VP/General Counsel          _____

Date: June 16, 2013                          Date: _____

32

**New TR Equity I, LLC**                    **Arnold Broser**

By: _____

Print: _____          Date: ___6/11/13___

Title: _____

Date: _____


**New TR Equity II, LLC**                   **David Broser**

By: _____

Print: _____          Date: ___6/16/13___

Title: _____

Date: _____

33

**New TR Equity I, LLC**                    **Arnold Broser**

By: _Mark S Hirsch_____                 _____

Print: _MARK S. Hirsch_____                 Date: _____

Title: _Executive VP/General Counsel_

Date: _June 16, 2013_____


**New TR Equity II, LLC**                   **David Broser**

By: _Mark S Hirsch_____                 _____

Print: _MARK S. Hirsch_____                 Date: _____

Title: _Executive VP/General Counsel_

Date: _June 16, 2013_____

33

**Trans-Resources, LLC**

By: _Mark S Hirsch_

Print: _MARK S. HIRSCH_

Title: _Executive VP / General Counsel_

Date: _June 16, 2013_

34

**Jules Trump**

Date: 6/16/2013

**Eddie Trump**

_____

Date: _____

**Mark Hirsch**

_____

Date: _____

35

**Jules Trump**

_____

Date: _____

**Eddie Trump**

_____

Date: June 16, 2013

**Mark Hirsch**

_____

Date: _____

35

**Jules Trump**

_____

Date: _____

**Eddie Trump**

_____

Date: _____

**Mark Hirsch**

_____

Date: June 16, 2013

35

EXHIBIT A

*6/16/13*
*Draft - Confidential*

## [FORM OF SUBORDINATED NOTE]

**THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE SOLD OR TRANSFERRED WITHOUT COMPLIANCE WITH THE REGISTRATION OR QUALIFICATION PROVISIONS OF APPLICABLE FEDERAL AND STATE SECURITIES LAWS OR APPLICABLE EXEMPTIONS THEREFROM.**

TRANS-RESOURCES

### SUBORDINATED NOTE

$7,500,000.00                                              June __, 2013

**FOR VALUE RECEIVED**, Trans-Resources, LLC a Delaware entity (the successor to Trans-Resources, Inc. and referred to herein as the "Maker"), hereby promises to pay to the order of [_____] (the "Payee"), the principal sum of Seven Million, Five-Hundred Thousand Dollars ($7,500,000.00) pursuant to the terms and conditions of and at the times provided in the Settlement Agreement (as defined below).

1.    Notes. This Subordinated Note (this "Note") is issued pursuant to, and is subject to the terms and conditions of, the Settlement Agreement and Release, dated as of June __, 2013 by and among the AG Group and the Trump Group, as amended, restated, supplemented or otherwise modified from time to time (the "Settlement Agreement"). Terms used herein and not otherwise defined herein shall have the respective meanings ascribed thereto in the Settlement Agreement.

2.    No Interest. This Note will not accrue interest, pursuant to the terms of the Settlement Agreement.

3.    Maturity. Subject to the terms and conditions of the Settlement Agreement and this Paragraph 3, this Note shall mature and be redeemed or satisfied in full by the Maker in one installment, which shall be paid by the Maker no later than the ___ anniversary of the Effective Date (the "Maturity Date"). Notwithstanding the foregoing, the Maturity Date shall automatically be extended until the earlier (the "Extended Maturity Date") of (i) such time as all pending claims, cross-claims and counter-claims brought by any of TPR, Sagi Genger, the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust (other than the Orly Trust Action), D&K Limited Partnership, D&K GP LLC, Rochelle Fang, and/or David Parnes (collectively, the "Sagi Group") against any member of the Trump Group have been dismissed with prejudice and the statute of limitations shall have run with respect to any other potential claims of the Sagi Group that might be the subject of the indemnification obligations provided for by Paragraph 5 of the Settlement Agreement and (ii) such time as each member of the Sagi Group shall have provided the Trump Group with a release of the Trump Group Released Parties and covenant not to sue in form and substance that is the same as the AG Group Release and covenant not to sue contained in Paragraph 6(a) of the Settlement Agreement. Subject to the foregoing, this Note shall become immediately due and payable upon the occurrence of any transaction or series of transactions which shall result in the Trump Group owning or controlling neither (i) a majority of the voting stock of Trans-Resources or its successors or each of its two principal subsidiaries, Haifa

Chemicals, Ltd. and Na-Churs Plant Food Company or their successors, nor (ii) directly or indirectly, a majority of the assets currently owned by Trans-Resources and its subsidiaries; provided, however, that in such event, at the request of the Trump Group, the amounts then payable on this Note shall be placed in escrow until the Maturity Date or until the Extended Maturity Date (if applicable) under the provisions of an escrow agreement on reasonable terms to be negotiated at such time in good faith between the Maker, the Payee and an escrow agent selected by mutual consent of the Maker and the Payee (such consent, not to be unreasonably withheld, conditioned or delayed), which shall provide for the release of funds from such escrow to the Maker in satisfaction of any and all Indemnification Amounts, AG Group Release Amounts and Discovery Costs owing to Maker, if any, and payment to the Payee of any amounts remaining in escrow after payment to Maker of all Indemnification Amounts, AG Group Release Amounts and Discovery Costs, if any, upon the Maturity Date hereunder or the Extended Maturity Date (if applicable).

4.    Optional Prepayments. The Maker may voluntarily prepay this Note prior to the Maturity Date, in whole or in part, at any time, without premium or penalty.

5.    Adjustment. In accordance with the terms of the Settlement Agreement, in the event that at any time Indemnification Amounts, Discovery Costs, AG Group Release Amounts, or other amounts due and payable by the AG Group to the Trump Group pursuant to the Settlement Agreement (the "Costs") have not been paid to the Trump Group in accordance with the terms of the Settlement Agreement, the Maker may, upon written notice to the Payee, set off and apply as a credit against the amount due under this Note any and all due, unpaid and outstanding Costs. The rights and remedies described herein are in addition to any other rights and remedies the Parties may have under the Settlement Agreement or other applicable law.

6.    Subordination. Pursuant to the terms of the Settlement Agreement, this Note is unsecured and shall be fully subordinated to any obligation of Trans-Resources, including, but not limited to, outstanding credit facilities, bonds, loans, tax obligations and payables.

7.    Enforcement. The Maker hereby agrees to pay on demand all reasonable costs and expenses, including without limitation attorneys' fees and costs of collection, incurred or paid by the Payee in enforcing this Note in accordance with the Settlement Agreement.

8.    Amendments. No failure or delay on the part of the Maker or the Payee in exercising any right, power, privilege or remedy shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power, privilege or remedy preclude any other or further exercise thereof or the exercise of any other right, power, privilege or remedy. This Note may not be amended and the provisions hereof may not be waived, except in accordance with the terms of the Settlement Agreement.

9.    Lost Notes, etc. If this Note is mutilated, destroyed, lost or stolen, upon receipt of evidence satisfactory to the Maker of such loss, theft, destruction or mutilation of this Note and, if requested in the case of any such loss, theft or destruction, upon delivery of an indemnity agreement reasonably satisfactory to the Maker, or, in the case of any such mutilation, upon surrender and cancellation of this Note, the Maker shall issue a new Note of like tenor and amount, in lieu of this Note.

- 2 -

Error! Unknown document property name.

10.    <u>ASSIGNMENT</u>. THIS NOTE, INCLUDING THE RESPECTIVE RIGHTS AND OBLIGATIONS OF THE MAKER AND THE PAYEE PURSUANT THIS NOTE, MAY NOT BE ASSIGNED, TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF BY EITHER THE MAKER OR THE PAYEE WITHOUT THE PRIOR WRITTEN CONSENT OF THE OTHER WHICH CONSENT MAY BE WITHHELD IN SUCH PARTY'S SOLE DISCRETION.

11.    <u>Binding Effect</u>. The provisions of this Note shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns permitted hereby.

*[signature page follows]*

Error! Unknown document property name.

**IN WITNESS WHEREOF,** the Maker has caused this Subordinated Note to be duly executed under seal on the date set forth above by a duly authorized representative of the Maker.

TRANS-RESOURCES, LLC


By:_____
    Name:
    Title:

4

**SURROGATE'S COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

In the Matter of DALIA GENGER, trustee of the ORLY
GENGER 1993 TRUST,

        Petitioner,

        - against -

ORLY GENGER, ARIE GENGER, GLENCLOVA
INVESTMENT COMPANY, TR INVESTORS, LLC, NEW
TR EQUITY I, LLC, NEW TR EQUITY II, LLC, TRANS-
RESOURCES, INC., ARNOLD BROSER, DAVID
BROSER, JOHN DOES 1-20, and JANE DOES 1-20,

        Respondents.

---

FILE NO.   2008-0017/E

Hon. Nora S. Anderson

**NOTICE OF MOTION**

---

PLEASE TAKE NOTICE THAT upon the Memorandum of Law in Support of
the TR Entities' Motion to Dismiss the Petition for Turnover of Trust Property and Other Relief,
the Affirmation of John Boyle in Support dated February 5, 2018 and all exhibits attached
thereto, the Affirmation of Mark S. Hirsch in Support dated February 5, 2018, and all prior
pleadings and proceedings heretofore, respondents Glenclova Investment Company, TR
Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC, and Trans-Resources LLC
(collectively the "TR Entities") will move this court, sitting at 31 Chambers Street, New York,
New York 10007, on February 27, 2018, at 10:00 a.m. or as soon thereafter as counsel can be
heard, for an Order pursuant to CPLR 213, CPLR 214, CPLR 311, CPLR 311-a, CPLR 3016(b),
CPLR 3211(a) (1), (3), (4), (5), (7) and (8), and SCPA 301 dismissing the Petition of Dalia
Genger as Trustee as against the TR Entities.

PLEASE TAKE NOTICE that pursuant to CPLR 2214(b), answering papers, if

any, and cross-motion, if any, must be served upon the undersigned at least seven (7) days before

the return date of this motion.

Dated: February 6, 2018
     New York, NY

                SKADDEN, ARPS, SLATE,
                MEAGHER & FLOM LLP

                John Boyle
                Four Times Square
                New York, New York  10036
                (212) 735-3000
                john.boyle@skadden.com

                *Attorneys for Respondents Glenclova*
                *Investment Co., TR Investors, LLC, New TR*
                *Equity I, LLC, New TR Equity II, LLC, and*
                *Trans-Resources LLC*

To:

JUDITH LISA BACHMAN, ESQ.
254 S. Main Street, Suite 306
New City, New York 10956
(845) 639-3210

*Attorney for Petitioner Dalia Genger*


KELLEY DRYE & WARREN LLP
John Dellaportas
101 Park Avenue
New York, NY 10178
(212) 808-5000

*Attorneys for Sagi Genger*


KASOWITZ BENSON TORRES LLP
Michael Paul Bowen
1633 Broadway
New York, New York 10019
(212) 506-1700

*Attorneys for Respondent Orly Genger*


STEVEN RIKER, ESQ.
One Grand Central Place, 46th Floor
New York, NY 10165
(212) 661-6410

*Guardian Ad Litem*

2

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In The Matter of DALIA GENGER, Trustee of     File No. 2008-0017/E
the ORLY GENGER 1993 TRUST,              :

                                     Hon. Nora S. Anderson

                 Petitioner,      :

          - against -                :

ORLY GENGER, ARIE GENGER,          :
GLENCLOVA INVESTMENT COMPANY,
TR INVESTORS, LLC, NEW TR EQUITY I,   :
LLC, NEW TR EQUITY II, LLC, TRANS-
RESOURCES, INC., ARNOLD BROSER,     :
DAVID BROSER, JOHN DOES 1-20, and
JANE DOES 1-20,                      :

               Respondents.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

STATE OF NEW YORK     )
                          ) ss.:
COUNTY OF NEW YORK   )

        Julie M. Thaxton, being duly sworn, deposes and says:

        1.  That deponent is over eighteen years of age, not a party to the action

and is employed by Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square,

New York, NY 10036.

        2.  That on the 6th day of February 2018, deponent served a true copy of

the

- *Notice of Motion,*

- *Affirmation of John Boyle in Support of the TR Entities' Motion to Dismiss the Petition For Turnover of Trust Property and Other Relief with the annexed Exhibits A-L,*

- *Affirmation of Mark S. Hirsch in Support of Motion to Dismiss* and

- ***Memorandum of Law in Support of the TR Entities' Motion to Dismiss the Petition for Turnover of Trust Property and Other Relief Filed on June 14, 2016, by Dalia Genger as Trustee of the Orly Genger 1993 Trust***

by Federal Express, overnight delivery upon:

Judith Lisa Bachman, Esq.
254 S. Main Street, Suite 306
New City, New York 10956

Kelley Drye & Warren LLP
John Dellaportas
101 Park Avenue
New York, NY 10178

Kasowitz Benson Torres LLP
Michael Paul Bowen
1633 Broadway
New York, NY 10019

Steven Riker, Esq.
One Grand Central Place, 46th Floor
New York, NY 10165

Julie M. Thaxton
_____
Julie M. Thaxton

Sworn to before me this
6th day of February 2018.

_____
Matthew Koenig
Notary Public, State of New York
Reg. No. 01KO6211943
Qualified in New York County
Commission Expires Sept. 23, 2021

2

File No. 2008-0017/E

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

In the Matter of DALIA GENGER, trustee of the ORLY GENGER 1993
TRUST,

Petitioner,

-against-

ORLY GENGER, ARIE GENGER, GLENCLOVA INVESTMENT
COMPANY, TR INVESTORS, LLC, NEW TR EQUITY I, LLC, NEW TR
EQUITY II, LLC, TRANS-RESOURCES, INC., ARNOLD BROSER, DAVID
BROSER, JOHN DOES 1-20, and JANE DOES 1-20,

Respondents.

## NOTICE OF MOTION

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

ATTORNEYS FOR GLENCLOVA INVESTMENT CO., TR INVESTORS, LLC,
NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, and TRANS-RESOURCES LLC.

FOUR TIMES SQUARE
NEW YORK, NEW YORK 10036
(212) 735-3000

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In The Matter of DALIA GENGER, Trustee of      File No. 2008-0017/E
the ORLY GENGER 1993 TRUST,                :
                                              Hon. Nora S. Anderson
                        Petitioner,        :

        - against -                        :

ORLY GENGER, ARIE GENGER,                  :
GLENCLOVA INVESTMENT COMPANY,
TR INVESTORS, LLC, NEW TR EQUITY I,        :
LLC, NEW TR EQUITY II, LLC, TRANS-
RESOURCES, INC., ARNOLD BROSER,            :
DAVID BROSER, JOHN DOES 1-20, and
JANE DOES 1-20,                            :

                        Respondents.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NEW YORK     )


        Julie M. Thaxton, being duly sworn, deposes and says:

        1.  That deponent is over eighteen years of age, not a party to the action

and is employed by Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square,

New York, NY 10036.

        2.  That on the 6th day of February 2018, deponent served a true copy of

the

- *Notice of Motion,*

- *Affirmation of John Boyle in Support of the TR Entities' Motion to Dismiss the Petition For Turnover of Trust Property and Other Relief with the annexed Exhibits A-L,*

- *Affirmation of Mark S. Hirsch in Support of Motion to Dismiss and*

- *Memorandum of Law in Support of the TR Entities' Motion to Dismiss the Petition for Turnover of Trust Property and Other Relief Filed on June 14, 2016, by Dalia Genger as Trustee of the Orly Genger 1993 Trust*

by Federal Express, overnight delivery upon:

Arnold Broser
5371 Fisher Island Drive
Miami Beach, FL 33109

Arie Genger
17001 Collins Avenue
Sunny Isles Beach, FL 33160

Julie M. Thaxton

Sworn to before me this
6th day of February 2018.

Matthew Koenig
Notary Public, State of New York
Reg. No. 01KO6211943
Qualified in New York County
Commission Expires Sept. 23, 2021

2

**SURROGATE'S COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

In the Matter of DALIA GENGER, trustee of the ORLY
GENGER 1993 TRUST,

      Petitioner,

      - against -

ORLY GENGER, ARIE GENGER, GLENCLOVA
INVESTMENT COMPANY, TR INVESTORS, LLC, NEW
TR EQUITY I, LLC, NEW TR EQUITY II, LLC, TRANS-
RESOURCES, INC., ARNOLD BROSER, DAVID
BROSER, JOHN DOES 1-20, and JANE DOES 1-20,

      Respondents.

FILE NO.    2008-0017/E

Hon. Nora S. Anderson

# MEMORANDUM OF LAW IN SUPPORT OF THE TR ENTITIES' MOTION TO DISMISS THE PETITION FOR TURNOVER OF TRUST PROPERTY AND OTHER RELIEF FILED ON JUNE 14, 2016, BY DALIA GENGER AS TRUSTEE OF THE ORLY GENGER 1993 TRUST

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

John Boyle
Four Times Square
New York, New York  10036
(212) 735-3000
(212) 735-2000 (facsimile)

*Attorneys for Glenclova Investment Co.,*
*TR Investors, LLC, New TR Equity I, LLC,*
*New TR Equity II, LLC, and*
*Trans-Resources LLC.*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................1

RELEVANT FACTUAL BACKGROUND.................................................................4

ARGUMENT...............................................................................................................8

I.      STANDARD OF REVIEW ........................................................................8

II.     THE COURT LACKS JURISDICTION OVER THE TR ENTITIES
        BECAUSE DALIA FAILED TO PROPERLY SERVE THEM............................9

III.    DISMISSAL OF THE PETITION IS REQUIRED AND THE CLAIMS
        AGAINST THE TR ENTITIES ARE NOW TIME-BARRED BECAUSE
        PROCESS WAS NOT SERVED WITHIN THE TIME PERIOD
        REQUIRED BY THE SCPA ......................................................................12

IV.     DALIA'S AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
        CLAIM IS INSUFFICIENTLY PLEADED AND WITHOUT MERIT..............13

        A.      Dalia's Claim Fails Because Orly, as Beneficiary, Does Not Owe
                Any Fiduciary Duties to the Trust .............................................13

        B.      Dalia's Claim Fails Because She Fails to Sufficiently Allege
                Knowing Participation by Any of the TR Entities......................13

V.      DALIA'S TORTIOUS INTERFERENCE WITH CONTRACT CLAIM IS
        INSUFFICIENTLY PLEADED AND WITHOUT MERIT ................................17

        A.      Dalia Has Not Sufficiently Alleged that Any of the Trump Group
                Entities Knowingly and Improperly Induced a Breach..............17

VI.     DALIA'S MONEY HAD AND RECEIVED AND TURNOVER
        CAUSES OF ACTION CANNOT STAND...............................................18

VII.    RES JUDICATA AND COLLATERAL ESTOPPEL BAR DALIA'S
        CLAIMS ..................................................................................................19

VIII.   SHOULD THE COURT NOT DISMISS THE PETITION FOR ANY OF
        THE ABOVE REASONS IT SHOULD BE STAYED OR DISMISSED ...........22

CONCLUSION...........................................................................................................23

## TABLE OF AUTHORITIES

Page

## CASES

*Alvord & Swift v. Stewart M. Muller Construction Co.,*
    46 N.Y.2d 276, 413 N.Y.S.2d 309 (1978) ........................................................18

*Basile v. Wiggs,*
    98 A.D.3d 640, 950 N.Y.S.2d 148 (2d Dep't 2012)...........................................9

*In re Bear Stearns Litigation,*
    23 Misc.3d 447, 870 N.Y.S.2d 709 (Sup. Ct. N.Y. Cty. 2008) .........................17

*Behrle v. Behrle,*
    150 A.D.3d 656, 53 N.Y.S.3d 697 (2d Dep't 2017)...........................................13

*Berardi v. Berardi,*
    108 A.D.3d 406, 969 N.Y.S.2d 444 (1st Dep't 2013).....................................9, 14

*Biondi v. Beekman Hill House Apartment Corp.,*
    257 A.D.2d 76, 692 N.Y.S.2d 304 (1st Dep't 1999), *aff'd*, 94 N.Y.2d 659 (2000) ............9

*Brasseur v. Speranza,*
    21 A.D.3d 297, 800 N.Y.S.2d 669 (1st Dep't 2005).........................................16

*Bronxville Knolls, Inc. v. Webster Town Center Partnership,*
    221 A.D.2d 248, 634 N.Y.S.2d 62 (1st Dep't 1995)...........................................9

*Ciafone v. Queens Center for Rehabilitation & Residential Healthcare,*
    126 A.D.3d 662, 5 N.Y.S.3d 462 (2d Dep't 2015)............................................10

*Dewey v. Hillcrest General Hospital,*
    201 A.D.2d 609, 607 N.Y.S.2d 967 (2d Dep't 1994)....................................10, 11

*Diamond v. McDonald,*
    41 Misc. 3d 1235(A), 983 N.Y.S.2d 202, 2013 N.Y. Slip Op. 51988(U) (Sup. Ct.
    N.Y. Cty. 2013)................................................................................................12

*In re Estate of Hunter,*
    4 N.Y.3d 260, 794 N.Y.S.2d 286 (2005) ...................................................19, 21

*Estate of Jervis v. Teachers Insurance & Annuity Association,*
    279 A.D.2d 367, 720 N.Y.S.2d 21 (1st Dep't 2001).........................................13

*Fesseha v. TD Waterhouse Investor Services, Inc.,*
    193 Misc. 2d 253, 747 N.Y.S.2d 676 (Sup. Ct. N.Y. Cty. 2002) ................18, 19

*Fifty CPW Tenants Corp. v. Epstein,*
  16 A.D.3d 292, 792 N.Y.S.2d 58 (1st Dep't 2005) .......................................19, 20

*Genger v. Genger,*
  144 A.D.3d 581, 41 N.Y.S.3d 414 (1st Dep't 2016) .................................8, 21, 22

*Genger v. Genger,*
  38 Misc. 3d 1213(A), 2013 WL 221485 (Sup. Ct. N.Y. Cty. Jan. 3, 2013) .......................5

*Genger v. Genger,*
  No. 651089/2010, 2015 N.Y. Slip Op. 30008(U) (Sup. Ct. N.Y. Cty. Jan. 7, 2015) .........4

*Genger v. TR Investors, LLC,*
  C.A. No. 6906-CS (Del. Ch. Ct.) ....................................................................6

*Greenway Medical Supply Corp. v. American Transit Insurance Co.,*
  58 Misc. 3d 147(A) (N.Y. App. Term. 2018) ..................................................20

*Grika v. McGraw,*
  55 Misc. 3d 1207(A), 57 N.Y.S.2d, N.Y. Slip Op. 51878(U) (Sup. Ct. N.Y. Cty.
  2016) ........................................................................................................17

*Gropper v. 200 Fifth Owner LLC,*
  151 A.D.3d 635, 58 N.Y.S.2d 42 (1st Dep't 2017) .......................................19, 21

*Insurance Co. of State of Pennsylvania v. HSBC Bank USA,*
  10 N.Y.3d 32, 852 N.Y.S.2d 812 (2008) ......................................................20

*Kaleidakolor, Inc. v. Edward N. Hoffman Advertising Corp.,*
  No. 25577/91, 1995 WL 17961040 (Sup. Ct. N.Y. Cty. May 8, 1995) ...........................11

*Kaufman v. Cohen,*
  307 A.D.2d 113, 760 N.Y.S.2d 157 (1st Dep't 2003) .................................14, 16

*Landau, P.C.  v. LaRossa, Mitchell & Ross,*
  11 N.Y.3d 8, 862 N.Y.S.2d 316 (2008) .........................................................19

*Lesavoy v. Lane,*
  304 F. Supp. 2d 520 (S.D.N.Y. 2004), *aff'd in relevant part,* 170 Fed. App'x. 721
  (2d Cir. 2006) ........................................................................................15, 16

*MBI International Holdings Inc. v. Barclays Bank PLC,*
  151 A.D.3d 108, 57 N.Y.S.3d 119 (1st Dep't 2017) ........................................12

*McDonald v. Ames Supply Co.,*
  22 N.Y.2d 111, 291 N.Y.S.2d 328 (1968) ......................................................11

iii

*O'Brien v. City of Syracuse,*
    54 N.Y.2d 353, 445 N.Y.S.2d 687 (1981) ........................................................19

*Ross v. Lan Chile Airlines,*
    14 A.D.3d 602, 789 N.Y.S.2d 77 (2d Dep't 2005) ...........................................11

*Schuykill Fuel Corp. v. B. & C. Nieberg Realty Corp.,*
    250 N.Y. 304 (1929) .........................................................................................20

*Singh v. PGA Tour, Inc.,*
    42 Misc. 3d 1225(A), 992 N.Y.S.2d 161, 2014 N.Y. Slip Op. 50191(U) (Sup. Ct.
    N.Y. Cty 2014) ..................................................................................................16

*Stuyvesant Fuel Service Corp. v. 99-105 3rd Avenue Realty LLC,*
    192 Misc. 2d 104, 745 N.Y.S.2d 680 (N.Y. Civ. Ct. 2002) .............................10

*Syncora Guarantee Inc. v. J.P. Morgan Securities LLC,*
    110 A.D.3d 87, 970 N.Y.S.2d 526 (1st Dep't 2013) .........................................23

*In re Thomas,*
    28 Misc. 3d 300, 901 N.Y.S.2d 493 (Sur. Ct. Broome Cty. 2010) ...................12

*Torrenzano Group, LLC v. Burnham,*
    26 A.D.3d 242 (1st Dep't 2006) ......................................................................18

*TR Investors, LLC v. Genger,*
    C.A. No. 3994-VCS, 2010 WL 2901704 (Del. Ch. July 23, 2010) .....................4

*White Plains Coat & Apron Co. v. Cintas Corp.,*
    8 N.Y.3d 422, 835 N.Y.S.2d 530 (2007) .........................................................17

*Whitney v. Whitney,*
    57 N.Y.2d 731, 454 N.Y.S.2d 977 (1982) .......................................................23

*Zanett Lombardier, Ltd. v. Maslow,*
    29 A.D.3d 495, 815 N.Y.S.2d 547 (1st Dep't 2006) ...........................................9

## STATUTES AND RULES

N.Y. Surr. Ct. Proc. Act 301(a) ......................................................................1, 12

N.Y. Surr. Ct. Proc. Act 307(5) ..........................................................................10

N.Y. C.P.L.R. 213 ................................................................................................9

N.Y. C.P.L.R. 213(3) ..........................................................................................12

N.Y. C.P.L.R. 214 ................................................................................................9

iv

N.Y. C.P.L.R. 214(4) ..................................................................................................12

N.Y. C.P.L.R. 311 ..................................................................................................1, 11

N.Y. C.P.L.R. 311-a ..............................................................................................1, 10

N.Y. C.P.L.R. 320(b) ..................................................................................................1

N.Y. C.P.L.R. 2201 ..................................................................................................22

N.Y. C.P.L.R. 3016(b) ..................................................................................................9

N.Y. C.P.L.R. 3211(a)(1) ..............................................................................................1

N.Y. C.P.L.R. 3211(a)(3) ..............................................................................................1

N.Y. C.P.L.R. 3211(a)(4) ..........................................................................................1, 23

N.Y. C.P.L.R. 3211(a)(5) ............................................................................................1, 9

N.Y. C.P.L.R. 3211(a)(7) ............................................................................................1, 9

N.Y. C.P.L.R. 3211(a)(8) ........................................................................................1, 9, 10

## OTHER AUTHORITIES

Deborah Kearns, Practice Commentaries, McKinney's SCPA 301, Book 58A (McKinney
2017) ..................................................................................................................12

Respondents Glenclova Investment Co., TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC, and Trans-Resources LLC[1] (collectively the "TR Entities") respectfully submit this memorandum of law in support of their Motion to Dismiss the Petition for Turnover of Trust Property and Other Relief filed on June 14, 2016, by Dalia Genger ("Dalia") as Trustee of the Orly Genger 1993 Trust (the "Petition"), as against the TR Entities, pursuant to CPLR 213, CPLR 214, CPLR 311, CPLR 311-a, CPLR 3016(b), CPLR 3211(a) (1), (3), (4), (5), (7) and (8), and SCPA 301.[2]

## **PRELIMINARY STATEMENT**

Insofar as the Petition[3] asserts causes of action against the TR Entities it is subject to dismissal pursuant to CPLR 3211 for myriad reasons. *First*, the Petition was never properly served. *See* CPLR. 311, 311-a. *Second*, the applicable three-year statute of limitations to certain claims has not been tolled because Dalia did not serve process on the TR Entities within 120 days after the filing of the Petition. *See* SCPA 301(a). *Third*, the Petition fails to state a claim as to the aiding and abetting breach of fiduciary duty and tortious interference with contract claims because, among other reasons, Dalia has not (and cannot) sufficiently allege necessary elements of each of the claims – including without limitation, that the TR Entities actually knew of and knowingly participated in the alleged breach. *Fourth*, the Petition fails as to the remaining

---

[1] There is no existing corporation known as Trans-Resources, Inc. It was converted into Trans-Resources LLC in June 2013, and is a limited liability company created under the laws of Delaware, and has its principal offices in Florida. (*See* Affidavit of Mark S. Hirsch in Support of Motion to Dismiss at ¶ 5, cited herein as "Hirsch Aff.").

[2] Because the TR Entities are objecting to jurisdiction under CPLR 3211(8), their limited appearance by way of this motion is not a waiver of service or a waiver of any challenge to jurisdiction, and is not a formal appearance for all purposes. *See* CPLR 320(b).

[3] A copy of the Petition is attached as Exhibit A to the Affirmation of John Boyle filed in Support of the TR Entities' Motion to Dismiss submitted herewith. Copies of other documents relied upon in the Petition and other documents that the Court may consider are similarly attached as exhibits to the Boyle Affirmation. The exhibits to the Boyle Affirmation are cited herein as "Boyle Aff., Ex. __".

claims of turnover and money had and received because Dalia has admitted that the TR Entities

have not received and are not holding any money from the Orly Genger 1993 Trust. And finally,

the claims in the Petition must be dismissed under principles of res judicata because, as admitted

in the Petition, Dalia, as trustee of the Orly Genger 1993 Trust, stipulated to a dismissal with

prejudice of all claims against the TR Entities concerning ownership of any Trans-Resources

shares that also were resolved by the Settlement Agreement, and Dalia could have (and, if she

ever intended to, should have) asserted but failed to assert the claims that underlie her Petition in

a prior proceeding.

Before turning to the allegations (and the insufficiency thereof) in the Petition, the

sage reflections of New York Supreme Court Justice Cooper, who recently presided over a

Genger family dispute, are noteworthy. In that proceeding, Justice Cooper detailed what has

been called the "Genger family's litigation saga." Citing his own Westlaw search he observed

that:

> the Genger's lawsuits against each other have resulted in almost 40 reported
> decisions from the New York State Supreme Court and the Federal District Court
> for the Southern District of New York. Of the state court decisions, at least 10
> have been from the Appellate Division, First Department. There has also been
> extensive litigation in the Delaware state courts, as well as counties; unpublished
> decisions and orders from trial judges in the matrimonial and IAS parts of this
> court.

*Genger v. Genger*, No. 302436/2002, Decision and Order at 2 (Sup. Ct. N.Y. County June 3,

2016) (A copy of Justice Cooper decision is attached as Ex. B to the Boyle Aff.). Justice Cooper

further noted that the "bitter and seemingly endless battle" pits the mother Dalia and the son Sagi

against the father Arie and the daughter Orly, and that the family has "employed a small army of

lawyers to fight over the pieces of the family pie and, it seems, to make each other's lives as

miserable as possible." (Boyle Aff., Ex. B at 3 (quoting *Genger v. Genger*, 76 F. Supp. 3d 488,

491 (S.D.N.Y. 2015), *aff'd*, 663 F. App'x 44 (2d Cir. 2016)).

2

In this regard, Justice Cooper rightly commented that the Genger cases seem to be more about "a dysfunctional family where each member is intent on inflicting as much pain as possible on his or her ex-spouse, parent, child or sibling," than about the merits of any claim. (Boyle Aff., Ex. B at 3-4). Recognizing that it is the Genger's right to make each other "as miserable as they want," the Genger's use of the New York Court's as their weapon of choice has consequences beyond the Genger family:

> Litigation like the type the Genger family members have engaged in over the last decade – litigation that knows no bounds and is brought to inflict punishment on former loved-ones as much as it is to resolve actual claims – demands a disproportionate share of already limited judicial resources. The result is that litigants who lack the resources to command a "small army of lawyers," but often have claims equally or more pressing than the Genger's, find themselves receiving less time and attention from the courts than theft cases deserve.

(Boyle Aff., Ex. B at 4). Justice Cooper provided some advice for future adjudicators who may find themselves tasked with the Genger litigation onslaught:

> . . . the time for the Gengers continuing to occupy center stage in the New York court system must also end. Recently, our new Chief Judge, Janet DiFiore, unveiled an initiative to curb what she described as "troublesome" inefficiencies in court operations. In an address to the court system's administrative judges, she stated that she wanted to "make certain that we are putting our resources to our highest and best uses" (New York Law Journal, March, 31, 2016 at 1, col 3). It seems obvious that continuing to give the Gengers the exorbitant amount of court time that they demand is not putting our resources to their "highest and best uses." . . . it is this judge's hope that the parties and their children might take a step back and reflect on how destructive this path of constant litigation is, not only to them, but to the courts and the other litigants who truly need our services. If they are unable to do so, it may be incumbent on judges and court administrators to devise a method to curb what is becoming perilously close to an abuse of the judicial system.

(Boyle Aff., Ex. B at 11).

To the extent that the Genger family feud continues (as in this proceeding) to improperly and without any merit haul innocent third-parties, such as the TR Entities, into their litigation blitz, this practice must come to an end. As Chief Justice Strine of the Delaware

3

Supreme Court (then-Vice-Chancellor of the Delaware Chancery Court) found: "the Genger family's internecine feud . . . is not the [TR Entities'] problem . . . ." *TR Investors LLC v. Genger*, C.A. 3994-VCS, 2010 WL 2901704, at *18 (Del. Ch. July 23, 2010). As described below, the claims asserted against the TR Entities in the Petition are without any merit and/or were settled or dismissed by the voluntary actions of Dalia (as trustee of the Trust) and Orly (individually and in her capacity under the Trust) many years ago. As Justice Jaffe has noted, the "economic consequence" arising out of the transfers of the Trans-Resources shares that underlie the claims alleged in this Petition are the result "of the bitter feud among the members of the Genger family, which should not be borne by [the TR Entities] . . . ." *Genger v. Genger*, No. 651089/2010, 2015 N.Y. Slip Op. 30008(U), at *12 (Sup. Ct. N.Y. County Jan. 7, 2015). Justice Jaffe further noted that the court should not extend any equity to "needlessly prolong this litigation, especially where the [TR Entities] . . . [are] essentially an outside bystander caught up in the contentious family feud." *Id.* at *14. These pointed admonitions should be heeded and, insofar as the Petition attempts to again drag the TR Entities back into the Genger family's courtroom combat, the Petition should be dismissed.

## RELEVANT FACTUAL BACKGROUND

This proceeding is purportedly brought on behalf of the Orly Genger 1993 Trust (the "Trust") by Dalia Genger (Orly's mother) as trustee. Dalia filed her Petition on June 14, 2016. She commenced this new proceeding despite that, at least since June 22, 2009, Orly has sought in this Court to remove Dalia as trustee. On June 21, 2017, this Court denied Dalia's motion to dismiss Orly's petition to have her removed, noting that Orly's allegations "raise significant issues about whether Dalia's efforts as trustee have been calculated to benefit herself and others at the expense of the Orly Trust in violation of her fiduciary duty and whether she

4

poses an ongoing threat to the assets of the Orly Trust." *In re Orly Genger*, No. 2008-0017/B, Decision at 12, dated June 21, 2017 (A copy is attached as Ex. C to the Boyle Aff.).

While that proceeding has been pending, the TR Entities have been subjected to several litigations with the Genger family over who is or was the legal and beneficial owner of certain shares of Trans-Resources, Inc., a fertilizer and specialty chemicals company. Ultimately, following several trips to and dispositive rulings and orders entered by the Delaware Chancery Court, the Delaware Supreme Court, the New York Supreme Court, the Appellate Division, First Department and the United States District Court for the Southern District of New York, and stipulations, settlements, and voluntary dismissals entered into with and/or by various persons, it has been conclusively determined that the TR Entities are the sole and only lawful and beneficial owners of all Trans-Resources shares. Discussed below are some of the proceedings, rulings, and other resolutions that are relevant to the Petition.

The New York Action

In July 2010, Arie Genger and others, including his daughter Orly, commenced an action against the TR Entities and others. *See Genger v. Genger*, 38 Misc. 3d 1213(A), 2013 WL 221485, at *3 (Sup. Ct. N.Y. County Jan. 3, 2013). In that action, Orly, acting individually and on behalf of the Trust, asserted a variety of causes of action against the TR Entities, Dalia (her mother and the putative trustee of the Trust), and others. *See id* at *1. The TR Entities, Dalia and others not relevant here moved to dismiss the complaint. In a Decision and Order dated January 3, 2013, the court granted Dalia's motion to dismiss in all respects, and granted in part and denied in part the TR Entities' motion to dismiss. *See id* at *20-*21. On July 1, 2013, the court "so ordered" and entered a Stipulation of Discontinuance with Prejudice that, among other things, dismissed all claims against the TR Entities brought by Orly, both individually and as beneficiary of the Trust (the "NY Dismissal with Prejudice"). (Boyle Aff., Ex. D).

5

Prior to entry of that order, on June 16, 2013, the AG Group, consisting of Arie Genger, Arnold and David Broser, and Orly (individually and as beneficiary of the Trust), and the TR Entities entered into a settlement agreement (the "Settlement Agreement") that settled all claims between and among the TR Entities and the AG Group. (*See* Boyle Aff., Ex. E; *see also* Ex. A [Petition] at ¶¶ 14-16)). It was in reliance upon the prior determination of the court that Orly, as beneficiary, was authorized to act on behalf of the Trust, that the TR Entities, Orly (both individually and as beneficiary of the Trust), and the other parties entered into the Settlement Agreement and into the NY Dismissal with Prejudice. Indeed, the NY Dismissal with Prejudice was "so ordered" by the court and expressly notes that Orly was acting "individually and as beneficiary of" the Trust. (Boyle Aff., Ex. E at 1). Moreover, Dalia acknowledges that, pursuant to court rulings, Orly had legal standing to represent the Trust. (*See* Boyle Aff., Ex. A [Petition] at ¶¶ 9-11).

The Settlement Agreement between the TR Entities and the AG Group provides that the AG group will receive up to $35 million, less amounts already held in escrow and subject to setoff, (the "Settlement Proceeds"), in return for a full release of claims against the TR Entities, including a general release by Orly, both as an individual and as beneficiary of the Trust, and a declaration that the TR Entities own "all right, title and interest (beneficially, of record, and otherwise)" to any Trans-Resources shares. (*See* Boyle Aff., Ex. E at ¶¶ 2-4).

<u>The Delaware Action</u>

On October 4, 2011, Dalia, as trustee of the Trust, filed an action in the Delaware Court of Chancery against the TR Entities and others seeking a determination as to the beneficial ownership of the so-called Orly Trust Shares – i.e., the Trans-Resources shares that the Trust claimed to beneficially own. *See Genger v. TR Investors, LLC*, C.A. No. 6906-CS (Del. Ch. Ct.). On August 30, 2013, after the NY Dismissal with Prejudice was entered, Dalia, as trustee of the

6

Trust, agreed to entry of a Stipulation and Proposed Order of Dismissal (the "Delaware

Dismissal"), which ordered that the TR Entities were the record and beneficial owners of the

Trans-Resources shares. (*See* Boyle Aff., Ex. F at ¶ 2 ("[The TR Entities] owns, for all purposes,

all right, title and interest (beneficially, of record and otherwise) to all authorized and issued

shares of Trans-Resources)). The Delaware Dismissal also dismissed with prejudice all of

Dalia's claims against the TR Entities. (*See* Boyle Aff., Ex. F at ¶ 4 ("The claims brought on

behalf of the Orly Genger 1993 Trust by the Trustee of the Orly Trust against the [TR Entities]

are dismissed with prejudice . . . ."). Before agreeing to dismiss all of the Trust's claims with

prejudice, however, Dalia made clear to the Delaware court that she was aware of the Settlement

Agreement, and that the TR Entities were willing to produce it to her (should the court direct

them to do so) to pursue claims. (*See* Boyle Aff., Ex. G). Rather than pursue those claims,

however, Dalia decided to stipulate to the Delaware Dismissal (based upon Orly's wishes) and to

dismiss her clams with prejudice without even reviewing the Settlement Agreement.

And so, through both actions – the New York Action and the Delaware Action –

the Trust had two opportunities to bring any and all claims that it could against the TR Entities.

Nevertheless, the Trust – through both its primary beneficiary (Orly in the New York Action)

and its trustee (Dalia in the Delaware Action) – dismissed all claims with prejudice rather than

litigating.

Dalia's Efforts to Step into Orly's Shoes

Approximately one year after she stipulated to the Delaware Dismissal, and

having previously opted to seek dismissal of the New York claims rather than remain involved in

any capacity in that action, Dalia, as trustee to the Trust, made an about face and moved to

substitute in the New York Action for the purpose of asserting claims on behalf of the Trust

against the TR Entities and others. That motion was held in abeyance pending the outcome, in

7

this Court, of Orly's petition to remove Dalia as trustee. (*See* Boyle Aff., Ex. A at ¶ 26). While

Dalia's motion was pending, the parties in the New York Action then sought to have the court

enter a second order reflecting complete dismissal with prejudice of claims brought by Orly,

which it did on November 25, 2014. (*See* Boyle Aff., Ex. H). Dalia, as trustee of the Trust,

never raised any objection to the entry of that dismissal with prejudice, notwithstanding her

pending motion to substitute in that action for Orly.

   Despite failing to raise any objection to the court's entry of that order, Dalia

appealed the dismissal and specifically argued that she should be permitted to pursue the Trust's

claims that the Settlement Proceeds paid under the Settlement Agreement belonged to the Trust.

The First Department denied her appeal and instead held that, because Dalia failed to object to

the dismissal in the first place, she was foreclosed from raising the issues she tried to raise below

– i.e., that the Trust is entitled to the Settlement Proceeds and the very same claims she belatedly

asserts in the Petition. Specifically the First Department ruled that:

> Defendant Dalia Genger, as Trustee for the Orly Genger 1993 Trust (Orly Trust),
> failed to articulate any objection to the court's entry of the November 25, 2014
> order dismissing plaintiff Orly Trust's breach of fiduciary duty and unjust
> enrichment claims against certain defendants, and her claim is not properly before
> this Court . . . In any case, that order did not dismiss any claims; rather, it
> recognized that all claims had previously been dismissed or discontinued by prior
> court orders, dismissed the complaint, and severed other viable third party claims,
> cross claims, and counterclaims unrelated to the Orly Trust.

*Genger v. Genger*, 144 A.D.3d 581, 581, 41 N.Y.S.3d 414, 414-15 (1st Dep't 2016).

## ARGUMENT

## I. STANDARD OF REVIEW

   When a motion to dismiss is asserted under CPLR 3211, the court is not required

to accept factual allegations that are contradicted by documentary evidence or legal conclusions

that are unsupported in the face of undisputed facts.[4] *See Zanett Lombardier, Ltd. v. Maslow*, 29 A.D.3d 495, 495, 815 N.Y.S.2d 547, 547 (1st Dep't 2006). For example, dismissal pursuant to CPLR 3211(a)(1) is warranted where the documentary evidence definitively disposes of plaintiff's claim. *See Bronxville Knolls, Inc. v. Webster Town Ctr.*, 221 A.D.2d 248, 248, 634 N.Y.S.2d 62, 63 (1st Dep't 1995). Further, where, as here, the claims allege a breach of fiduciary duty, the circumstances constituting the breach must be pleaded in detail. *See* CPLR 3016(b); *Berardi v. Berardi*, 108 A.D.3d 406, 407, 969 N.Y.S.2d 444, 446 (1st Dep't 2013). And finally, CPLR 3211(a)(5) provides for dismissal where the cause of action may not be maintained because of collateral estoppel, res judicata, or statute of limitations. *See* CPLR 3211(a)(5).

Regardless, the Court need not reach the CPLR 3211 arguments since, as established below, the Court lacks jurisdiction over the TR Entities and the claims raised in the Petition are time-barred. *See* CPLR 3211(a)(8); CPLR 213, 214.

## II.     THE COURT LACKS JURISDICTION OVER THE TR ENTITIES BECAUSE DALIA FAILED TO PROPERLY SERVE THEM

Dismissal of the Petition is required because Dalia has not served the necessary citations on any of the TR Entities. Although Dalia attempted service on January 5, 2018 – some 570 days after she filed the Petition – Dalia's belated effort was indisputably ineffective and lacked diligence. On that date, Dalia had the citations delivered to the offices of Creative World Management, Inc. ("CWM") at 400 Park Avenue, New York, NY. (Hirsch Aff. ¶ 6). Delivery

---

[4]     In reaching its determination on a motion to dismiss, a court may consider facts that are indisputable and a court may also "consider evidentiary material submitted by a [movant] in support of a motion to dismiss a complaint pursuant to CPLR 3211(a)(7)." *Basile v. Wiggs*, 98 A.D.3d 640, 641, 950 N.Y.S.2d 148, 149 (2d Dep't 2012). Where a movant indisputably demonstrates through evidentiary material that an allegation was not a fact at all, a motion to dismiss may be properly granted. *Id.* And where allegations consists of bare legal conclusions and inherently incredible factual claims or claims contradicted by documentary evidence they are not presumed to be true. *See Biondi v. Beekman Hill House Apartment Corp.*, 257 A.D.2d 76, 81, 692 N.Y.S.2d 304, 308 (1st Dep't 1999) (where court considers extrinsic evidence on CPLR 3211 motion allegations of the complaint are not deemed true and the motion should be granted where the essential facts have been negated by the evidentiary matter), *aff'd*, 94 N.Y.2d 659 (2000).

9

merely consisted of the process server leaving the citations with an administrative assistant. (Hirsch Aff. ¶ 7). The citations were not personally delivered to any member, officer, or authorized agent of any of the TR Entities. Under the CPLR, such service, even if it had been timely made (which it was not), was improper and does not confer jurisdiction over any of the TR Entities.[5] Therefore dismissal under CPLR 3211(a)(8) is warranted.

       *First*, none of the TR Entities maintain an office at CWM, or anywhere else in New York State. (Hirsch Aff. ¶ 3). And, *second*, four of the five TR Entities are limited liability companies.[6] Service on a limited liability company is only effective if personally delivered to a member, manager, or other agent authorized to receive process. *See* CPLR 311-a. The administrative assistant with whom service was left has none of those roles, is not an employee of any of the TR Entities, and does not even work in an office maintained by the TR Entities. (Hirsch Aff. ¶¶ 6-7). Attempted service of these citations by delivery to an administrative assistant in these circumstances is improper. *See, e.g., Ciafone v. Queens Ctr. for Rehab. & Residential Healthcare*, 126 A.D.3d 662, 663-64, 5 N.Y.S.3d 462, 464 (2d Dep't 2015) (dismissing action against LLC holding that delivery of process to someone other than person authorized under CPLR 311-a is insufficient); *Stuyvesant Fuel Service Corp. v. 99-105 3rd Ave. Realty LLC*, 192 Misc. 2d 104, 106, 745 N.Y.S.2d 680, 681 (N.Y. Civ. Ct. 2002) (dismissing claims against LLC because service on receptionist was improper); *see also Dewey v. Hillcrest Gen. Hosp.*, 201 A.D.2d 609, 609–10, 607 N.Y.S.2d 967, 968 (2d Dep't 1994) (because process

---

[5]    Under SCPA 307(5) service of process upon a corporation or a limited liability company is governed by CPLR 311 and 311-a.

[6]    TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC, and Trans Resources, LLC are all limited liability companies. (Hirsch Aff. ¶ 4).

was neither delivered to defendant's place of business nor to one of its employees, service was improper).[7]

Service was also ineffective as to Glenclova Investment Co., a Cayman Islands company, and the only non-LLC among the TR Entities. Again the CPLR provides the rule: service upon a corporation is effective only if it is personally served upon an officer, director, managing agent or some other agent authorized to receive service. *See* CPLR 311. As noted above, the administrative assistant with whom such service was left has no such role, is not a Glenclova employee, and was not even working in an office maintained by Glenclova. (*See* Hirsch Aff. ¶¶ 6-7). As a consequence, service upon her was improper. *See McDonald v. Ames Supply Co.*, 22 N.Y.2d 111, 114-16, 291 N.Y.S.2d 328, 331 (1968) (delivery to building receptionist who was not corporation's employee insufficient under CPLR 311 even though receptionist later re-delivered process to a proper person); *Dewey*, 201 A.D.2d at 609-10, 607 N.Y.S.2d at 968 (delivery of process to executive secretary, even where secretary agreed to accept service on behalf of defendant, was ineffective under CPLR 311 where secretary was not employee of defendant and had never been authorized to accept service on behalf of defendant); *Kaleidakolor, Inc. v. Edward N. Hoffman Advert. Corp.*, No. 25577/91, 1995 WL 17961040, at *1 (Sup. Ct. N.Y. County May 8, 1995) (service invalid on employee at office where employee was not authorized to accept service, was not employed by defendant, and office was not office of defendant).

---

[7]     Moreover, although the Petition and citation purport to identify Trans-Resources, Inc. as a respondent, Trans-Resources, Inc. was not a party to the Settlement Agreement at issue. (*See* Boyle Aff., Ex. E). Rather, the proper party is Trans-Resources LLC, a Delaware limited liability company. (Hirsch Aff. ¶ 5). Dalia's failure to properly name and serve Trans-Resources, LLC provides an additional ground for dismissal. *See Ross v. Lan Chile Airlines*, 14 A.D.3d 602, 603-04, 789 N.Y.S.2d 77, 78-79 (2d Dep't 2005) (holding that misnaming of the entity as an "Inc." rather than an "LLC" was "in fact no naming at all").

11

## III.    DISMISSAL OF THE PETITION IS REQUIRED AND THE CLAIMS AGAINST THE TR ENTITIES ARE NOW TIME-BARRED BECAUSE PROCESS WAS NOT SERVED WITHIN THE TIME PERIOD REQUIRED BY THE SCPA

For a petition to be timely commenced to toll any statute of limitation, the citation must be served on the respondent within 120 days after the date on which the petition was filed. SCPA 301(a). Dalia filed her Petition on June 14, 2016. As discussed above, no service was attempted within the statutory 120-day period and no proper service has been made on any of the TR Entities despite the lapse of 570 days from the date of filing. Accordingly, the Petition must be dismissed.[8]

The practical effect of Dalia's lack of diligence in serving process and her failure to properly serve the TR Entities is that her claims of aiding and abetting breach of fiduciary duty, tortious interference with contract, and turnover are now time-barred. Dalia's aiding and abetting claim, which seeks money damages, is subject to a three-year statute of limitation. CPLR 214(4); *Diamond v. McDonald*, 41 Misc. 3d 1235(A), 983 N.Y.S.2d 202, 2013 N.Y. Slip Op. 51988(U), at *2 (Sup. Ct. N.Y. County 2013) ("The third cause of action for breach of fiduciary duty and the fourth cause of action for aiding and abetting breach of fiduciary duty are subject to a three year statute of limitations."). Similarly, because the gravamen of Dalia's tortious interference claim is an alleged economic injury, the same three-year statute of limitations applies. *See MBI Int'l Holdings Inc. v. Barclays Bank PLC*, 151 A.D.3d 108, 116, 57 N.Y.S.3d 119, 126 (1st Dep't 2017). And, because Dalia's turnover claim seeks the return of property, it is akin to a conversion claim and is also subject to a three-year limitations period. *See* CPLR 213(3); *In re Thomas*, 28 Misc. 3d 300, 305, 901 N.Y.S.2d 493, 497 (Sur. Ct. Broome

---

[8]    *See* Deborah Kearns, McKinney's SCPA 301, 2017 Practice Commentaries ("If the proceeding is commenced and the citation is served such that the requisite notice is not given, jurisdiction will not be obtained. . . . Where the statute of limitations period has run, a new proceeding must be commenced under SCPA 301(b)").

County 2010). As a consequence, because Dalia's claims accrued, at the latest, on the date of the Settlement Agreement – i.e., on June 16, 2013, more than three years ago – these claims are time-barred.

In addition, as a matter of equity, Dalia's failure to even attempt service within the 120-day period, coupled with an extensive 570 day delay in attempting service and failure to have properly served any of the TR Entities, militates *against* granting her any right to file a new petition. *Cf. Estate of Jervis v. Teachers Ins. & Annuity Ass'n*, 279 A.D.2d 367, 368, 720 N.Y.S.2d 21, 22 (1st Dep't 2001) (holding that plaintiff's failure to serve process by deadline and her "unacceptably protracted delay measured from the expiration of the 120-day period" to even attempt service, did not establish either "good cause" or "interest of justice" to extend time for service or to allow plaintiff to avoid the bar of the statute of limitation).

## IV.    DALIA'S AIDING AND ABETTING BREACH OF FIDUCIARY DUTY CLAIM IS INSUFFICIENTLY PLEADED AND WITHOUT MERIT

### A.    Dalia's Claim Fails Because Orly, as Beneficiary, Does Not Owe Any Fiduciary Duties to the Trust

It is axiomatic, that a claim for aiding and abetting a breach of fiduciary duty cannot stand where no fiduciary duty exists. Dalia's claim is premised on allegation that Orly was a fiduciary to the Trust. However, Orly, as a beneficiary under the Trust, does not owe any fiduciary duties to the Trust. *See Behrle v. Behrle*, 150 A.D.3d 656, 657, 53 N.Y.S.3d 697, 698 (2d Dep't 2017). Since Orly owed no fiduciary duties to the Trust, the Court should dismiss any claim that the TR Entities aided and abetted Orly in breaching any non-existent duties.

### B.    Dalia's Claim Fails Because She Fails to Sufficiently Allege Knowing Participation by Any of the TR Entities

To sufficiently allege a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must plead, with particularity, a breach of fiduciary duty, which the defendants

13

knowingly induced or participated in the breach, and damages resulting from the breach. *See Kaufman v. Cohen*, 307 A.D.2d 113, 125, 760 N.Y.S.2d 157, 169 (1st Dep't 2003); *Berardi*, 108 A.D.3d at 407, 969 N.Y.S.2d at 446. A person only "knowingly" participates in a breach of fiduciary duty when he has both knowledge of the breach and when he also provides "substantial assistance" to the breaching party. *Kaufman*, 307 A.D.2d at 126, 760 N.Y.S.2d at 170. Actual knowledge of the fiduciary breach is required and a plaintiff may not rely on conclusory allegations that the defendant knew or should have known about the primary breach of fiduciary duty. *Id.* at 125, 760 N.Y.S.2d at 170; *Berardi*, 108 A.D.3d at 406, 969 N.Y.S.2d at 446 (fiduciary breach held unsustainable because allegations were "vague and conclusory, made without any specific instances of the alleged misconduct"). Further, mere inaction on the part of an alleged aider and abettor, who does not himself directly owe any fiduciary duties, does not constitutes substantial assistance. *Kaufman*, 307 A.D.2d at 126, 760 N.Y.S.2d at 170.

Here, all of Dalia's claims are premised on her allegation that Orly, acting as a "de facto trustee," breached her fiduciary duties to the Trust because she allegedly did not properly turnover any Settlement Proceeds to the Trust, but instead purportedly used them for another purpose.

Plainly, the Petition fails to satisfy the aforementioned pleading requirement. Among other infirmities, it relies, without legal citation, on the imposition of a "de facto" fiduciary status in an attempt to allege the existence of an underlying fiduciary duty that could be breached. This conclusory legal imputation is insufficient to allege that the TR Entities had actual knowledge that Orly owed any fiduciary duty to the Trust.[9] In any event, mere knowledge

---

[9]   To the extent that Dalia is alleging that Orly was a "de facto trustee" of the Trust, and therefore owed fiduciary duties to the Trust, such status also carries with it all the duties and obligations of a trustee. In this regard, the Trust Agreement expressly allows the Trustee to settle or compromise any claims. (Boyle Aff., Ex. I at Art.

*(cont'd)*

14

of a person's fiduciary duty is insufficient as it is not equivalent to actual knowledge of that

person's breach of that duty. *See Lesavoy v. Lane*, 304 F. Supp. 2d 520, 527 (S.D.N.Y. 2004)

(applying New York law), *aff'd in relevant part*, 170 Fed. App'x. 721 (2d Cir. 2006).

Moreover, nowhere in the Petition is it alleged that the TR Entities had actual

knowledge as to how those Settlement Proceeds were to be applied. As set forth in the

Settlement Agreement, the settlement was to settle all claims with the "AG Group," which

included Arie Genger, Arnold and David Broser, and also Orly in her individual capacity and "as

beneficiary of the Orly Genger 1993 Trust." (Boyle Aff., Ex. E at 1). The Settlement Proceeds

were then paid (or are to be paid) to the law firm acting "as attorneys for the AG Group." (*Id.* at

2, ¶ 2(b)). It is undisputed that nowhere does the Settlement Agreement recite how the

Settlement Proceeds were to be apportioned among the "AG Group" or otherwise disclose any

facts as to how the Settlement Proceeds would be applied. Thus, the Settlement Agreement

makes clear the TR Entities lacked any knowledge about whether Orly, in any capacity, would

receive (or not receive) any Settlement Proceeds. Thus, outside of conclusory allegations, the

Petition is devoid of any detail or facts from which it can be inferred that the TR Entities had

actual knowledge of Orly's alleged breach.[10] Without any such detail, the cause of action must

---

*(cont'd from previous page)*

    11.A (7)). Most important, however, the Trust expressly limits the liability for any person who makes a
payment to the Trustee. (Boyle Aff. Ex. I at Art. 11.B ("No person or party dealing with the Trustees shall be
bound to see the application of any money . . . paid by him or her to the Trustees.")). Similarly, the EPTL
provides that no person, such as the TR Entities, who in good faith transfers money to a trustee, is "responsible
for the proper application of such money." Thus, to the extent Dalia's relies on a position that Orly is a de facto
trustee, there is no merit to any allegation that: (1) she breached any fiduciary duty by entering into the
Settlement Agreement; or (2) that somehow the TR Entities aided and abetted any fiduciary breach concerning
the application of the Settlement Proceeds. Dalia cannot have it both ways: either Orly is a beneficiary, and
therefore there is no underlying breach of fiduciary duty, or Orly is a de facto trustee and therefore the TR
Entities are protected against any aiding and abetting claim concerning their good faith payment of the
Settlement Proceeds. Dalia has not advanced any allegations (nor could she) that the TR Entities were not
acting in good faith when they entered into the Settlement Agreement.

[10]    Where, as here, a claim of a breach of fiduciary duty has been asserted, the sufficiency of any claim falls within
the ambit of CPLR 3016(b), which requires that the circumstance constituting the wrong must be pleaded in

                                                *(cont'd)*

be dismissed. *See Kaufman*, 307 A.D.2d at 125 (affirming dismissal of plaintiff's claim for

aiding and abetting breach of fiduciary duty dismissed in absence of evidence that defendant

acted with actual knowledge); *Lesavoy*, 304 F. Supp.2d at 527 (applying NY law in dismissing

an aiding and abetting claim where plaintiff pled no facts as to where, when, or how, fiduciary

advised defendants of facts supporting alleged breach but instead relied on conclusory

allegations).

Similarly, Dalia's (conclusory) allegation that it was the complicity of the TR

Entities by drafting and entering into the Settlement Agreement without which Orly could not

have breached her alleged fiduciary does not demonstrate the requisite "substantial assistance"

for aider and abettor liability. *See Kaufman*, 307 A.D.2d at 126; *Brasseur v. Speranza*, 21

A.D.3d 297, 299, 800 N.Y.S.2d 669, 671 (1st Dep't 2005).

In addition, the Petition nowhere alleges in any credible manner or with the

required level of specificity that there was, in fact, a breach of any duty. Rather, at best, the

Petition can be read to allege that there may have been a breach. Dalia's rank speculation and her

effort to link that speculation and other unsupported inferences to fashion her claim fail to satisfy

the CPLR's pleading requirements. And, where, as here, it is indisputable that the Settlement

Agreement arose out of a negotiation by litigation adversaries to settle their disputes – even

assuming that a breach of duty has been sufficiently alleged (it has not) and that the TR Entities

had actual knowledge of the same (they do not) – the case law routinely rejects the use of such

_____

*(cont'd from previous page)*

detail. *See, e.g., Singh v. PGA Tour, Inc.*, 42 Misc. 3d 1225(A), 992 N.Y.S.2d 161, 2014 N.Y. Slip Op.
50191(U), at *6-*7 (Sup. Ct. N.Y. County 2014) ("Moreover, the First Department has held that a cause of
action for breach of fiduciary duty is subject to the particularized pleading requirement of CPLR 3016(b) . . . .")
(citing *Berardi*, 108 A.D.3d at 407, 969 N.Y.S.2d at 446). No such details have been pleaded. For example, the
Petition does not allege in detail how the Settlement Proceeds were used, who among the AG Group actually
received any of the Settlement Proceeds or how much they received, or how, specifically, the TR Entities
gained actual knowledge of how the Settlement Proceeds were or were not to be used. Indeed, to this day, the
TR Entities are without knowledge of any such information.

an arms-length transaction as the Settlement Agreement as grounds for aiding and abetting

liability. *See, e.g., In re Bear Stearns Litig.*, 23 Misc.3d 447, 478, 870 N.Y.S.2d 709, 739 (Sup.

Ct. N.Y. County 2008) (holding that aiding and abetting claim should be dismissed where record

demonstrates arms-length transaction between the parties). Thus, the fact that the TR Entities –

an adversary to Orly – entered into the Settlement Agreement and paid the Settlement Proceeds

cannot serve as a basis for aiding and abetting liability.[11]

Moreover, as the Petition alleges, in the underlying litigation that gave rise to the

Settlement Agreement, the court held that Orly had the right to assert the very claims that she

released in the Settlement Agreement. Dalia's admission of this judicial imprimatur provides a

further basis for establishing, indisputably, that the TR Entities acted appropriately and did not

tortiously aid Orly in any breach by entering into a settlement with her in the very capacities the

court had already approved.

## V.   DALIA'S TORTIOUS INTERFERENCE WITH CONTRACT CLAIM IS INSUFFICIENTLY PLEADED AND WITHOUT MERIT

### A.   Dalia Has Not Sufficiently Alleged that Any of the Trump Group Entities Knowingly and Improperly Induced a Breach

In order to state a claim for tortious interference with contract the plaintiff must

allege the existence of a valid contract with a third party, defendant's knowledge of that contract,

defendant's intentional and improper procuring of a breach, and damages. *See White Plains Coat*

*& Apron Co. v. Cintas Corp.*, 8 N.Y.3d 422, 426, 835 N.Y.S.2d 530, 532 (2007).

---

[11]   The Petition also fails on this claim because it does not offer any specific allegations of wrongdoing as to each of the TR Entities and instead impermissibly relies on a general group pleading approach. Such allegations do not comply with the heightened pleading requirements of CPLR 3016(b) for aiding and abetting breach of fiduciary duty claims. *See Grika v. McGraw*, 55 Misc. 3d 1207(A), 57 N.Y.S.2d 675, N.Y. Slip Op. 51878(U), at *15-*16 (Sup. Ct. N.Y. County 2016).

For the same reasons discussed above with regard to the aiding and abetting claim, dismissal is warranted because the Petition does not sufficiently allege that the TR Entities intentionally and improperly procured any breach of contract by Orly. (*See supra* at heading IV). Moreover, for any interference to be tortious, the TR Entities must have acted without justification and their action must not have been incidental to a lawful purpose. *See Alvord & Swift v. Stewart M. Muller Constr. Co.*, 46 N.Y.2d 276, 281-82, 413 N.Y.S.2d 309, 312 (1978); *Torrenzano Group, LLC v. Burnham*, 26 A.D.3d 242, 243 (1st Dep't 2006). As discussed above, the TR Entities as litigation adversaries to Orly, who had lost their motion to dismiss her claims in the trial court, unquestionably were justified and exercising their lawful rights when entering into the Settlement Agreement in June 2013. Their payment of the Settlement Proceeds to the attorney for the AG Group was also the by-product of this lawful and arm's length settlement. Further, and as discussed above, other than the Petition's speculation that the Settlement Proceeds may have been used to pay Orly's creditors, there are no facts alleged to support this incredible claim, none alleged to support a claim that the TR Entities possibly could have known this, yet alone actually did know this, and none alleged to support any claim that the TR Entities have intentionally and improperly assisted in the same.

## VI.    DALIA'S MONEY HAD AND RECEIVED AND TURNOVER CAUSES OF ACTION CANNOT STAND

To sustain a cause of action for money had and received, a plaintiff must allege and establish that the defendant received money belonging to the plaintiff, that the defendant benefitted from the receipt of that money, and that the defendant should not be permitted to retain the money. *See Fesseha v. TD Waterhouse Investor Services, Inc.*, 193 Misc. 2d 253, 260, 747 N.Y.S.2d 676, 683 (Sup. Ct. N.Y. County 2002). This cause of action, along with the "turnover" cause of action, must be dismissed because Dalia has not alleged (and cannot) that the

18

TR Entities ever "received" or "retained" money purportedly belonging to the Trust. *See id.* at

260-61, 747 N.Y.S.2d at 683. In fact, in the Petition, Dalia actually admits that none of the TR

Entities received or have in their possession any of the Settlement Proceeds that she is claiming.

(*See* Boyle Aff., Ex. 1, at ¶¶ 72-73). This admission forecloses these claims.[12]


## VII.   RES JUDICATA AND COLLATERAL ESTOPPEL BAR DALIA'S CLAIMS

All of Dalia's claims against the TR Entities are subject to dismissal under the

principles of res judicata. Under New York law any stipulated discontinuance with prejudice[13]

in a prior action bars re-litigation of not only those claims but of all other claims arising out of

the same transaction that could have been asserted in a prior proceeding, even if they are now

based on different theories or seeking different remedies. *See O'Brien v. City of Syracuse*, 54

N.Y.2d 353, 357-58, 445 N.Y.S.2d 687, 689 (1981); *Fifty CPW Tenants Corp. v. Epstein*, 16

A.D.3d 292, 293, 792 N.Y.S.2d 58, 59 (1st Dep't 2005); *see also Landau, P.C. v. LaRossa,*

*Mitchell & Ross*, 11 N.Y.3d 8, 12-13, 862 N.Y.S.2d 316, 319 (2008) ("[O]nce a claim is brought

to a final conclusion, all other claims arising out of the same transaction or series of transactions

are barred, even if based upon different theories or if seeking a different remedy.") (quotations

omitted); *In re Estate of Hunter*, 4 N.Y.3d 260, 269, 794 N.Y.S.2d 286, 291 (2005) (noting the

doctrine applies "not only to claims actually litigated but also to claims that could have been

raised in the prior litigation"). Thus, "a claim will be barred by the prior adjudication of a

---

[12]   As the Petition notes, $17.3 million of the Settlement Proceeds has already been paid out to the AG Group. *See* Boyle Aff., Ex. A at ¶ 22). The remaining $15 million in Settlement Proceeds is only to be paid subject to the satisfaction of certain conditions, which have not yet occurred, and is also subject to set off. (*See id.* at ¶¶ 22-23; *see also* Boyle Aff., Ex. E at ¶ 3).

[13]   A stipulation of discontinuance with prejudice in an action in another forum has the same res judicata preclusive effect as a judgment on the merits. *See Gropper v. 200 Fifth Owner LLC*, 151 A.D.3d 635, 635, 58 N.Y.S.2d 42, 43 (1st Dep't 2017).

different claim arising out of the same 'factual grouping' even if the claims involve 'materially

different elements of proof' and even if the claims 'would call for different measures of liability

or different kinds of relief.'" *Fifty CPW Tenants Corp.*, 16 A.D.3d at 293 (citations omitted).

Moreover, "[t]he doctrine of res judicata, or claim preclusion, is designed to

'relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by

preventing inconsistent decisions, encourage reliance on adjudication.'" *Ins. Co. of State of*

*Pennsylvania v. HSBC Bank USA*, 10 N.Y.3d 32, 38, 852 N.Y.S.2d 812, 815 (2008) (citation

omitted). One of the tests for determining what constitutes the same cause of action has been

expressed as whether a different judgment in the second action would impair or destroy any

rights or interests established in the prior actions. *See Schuykill Fuel Corp. v. B. & C. Nieberg*

*Realty Corp.*, 250 N.Y. 304, 306-07 (1929); *see also Greenway Med. Supply Corp. v. Am.*

*Transit Ins. Co.*, 58 Misc. 3d 147(A) (N.Y. App. Term. 2018) (affirming res judicata dismissal

where "any judgment in favor of plaintiff in the present action would destroy or impair rights or

interests established by the judgment in the [prior action]") (*citing Schuylkill Fuel Corp.*, 250 NY

at 306-07).

Here, the fundamental gravamen of the Petition concerns the beneficial ownership

of the Trans-Resources shares and any concomitant right to monetize that ownership interest,

whatever it may have been. But, as described above, the issues of beneficial ownership of all

Trans-Resources shares were finally and fully resolved with Orly, both in her individual capacity

and in her capacity of beneficiary of the Trust, on June 16, 2013. And then, on August 30, 2013,

in the Delaware Dismissal, Dalia in her role as trustee to the Trust and with knowledge of the

Settlement Agreement and after voluntarily foregoing an opportunity to review the Settlement

Agreement (*see* Boyle Aff., Ex. G), also finally and fully resolved all issues related to the

20

ownership of the Trans-Resources shares in the Delaware Action. (Boyle Aff., Ex. F). To the

extent that Dalia now attempts to enforce the Trust's rights or entitlements as a beneficial owner

of the Trans-Resources shares by, among other things, seeking to monetize that interest by taking

possession of the Settlement Proceeds, the Delaware Dismissal (with Dalia's consent) bars any

such relief.

In fact, Dalia has notably represented to the Supreme Court (in support of a

motion on which she prevailed) that the Delaware Action was designed to provide a "**full**

**adjudication**" of issues relating to the Trusts right to the Trans-Resources shares that underlay

the Settlement Agreement. (*See* Boyle Aff., Ex. J at __ ("Further, it is important to note that an

action is pending in the Delaware Chancery Court to declare that the Orly Trust is the beneficial

ownership [stet.] of the TRI, allowing for a full adjudication of beneficial ownership of the TRI

shares. *Dalia Genger v. TR Investors, LLC et. al.* (Del. Ch. 6906-CS. filed Oct. 4, 2011)")

(emphasis added)).

As there is no dispute that in the Delaware Action Dalia stipulated to a dismissal

with prejudice of all claims relating to the ownership of the Trans-Resources shares at a time

when she was aware of the Settlement Agreement, and, as such, could have raised any claims

relating to that settlement (including those purportedly brought here) in the Delaware Action, she

is now precluded from raising them in this proceeding. *See Gropper v. 200 Fifth Owner LLC*,

151 A.D.3d 635, 636, 58 N.Y.S.2d 42, 43 (1st Dep't 2017); *see also In re Hunter*, 4 N.Y.3d at

270-71, 794 N.Y.S.2d at 292 (confirming res judicata bar to claims that were discernible from

document filed in prior proceedings).

A separate basis for res judicata as to the Trust arises out of the First Department's

decision in *Genger v. Genger*, 144 A.D.3d 581, 41 N.Y.S.3d 414 (1st Dep't 2016). In that

21

decision, the First Department expressly rejected Dalia's attempt to assert the same claim she is

making in this Petition: that the Settlement Proceeds belong to the Trust. (*See* Boyle Aff., Ex. L

at 1 (requesting an order directing the Settlement Proceeds be paid into court because "some or

all of the settlement proceeds" belong to the Trust")). The First Department did so because it

concluded that "all [Orly Trust] claims had previously been dismissed or discontinued by prior

court orders." *Genger*, 144 A.D.3d at 581, 41 N.Y.S.3d at 415. Because, as the First

Department correctly noted, those claims were previously "dismissed or discontinued," res

judicata precludes their assertion here.

## VIII.   SHOULD THE COURT NOT DISMISS THE PETITION FOR ANY OF THE ABOVE REASONS IT SHOULD BE STAYED OR DISMISSED

It is undisputed that Dalia's standing to assert these claims derives from her status

as trustee. At least since June 2009, however, a proceeding brought by Orly to remove Dalia as

trustee has been pending in this Court. In fact, on June 21, 2017, this Court denied Dalia's

motion to dismiss that proceeding, noting that Orly's allegations "raise significant issues about

whether Dalia's efforts as trustee have been calculated to benefit herself and others at the expense

of the Orly Trust in violation of her fiduciary duty and whether she poses an ongoing threat to

the assets of the Orly Trust." *In re Orly Genger*, No. 2008-0017/B, Decision at 12 (Boyle Aff.,

Ex. C). Thus, should this proceeding not be dismissed, it should be stayed pending resolution of

the threshold issue of whether Dalia is a proper trustee of the Trust. *See* CPLR 2201.

Moreover, Dalia, in a cross-petition she filed and served many months ago,

asserted identical claims of breach of fiduciary duty and turnover solely against Orly concerning

the Settlement Proceeds and on these very same facts. (*See* Boyle Aff., Ex. K). A motion to

dismiss that cross-petition filed by Orly (and joined by the guardian *ad litem*) is currently *sub*

22

*judice* before this Court. The existence of that proceeding provides yet another reason for the

Court to exercise its discretion to dismiss or stay any proceedings on this Petition.[14]

## CONCLUSION

For the foregoing reasons, the TR Entities respectfully request that this Court dismiss the

Petition and all claims therein as against the TR Entities, and grant the TR Entities such other

relief as may be just and proper.

Dated:  New York, New York
        February 6, 2018

Respectfully submitted,

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP

John Boyle
Four Times Square
New York, New York 10036
(212) 735-3000
john.boyle@skadden.com

*Attorneys for Glenclova Investment Co.,*
*TR Investors, LLC, New TR Equity I, LLC,*
*New TR Equity II, LLC, and Trans-Resources*
*LLC.*

---

[14]  The existence of the already pending action also provides a basis for dismissal under CPLR 3211(a)(4), which allows a party to move for judgment dismissing one or more causes of action asserted against it on the ground that "there is another action pending between the same parties for the same cause of action in a court of any state or the United States; the court need not dismiss upon this ground but may make such order as justice requires."  The subject of the two actions need not be identical to invoke CPLR 3211(a)(4); rather, "[t]he critical element is that both suits arise out of the same subject matter or series of alleged wrongs." *Syncora Guarantee Inc. v. J.P. Morgan Sec. LLC*, 110 A.D.3d 87, 96, 970 N.Y.S.2d 526, 533 (1st Dep't 2013).  CPLR 3211(a)(4) "vests a court with broad discretion in considering whether to dismiss an action." *Whitney v. Whitney*, 57 N.Y.2d 731, 732, 454 N.Y.S.2d 977, 977 (1982).

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In The Matter of DALIA GENGER, Trustee of     File No. 2008-0017/E
the ORLY GENGER 1993 TRUST,           :

                                  Hon. Nora S. Anderson

               Petitioner,     :

         - against -             :

ORLY GENGER, ARIE GENGER,         :
GLENCLOVA INVESTMENT COMPANY,
TR INVESTORS, LLC, NEW TR EQUITY I, :
LLC, NEW TR EQUITY II, LLC, TRANS-
RESOURCES, INC., ARNOLD BROSER,    :
DAVID BROSER, JOHN DOES 1-20, and
JANE DOES 1-20,                  :

              Respondents.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

STATE OF NEW YORK     )
                       ) ss.:
COUNTY OF NEW YORK   )

       Julie M. Thaxton, being duly sworn, deposes and says:

         1.  That deponent is over eighteen years of age, not a party to the action

and is employed by Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square,

New York, NY 10036.

         2.  That on the 6th day of February 2018, deponent served a true copy of

the

- *Notice of Motion,*

- *Affirmation of John Boyle in Support of the TR Entities' Motion to Dismiss the Petition For Turnover of Trust Property and Other Relief with the annexed Exhibits A-L,*

- *Affirmation of Mark S. Hirsch in Support of Motion to Dismiss* and

- ***Memorandum of Law in Support of the TR Entities' Motion to Dismiss the Petition for Turnover of Trust Property and Other Relief Filed on June 14, 2016, by Dalia Genger as Trustee of the Orly Genger 1993 Trust***

by Federal Express, overnight delivery upon:

Judith Lisa Bachman, Esq.
254 S. Main Street, Suite 306
New City, New York 10956

Kelley Drye & Warren LLP
John Dellaportas
101 Park Avenue
New York, NY 10178

Kasowitz Benson Torres LLP
Michael Paul Bowen
1633 Broadway
New York, NY 10019

Steven Riker, Esq.
One Grand Central Place, 46th Floor
New York, NY 10165

Julie M. Thaxton
Julie M. Thaxton

Sworn to before me this
6th day of February 2018.

Matthew Koenig
Notary Public, State of New York
Reg. No. 01KO6211943
Qualified in New York County
Commission Expires Sept. 23, 2021

File No. 2008-0017/E

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

In the Matter of DALIA GENGER, trustee of the ORLY GENGER 1993 TRUST,

Petitioner,

-against-

ORLY GENGER, ARIE GENGER, GLENCLOVA INVESTMENT COMPANY, TR INVESTORS, LLC, NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, TRANS-RESOURCES, INC., ARNOLD BROSER, DAVID BROSER, JOHN DOES 1-20, and JANE DOES 1-20,

Respondents.

**MEMORANDUM OF LAW IN SUPPORT OF THE TR ENTITIES' MOTION TO DISMISS THE PETITION FOR TURNOVER OF TRUST PROPERTY AND OTHER RELIEF FILED ON JUNE 14, 2016, BY DALIA GENGER AS TRUSTEE OF THE ORLY GENGER 1993 TRUST**

Skadden, Arps, Slate, Meagher & Flom LLP

ATTORNEYS FOR GLENCLOVA INVESTMENT CO., TR INVESTORS, LLC,
NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, and TRANS-RESOURCES LLC.

FOUR TIMES SQUARE
NEW YORK, NEW YORK 10036
(212) 735-3000

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In The Matter of DALIA GENGER, Trustee of        File No. 2008-0017/E
the ORLY GENGER 1993 TRUST,                 :
                                                 Hon. Nora S. Anderson
                          Petitioner,       :

          - against -                       :

ORLY GENGER, ARIE GENGER,                   :
GLENCLOVA INVESTMENT COMPANY,
TR INVESTORS, LLC, NEW TR EQUITY I,         :
LLC, NEW TR EQUITY II, LLC, TRANS-
RESOURCES, INC., ARNOLD BROSER,             :
DAVID BROSER, JOHN DOES 1-20, and
JANE DOES 1-20,                             :

                          Respondents.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


STATE OF NEW YORK     )
                      ) ss.:
COUNTY OF NEW YORK    )


      Julie M. Thaxton, being duly sworn, deposes and says:

      1.  That deponent is over eighteen years of age, not a party to the action

and is employed by Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square,

New York, NY 10036.

      2.  That on the 6th day of February 2018, deponent served a true copy of

the

- *Notice of Motion,*

- *Affirmation of John Boyle in Support of the TR Entities' Motion to Dismiss the Petition For Turnover of Trust Property and Other Relief with the annexed Exhibits A-L,*

- *Affirmation of Mark S. Hirsch in Support of Motion to Dismiss and*

- ***Memorandum of Law in Support of the TR Entities' Motion to Dismiss the Petition for Turnover of Trust Property and Other Relief Filed on June 14, 2016, by Dalia Genger as Trustee of the Orly Genger 1993 Trust***

by Federal Express, overnight delivery upon:

> Arnold Broser
> 5371 Fisher Island Drive
> Miami Beach, FL 33109
>
> Arie Genger
> 17001 Collins Avenue
> Sunny Isles Beach, FL 33160

_____
Julie M. Thaxton

Sworn to before me this
6th day of February 2018.

_____
Matthew Koenig
Notary Public, State of New York
Reg. No. 01KO6211943
Qualified in New York County
Commission Expires Sept. 23, 2021

2

**SURROGATE'S COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| |
|---|
| In the Matter of |
| |
| DALIA GENGER, trustee of the ORLY GENGER 1993 TRUST, |
| |
|       Petitoner, |
| |
|       - against - |
| |
| ORLY GENGER, ARIE GENGER, GLENCLOVA INVESTMENT COMPANY, TR INVESTORS, LLC, NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, TRANS-RESOURCES, INC., ARNOLD BROSER, DAVID BROSER, JOHN DOES 1-20, and JANE DOES 1-20, |
| |
|       Respondents. |

FILE NO.    2008-0017

### AFFIRMATION OF MARK S. HIRSCH
### IN SUPPORT OF MOTION TO DISMISS

Mark S. Hirsch, an attorney duly admitted to practice law in the State of New York, hereby affirms under penalty of perjury pursuant to CPLR 2106 as follows:

1.       I am a member of the bar of the State of New York.  I make this affirmation in support of the motion to dismiss filed by Glenclova Investment Co., TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC and Trans-Resources LLC.[1]  I am fully familiar with the matters set forth in this affirmation.

---

[1]    While the petition and citation lists Trans-Resources, Inc. as a Respondent, no such entity exists. Rather, in June 2013, Trans-Resources, Inc. converted into a limited liability company named Trans-Resources, LLC. *See infra* ¶ 5.

2.      I am Executive Vice President and General Counsel of Creative Worldwide Management, LLC ("CWM"), which maintains offices at 400 Park Avenue, 19th Floor, New York, New York 10022 ("CWM's Offices").

3.      I also serve as Executive Vice President and General Counsel for each of Glenclova Investment Co., TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC and Trans-Resources LLC (the "TR Entities"). None of the TR Entities maintain an office in New York State. As a consequence, none of the TR Entities share office space with CWM or at CWM's Offices. Moreover, CWM is not a member of any of the TR Entities.

4.      Four of the five TR Entities (TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC and Trans-Resources LLC) are limited liability companies. Only Glenclova Investment Co., is a corporation. Glenclova is incorporated under the laws of the Cayman Islands and has its principal offices in the Cayman Islands.

5.      There is no existing corporation known as Trans-Resources, Inc. It was converted into Trans-Resources, LLC in June 2013, and is a limited liability company created under the laws of Delaware, and has its principal offices in Florida.

6.      On January 5, 2018, several copies of the attached citation were purportedly left at CWM's Offices. None of those copies contained any attachments, such as the petition that I understand is underlying this action. In addition, none of those copies were left with me. Rather, those copies were left with CWM's administrative assistant, Ms. Tatiana Selca, who is not authorized to receive process for CWM (which is not a party to any Genger-related action) or for any of the TR Entities (which, again, do not maintain an office in New York).

2

7.    CWM's administrative assistant, Ms. Tatiana Selca, is not an employee of any of the TR Entities and does not work in any of the principal offices for any of the TR Entities.

I affirm under penalty of perjury that the foregoing is true and correct.  Executed on February 5, 2018 in New York, New York.

_____

Mark S. Hirsch

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In The Matter of DALIA GENGER, Trustee of      File No. 2008-0017/E
the ORLY GENGER 1993 TRUST,                :
                                                                  Hon. Nora S. Anderson
                                    Petitioner,       :

              - against -                              :

ORLY GENGER, ARIE GENGER,              :
GLENCLOVA INVESTMENT COMPANY,
TR INVESTORS, LLC, NEW TR EQUITY I,   :
LLC, NEW TR EQUITY II, LLC, TRANS-
RESOURCES, INC., ARNOLD BROSER,       :
DAVID BROSER, JOHN DOES 1-20, and
JANE DOES 1-20,                                   :

                                   Respondents.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


STATE OF NEW YORK        )
                                         ) ss.:
COUNTY OF NEW YORK    )


          Julie M. Thaxton, being duly sworn, deposes and says:

          1.  That deponent is over eighteen years of age, not a party to the action

and is employed by Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square,

New York, NY 10036.

          2.  That on the 6th day of February 2018, deponent served a true copy of

the

- *Notice of Motion,*

- *Affirmation of John Boyle in Support of the TR Entities' Motion to Dismiss the Petition For Turnover of Trust Property and Other Relief with the annexed Exhibits A-L,*

- *Affirmation of Mark S. Hirsch in Support of Motion to Dismiss* and

- *Memorandum of Law in Support of the TR Entities' Motion to Dismiss the Petition for Turnover of Trust Property and Other Relief Filed on June 14, 2016, by Dalia Genger as Trustee of the Orly Genger 1993 Trust*

by Federal Express, overnight delivery upon:

Judith Lisa Bachman, Esq.
254 S. Main Street, Suite 306
New City, New York 10956

Kelley Drye & Warren LLP
John Dellaportas
101 Park Avenue
New York, NY 10178

Kasowitz Benson Torres LLP
Michael Paul Bowen
1633 Broadway
New York, NY 10019

Steven Riker, Esq.
One Grand Central Place, 46th Floor
New York, NY 10165

Julie M. Thaxton

Sworn to before me this
6th day of February 2018.

Matthew Koenig
Notary Public, State of New York
Reg. No. 01KO6211943
Qualified in New York County
Commission Expires Sept. 23, 2021

File No. 2008-0017/E

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

In the Matter of DALIA GENGER, trustee of the ORLY GENGER 1993
TRUST,

Petitioner,

-against-

ORLY GENGER, ARIE GENGER, GLENCLOVA INVESTMENT
COMPANY, TR INVESTORS, LLC, NEW TR EQUITY I, LLC, NEW TR
EQUITY II, LLC, TRANS-RESOURCES, INC., ARNOLD BROSER, DAVID
BROSER, JOHN DOES 1-20, and JANE DOES 1-20,

Respondents.

**AFFIRMATION OF MARK S. HIRSCH IN SUPPORT
OF MOTION TO DISMISS**

Skadden, Arps, Slate, Meagher & Flom LLP

ATTORNEYS FOR GLENCLOVA INVESTMENT CO., TR INVESTORS, LLC,
NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, and TRANS-RESOURCES LLC.

FOUR TIMES SQUARE
NEW YORK, NEW YORK 10036
(212) 735-3000

**SURROGATE'S COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

In the Matter of DALIA GENGER, trustee of the ORLY
GENGER 1993 TRUST,

        Petitioner,

        - against -

ORLY GENGER, ARIE GENGER, GLENCLOVA
INVESTMENT COMPANY, TR INVESTORS, LLC, NEW
TR EQUITY I, LLC, NEW TR EQUITY II, LLC, TRANS-
RESOURCES, INC., ARNOLD BROSER, DAVID
BROSER, JOHN DOES 1-20, and JANE DOES 1-20,

        Respondents.

---

FILE NO.    2008-0017/E

Hon. Nora S. Anderson

**AFFIRMATION
OF JOHN BOYLE
IN SUPPORT OF THE TR
ENTITIES' MOTION TO
DISMISS THE PETITION
FOR TURNOVER OF TRUST
PROPERTY AND OTHER
RELIEF**

        I, John Boyle, an attorney duly admitted to practice before the courts of the State

of New York, hereby affirm, under CPLR 2106, the following under penalty of perjury:

        1.      I am an attorney admitted to practice before the courts of the State of New

York and counsel at Skadden, Arps, Slate, Meagher & Flom, LLP, attorneys for Respondents

Glenclova Investment Company, TR Investors, LLC, New TR Equity I, LLC, New TR Equity II,

LLC, Trans-Resources LLC, in the above-captioned proceeding.

        2.      I submit this Affirmation in support of Respondent's Motion to Dismiss

the Petition for Turnover of Trust Property and Other Relief.  I am familiar with the facts and

circumstances of this proceeding by virtue of my personal involvement in it and a review of the

case files, and the information provided herein is true and correct to the best of my knowledge,

information, and belief.

3.    Attached as **Exhibit A** is a true and correct copy of the Petition for Turnover and Other Relief filed in this proceeding by Dalia Genger as trustee of the Orly Genger 1993 Trust.

4.    Attached as **Exhibit B** is a true and correct copy of the Decision of Justice Cooper, dated June 3, 2016 in *Genger v. Genger*, Index No. 302436/2002 (Sup. Ct. N.Y. Cty).

5.    Attached as **Exhibit C** is a true and correct copy of this Court's June 21, 2017 decision in *In re Orly Genger*, File No. 2008-0017 (Surr. Ct. N.Y. Cty), denying Dalia Genger's motion to dismiss Orly Genger's application to remove Dalia Genger as trustee of the Orly Genger 1993 Trust.

6.    Attached as **Exhibit D** is a true and correct copy of the Second Amended Stipulation of Discontinuance (the "NY Dismissal with Prejudice") [Dkt. #487], dated July 1, 2013, in *Genger v. Genger*, 651089/2010 (Sup. Ct. N.Y. County).

7.    Attached as **Exhibit E** is a true and correct copy of the Settlement Agreement dated June 16, 2013.

8.    Attached as **Exhibit F** is a true and correct copy of the Stipulation and Proposed Order of Dismissal (the "Delaware Dismissal"), entered August 30, 2013 in *Genger v. TR Investors, LLC*, C.A. No. 6906-CS (Del. Ch. Ct).

9.    Attached as **Exhibit G** is a true and correct copy of a letter, dated August 9, 2013, from Jeremy Anderson, as attorney for Dalia Genger as trustee of the Orly Genger 1993 Trust, to Chancellor Strine in *Genger v. TR Investors, LLC*, C.A. No. 6906-CS (Del. Ch. Ct).

10.    Attached as **Exhibit H** is a true and correct copy of the Order to Sever [Dkt. # 1153], entered November 25, 2014, in Genger v. Genger, Index No. 651089/2010 (Sup. Ct. N.Y. County).

2

11.     Attached as **Exhibit I** is a true and correct copy of the Orly Genger 1993 Trust Agreement.

12.     Attached as **Exhibit J** is a true and correct copy of the Memorandum of Law of Dalia Genger [Dkt. #216], filed March 6, 2012, in support of Dalia Genger's motion to dismiss the complaint in *Genger v. Genger*, Index No. 651089/2010 (Sup. Ct. N.Y. County).

13.     Attached as **Exhibit K** is a true and correct copy of the Amended Answer and Cross-Petition of Dalia Genger, filed August 22, 2017, in *In re Orly Genger*, File No. 2008-0017 (Surr. Ct. N.Y. County).

14.     Attached as **Exhibit L** is a true and correct copy of the Notice of Motion [Dkt. #1099], filed on August 11, 2014, by Dalia Genger in *Genger v. Genger*, Index No. 651089/2010 (Sup. Ct. N.Y. County).

Dated: New York, NY
      February 5, 2018

By: _____
      John Boyle

3

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------------X

In the Matter of

    DALIA GENGER,
    Trustee of the Orly Genger 1993 Trust,

          Petitioner,

            -against-

ORLY GENGER, ARIE GENGER, GLENCLOVA
INVESTMENT COMPANY, TR INVESTORS, LLC
NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC,
TRANS-RESOURCES, INC., ARNOLD BROSER,
DAVID BROSER, JOHN DOES. 1-20, and
JANE DOES 1-20,

          Respondents,

-------------------------------------------------------------------------X

New York County Surrogate's Court
MISCELLANEOUS DEPT.
**JUN 1 4 2016**
**FILED**
Clerk_____

Index No. 2008 -17

**PETITION FOR**
**TURNOVER OF**
**TRUST PROPERTY**
**AND OTHER RELIEF**

TO THE SURROGATE'S COURT, COUNTY OF NEW YORK:

    It is respectfully alleged:

**The Parties**

    1.    Petitioner, Dalia Genger, resides and is domiciled at 200 E. 65th Street, in the City

of New York, County of New York and State of New York.

    2.    Petitioner is the Trustee of the Orly Genger 1993 Trust (the "Orly Trust").

    3.    Respondent Orly Genger ("Orly") is the only non-contingent beneficiary of the

Orly Trust. The remaining respondents ("Respondents") are interested parties who wrongfully

aided and abetted Orly in the misappropriation of Orly Trust assets.

**Jurisdiction and Venue**

    4.    This Court has subject matter jurisdiction pursuant to the Surrogate's Court

Procedure Act, inter alia, SCPA 103(50), SCPA 207(1), and SCPA 209(6).

-1-

5.      Venue in this County is proper pursuant to, inter alia, SCPA 207(1).

## The Orly Trust

6.      On or around December 13, 1993, Arie Genger ("Arie") settled the Orly Trust

pursuant to a written Trust Agreement executed by Arie, as Grantor, the two prior Trustees,

Lawrence M. Small and Sash A. Spencer (the "Trust Agreement"). (Ex. 1.)

7.      Pursuant to Article ELEVENTH, Section C of the Trust Agreement, all trust

funds are to be held in the name of the Orly Trust, and no Orly Trust assets are to be used for the

benefit of Orly's creditors (the "Trust Agreement Obligations").

8.      The Respondents were aware of the Trust Agreement Obligations.

## Orly Trust Derivative Litigation

9.      In July 2010, Orly instituted a derivative action the Supreme Court, New York

County entitled Arie Genger, et al. v. Sagi Genger, et al., Index No. 651089/2010, by which she

brought claims "on behalf of the Orly Trust as the beneficiary of the Orly Trust" (the "Orly Trust

Derivative Litigation"). The Complaint sought to assert claims for the Orly Trust's ownership in

shares of stock in a company called Trans-Resources, Inc. ("TRI"). Orly later amended her

pleading to assert claims against, inter alia, the purchasers of those TRI shares, Respondents

Glenclova Investment Company, TR Investors, LLC, New TR Equity I, LLC, and New TR

Equity II, and TRI (collectively, the "Trump Group Entities"). (Ex. 2.)

10.     On January 2, 2013, in the Orly Trust Derivative Litigation, Justice Jaffe of the

Supreme Court, New York County adopted Orly's position that she "has legal standing to

represent the Orly Trust" and "may act on behalf of the Orly Trust unless and until the

Surrogate's Court rules otherwise in an appropriate action there." (Ex. 3.)

11.     Earlier on in the same Orly Trust Derivative Litigation, Orly moved to restrain

Petitioner from pursuing what Orly characterized as a "duplicative" action as Trustee of the Orly Trust before the Delaware Chancery Court, by which Petitioner was seeking a declaration of obtain ownership of the same TRI shares. According to Orly: "In the instant action ..., I seek, among other things, the return of those [same] TRI Shares to the Orly Trust." Also according to Orly, Petitioner's "contention that the Orly Trust is not a party to this action ... is meritless. Orly is prosecuting this action on behalf of the Orly Trust." The Supreme Court, New York County, agreed, restraining Petitioner from pursuing the action in the Delaware Chancery Court by which the Orly Trust had sought the TRI shares. (Ex. 4.)

12.     As a derivative plaintiff for the Orly Trust, having prevented the 'duplicative litigation' brought by Petitioner herself on behalf of the Orly Trust, Orly became the de facto trustee of the Orly Trust and owed fiduciary duties to the Orly Trust.

13.     Respondents knew that Orly owed fiduciary duties to the Orly Trust.

## Discontinuance With Prejudice of The Orly Trust Claims

14.     In June 2013, Orly disclosed that she had "entered into a confidential settlement agreement to resolve all issues among the stipulating parties," which included the Trump Group Entities. However, the settlement terms were left undisclosed. Petitioner sought production of the settlement agreement, but Orly refused to produce it, claiming the document was too "confidential." When it was proposed that the document be produced under "Attorney's Eye's Only" limitation, Orly refused that proposal as well. Instead, Orly submitted the Settlement Agreement to Justice Jaffe, unsolicited, for in camera inspection.

15.     By letter dated June 28, 2013, counsel to the Trump Group Entities wrote to the Court on behalf of all settling parties "including ... Orly Genger" confirming that: "A material term of the agreement among the settling parties was the dismissal of *all* claims presently

-3-

pending against one another, in whatever capacity they were brought. [If the settlement stipulation was drafted so as to] have the effect of *not* dismissing Orly Genger's derivative claims against the Trump Group [Entities], contrary to the agreement of the settling parties. Excluding such claims from the claims that are to be dismissed is not what the Trump Group [Entities] bargained and paid for in the settlement . . ." (Ex. 5, emphases in original.)

16.      Neither Orly nor any of the other settling parties disagreed with counsel's statements regarding the scope of the settlement. Accordingly, on July 1, 2013, Justice Jaffe signed the requested Stipulation and Order of Discontinuance with Prejudice. (Ex. 6.)

### The Trump Group Entities Settlement Agreement

17.      Months later, as part of a parallel proceeding, the United States District Court directed Orly to produce her settlement agreement with the Trump Group Entities (the "Trump Group Entities Settlement Agreement"). (Ex. 7.) The document revealed that Orly had settled her claims against the Trump Group Entities both "in her individual capacity and in her capacity as beneficiary of the Orly Genger 1993 Trust" – the latter being the very capacity by which this Court permitted Orly to assert derivative claims. According to its signatories, the purpose of the agreement was "to resolve all issues, disputes and disagreements between [Orly and the other Settling Parties], including but not limited to the issue of ownership of all [TRI] shares," most significantly those TRI shares claimed by the Orly Trust.

18.      In exchange, the Trump Group Entities agreed to pay $32.3 million to the so-called "AG Group," consisting of Orly, her father Arie, and Respondents Arnold and David Broser (collectively, "the Brosers"). Upon information and belief, the Brosers are creditors of Orly personally, to whom Orly owes many millions of dollars. The payments were broken up into: (a) an immediate payment of $17.3 million and (b) two follow-up payments of $7.5 million.

-4-

According to the federal court, which reviewed the document, "Orly monetized her beneficial interest in the Orly Trust['s] [TRI] shares for $32.3 million ...." (Ex. 8.)

19.     The Trump Group Entities have since reaffirmed that the federal court construed the Trump Group Entities Settlement Agreement correctly:

> "[Any suggestion] that the confidential settlement agreement *might* only dis-miss Orly's individual claims against the Trump Group [Entities], but not resolve the Orly Trust's claims against the Trump Group [Entities] and the TPR Group . . . is counterfactual.  This Court has already held that certain of Orly's claims in this action, including the remaining claims, are derivative in nature, and may be maintained by Orly on behalf of the Orly Genger 1993 Trust. ...  In settling the claims among them, the Trump Group [Entities], Trans-Resources, Orly and Arie agreed to the dismissal of all claims presently pending against one another.  This agreement is memorialized in the Second Amended Stipulation of Discontinuance.

20.     Evidencing this intent, in Section 6(a) of the Trump Group Entities Settlement Agreement, Orly settled and released all of her claims in the Trump Group Entities Settlement in both her derivative and individual capacities.  (Ex. 7, p. 10: Orly releasing the Trumps "in all capacities.")  In Section 8(a) thereof, Orly further agreed to "cause" the Orly Trust to do the same, which she later did, advising the Delaware Chancery Court that she favored dismissal of Petitioner's action on behalf of the Orly Trust.  The case was dismissed.

### The Settlement Proceeds

21.     Under applicable law, the proceeds of a settlement obtained in a derivative lawsuit belong to the direct plaintiff (in this case, the Orly Trust), not the derivative plaintiff (in this case, Orly personally).  Nonetheless, to date, none of the aforementioned $32.3 million (the "Settlement Proceeds") has been remitted to the Orly Trust, nor have any of the settling parties indicated an intention to do so in the future.

22.     At a hearing before Justice Jaffe on March 25, 2015, counsel to the Trump Group Entities confirmed that $17.3 million of the Settlement Proceeds has already been paid, but that

2015, Justice Jaffe neither granted nor denied the motion, but rather held it in abeyance pending this Court's determination of Orly's removal petition. (Ex. 10.)

27.    At the March 25, 2015 hearing on Petitioner's motion, Justice Jaffe suggested it might already be too late to deposit the Initial Payment into Court, as the $17.3 million apparently has already been paid out to non-parties. (Ex. 9, p. 28: "it sounds like that ship has sailed").   Accordingly, Petitioner brings this Petition seeking, inter alia, monetary damages for misappropriation of Orly Trust assets.  To the extent such Settlement Proceeds are recoverable, Petitioner seeks turnover of those funds for the Orly Trust.

### Count I: Aiding and Abetting Breach of Fiduciary Duty
### Against All Respondents

28.    The allegations contained in paragraphs 1 through 27 hereinbefore are realleged as if fully set forth herein.

29.    Because the Orly Trust Derivative Litigation was brought on behalf of the Orly Trust, the Settlement Proceeds therefrom belong to the Orly Trust.

30.    Orly owed a fiduciary duty to the Orly Trust.

31.    Consistent with her fiduciary duty to the Orly Trust, Orly was required to ensure that the Settlement Proceeds were paid to the Orly Trust.

32.    Orly did not so do.  Instead, she entered into the Trump Group Entities Settlement Agreement, which provided for the Settlement Proceeds to be paid to parties other than the Orly Trust, and she authorized payment of the Settlement Proceeds to such other parties.

33.    Orly's actions constitute a breach of fiduciary duty.

34.    Respondents were aware of Orly's fiduciary duty to the Orly Trust.

35.    Respondents knowingly induced and/or participated in Orly's breach of her fiduciary duty to the Orly Trust by, inter alia, taking the Settlement Proceeds which belong to the

Orly Trust, by drafting and entering into the Trump Group Entities Settlement Agreement which failed to direct payment of the Settlement Proceeds to the Orly Trust, by advising and inducing Orly to enter into the Trump Group Entities Settlement Agreement which failed to direct payment of the Settlement Proceeds to the Orly Trust, and/or by directing and authorizing payment of the Settlement Proceeds to parties other than the Orly Trust.

36.     In doing so, Respondents aided and abetted Orly's breach of fiduciary duty.

37.     The Orly Trust has been injured by Respondents' aiding and abetting of Orly's breach of her fiduciary duty to the Orly Trust in the amount of $32.3 million, plus statutory interest.

### Count II: Tortious Interference with Contract
### Against All Respondents

38.     The allegations contained in paragraphs 1 through 37 hereinbefore are realleged as if fully set forth herein.

39.     The Trust Agreement is a valid contractual agreement by the Orly Trust.

40.     Pursuant to the Trust Agreement Obligations, all trust funds were to be held in the name of the Orly Trust, and no Orly Trust assets were to be used for the benefit of Orly's creditors.

41.     Because the Orly Trust Derivative Litigation was brought on behalf of the Orly Trust, the Settlement Proceeds therefrom belong to the Orly Trust.

42.     Respondents were aware of the Trust Agreement Obligations.

43.     The Orly Trust, acting through its de facto trustee Orly in the Orly Trust Derivative Litigation, breached the Trust Agreement Obligations by causing the Settlement Trustees to not be held in the name of the Orly Trust, and to instead use the Settlement Proceeds for the benefit of Orly's creditors, including the Brosers.

-8-

44.     Respondents caused the Orly Trust's breach of the Trust Agreement Obligations by, inter alia, taking the Settlement Proceeds which belong to the Orly Trust, by drafting and entering into the Trump Group Entities Settlement Agreement which failed to direct payment of the Settlement Proceeds to the Orly Trust, by advising and inducing Orly to enter into the Trump Group Entities Settlement Agreement which failed to direct payment of the Settlement Proceeds to the Orly Trust, and/or by directing and authorizing payment of the Settlement Proceeds to parties other than the Orly Trust.

45.     In doing so, Respondents tortiously interfered with the Trust Agreement Obligations.

46.     Respondents' interference with the Trust Agreement Obligations was both intentional and improper.

47.     The Orly Trust has been injured by Respondents' tortious interference with contract in the amount of $32.3 million, plus statutory interest.

### Count III: Money Had and Received
### Against All Respondents

48.     The allegations contained in paragraphs 1 through 47 hereinbefore are realleged as if fully set forth herein.

49.     Pursuant to the Trust Agreement Obligations, all trust funds were to be held in the name of the Orly Trust, and no Orly Trust assets were to be used for the benefit of Orly's creditors.

50.     Because the Orly Trust Derivative Litigation was brought on behalf of the Orly Trust, the Settlement Proceeds therefrom belong to the Orly Trust.

51.     Orly was required to ensure that the Settlement Proceeds were paid to the Orly Trust.

52.     Respondents knew that Orly was required to ensure that the Trump Group Entities Settlement proceeds were paid to the Orly Trust.

53.     However, pursuant to the terms of the Trump Group Entities Settlement Agreement, the Settlement Proceeds were and are to be paid by the Trump Group Entities to parties other than the Orly Trust.

54.     None of the Settlement Proceeds have been paid to the Orly Trust.

55.     Respondents received and/or are currently holding the Settlement Proceeds instead of the Orly Trust.

56.     Respondents received a benefit from the Settlement Proceeds which belongs to the Orly Trust.

57.     Under principles of good conscience, Respondents should not be allowed to retain the Settlement Proceeds which belong to the Orly Trust, but rather should be compelled to return all $32.3 million to the Orly Trust, plus statutory interest.

### Count IV: Unjust Enrichment
### Against All Respondents Except Trump Group Entities

58.     The allegations contained in paragraphs 1 through 57 hereinbefore are realleged as if fully set forth herein.

59.     Pursuant to the Trust Agreement Obligations, all trust funds were to be held in the name of the Orly Trust, and no Orly Trust assets were to be used for the benefit of Orly's creditors.

60.     Because the Orly Trust Derivative Litigation was brought on behalf of the Orly Trust, the Settlement Proceeds therefrom belong to the Orly Trust.

61.     Orly was required to ensure that the Settlement Proceeds were paid to the Orly Trust.

62.     Respondents knew that Orly was required to ensure that the Settlement Proceeds were required to be paid to the Orly Trust.

63.     Respondents (except the Trump Group Entities) received the Settlement Proceeds instead of the Orly Trust.

64.     Respondents (except the Trump Group Entities) received a benefit from receiving the Settlement Proceeds which belong to the Orly Trust.

65.     The benefit Respondents (except the Trump Group Entities) received from payment of the Settlement Proceeds was at the expense of the Orly Trust.

66.     Under principles of equity and good conscience, Respondents (except the Trump Group Entities) must make restitution to the Orly Trust in the amount of $32.3 million, plus statutory interest.

### Count V: Turnover
### Against All Respondents

67.     The allegations contained in paragraphs 1 through 66 hereinbefore are realleged as if fully set forth herein.

68.     Pursuant to the Trust Agreement Obligations, all trust funds were to be held in the name of the Orly Trust, and no Orly Trust assets were to be used for the benefit of Orly's creditors.

69.     Because the Orly Trust Derivative Litigation was brought on behalf of the Orly Trust, the Settlement Proceeds therefrom belong to the Orly Trust.

70.     Orly was required to ensure that the Settlement Proceeds were paid to the Orly Trust.

71.     Respondents knew that Orly was required to ensure that the Settlement Proceeds were required to be paid to the Orly Trust.

-11-

72.     Respondents (except the Trump Group Entities) received the Settlement Proceeds instead of the Orly Trust.

73.     Respondents (except the Trump Group Entities) have in their possession the Settlement Proceeds which should be delivered to the Orly Trust.

74.     Respondents have refused to turn over the Settlement Proceeds to the Orly Trust or pay it into Court.

75.     Respondents should be compelled to turn over to the Orly Trust all Settlement Proceeds in their possession, custody or control.

### Count VI: Accounting
### Against Respondent Orly

76.     The allegations contained in paragraphs 1 through 75 hereinbefore are realleged as if fully set forth herein.

77.     Orly has never provided an accounting of the Settlement Proceeds, which are an asset of the Orly Trust.

78.     As a matter of law and equity, Orly should provide an accounting of the Settlement Proceeds.

### Interested Parties

79.     The names and addresses of all persons, other than the Petitioner, interested in the obtaining a determination of the issues presented in this Petition, and all other persons interested in this proceeding who are required to be cited upon this application or concerning whom this Court is required to have information, are:

(a)     The following who are of full age and sound mind or are corporations or associations:

ORLY GENGER
780 Greenwich Street, Apt. 4P

-12-

New York, New York

Interest: Beneficiary and Respondent

ARIE GENGER
17001 Collins Avenue,
Sunny Isles Beach, Florida

Interest: Respondent

GLENCLOVA INVESTMENT COMPANY
41 Madison Ave,
New York, New York

Interest: Respondent

TR INVESTORS, LLC
41 Madison Ave,
New York, New York

Interest: Respondent

NEW TR EQUITY I, LLC
41 Madison Ave,
New York, New York

Interest: Respondent

NEW TR EQUITY II, LLC,
41 Madison Ave,
New York, New York

Interest: Respondent

TRANS-RESOURCES, INC.
41 Madison Ave,
New York, New York

Interest: Respondent

ARNOLD BROSER
5371 Fisher Island Drive,
Miami Beach, Florida

Interest: Respondent

-13-

DAVID BROSER
104 West 40th Street, 19th Floor
New York, New York

Interest: Respondent

SAGI GENGER 1993 TRUST
C/O John Dellaportas
Morgan, Lewis
101 Park Avenue,
New York, New York

Interest: Contingent Remainderman

(b)    The following who are persons under disability:
Infants: None
Others under a disability: None

(c)    The following persons who are confined in prison: None
(d)    The following persons whose names or whereabouts are unknown: None

80.    There are no persons, corporations or associations other than those mentioned who are interested in this proceeding.

81.    No previous application for this or similar relief has been made to this or any other court except Motion Seq. 42 (for payment into Court) in the Orly Trust Derivative Litigation, entitled Arie Genger, et al. v. Sagi Genger, et al., Index No. 651089/2010 in New York Supreme Court, New York County. Motion Seq. 42 was held in abeyance by the Supreme Court pending a determination by this Court.

-14-

WHEREFORE, Petitioner requests the following relief against all Respondents:

a.      damages in in the amount of $32.3 million, plus statutory interest;

b.      imposition of a constructive trust on the Settlement Proceeds;

c.      an order directing the delivery of the Settlement Proceeds to her as Trustee;

d.      an accounting of the Settlement Proceeds; and

e.      such other relief as to the Court seems just and necessary.

Dated: June 13, 2016


(Signature of Petitioner)


Dalia Genger

(Print Name)

STATE OF NEW YORK            )

                            )   ss:

COUNTY OF NEW YORK   )

## VERIFICATION

I, the undersigned the petitioner named in the foregoing petition, being duly sworn, say:

VERIFICATION: I have read the foregoing petition subscribed by me and know the contents thereof, and the same is true of my own knowledge, except as to the matters therein stated to be alleged upon information and belief, and as to those matters I believe it to be true.

(Signature of Petitioner)

Dalia Genger

(Print Name)

On the ____ 13th ____ day of ____ June ____, 20 16 , before me personally came Dalia Genger to me known to be the person described in and who executed the foregoing instrument. Such person duly swore to such instrument before me and duly acknowledged that he/she executed the same.

Notary Public

Judith Bachman
Notary Public, State of New York
No. 02-BA6048319
Qualified in Rockland County
Commission Expires Sept. 25, 200
2018

JUDITH BACHMAN
LAW OFFICES OF JUDITH BACHMAN
254 S. Main Street, Suite 306
New City, New York 10956
(845) 639-3210
jlbesq_99@yahoo.com
*Attorneys for Petitioner Dalia Genger*

**SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY**

PRESENT: _COOPER_    PART _51_

_Justice_

GENGER, DALIA

- v -

ARIE GENGER

INDEX NO. _302436/02_

MOTION DATE _____

MOTION SEQ. NO. _21_

MOTION CAL. NO. _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

|                                                                        | PAPERS NUMBERED |
|------------------------------------------------------------------------|-----------------|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ...      | _____ |
| Answering Affidavits — Exhibits _____    | _____ |
| Replying Affidavits _____   | _____ |

**Cross-Motion:**  ☐ Yes  ☒ No

Upon the foregoing papers, it is ordered that this motion

**MOTION IS DECIDED IN ACCORDANCE
WITH ATTACHED MEMORANDUM DECISION.**

Dated: JUN 03 2016 _____

MATTHEW F. COOPER _J.S.C._
J.S.C.

Check one:  ☒ FINAL DISPOSITION    ☐ NON-FINAL DISPOSITION

Check if appropriate:  ☐ DO NOT POST    ☐ REFERENCE

☐ SUBMIT ORDER/ JUDG.    ☐ SETTLE ORDER/ JUDG.

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE
FOR THE FOLLOWING REASON(S):

**SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY**

PRESENT: _____Cooper_____                    PART _51_

                    *Justice*

Gewgew, D

- v -

Gewgew, A

INDEX NO. _362436/02_

MOTION DATE _____

MOTION SEQ. NO. _22_

MOTION CAL. NO. _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

| | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | |
| Answering Affidavits — Exhibits | |
| Replying Affidavits | |

**Cross-Motion:** ☐ Yes  ☒ No

Upon the foregoing papers, it is ordered that this motion

is decided in accordance with the memorandum decision
in connection with motion sequence 21

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE
FOR THE FOLLOWING REASON(S):

JUN 0 3 2016

Dated: _____

MATTHEW F. COOPER *J.S.C.*
J.S.C.

Check one: ☒ FINAL DISPOSITION    ☐ NON-FINAL DISPOSITION

Check if appropriate:    ☐ DO NOT POST    ☐ REFERENCE

☐ SUBMIT ORDER/ JUDG.    ☐ SETTLE ORDER/ JUDG.

# SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT: _____*COOPER*_____       PART _*51*_
                        *Justice*

GENGER, DALIA                    INDEX NO. *302436/02*

                                 MOTION DATE _____

          - v -                  MOTION SEQ. NO. ___*23*___

ARIE GENGER                      MOTION CAL. NO. _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

|  | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | |
| Answering Affidavits — Exhibits | |
| Replying Affidavits | |

**Cross-Motion:**   ☐ Yes   ☒ No

Upon the foregoing papers, it is ordered that this motion

is decided in accordance with the memorandum decision
in connection with motion sequence 21

Dated: **JUN 03 2016** _____        MATTHEW F. COOPER
                                                      J.S.C.          J.S.C.

**Check one:**   ☒ FINAL DISPOSITION   ☐ NON-FINAL DISPOSITION

**Check if appropriate:**   ☐ DO NOT POST   ☐ REFERENCE
          ☐ SUBMIT ORDER/ JUDG.   ☐ SETTLE ORDER/ JUDG.

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE
FOR THE FOLLOWING REASON(S):

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:  PART 51
-------------------------------------------------------X
DALIA GENGER,

                          Plaintiff,

                                                            Index No. 302436/2002
                                                            Motion Sequence Nos. 21, 22 and 23

                    -against-
                                                            **DECISION AND ORDER**

ARIE GENGER,

                          Defendant.

-------------------------------------------------------X

| For the Plaintiff | For the Defendant |
|---|---|
| Judith Lisa Bachman, Esq. | Robert Z. Dobrish, Esq. |
| 100 Park Avenue, 16th Floor | Dobrish Michaels Gross LLP |
| New York, NY 10017 | 757 Third Avenue |
| (212) 210-9272 | New York, NY 10017 |
| | (212) 532-4000 |

Papers and exhibits considered in review of defendant's Orders to Show Cause:

Motion Sequence No. 21
    Defendant's Order to Show Cause...............................................................1
    Plaintiff's Opposition............................................................................2
    Defendant's Reply Affirmation..............................................................3

Motion Sequence No. 22
    Defendant's Order to Show Cause...............................................................1
    Plaintiff's Opposition............................................................................2
    Defendant's Reply Affirmation..............................................................3

Motion Sequence No. 23
    Defendant's Order to Show Cause...............................................................1
    Plaintiff's Opposition............................................................................2
    Defendant's Reply Affirmation..............................................................3

**Matthew F. Cooper, J.:**

    Divorced more than a decade ago, the parties, along with their two grown children, have

been relentlessly litigating against one another ever since.  The case is now before me on a series

of post-judgment matrimonial motions brought by the ex-husband, Arie Genger ("Arie"), against

the ex-wife, Dalia Genger ("Dalia").

    The issue in all three motions is which ex-spouse owns a stock purchase agreement (the

"S.P.A.") that was used by Arie to sell shares of a company he owned to the parties' son, Sagi

Genger ("Sagi"). The S.P.A. is also the subject of a lawsuit between Arie and Sagi in which Arie

seeks to collect payment from his son on the instrument.

Arie contends that the S.P.A. is his separate property. Dalia asserts that the S.P.A. is a

non-liquid marital asset and, pursuant to the terms of a Stipulation of Settlement (the

"Stipulation"), which was signed by the parties on October 26, 2004, and was incorporated into

the judgment of divorce dated January 14, 2005, is subject to distribution by way of a coin toss.

As a result of having unilaterally conducted the coin toss on January 5, 2015, Dalia further

contends that the S.P.A. now belongs to her. In each of the motions, Arie seeks a finding that the

coin toss was invalid and that the instrument belongs to him.

*Background*

What is notable about the motions is not so much the S.P.A., it being of little value

relative to the parties' overall wealth. Rather, it is that the motions are just one more installment

in what has been described as the "Genger family's litigation saga" (*Genger v Genger*, 76 F Supp

3d 488, 491 [SDNY 2015]), with the parties and their two children continually suing one another

personally and through their various family-held businesses. A Westlaw search reveals that the

Genger's lawsuits against each other have resulted in almost 40 reported decisions from the New

York State Supreme Court and the Federal District Court for the Southern District of New York.

Of the state court decisions, at least 10 have been from the Appellate Division, First Department.

There has also been extensive litigation in the Delaware state courts, as well as countless

unpublished decisions and orders from trial judges in the matrimonial and IAS parts of this court.

As other judges have lamented, the "bitter and seemingly endless battle" (*Glencova*

*Investment Co. v Trans-Resources, Inc.*, 874 F Supp 2d 292, 295 [SDNY 2012]) between the

family members, which pits Dalia and Sagi against Arie and the couple's daughter, Orly Genger,

2

("Orly"), results, in large part, from the divorce itself. In one of the Genger family cases that was before her, Federal Judge Katherine B. Forrest stated

> "As Tolstoy famously wrote, 'Happy families are all alike; every unhappy family is unhappy in its own way.' (Leo Tolstoy, *Anna Karenina* 1 [Constance Garnett trans., 1978]). In the case of the wealthy Genger family, that unhappiness has taken the form of a seemingly never-ending series of lawsuits stemming from the divorce of Arie Genger and Dalia Genger, the family patriarch and matriarch, respectively. Together, Arie, Dalia, their son Sagi, and their daughter Orly have employed a small army of lawyers to fight over the pieces of the family pie and, it seems, to make each other's lives as miserable as possible"

(*Genger*, 76 F Supp 3d at 491).

In a decision rendered in February of this year after a 27-day trial in one of the many lawsuits that Orly and Sagi have brought against each other in New York County Supreme Court, Justice Barbara Jaffe wrote:

> "The parties are siblings; their family has been mired in litigation in several jurisdictions for many years, all inspired by the contentious divorce of the parties' parents. This action reflects the parents' enmity which has malignantly spread to their children".

(*Orly Genger v Sagi Genger*, Sup Ct, NY County, February 10, 2016, Jaffe, J., index No. 100697/08)

Despite having more money than they could ever hope to spend, the Genger's interminable battle over who gets what has resulted in the two family camps having no relationship with the other; the only contact the siblings have with each other and each parent has with the child with whom he or she is not aligned is when they are in a courtroom litigating. Perhaps the saddest manifestation is that Arie has never seen his grandchildren. One gets the sense that this may indeed be a case where it really is not about the money: it is about a

dysfunctional family where each member is intent on inflicting as much pain as possible on his or her ex-spouse, parent, child or sibling.

The Gengers have the right, of course, to make each other as miserable as they want. The problem is that the method they have chosen adversely impacts the court system and the people it serves. Litigation like the type the Genger family members have engaged in over the last decade – litigation that knows no bounds and is brought to inflict punishment on former loved-ones as much as it is to resolve actual claims – demands a disproportionate share of already limited judicial resources. The result is that litigants who lack the resources to command a "small army of lawyers," but often have claims equally or more pressing than the Genger's, find themselves receiving less time and attention from the courts than their cases deserve.

*Statement of Facts*

According to Justice Jaffe's trial decision, quoted above, much of the blame for making the Gengers a family whose *raison d'etre* is to sue one another rests with Arie and Dalia's decision to have Sagi take an active role in arriving at the terms of the divorce Stipulation. To make matters worse, the Stipulation provided that Sagi was to be appointed attorney-in-fact so that he could allocate non-liquid marital assets to his mother and father in order to effectuate an equal distribution of those assets. Predictably, this proved highly problematic, with Arie, joined by Orly, charging that Sagi was making allocations solely to benefit Dalia, and in turn, Sagi himself.

The S.P.A. is but one tiny sliver of the family's financial pie. Dated March 8, 2004, it requires Sagi to make payments each year to Arie in exchange for Arie having transferred to him 100 shares of common stock of AG Real Estate GP, Inc., a company used by Arie in connection with the family's Canadian real estate investments.

4

Notably, the value of the S.P.A. is only worth the amount that Arie will obtain by suing his son on the instrument, there being no indication that Sagi will ever pay voluntarily. At oral argument, both sides conceded that the very most Arie could hope to realize is $300,000. Moreover, if things proceed the way they have, it will presumably be years, along with hundreds of thousands of dollars in additional legal fees, before he gets a penny. On the other hand, if Dalia was granted ownership of the S.P.A., it can safely be assumed that she would waive enforcement of the instrument against Sagi, thereby relieving the child with whom she is aligned from having to make the required payments.

The "coin toss" provision, which is found in Article II of the Stipulation ("Distribution of Assets"), states that if the parties have not sold or divided a non-liquid marital asset by the second anniversary of the Stipulation, and are then unable to reach an agreement as to its disposition within 45 days of the anniversary date, a coin toss will be held to determine the value of the asset and which party owns it. The Stipulation sets out the procedure for the coin toss with the same type of detail one would expect from the rules governing the coin toss at the National Football League's Super Bowl.

The second anniversary of the Stipulation was October 26, 2006, a date that passed without the S.P.A. being sold or divided. Similarly, no agreement was reached as to the disposition of the S.P.A. by December 10, 2006, that being the 45th day following the two-year anniversary date. Despite the absence of a sale, division, or agreement as to the disposition of the instrument by either of the trigger dates, there was no demand by either party for a coin toss. In fact, the purported coin toss did not take place until more than nine years later when, on January 5, 2015, Dalia unilaterally conducted the event without her ex-husband's participation. As a result of having done so, she now claims ownership of the asset.

5

Dalia's decision to move forward with the coin toss after so many years was not the result of whim or happenstance. Instead, it was precipitated by the Appellate Division rendering a decision on December 4, 2014, in *Genger v Genger*, 123 AD3d 445 (1st Dept 2014), one of a multitude of Genger appeals before it. This appeal, which pitted Arie against Sagi and Dalia, stemmed from a decision by Justice Cynthia Kern, another Supreme Court judge who has handled Genger cases. Although she found that Arie owned the S.P.A., she denied summary judgment to him in his effort to collect against Sagi on the instrument and on three promissory notes. The Appellate Division reversed the denial of summary judgment and remanded the matter to Justice Kern for "a calculation of the amount of damages owed to Arie under the stock purchase agreement," as well as a "calculation of the simple interest owed to him in accordance with the terms of [the] notes...and the stock purchase agreement" (*Genger* at 447-448).

While Arie construed the Appellate Division's decision as a clear acknowledgment that he owned the S.P.A., Dalia apparently viewed certain language used in the decision as reason for her to demand the coin toss. On December 22, 2014, two weeks after the decision, one of Dalia's matrimonial attorneys, Judith Bachman, Esq., sent notice to one of Arie's attorneys, Edward Klimerman, Esq., notifying him that the long-delayed event would take place on January 5, 2015. Despite being advised by a letter from Arie's matrimonial attorney, Robert Z. Dobrish, Esq., that Arie objected to the coin toss and would not participate, Dalia proceeded with the toss on January 5 without Arie being present. Although the Stipulation specifies that "the coin will be tossed in the air by Orly Genger, or in her absence by a person mutually acceptable to the Husband and the Wife," neither Orly nor a "mutually acceptable" person tossed the coin on January 5, 2015. Instead, it was done by one of Sagi's lawyers, John Dellaportas, Esq., of Morgan, Lewis & Bockius, LLP, who was presumably properly attired for the task in a head referee's striped jersey and white cap.

6

As one would imagine, these events gave rise to another round of frenzied motion practice. Arie brought the series of motions that are the subject of this decision, and he moved before Justice Kern, pursuant to the Appellate Division's decision remanding the case to her, for judgment against Sagi on the S.P.A. Dalia, in turn, cross-moved for summary judgment declaring her to be the instrument's rightful owner.

Naturally, I would have preferred if Justice Kern had decided the coin toss issue, thereby subjecting her decision, rather than mine, to the inevitable appeal. She, however, in a decision dated February 26, 2015, ruled that "the determination of whether the coin toss was valid should be made by the Honorable Matthew Cooper in the matrimonial part" (*Genger v Genger*, Sup Ct, NY County, Kern J., index No. 104249/07). In making the referral, she reasoned that this was ultimately a decision to be made within the context of the post-divorce proceeding, especially in that the ex-husband had already moved before me to set aside the coin toss as invalid. In the end, the coin toss issue, like just about everything in world of the Gengers, goes back to the divorce itself. Thus, it is appropriate for the issue to be decided in a matrimonial part.

### *Legal Analysis*

In support of their quest for ownership of the S.P.A., both sides look to this stand-alone, single-sentence paragraph, from the Appellate Division's December 2014 decision:

> "To the extent the notes and stock purchase agreement were
> considered 'non-liquid assets,' subject to a 'coin toss' procedure set
> forth in the divorce settlement, Arie owns the instruments and the
> debts are owed to him"

(*Genger*, 123 AD3d at 446).

More precisely, each side looks to one or the other of the two clauses comprising the sentence. Dalia points to the sentence's dependent clause, consisting of these words: "To the extent the notes and stock purchase agreement were considered 'non-liquid assets,' subject to a

7

'coin toss' procedure set forth in the divorce settlement." According to Dalia, by including this language in the sentence, the Appellate Division authorized her to proceed with the coin toss, which resulted in her obtaining ownership of the S.P.A. Arie, on the other hand, focuses on the independent clause, which consists of these words: "Arie owns the instruments and the debts are owed to him." According to Arie, this was a definitive declaration by the Appellate Division that he owns the S.P.A.

The problem with each side's textual analysis is that it disregards the need to look at the sentence as a whole rather than just the individual clauses of which it is composed. While the dependent clause refers to the coin toss procedure, it is not a statement by the Appellate Division that the S.P.A. is an asset subject to the procedure. It serves only to introduce and modify the independent clause that follows it; grammatically, it cannot stand on its own as a declaration of anything. Likewise, the statement contained in the independent clause that Arie owns the instruments is not absolute; it is subject to the provisions of the words preceding it.

Because of the wording of the dependent clause, it is impossible to reconcile the two clauses in a way that would result in the sentence as a whole making any sense, particularly when viewed in the context of what the Stipulation states. If one substitutes the common meaning for the prepositional phrase "to the extent that," the sentence would read like this: "[Inasmuch as] the notes and stock purchase agreement were considered 'non-liquid assets,' subject to a 'coin toss' procedure set forth in the divorce settlement, Arie owns the instruments and the debts are owed to him." And because it is necessary to give full force and effect as to each word in the sentence's two clauses, the conclusion to be drawn is that if the S.P.A. is subject to the coin toss procedure, it is Arie's property. This, of course, is in total conflict with the Stipulation. Under the very clear terms of the Stipulation, the complete opposite is true: If the S.P.A. is an asset that is subject to a

8

coin toss, then the only way Arie would be able to claim ownership of it is by winning the coin

toss. Put another way, absent a coin toss, the only way the S.P.A. can be found to belong to Arie

is if it is not a marital asset, and instead, as he asserts, is his separate property. In that case, the

S.P.A. would not be subject to equitable distribution by way of the coin toss provision, or, for that

matter, by any other method.

  With a textual analysis of the crucial sentence proving to be unproductive, the alternative

is to look to what the Appellate Division *did* with regard to the S.P.A., as opposed to what it *said*.

What it did was remand the matter to Justice Kern for a "calculation of the amount of damages

owed to Arie under the stock purchase agreement" (*Genger,* 123 AD3d at 447). Significantly, it

did not remand the matter for a determination as to who owns the S.P.A. or whether it is subject

to the coin toss procedure. Moreover, it did not authorize Dalia to proceed with the coin toss. It

simply sent the case back for a determination as to how much Sagi owes Arie. To the extent that

the Appellate Division acted as it did, it was clearly indicating, by deed if not by words, that it

considered the S.P.A. to be Arie's separate property.

  Additional authority supporting the finding that the S.P.A. belongs to Arie comes from a

a post-judgment matrimonial arbitration decision, which the arbitrator, retired Judge E. Leo

Milonas, rendered on May 6, 2008, after hearing 14 days of testimony. With regard to the

family's Canadian real estate investments, he stated the following: "Dalia never had any real or

equitable marital interest in the Canadian venture. The arbitrator therefore dismisses Dalia's AG

Properties claim." According to the decision, what is referred to as "AG Properties" primarily

includes the limited partnership that Arie established, AG Real Estate Partners, L.P., of which

90% was owned by Sagi and Orly as limited partners, with the remaining 10% owned by the

general partner, AG Real Estate GP, Inc., a corporation owned by Arie. It was the stock in AG

Real Estate GP, Inc. that Arie then sold to Sagi through the S.P.A.

Inasmuch as the S.P.A. consists of shares of the general partner in AG Real Estate

Partners, L.P., the partnership at the center of the Canadian real estate investments, it constitutes

property that comes within the scope of the arbitrator's dismissal of Dalia's "AG Properties

claim." The dismissal is based on the arbitrator's express finding that "Dalia never had any real

or equitable marital interest in the Canadian venture." Thus, the arbitration decision must be seen

as conclusively determining that the S.P.A. was not marital property to which Dalia had an

equitable claim.

The fact that Dalia took no action for so many years with regard to the S.P.A.

demonstrates that she too regarded the arbitrator's decision to be a binding determination that she

had no claim to the instrument. It was only after Arie sued Sagi on the S.P.A. and the Appellate

Division rendered its decision, with its confusing sentence referencing the coin toss, that Dalia

was suddenly motivated – after close to a decade of inactivity – to demand and then proceed with

the coin toss. The effort, however, was to no avail. Whatever happened when Dalia's attorney

flipped a coin into the air on January 5, 2015, was of no force and effect. This is because the

S.P.A. was not, and is not, properly the subject of such a procedure. Although it is a non-liquid

asset, the record establishes that it is not a marital asset; instead, the S.P.A. is Arie's separate

property and thus not susceptible to division between the parties by coin toss or other means.

*Conclusion*

The Genger story is compelling in its own way, as is any story of a family in turmoil.

Much like watching a televison series about a rich and powerful, but ultimately tragic, family, we

marvel at how people can have so much materially, and yet be so incredibly unhappy that they

10

dedicate their lives to suing their own sons, daughters, mothers, fathers, brothers and sisters. But as with most stories like this, there comes a time when it becomes simply tiresome, a time when we have seen far too much of the characters, their constant self-absorption and sense of entitlement, and their incessant troubling behavior.

The same way that a series about an unhappy family must ultimately come to an end, the time for the Gengers continuing to occupy center stage in the New York court system must also end. Recently, our new Chief Judge, Janet DiFiore, unveiled an initiative to curb what she described as "troublesome" inefficiencies in court operations. In an address to the court system's administrative judges, she stated that she wanted to "make certain that we are putting our resources to our highest and best uses" *(New York Law Journal*, March 31, 2016 at 1, col 3). It seems obvious that continuing to give the Gengers the exorbitant amount of court time that they demand is not putting our resources to their "highest and best uses."

With the dispute over the S.P.A. having been decided, it is this judge's hope that the parties and their children might take a step back and reflect on how destructive this path of constant litigation is, not only to them, but to the courts and the other litigants who truly need our services. If they are unable to do so, it may be incumbent on judges and court administrators to devise a method to curb what is becoming perilously close to an abuse of the judicial system.

In light of the foregoing, defendant's three motions are granted to the extent they seek to have him declared the owner of the S.P.A. and the coin toss declared invalid.

This constitutes the decision and order of the court.


Dated: June 3, 2016                    Enter: _____

                                              **MATTHEW F. COOPER**
                                                        **J.S.C.**



11

SURROGATE'S COURT : NEW YORK COUNTY
----------------------------------------X
In the Matter of the Application of
Orly Genger to Remove Dalia Genger
as Trustee of the The Orly
Genger 1993 Trust Established on
December 13, 1993, by

          ARIE GENGER,

             Grantor.
----------------------------------------X


New York County Surrogate's Court
Date: June 21, 2017

File No. 2008-0017

A N D E R S O N,  S .

    This is a proceeding by Orly Genger, the primary
beneficiary of an irrevocable inter vivos trust established in
1993 by her father, Arie Genger, seeking removal of her mother,
Dalia Genger, as trustee and the appointment of a successor
trustee.  Pending are two motions to dismiss Orly's third
amended petition, one by Dalia and the other by the trustee of
the contingent remainder beneficiary, a trust Arie Genger
established for the benefit of Orly's brother Sagi (the "Sagi
Trust").  For the reasons stated below, the motions are denied.

    The trust at issue (the "Orly Trust") provides for
discretionary income and principal distributions to Orly for
life, with remainder to her descendants, or, if none, to the
Sagi Trust.  The original trustees and a series of successors
served until January 2008, at which time Dalia was designated
trustee. By this time, Dalia and Arie had concluded a bitter
divorce. Orly, who believed her mother "would not protect her
interests ... because of [her] animosity towards Arie, and her
collusion with Sagi" immediately commenced a proceeding in this

court, challenging the validity of her mother's appointment. In
the alternative, she sought the appointment of a "special
trustee" to investigate alleged "wrongful dealings concerning
the assets and income of the trust."  In deference to Orly's
position, Dalia refrained from acting as trustee during the
pendency of the application. However, on December 31, 2008, the
court held that Dalia's appointment was valid under the terms
of the trust and that Orly had set forth no grounds that would
warrant the appointment of a "special trustee." The application
was thus denied "without prejudice to renewal if future
circumstances warrant[ed] such relief" (*Matter of Genger*, NYLJ,
Jan. 9, 2009, at 34, col 2 [Sur Ct, NY County 2009]).
Thereafter, Dalia began acting as trustee.

Seven months later, Orly commenced the instant proceeding
to remove her mother as trustee and to appoint a successor
trustee. Orly also sought to restrain Dalia, during the
pendency of the proceeding, from selling or otherwise
encumbering the Orly Trust's 19.43% interest in Trans-
Resources, Inc. ("TRI"), an allegedly valuable agricultural and
industrial chemical manufacturing company founded by Arie.
After a hearing, the court memorialized an agreement between
the parties in an order dated July 1, 2009, which directed that
Dalia give 10-days' notice of any offer to purchase the shares
and of any attempt by Dalia or anyone acting on her behalf to
sell or otherwise encumber those shares (the "July 1 2009

2

Order").[1]

After Orly amended the petition for a third time to allege additional conduct as a basis for removal, Dalia moved to dismiss for failure to state a claim and for failure to join a necessary party, the Sagi Trust (CPLR 3211[a][7],[10]). The court directed joinder of the Sagi Trust and held the balance of Dalia's motion in abeyance pending the completion of jurisdiction (*see Matter of Genger*, NYLJ 1202666658274 [Sur Ct, NY County 2014]). After Orly served the trustee of the Sagi Trust (the "Sagi Trustee"), he moved to dismiss for lack of personal jurisdiction (CPLR 3211[a][8]), claiming that service of process upon him by registered mail in Israel where he resides was insufficient under the Hague Convention. The court granted the motion (see *Matter of Genger,* NYLJ 1202723666996 [Sur Ct, NY County 2015).

After the trustee was served process in accordance with the Hague Convention, Dalia renewed her motion to dismiss the removal petition and the Sagi Trustee moved to dismiss as well. Both movants seek dismissal on the ground that the petition fails to state a claim (CPLR 3211[a][7]). In addition, the Sagi Trustee argues that the petition should be dismissed because

---

[1]   The July 1, 2009 Order was subsequently reaffirmed by the court on August 18, 2009 and then supplemented by a stipulation dated September 8, 2010, which provided that, in addition, Dalia would give notice of any intention to vote the Orly Trust's TRI shares for any purpose.

3

Orly purportedly 1) attempted to commit a fraud against the court by making a false statement in her petition concerning her proposed successor trustee and 2) is "exploiting" this proceeding to delay Dalia's efforts to recover on behalf of the Orly Trust funds that Orly allegedly has received on the trust's behalf in settlement of various litigations in other courts, but has kept for her personal use. Orly and the guardian ad litem for Orly's unborn issue oppose the motions.

Before turning to the merits of these motions, the court notes that Dalia did not attach to her motion papers a copy of the third amended petition.  This is a technical defect which could be viewed as a basis to deny Dalia's motion (*see e.g. Alizio v Perpignano*, 225 AD2d 723 [2d Dept 1996]). This court has noted previously that "filing a motion which requires the court to search its records to obtain a pleading upon which the motion is based is not an advisable litigation practice" (*Matter of Terian*, NYLJ 1202646597731, at *3 [Sur Ct, NY County 2014], *citing Sheedy* v Pataki, 236 AD2d 92 [2d Dept 1997]; Loeb *v Tanenbaum*, 124 AD2d 941 [3d Dept 1986]). However, in this instance, the court will consider the motion, since the pleading was annexed properly to the Sagi Trustee's related motion to dismiss and is therefore easily accessible for review.

Since both movants seek dismissal pursuant to CPLR 3211(a)(7), we address first whether the allegations in the

4

amended petition state sufficient grounds for removal under
SCPA § 711.  On a motion to dismiss for failure to state a
claim, the court must "'accept the facts as alleged in the
[pleading] as true, accord [petitioner] the benefit of every
possible favorable inference, and determine only whether the
facts as alleged fit within any cognizable legal theory'"
(*Braddock v Braddock*, 60 AD3d 84, 86 [1st Dept 2009], *quoting*
*Leon v Martinez*, 84 NY2d 83, 87-88 [1994]).  Respondent on the
motion may submit affidavits, but they "will almost never
warrant dismissal under CPLR 3211 unless they 'establish
conclusively that [petitioner] has no [claim or] cause of
action'" (*Matter of Lawrence*, 11 NY3d 588, 595 [2008], *quoting*
*Rovello v Orofino Realty Co.*, 40 NY2d 633, 635-636 [1976]; *see*
*also Basis Yield Alpha Fund v Goldman Sachs Group, Inc.*, 115
AD3d 128 [1st Dept 2014]).  The issue of "[w]hether a
[petitioner] can ultimately establish [his or her] allegations
is not part of the calculus in determining a motion to dismiss"
(*EBC I, Inc. v Goldman, Sachs & Co.*, 5 NY3d 11, 19 [2005]).

Petitioner seeks removal under subsections 2, 3, 7, 8 of
SCPA § 711. SCPA § 711(2) provides that a fiduciary's letters
may be revoked,

> "[w]here by reason of his having wasted or improperly
> applied the assets of the estate, ... or otherwise
> improvidently managed or injured the property committed
> to his charge, ... or by reason of other misconduct in the
> execution of his office or dishonesty, drunkenness,
> improvidence or want of understanding, he is unfit for
> the execution of his office."

Subsections 711(3) and (7) provide a further ground for removal where a fiduciary has "wilfully refused or without good cause neglected to obey any lawful direction of the court contained in any decree or order or any provision of law relating to discharge of his duty" or "has removed property of the estate without the state without prior approval of the court." Finally, 711(8) provides for removal where a fiduciary "does not possess the qualifications required of a fiduciary by reason of substance abuse, dishonesty, improvidence, want of understanding, or ... is otherwise unfit for the execution of the office."

Here, the conduct alleged (and assumed to be true) in Orly's 31-page pleading details a course of conduct by Dalia after December 31, 2008 (the date the court determined her appointment was proper) that, if true, could be a basis for removal under the above subdivisions of SCPA § 711. Orly alleges in great detail numerous actions by Dalia that have contributed to and/or resulted in the depletion of assets of the Orly Trust or otherwise disadvantaged the Orly Trust in violation of her fiduciary duty. She offers a substantial motive for such conduct as well: a desire to punish Orly, who has maintained a relationship with her father following the divorce, and to benefit Sagi with whom Dalia maintains a close relationship.

Orly alleges that the Orly Trust and the Sagi Trust were

6

established by Arie in 1993 as an estate planning vehicle for
Arie and Dalia to pass some of their substantial wealth to
their children. Initially, each trust was funded with a
$600,000 gift from Arie and each child's 48% interest in D & K
LP ("D & K"), a family owned limited partnership which was
named for "Dalia and the Kids." Dalia was general partner and
owned the remaining 4% of D & K.

At about the same time that the trusts were funded, D & K
purchased 240 shares (a 49% interest) in TPR Investment
Associates, Inc. ("TPR"), a closely held family corporation,
for $10,200,000. The shares were purchased in part with
$600,000 from each trust and $50,000 from Dalia. The balance
($8,950,000) was satisfied with a recourse promissory note (the
D & K Note") payable over ten years. The D & K Note was secured
by a pledge of the 240 TPR shares owned by D & K. Each trust
and Dalia assumed liability on the note in proportion to
its/her interest in D & K. Thus, at the conclusion of the
transaction, each trust had assumed liability for 48% of the D
& K Note, but also through D & K obtained an indirect interest
in 23.52% of TPR.  Dalia, for her part, had assumed liability
for 4% of the D & K Note and obtained an indirect interest in
1.96% of TPR.

At this time, Arie owned the remaining 51% of TPR. TPR
also had a majority interest in TRI. D & K initially used
dividends from TRI (distributed by TPR) to pay the D & K Note.

7

However, in 1999, TRI stopped paying dividends and so D & K stopped making payments on the note. No effort was made to enforce the D & K Note, however. According to Orly, everyone involved understood that the D & K Note and the pledge of TPR shares as security were part of an estate plan that would be defeated if the note were enforced by TPR.

In October 2004, when Arie and Dalia divorced, Dalia received as part of the divorce settlement Arie's 51% interest in TPR. In addition, the parties caused TPR's 52.85% interest in TRI to be divided among Arie (13.99%), the Orly Trust (19.43%) and the Sagi Trust (19.43%). The Orly Trust and the Sagi Trust also granted Arie an irrevocable lifetime voting proxy over their TRI shares. As a result, Arie and the trusts in combination had a controlling interest in TRI and TPR no longer had an interest in TRI.

According to Orly, as divorce loomed, Dalia as the general partner of D & K took steps to give Sagi control over the management of D & K. To that end, she and Sagi formed D & K GP LLC ("D & K GP). Dalia then exchanged her general partnership interest in D & K and $1.00 for a 99% membership interest in D & K GP. Sagi purchased a 1% interest in D & K GP for $1.00 and, pursuant to D & K's Limited Liability Agreement, Sagi obtained the power to select a manager of D & K GP, who would be responsible for managing D & K's assets. Sagi then selected himself to manage D & K GP. Orly claims that the creation of D

8

& K GP shielded Dalia and Sagi from any personal liability
stemming from their interests in D & K, including personal
liability relating to the D & K Note. In addition, Dalia, as
the majority shareholder of TPR, facilitated Sagi's becoming a
board member of TPR (along with Dalia) and its Chief Executive
Officer. Later (but prior to her becoming trustee) Dalia, in
exchange for $5 million, divested herself of her interest in
TPR, leaving Sagi squarely in control of TPR and its interest
in the D & K Note, while at the same time controlling D & K
through D & K GP.

    Orly further alleges that, once in control of TPR and D &
K, Sagi (with the assistance of Dalia) embarked on a scheme to
benefit himself and Dalia at the expense of Arie and Orly,
which involved trying to strip the Orly Trust of its indirect
interest in TPR and direct interest in TRI. The scheme was
first aided by Dalia's insistence as part of the divorce
settlement that the original trustees of the Orly Trust and the
Sagi Trust be replaced by friends or relatives of Sagi, who
would act at her and Sagi's behest. Then, in 2008, one such
trustee of the Orly Trust, Sagi's sister-in-law Lea Fang,
resigned and appointed Dalia against the wishes of Orly.
According to Orly, Dalia in her role as trustee then became an
"active and willing participant in Sagi's scheme."

    Among the many specific acts as trustee that Orly asserts
were part of the scheme and are grounds for removal is Dalia's

9

execution of an agreement as trustee with D & K GP (by Sagi) and TPR (by Sagi) on February 9, 2009, entitled, "Meeting of Partners of D & K LP" (the "Agreement"). The Agreement, alleged to have been signed by Dalia for no consideration, explicitly "clarified" the authority of D & K GP (as per an earlier agreement executed by Lea Fang, the prior trustee of the Orly Trust) to encumber the Orly Trust's TRI shares for the benefit of D & K in connection with the D & K Note. The Agreement also provided that Sagi and Dalia would be indemnified for any claim in connection with the Agreement. According to Orly, the purpose of the Agreement was to give TPR, which was controlled by Sagi, the ability to deplete the Orly Trust of its assets.

Orly also alleges that Dalia failed to stop TPR from foreclosing on the D & K Note (which she asserts was never intended to be enforced) and from selling at auction on February 27, 2009, D & K's 240 shares of TPR which secured the D & K Note. TPR then purchased the shares for $2.2 million in what Orly alleges was a "bogus sale" because the value of TPR shares was significantly higher. The result was that D & K's obligation on the note was reduced far less than it should have been while D & K's interest in TPR was in effect forfeited to TPR. This, in turn, not only rendered the Orly Trust's interest in D & K worthless, since D &K no longer owned TPR shares, but also left the Orly Trust liable for its proportionate share of the deficiency (about $4.5 million) and exposed it to the

10

possibility that TPR would seek to foreclose on the Orly Trust's TRI shares to satisfy the D & K Note as the Agreement would allow.

Orly alleges that, despite numerous requests for information about Dalia's administration of the Orly Trust, she was not informed by Dalia of the foreclosure and the sale of D & K's TPR shares even though, by this time, there was no issue that Dalia was acting as trustee and was aware that TPR was enforcing the D & K Note. According to Orly, when she finally learned of the foreclosure - after it had been concluded - she commenced the instant proceeding to remove Dalia and obtained the July 1 2009 Order. However, Dalia repeatedly violated the July 1 2009 Order by executing on behalf of the Orly Trust a series of agreements in 2011 and 2012 that negatively impacted the trust and its interest in TRI.[2]

One such agreement was a settlement with TPR that Dalia executed as trustee in October 2011. Pursuant to such agreement, the Orly Trust transferred its interest in D & K to TPR and disclaimed any interest it might have in TPR directly or indirectly (through D & K). TPR, for its part, cancelled the Orly Trust's share of the deficiency as guarantor of the D & K Note (about $4.5 million) and the Orly Trust executed a

---

[2]   During the course of this proceeding, Orly, on behalf of the Orly Trust, commenced lawsuits in New York County Supreme Court relating to the Orly Trust's TRI shares and D & K's interest in TPR. Orly alleges that by executing these agreements in 2011 and 2012 Dalia also violated restraints issued in those actions as well.

11

$4,000,000 promissory note in favor of TPR. In addition, TPR relinquished any claim it might have to the Orly Trust's TRI shares. Orly alleges that the settlement agreement was unfavorable for a variety of reasons, including that it unnecessarily saddled the Orly Trust with debt "that it has no hope of paying off" and improperly sought to entrench Dalia as trustee, since her removal as trustee was made an "event of default" under the note.

These allegations and others raise significant issues about whether Dalia's efforts as trustee have been calculated to benefit herself and others at the expense of the Orly Trust in violation of her fiduciary duty and whether she poses an ongoing threat to the assets of the Orly Trust. In other words, Dalia's fitness to serve within the meaning of SCPA § 711 has been squarely placed in issue in the petition. In view of the above, movants' arguments are insufficient to support dismissal for failure to state a claim.

For example, movants rely upon self-serving justifications for Dalia's conduct, when any purported explanation is irrelevant under circumstances where the allegations in the petition are assumed to be true (*see Braddock v Braddock*, 60 AD3d 84, *supra*). Movants also challenge Orly's allegations with matters outside the pleading. However, movants' submissions and arguments in this regard do not conclusively establish that Orly has no claim for removal (*see Basis Yield Alpha Fund*

12

*v Goldman Sachs Group, Inc.*, 115 AD3d 128, *supra*). Moreover, such submissions are more appropriate on a motion for summary judgment rather than on the present motions. Movants do not request that the court convert the motions into ones for summary judgment (CPLR 3211[c] and the court, on its own, declines to do so (*id.*). This proceeding, despite the time that has elapsed since its commencement, is still in its pre-discovery stage and should continue in due course as contemplated under the SCPA and CPLR.

As for the other arguments raised by the Sagi Trustee, none provides a basis for dismissal under CPLR 3211. His argument that Orly committed a "fraud on the court" for which dismissal is warranted is without merit.  There is a sharp factual dispute as to the truth or falsity of Orly's statement that the successor trustee she nominated, Joel Isaacson, "is not acquainted with any members of the Genger family." In any event, the alleged fraud on the court is not, as the trustee argues, a "central aspect of this case." Rather, it is tangential to the main issue before the court, namely Dalia's fitness to serve, and involves one statement in the petition. Under these circumstances, the case relied upon by the Sagi Trustee, *CDR Creances S.A.S. v Cohen* (23 NY3d 307, 323 [2014]), is plainly inapposite. In that case, unlike here, the court found clear and convincing evidence of "numerous instances of perjury, subornation of perjury, witness tampering and

13

falsification of documents by defendants."

Equally unavailing is the Sagi Trustee's argument that dismissal is warranted because "Orly is exploiting this proceeding to delay a determination on [Dalia's] application for the return of $32.3 million that Orly monetized and retained from claims she brought on behalf of the Orly Trust [in Supreme Court, New York County]." Again, there is a sharp factual dispute concerning the accuracy of the Sagi Trustee's allegation. Moreover, this issue bears no relationship to the issue before the court on this motion, namely whether Orly's third amended petition states a claim for Dalia's removal. Significantly, the Sagi Trustee cites no authority to support dismissal under these circumstances (even assuming arguendo they are true), and the court is aware of none.

Moreover, the Sagi Trustee's expressed concern as to delays in this proceeding is difficult to reconcile with his decision to defer a determination of the merits of this proceeding by moving to dismiss the petition based upon the waivable and ultimately curable defense of personal jurisdiction. As noted above, this tactical maneuver not only required a decision from the court, but then Orly's service of process upon the Sagi Trustee under the Hague Convention. The Sagi Trustee then appeared (as he could have done at the

14

outset) and the instant motions were filed.

Based upon the foregoing analysis, the motions to dismiss are denied. This decision constitutes the order of the court.


Dated: June 21, 2017

_____

S U R R O G A T E

15

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

ARIE GENGER and ORLY GENGER, in her individual
capacity and on behalf of the ORLY GENGER 1993
TRUST,

        Plaintiffs,

          - against -

SAGI GENGER, TPR INVESTMENT ASSOCIATES,
INC., DALIA GENGER, THE SAGI GENGER 1993
TRUST, ROCHELLE FANG, individually and as Trustee
of the SAGI GENGER 1993 TRUST, GLENCLOVA
INVESTMENT CO., TR INVESTORS, LLC, NEW TR
EQUITY I, LLC, NEW TR EQUITY II, LLC, JULES
TRUMP, EDDIE TRUMP, MARK HIRSCH, and
TRANS-RESOURCES, INC.,

        Defendants.

SAGI GENGER, individually and as assignee of THE
SAGI GENGER 1993 TRUST, and TPR INVESTMENT
ASSOCIATES, INC.,

        Cross-Claimants, Counterclaimants, and Third-
        Party Claimants,

          - against -

ARIE GENGER, ORLY GENGER, GLENCLOVA
INVESTMENT COMPANY, TR INVESTORS, LLC,
NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC,
JULES TRUMP, EDDIE TRUMP, MARK HIRSCH,
TRANS-RESOURCES, INC., and WILLIAM DOWD,

        Cross-Claim, Counterclaim and/or Third-Party
        Defendants.

INDEX NO. 651089/2010

_(SECOND)_
AMENDED STIPULATION OF
DISCONTINUANCE WITH
PREJUDICE

Hon. Barbara Jaffe

Part 12

5385242.1/43419-00001

GLENCLOVA INVESTMENT CO., TR INVESTORS,
LLC, NEW TR EQUITY I, LLC, NEW TR EQUITY II,
LLC, JULES TRUMP, EDDIE TRUMP, MARK
HIRSCH, and TRANS-RESOURCES, INC.,

        Counterclaimants, Cross-Claimants, and Third-
        Party Plaintiffs,

        - against –

ARIE GENGER, ORLY GENGER, SAGI GENGER,
TPR INVESTMENT ASSOCIATES, INC., THE SAGI
GENGER 1993 TRUST, WILLIAM DOWD, ARNOLD
BROSER, DAVID BROSER, and ONE OR MORE
ENTITIES DIRECTED, OWNED OR CONTROLLED
BY ARNOLD BROSER AND/OR DAVID BROSER,

        Counterclaim, Cross-Claim, and/or Third-Party
        Defendants.

WHEREAS no party hereto is an infant or an incompetent as to whom a committee has been

appointed;

WHEREAS the parties hereto have entered into a confidential agreement finally resolving the

disputes between them as it relates to the subject matter of this action;

IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned counsel for

Plaintiffs/Counterclaim Defendants Arie Genger and Orly Genger ("Orly"), in her individual capacity

 and ~~on behalf of~~ *(as beneficiary of)* the Orly Genger 1993 Trust, and Third-Party Defendants Arnold Broser, David Broser

and One or More Entities Directed, Owned or Controlled by Arnold Broser and/or David Broser

(collectively, the "AG Group"), and Defendants/Counterclaimants/Third-Party Plaintiffs Glenclova

Investment Co., TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC, Jules Trump,

Eddie Trump, Mark Hirsch, and Trans-Resources, Inc. (collectively, the "Trump Group"), that:

1

1.      All claims, counterclaims and third-party claims of the AG Group in this action against the Trump Group are discontinued with prejudice and without costs;

2.      All claims, counterclaims and third-party claims of the Trump Group in this action against the AG Group are discontinued with prejudice and without costs;

3.      Any and all orders, including, without limitation, the Order to Show Cause dated August 8, 2011 (Mot. Seq. 5), the Order to Show Cause for Temporary Restraining Order and Preliminary Injunction dated August 11, 2011 (Mot. Seq. 4), the Order to Show Cause and Temporary Restraining Order dated November 9, 2011 (Mot. Seq. 13) (the "November 9, 2011 OSC") and the Decision and Order dated December 28, 2011 entered in this action which restrain, enjoin or in any way limit actions by any members of the Trump Group shall be, and are hereby, vacated and dissolved. Except as specifically provided in paragraph 4 of this Stipulation, nothing in this Stipulation is intended to vacate or dissolve any order entered in this action restraining, enjoining or in any way limiting acts by Sagi Genger, TPR Investment Associates, Inc., Dalia Genger, individually and/or as Trustee of the Orly Genger 1993 Trust, William Dowd, the Sagi Genger 1993 Trust, or Rochelle Fang, individually and/or as Trustee of the Sagi Genger 1993 Trust.

4.      Orly's applications that resulted in the Order to Show Cause and Temporary Restraining Order entered October 26, 2011 (the "October 26, 2011 OSC") (Mot. Seq. 012) and the November 9, 2011 OSC are hereby withdrawn. The parties hereto stipulate and agree that any and all orders, restraints, injunctions or other limiting actions in the October 26, 2011 OSC and the November 9, 2011, which restrain, enjoin or in any way limit actions by any party, individual or entity from proceeding in the matter entitled *Dalia Genger, as Trustee of the Orly Genger 1993 Trust v. TR Investors LLC et al.*, C.A. No. 6906-CS ( Del. Ch) shall be, and are hereby, vacated and dissolved.

2

5389781.1/43419-00001

5.    Nothing in this Stipulation is intended to dismiss, discontinue or release any claim asserted in this action as against Sagi Genger, TPR Investment Associates, Inc., Dalia Genger, individually and/or as Trustee of the Orly Genger 1993 Trust, William Dowd, the Sagi Genger 1993 Trust, or Rochelle Fang, individually and/or as Trustee of the Sagi Genger 1993 Trust.

[INTENTIONALLY BLANK]

3

IT IS FURTHER STIPULATED AND AGREED that this Stipulation may be executed by facsimile and in counterparts that together shall constitute one and the same Stipulation.

DATED:  New York, New York
        June 21, 2013

MITCHELL SILBERBERG & KNUPP LLP

By: _____
    Paul D. Montclare
    pdm@msk.com
    12 East 49th Street, 30th Floor
    New York, New York 10017-1028
    Telephone: (212) 509-3900
    Facsimile: (212) 509-7239

    *Attorneys for Plaintiff Arie Genger*

FELDMAN GALE P. A.
&
LAWRENCE, WORDEN, RAINIS, & BARD P.C.

By: _____
    Michael P. Hogan
    Jeffrey D. Feldman
    Ashley G. Kessler
    mhogan@feldmangale.com
    1700 Market Street, Suite 3010
    Philadelphia, Pennsylvania 19103
    (305) 358-5001
    &
    Russell T. McHugh
    rmchugh@lwrlawyer.com
    225 Broad Hollow Road, Suite 105E
    Melville, New York 11747
    (631) 694-0033

    *Attorneys for Third-Party Defendant*
    *Arnold Broser*

SKADDEN, ARPS, SLATE MEAGHER & FLOM LLP

By: _____
    William P. Frank
    Thomas J. Allingham II
    John Boyle
    William.Frank@skadden.com
    Thomas.Allingham@skadden.com
    John.Boyle@skadden.com
    Four Times Square
    New York, New York 10036
    (212) 735-3000

    *Attorneys for Third Party Glenclova*
    *Investment Company, TR Investors, LLC,*
    *New TR Equity I, LLC, New TR Equity II,*
    *LLC, Jules Trump, Eddie Trump, Mark*
    *Hirsch And Trans-Resources, Inc.*
    *(Collectively, The "Trump Group")*

4

5389781.1/43419-00001

IT IS FURTHER STIPULATED AND AGREED that this Stipulation may be executed by facsimile and in counterparts that together shall constitute one and the same Stipulation.

DATED:  New York, New York
         June 20, 2013

MITCHELL SILBERBERG & KNUPP LLP

By: _____
    Paul D. Montclare
    pdm@msk.com
    12 East 49th Street, 30th Floor
    New York, New York 10017-1028
    Telephone: (212) 509-3900
    Facsimile: (212) 509-7239

    *Attorneys for Plaintiff Arie Genger*

FELDMAN GALE P. A.
&
LAWRENCE, WORDEN, RAINIS, & BARD P.C.


By: _____
    Michael P. Hogan
    Jeffrey D. Feldman
    Ashley G. Kessler
    mhogan@feldmangale.com
    1700 Market Street, Suite 3010
    Philadelphia, Pennsylvania 19103
    (305) 358-5001
    &
    Russell T. McHugh
    rmchugh@lwrlawyer.com
    225 Broad Hollow Road, Suite 105E
    Melville, New York 11747
    (631) 694-0033

    *Attorneys for Third-Party Defendant Arnold Broser*

SKADDEN, ARPS, SLATE MEAGHER & FLOM LLP

By: _____
    William P. Frank
    Thomas J. Allingham II
    John Boyle
    William.Frank@skadden.com
    Thomas.Allingham@skadden.com
    John.Boyle@skadden.com
    Four Times Square
    New York, New York 10036
    (212) 735-3000

    *Attorneys for Third Party Glenclova Investment Company, TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC, Jules Trump, Eddie Trump, Mark Hirsch And Trans-Resources, Inc. (Collectively, The "Trump Group")*

3

5389781.1/43419-00001

ZEICHNER, ELLMAN & KRAUSE LLP          THE FREYBERG LAW GROUP

By: _____          By: _____
   Yoav M. Griver                        Mark L. Freyberg
   Brian D. Leinbach                      Mitchell Goldberg
   YGriver@zeklaw.com                     mfreyberg@freyberglaw.com
   BLeinbach@zeklaw.com                   mitchell@oglaw.net
   575 Lexington Avenue                   950 Third Avenue, 32nd Floor
   New York, New York 10022               New York, New York 10022
   (212) 223-0400                         (212) 754-9200

*Attorneys for Plaintiff Orly Genger, in her*      *Attorneys for Third Party Defendant*
*individual capacity and* ~~*on behalf of*~~ *the Orly*      *David Broser*
*Genger 1993 Trust*   *as beneficiary of*

So-Ordered: _____

        Hon. Barbara Jaffe

5

5389781.1/43419-00001

ZEICHNER, ELLMAN & KRAUSE LLP                THE FREYBERG LAW GROUP


By: _____                By: _____
    Yoav M. Griver                              Mark L. Freyberg
    Brian D. Leinbach                           Mitchell Goldberg
    YGriver@zeklaw.com                          mfreyberg@freyberglaw.com
    BLeinbach@zeklaw.com                        mitchell@oglaw.net
    575 Lexington Avenue                        950 Third Avenue, 32nd Floor
    New York, New York 10022                    New York, New York 10022
    (212) 223-0400                              (212) 754-9200

*Attorneys for Plaintiff Orly Genger, in her*              *Attorneys for Third Party Defendant*
*individual capacity and on behalf of the Orly*           *David Broser*
*Genger 1993 Trust*


So-Ordered: _____
       Hon. Barbara Jaffe

5389781.1/43419-00001

## SETTLEMENT AGREEMENT AND RELEASE

This settlement agreement and release (this "Agreement") is entered into as of June 16, 2013, by and between Arie Genger and Orly Genger (in her individual capacity and in her capacity as beneficiary of the Orly Genger 1993 Trust), Arnold Broser, David Broser, (in their individual capacity and on behalf of all entities managed, owned or controlled in any way by Arnold Broser or David Broser and which are in any way related to the subject matter hereof ("Broser Entities" and collectively with Arie Genger and Orly Genger in all capacities referenced above, the "AG Group"), and TR Investors, LLC ("TR Investors"), Glenclova Investment Co. ("Glenclova"), New TR Equity I, LLC ("New TR I"), New TR Equity II, LLC ("New TR II" and, together with TR Investors, Glenclova and New TR I, the "Trump Entities"), Trans-Resources, LLC (the successor to Trans-Resources, Inc. and together with its predecessor entities referred to herein as, "Trans-Resources"), Jules Trump, Eddie Trump and Mark Hirsch (collectively, with the Trump Entities and Trans-Resources, the "Trump Group"). The members of the AG Group and the Trump Group are each referred to herein individually as a "Party" and together as the "Parties".

**WHEREAS**, in March 2001, TR Investors, Glenclova, Trans-Resources and TPR Investment Associates, Inc. ("TPR") entered into a stockholders agreement with respect the common stock of Trans-Resources (the "Stockholders Agreement");

1

WHEREAS, since August 2008, Arie Genger, Orly Genger, the Trump Group and others have been engaged in various litigations (described below) concerning the ownership and control of Trans-Resources; and

WHEREAS, the Parties wish to resolve all issues, disputes and disagreements between them, including but not limited to the issue of ownership of all Trans-Resources shares;

NOW, THEREFORE, in consideration of the promises and representations contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1.    **Recitals.**    The above recitals are incorporated into and made a part of this Agreement and are binding on all Parties hereto.

2.    **Initial Consideration from the Trump Group.**    Upon dismissal with prejudice of the claims, counterclaims, cross-claims, third-party claims, issues and matters as provided in Paragraph 4 below, the Trump Group shall promptly:

(a)    release all claims they may have to the (i) $7,428,994.00 plus interest held by Skadden, Arps, Slate, Meagher & Flom LLP as escrow agent (the "Skadden Escrow") and (ii) $10,314,005.00 plus interest held by with Pedowitz & Meister as escrow agent (the "P&M Escrow");

(b)    pay to Wachtel, Masyr & Missry, LLP as attorneys for the AG Group ("Wachtel") an amount in cash equal to $35,000,000.00 minus (i) the amount held in the Skadden Escrow, and (ii) the amount held in the P&M Escrow.

3.     **Further Consideration from the Trump Group.**  Trans-Resources on behalf of the Trump Group shall pay: (i) $7,500,000 to Wachtel on the third anniversary of the Effective Date (defined below), and (ii) $7,500,000 to Wachtel 364 days following the third anniversary of the Effective Date The payments provided under this paragraph shall be (a) subject to the terms and conditions herein and (b) evidenced by two (2) promissory notes that are substantially in the form attached as Exhibit A hereto (the "Notes").  Notwithstanding anything else herein, the maturity of the two $7,500,000 Notes shall be delayed beyond their due date until the earlier (the "Extended Maturity Date") of (A) such time as all pending claims, cross-claims and counter-claims brought by any of TPR, Sagi Genger, the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust (other than the Orly Trust Action (as defined below)), D&K Limited Partnership, D&K GP LLC, Rochelle Fang, and/or David Parnes (collectively, the "Sagi Group") against any member of the Trump Group have been dismissed with prejudice and the statute of limitations shall have run with respect to any other potential claims of the Sagi Group that might be the subject of the Indemnification provided for by Paragraph 5 below or (B) such time as each member of the Sagi Group shall have provided the Trump Group with a release of the Trump Group Released Parties (as defined below) and covenant not to sue in form and substance that is the same as the AG release and covenant not to sue contained in Paragraph 6(a) below (the "Sagi Group Release").

Subject to the foregoing, the Notes shall become immediately due and payable upon the occurrence of any transaction or series of transactions which shall result in the Trump Group owning or controlling neither (i) a majority of the voting stock of Trans-Resources or its successors or each of its two principal subsidiaries, Haifa Chemicals, Ltd. and Na-Churs Plant

3

Food Company or their successors, nor (ii) directly or indirectly, a majority of the assets currently owned by Trans-Resources and its subsidiaries; provided, however, that in such event, at the request of the Trump Group, the amounts then payable on the Notes shall be placed in escrow for the duration of their original term or until the Extended Maturity Date (if applicable) under the provisions of an escrow agreement on reasonable terms to be negotiated at such time in good faith between Trans-Resources, the payee and an escrow agent selected by their mutual consent, which shall provide for their release to the Trump Group in payment of Indemnification Amounts, AG Group Release Amounts and Discovery Costs (as such terms are defined below), if any, and payment to the payee of such amounts after reduction for Indemnification Amounts, AG Group Release Amounts and Discovery Costs, if any, upon their original maturity date or the Extended Maturity Date (if applicable).  If Trans-Resources is unable to pay the Notes as and when they mature, the Trump Group will be obligated to make payment thereon in an amount equal to the lesser of (x) the outstanding amounts not paid by the obligor thereunder and (y) any amount by which cash payments received by members of the Trump Group (other than Trans-Resources) from Trans-Resources and its subsidiaries since the Effective Date (whether in the form of dividends, distributions, compensation or otherwise) exceeds reasonable compensation for services rendered plus payments for goods, services and assets provided by such persons in amounts that would have been paid for such goods, services and assets in arms' length transactions with unaffiliated third parties; provided, however, that in neither case shall the Trump Group be obligated to pay any amount that exceeds the outstanding amounts not paid by Trans-Resources on the Notes (subject to any Indemnification Amounts, AG Group Release Amounts or Discovery Costs).

4

4.    **Dismissal of Claims with Prejudice.**  Within two (2) business days of the

Effective Date (defined below), the AG Group and the Trump Group shall take all actions

necessary or desirable to:  (i) effect the dismissal with prejudice of all claims, counterclaims,

cross-claims, third-party claims, issues and matters between them, and to vacate all court orders

which restrain, enjoin or in any way limit actions by any members of the Trump Group, in each

pending action in which members of the AG Group and the Trump Group are parties (whether or

not service of process with respect thereto has been effected), including, without limitation, each

of the following pending actions (collectively, the "Litigation"):  *Genger v. TR Investors, LLC*,

No. 168, 2013 (Del.); *TR Investors, LLC v. Genger*, C.A. No. 6697-CS (Del. Ch.); *Trans-*

*Resources, Inc. v. Genger*, C.A. No. 4391-CS (Del. Ch.) (with respect to Arie Genger only); *TR*

*Investors, LLC, et al. v. Genger*, C.A. No. 3994-CS (Del. Ch.); *Glenclova Investment Co. v.*

*Trans-Resources, Inc., at al.*, No. 08 Civ. 7140 (JFK) (S.D.N.Y.); *Arie Genger and Orly Genger*

*v. Sagi Genger, et al.*, Index No. 651089/2010 (N.Y. Supr.); and (ii) have the New York State

Supreme Court enter a definitive non-appealable order declaring that members of the Trump

Group own all right, title and interest (beneficially, of record and otherwise) to the shares of

Trans-Resources purportedly transferred by TPR in October 2004 to Arie Genger (the ("Arie

Shares") and to the Orly Genger 1993 Trust (the "Orly Trust Shares"),  with the understanding

and agreement that should the request for the entry of such an order with respect to the "Orly

Trust Shares" be denied or not entered in a reasonably timely fashion,  then the AG Group and

the Trump Group shall take all action necessary or desirable to have the New York State

Supreme Court vacate all court orders which restrain, enjoin or in any way limit actions by the

5

parties to the pending action captioned *Dalia Genger, as Trustee of the Orly Genger 1993 Trust v. TR Investors, LLC, et al.*, C.A. No. 6906-CS (Del. Ch.) (the "Orly Trust Action"), to prosecute, defend, compromise, settle and otherwise deal with all claims, counterclaims, cross-claims, third-party claims, issues and matters asserted therein; provided, however, that nothing in this Agreement is intended to require or permit the dismissal of any claims, counterclaims, cross-claims, third-party claims, issues and matters, (i) in *Trans-Resources, Inc. v. Genger*, C.A. No. 4391-CS (Del. Ch.) (the "Breach of Fiduciary Duty Case"), as between the Trump Group and Avi Pelossof and/or William Dowd (subject to the exchange of general releases between the members of the Trump Group and William Dowd as contemplated below) and (b) against TPR, the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust, D&K Limited Partnership, D&K GP LLC, Sagi Genger or Dalia Genger. Any member of the AG Group including, without limitation, Orly Genger, who is called to testify in the Litigation or the Orly Trust Action, agrees to testify that he, she (in her individual capacity, ~~on behalf of the Orly Genger 1993 Trust~~, and as beneficiary of the Orly Genger 1993 Trust) or it has waived all claims he, she (in her individual capacity, ~~on behalf of the Orly Genger 1993 Trust~~, and as beneficiary of the Orly Genger 1993 Trust) or it had or may have to ownership (record, beneficial or otherwise) of any shares of Trans-Resources and that he, she (in her individual capacity, ~~on behalf of the Orly Genger 1993 Trust~~, and as beneficiary of the Orly Genger 1993 Trust) or it is opposed to the Orly Genger 1993 Trust seeking any remedy of any kind against any member of the Trump Group. Notwithstanding the foregoing, upon receipt by the Trump Group of a general release in form and substance reasonably satisfactory to it, the Trump Group shall provide the same general

6

release to William Dowd and cause the dismissal of the Breach of Fiduciary Duty Case as between the Trump Group and him.

     5.    **Indemnification.**

     (a)    Upon closing of this Agreement, each of the members of the AG Group with the exception of Arnold Broser and David Broser and the Broser Entities, jointly and severally, agrees to indemnify and hold harmless (i) each of the members of the Trump Group, and their respective past and present affiliates and direct and indirect subsidiaries, and (ii) each of the past and present agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, predecessors, successors, heirs, executors, administrators and assigns of each person and entity referenced in clause (i), from all reasonable costs, expenses, attorneys' fees of counsel selected by the Trump Group (it being agreed that the Trump Group will cooperate with the AG Group in all reasonable respects to cause the amount of such costs, expenses and its attorneys' fees to be minimized), settlements and/or judgments (whether direct or related to joint and several liability) (the "Indemnification Amounts") incurred as a result of, in connection with, or relating in any way to any (x) claims, counterclaims, cross-claims or third-party claims raised or that could have been raised in the Litigation, and (y) claims that are pending, have been brought, or that may in the future be brought by or on behalf of any of TPR, the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust (other than those claims currently pending in the Orly Trust Action), D&K Limited Partnership, D&K GP LLC, Sagi Genger, David Parnes or Dalia Genger, regardless of whether they were or could have been raised in the Litigation or the Orly Trust Action, relating in any way, whether directly or indirectly, to (A) the Shareholders Agreement entered into by Trans-Resources

7

shareholders and Trans-Resources on March 30, 2001, (B) the transfer of interests in TPR or the

purported transfer of shares of Trans-Resources by TPR in October 2004, (C) any activities or

developments relating to or conducted by Trans-Resources or any of its direct or indirect

subsidiaries that occurred prior to September 26, 2008, (D) the acquisition by the Trump Group

of all interests (record, beneficial or otherwise) of the so called "Arie Shares", "Orly Trust

Shares" and the shares of Trans-Resources purportedly transferred by TPR in October 2004 to

the Sagi Genger 1993 Trust (the "Sagi Trust Shares") (including, without limitation, the

negotiations for the ownership or acquisition of such shares), (E) the control of Trans-Resources

or any of its direct or indirect subsidiaries by the Trump Group through its acquisition of the

aforementioned shares, (F) records and documents (including but not limited to electronic files)

in the possession, custody or control of Trans-Resources or any of its direct or indirect

subsidiaries, (G) misrepresentations made or improper acts conducted prior to September 26,

2008 by any officer or director of Trans-Resources, (H) this Agreement, (I) the business or

operations of Trans-Resources or any of its direct or indirect subsidiaries conducted prior to

September 26, 2008 arising from or in any way related to the conduct of any member of the AG

Group, Avi Pelossof or William Dowd, or (J) the conduct of any other individual to the extent

Arie Genger is aware, or should have been aware, thereof. Notwithstanding the foregoing, the

indemnity provided for above shall not apply to any claims which may be brought subsequent to

the Effective Date (and which are entirely unrelated to any claim brought prior to such date) by

any of Sagi Genger, the Sagi Genger 1993 Trust or TPR and which arise solely out of actions

taken or not taken by members of the Trump Group which actions or inactions no member of the

AG Group was aware of or should have been aware of; provided, however, that such claim was

8

<u>not</u> encouraged or solicited by any member of the AG Group and no member thereof cooperates in asserting, instituting or prosecuting such claim. Notwithstanding anything herein to the contrary, the undertaking of William Wachtel hereunder shall not exceed under any circumstance an amount greater than $5,000,000.

(b)   The Trump Group may request payment or reimbursement of the Indemnification Amounts at any time by providing a written statement or copy of an underlying invoice or expense documentation to any member of the AG Group at the addresses set forth in Paragraph 16 below, and the AG Group shall pay such indemnified expenses in full and in cash within five (5) business days of the date such request is made.  The supporting documentation submitted with any payment or reimbursement request hereunder may be redacted as necessary to preserve attorney-client privilege, attorney work product, or confidential information the Trump Group may, in its reasonable determination, need to protect.  The Trump Group will provide the AG Group with reasonable notice prior to making any motion or taking any appeal with respect to, or in, any past, present or future action or claim for which the Trump Group is seeking indemnification, and such notice will be accompanied by a non-binding estimate of the legal fees and costs associated with such motion or appeal. The Trump Group authorizes the AG Group and their respective counsel to discuss directly with the Trump Group's appointed counsel the amount and scope of any invoice for which the Trump Group is seeking indemnification. The AG Group in its sole discretion may settle any indemnified claim so long as there is no monetary contribution to be paid by the Trump Group, and the Trump Group is released, in form and substance reasonably satisfactory to it, from any liability relating to any such indemnified

9

claim. The Trump Group shall not enter into any settlement of any indemnified claim, or discussions with respect thereto, without the express written consent of the AG Group.

(c)     With respect to each Indemnification Amount, until such time as it has been paid over to the Trump Group, the members of the AG Group shall remain jointly and severally liable for such Indemnification Amount and, the Trump Group may at its option pursue all legal remedies available to it and/or withhold an amount equal to such unreimbursed Indemnification Amount from any payments by Trans-Resources to be made pursuant to the Notes.

6.      **Releases.**

(a)     **The AG Group Release.** Effective on the Effective Date, each of the members of the AG Group, for itself, himself or herself, and in all capacities, and on behalf of its (and its respective affiliates' and direct and indirect subsidiaries'), his or her respective agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and affiliates, and each of their respective predecessors, successors, heirs, executors, administrators and assigns, and any other persons or entities acting in concert with any of them including, without limitation, any member of the Sagi Group which he, she or it shall at any time directly or indirectly control or be deemed authorized to act on behalf of (individually, an "AG Group Releasing Party" and collectively, the "AG Group Releasing Parties"): (i) fully, finally, irrevocably and unconditionally waives, releases and discharges each of the members of the Trump Group and its (and its respective past and present affiliates' and direct and indirect subsidiaries'), his or her respective past and present agents

10

(including Skadden, Arps, Slate, Meagher & Flom LLP in any capacity, including as Escrow Agent for the Skadden Escrow or for any escrow in which it held, holds, or may hold, any dividends or distributions from Trans-Resources), representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and affiliates, and each of their respective predecessors, successors, heirs, executors, administrators and assigns (collectively, the "Trump Group Released Parties"), from any and all claims, counterclaims, demands, proceedings, actions, causes of action, orders, obligations, damages, debts, costs, expenses and other liabilities whatsoever and however arising, whether known or unknown, past, present or future, suspected or unsuspected, contingent or actual, both at law and in equity, including without limitation, claims for fraud or fraud in the inducement (collectively, "Claims"), which such AG Group Releasing Party now has, has ever had or may hereafter claim to have against any Trump Group Released Party or its, his or her assets, liabilities or operations from the beginning of the world through the Effective Date (individually, an "AG Group Released Claim" and collectively, the "AG Group Released Claims"); and (ii) agrees not to assert, institute or prosecute, or encourage, solicit or cooperate with any other person or entity in asserting, instituting or prosecuting, any proceeding against any of the Trump Group Released Parties in any jurisdiction (domestic or foreign, including, without limitation, the State of Israel) with respect to any AG Group Released Claim or any other Claim relating in any way, directly or indirectly, to Trans-Resources or any of its direct or indirect subsidiaries, the ownership or acquisition of Trans-Resources shares (including any dividends or distributions relating thereto or any escrow in which such dividends or distributions may currently be or in the past have been held), the Litigation, the Orly Trust Action, control of Trans-Resources or any of its direct or

11

indirect subsidiaries, the business or operations of Trans-Resources or any of its direct or indirect subsidiaries, or arising out of this Agreement including, without limitation, the negotiation and execution of this Agreement or the AG Group Releases provided hereunder; provided, however, that this AG Group Release shall not apply to any Claims (x) seeking equitable relief to enforce the terms of this Agreement or claims seeking payment of the Notes or any indemnification payments required to be paid hereunder, (y) relating solely to events that transpired in their entirety subsequent to the Effective Date and that could not, under any circumstances, have possibly been pursued prior to the Effective Date whether or not then known, and (z) between any of the AG Group Releasing Parties and TPR, and/or any other member of the Sagi Group.

If an AG Releasing Party brings an AG Group Released Claim or other Claim in violation of the immediately preceding paragraph, the AG Group, jointly and severally, agrees to indemnify the Trump Group for any and all settlements, judgments, costs and fees, including legal fees and disbursements of counsel chosen by the Trump Group, incurred in working on, preparing for or defending such claim ("AG Group Release Amounts"). With respect to each AG Group Release Amount, until such time as such AG Group Release Amount has been paid over to the Trump Group, the members of the AG Group shall remain jointly and severally liable for such AG Group Release Amount, and the Trump Group may at its option pursue all legal remedies available to it and/or withhold an amount equal to such unreimbursed AG Group Release Amount from any payments to be made by Trans-Resources pursuant to the Notes. For purposes of the removal of all doubt, it is the parties' intention that no claims shall be brought or pursued by any member of the AG Group against any member of the Trump Group for any

12

reason whatsoever (other than claims permitted under clause (x), (y) and (z) of the immediately preceding paragraph).

(b)    **The Trump Group Release.** Effective on the Effective Date, each of the members of the Trump Group, for itself or himself, and in all capacities, and on behalf of its (and its respective affiliates' and direct and indirect subsidiaries'), or his respective agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and affiliates, and each of their respective predecessors, successors, heirs, executors, administrators and assigns, and any other persons or entities acting in concert with any of them (individually, a "Trump Group Releasing Party" and collectively, the "Trump Group Releasing Parties"): (i) fully, finally, irrevocably and unconditionally waives, releases and discharges each of the members of the AG Group and its (and its respective past and present affiliates' and direct and indirect subsidiaries'), his or her respective past and present agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and affiliates, and each of their respective predecessors, successors, heirs, executors, administrators and assigns (collectively, the "AG Group Released Parties"), from any and all claims, counterclaims, demands, proceedings, actions, causes of action, orders, obligations, damages, debts, costs, expenses and other liabilities whatsoever and however arising, whether known or unknown, past, present or future, suspected or unsuspected, contingent or actual, both at law and in equity including, without limitation, claims for fraud or fraud in inducement, ("Claims"), which such Trump Group Releasing Party now has, has ever had or may hereafter claim to have against any AG Group Released Party or its, his or her assets, liabilities or operations from the beginning of the world through the Effective Date (individually,

13

a "Trump Group Released Claim" and collectively, the "Trump Group Released Claims"); and (ii) agrees not to assert, institute or prosecute, or encourage, solicit or cooperate with any other person or entity in asserting, instituting or prosecuting, any proceeding against any member of the AG Group Released Parties with respect to any Trump Group Released Claim or any other Claim relating in any way, directly or indirectly, to Trans-Resources or any of its direct or indirect subsidiaries, the ownership or acquisition of Trans-Resources shares, control of Trans-Resources or any of its direct or indirect subsidiaries, the business or operations of Trans-Resources or any of its direct or indirect subsidiaries, or the negotiation and execution of this Agreement or the Trump Group Releases provided hereunder; provided, however, that this Trump Group Release shall not apply to any Claims (x) seeking equitable relief to enforce the terms of this Agreement or claims seeking payment of any indemnification payments required to be paid hereunder, (y) relating solely to events that transpired in their entirety subsequent to the Effective Date and that could not, under any circumstances, have possibly been pursued prior to the Effective Date whether or not then known, and (z) between any of the Trump Group Releasing Parties and Avi Pelossof, William Dowd (unless and until the exchange of mutual general releases between the Trump Group and William Dowd referred to above) and/or TPR.

If a Trump Group Releasing Party brings a Trump Group Released Claim or other Claim in violation of the immediately preceding paragraph, the Trump Group, jointly and severally, agrees to indemnify the AG Group for any and all settlements, judgments, costs and fees, including legal fees and disbursements of counsel chosen by the AG Group, incurred in working on, preparing for or defending such claim ("Trump Group Release Amounts"). With respect to each Trump Group Release Amount, until such time as such Trump Group Release Amount has

14

been paid over to the AG Group, the members of the Trump Group shall remain jointly and severally liable for such Trump Group Release Amount, and the AG Group may at its option pursue all legal remedies available to it. For purposes of the removal of all doubt, it is the parties intention that no claims shall be brought or pursued by any member of the Trump Group against any member of the AG Group for any reason whatsoever (other than claims permitted under clause (x), (y) and (z) of the immediately preceding paragraph).

7.    **Discovery Obligations**.    Effective on the Effective Date (defined below), to the extent that a member of the AG Group or the Orly Genger 1993 Trust seeks discovery or testimony from any member of the Trump Group, or if any member of the Trump Group is subpoenaed by any party to an action in which any member of the AG Group or the Orly Genger 1993 Trust is a party, each of the members of the AG Group, jointly and severally, agrees that to the extent indemnities of the Trump Group provided for elsewhere in this Agreement do not apply, they shall indemnify the Trump Group for any and all costs and fees, including reasonable legal fees and disbursements of counsel to be chosen by the Trump Group (it being understood that for the purposes of this Discovery Obligation indemnity only, the indemnification for legal fees shall be limited to $750 per hour of legal services), incurred in working on, preparing for or defending such claim, it being agreed that the Trump Group will cooperate with the AG Group in all reasonable respects to cause the amount of such costs and fees, including its attorneys' fees and disbursements to be minimized ("Discovery Costs"). With respect to each Discovery Cost, until such time as such Discovery Cost has been paid over to the Trump Group, the members of the AG Group shall remain jointly and severally liable for such Discovery Cost, and the Trump Group may at its option pursue all legal remedies available to it

15

and/or withhold an amount equal to such unreimbursed Discovery Cost from any payments to be made by Trans-Resources pursuant to the Notes.

### 8.   Cooperation.

(a)   Each member of the AG Group shall take all actions necessary or desirable, as promptly as practicable and as may be requested by the Trump Group from time to time including, without limitation, testifying in the Orly Trust Action, to (i) effectuate the release of the AG Group Released Claims and to prevent or preclude any other person or entity from asserting, instituting or prosecuting, or encouraging, soliciting or cooperating with any other person or entity in asserting, instituting or prosecuting, any proceeding or claims against any of the Trump Group Released Parties with respect to any AG Group Released Claim or any other Claim relating in any way, directly or indirectly, to Trans-Resources or any of its direct or indirect subsidiaries, the ownership or acquisition of Trans-Resources shares, the control of Trans-Resources or any of its direct or indirect subsidiaries, records and documents (including but not limited to electronic files) in the possession, custody or control of Trans-Resources or any of its direct or indirect subsidiaries or the business or operations of Trans-Resources or any of its direct or indirect subsidiaries brought by any party without regard to whether such party is a signatory hereto and (ii) cause the Orly Genger 1993 Trust to release any and all claims against the Trump Group Released Parties, including, without limitation, any claims pending in the Orly Trust Action.

(b)   As a condition to any settlement that any member of the AG Group shall enter into with any member of the Sagi Group, the AG Group parties to such settlement shall cause each Sagi Group party to such settlement to (i) dismiss with prejudice all pending claims, cross-claims and counter claims against any of the Trump Group Released Parties (as defined below)

16

and to provide the Sagi Group Release, and (ii) if the Orly Genger 1993 Trust is a party to such settlement, cause it to agree in writing to become an AG Group member for purposes of providing the indemnity contained in Paragraph 5. Likewise, as a condition to any agreement by the AG Group to a replacement trustee for the Orly Genger 1993 Trust, the AG Group shall use its best efforts to cause such trustee to agree in writing on behalf of the Orly Genger 1993 Trust that it shall be a member of the AG Group for purposes of providing the indemnity contained in Paragraph 5.

(c)    Each member of the AG Group covenants that for so long as the indemnity contained in Paragraph 5 remains in effect, he, she or it shall not contribute or deposit any amounts, or permit to be contributed or deposited any amounts (including, without limitation, any payments made under Paragraphs 2 and 3), to or with the Orly Genger 1993 Trust or to any other trust or entity that any of them directly or indirectly controls or is or was established at their direction, or that is or was established or exists for any of their direct or indirect benefit, unless such trust or entity has agreed in writing to being a member of the AG Group for purposes of providing the indemnity contained in Paragraph 5. The foregoing shall not restrict members of the AG Group from investing in or with such entities provided that that such investment may be liquidated, without restriction, by such member of the AG Group from time to time as may be necessary to comply with the terms of the indemnity contained in Paragraph 5.

(d)    The AG Group covenants that, subject to any confidentiality orders of any court or other restrictions imposed by law (i) with respect to any court filing made or received by it concerning the Orly Genger 1993 Trust, it shall contemporaneously provide a copy thereof to the Trump Group, and (ii) contemporaneously with its becoming aware of any changes or

17

contemplated material changes to the Orly Genger 1993 Trust including, without limitation, the resignation of its trustee and/or the appointment of a replacement trustee, it shall provide written notice thereof to the Trump Group.

9. **Confidentiality.** The Parties and their counsel shall not disclose the terms of this Agreement, except if, upon written advice of counsel, it is required to do so by law. Notwithstanding the foregoing, disclosure may be made by the Parties: (i) to their respective accountants, financial advisors or attorneys (collectively, "Advisors") as required to obtain tax or legal advice, it being agreed that each Party shall apprise its Advisors of the obligation to maintain such confidentiality and that each Party shall be accountable for any breach of this provision by its respective Advisors, and (ii) notwithstanding anything to the contrary in this Agreement, the Parties may disclose the terms of this Agreement if necessary in any action to enforce this Agreement or as may be required to respond to a valid subpoena, court order or other legal process. Each Party agrees that he, she or it will promptly give notice of any attempt to compel disclosure of the terms of this Agreement to each of the other Parties, at least five (5) days before compliance is required.

10. **Third Party Beneficiaries.** This Agreement shall have no third party beneficiaries except for those persons and entities that are not Parties hereto but are covered by the releases set forth in Paragraph 6 above, who may enforce those releases.

11. **Binding Effect**

This Agreement shall be binding upon and inure to the benefit of each of the Parties hereto and (where applicable) their respective current and former agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and

18

affiliates, and each of their respective predecessors, successors, heirs, executors, administrators and assigns.

12.     **Representations and Warranties.**

(a)     Each Party represents that it, he or she is authorized to enter into this Agreement and to grant the rights granted by it, him or her in this Agreement. Each Party further represents that, to the extent any non-party consents are required for the performance of any of its, his or her obligations under this Agreement (including, without limitation, with any entity controlled by any Party, including any of its partners or equity holders), it, he or she has obtained such consents.

(b)     Each Party has the benefit of the advice of counsel chosen and employed by it, him or her concerning this Agreement.

(c)     Each Party is the sole owner and holder of the Claims it is releasing under this Agreement, and represents that none of the Claims released herein have been assigned, pledged, encumbered, or otherwise transferred in whole or in part, to any other person or entity.

(d)     Each member of the AG Group represents that he, she or it is knowledgeable, sophisticated and experienced in business, financial and other matters relevant to his, her or its entry into this Agreement and the transactions contemplated hereby, and has engaged advisors, experienced in the matters contemplated by this Agreement. Each member of the AG Group has undertaken such investigation and has been provided with and has evaluated such documents and information as he, she or it has deemed necessary to enable him, her or it to make an informed decision with respect to the execution, delivery and performance of this Agreement and the transactions contemplated hereby. Each member of the AG Group is

19

consummating the transactions contemplated hereby without reliance upon any express or

implied representations or warranties of any nature, whether in writing, orally or otherwise, made

by or on behalf of or imputed to any of the Trump Group Released Parties, except as expressly

set forth in this Agreement, and no member of the AG Group shall make any Claim with respect

thereto. Each member of the AG Group acknowledges that he, she or it is taking full

responsibility for making his, her or its own evaluation of the adequacy and accuracy of all

documents or information that may have been furnished to him, her or it, and that no member of

the AG Group shall have any Claim against any of the Trump Group Released Parties with

respect thereto, including for Claims relating to the accuracy or completeness of the information

that may have been furnished to him her or it. Each member of the AG Group acknowledges and

understands that each member of the Trump Group Released Parties expressly disclaims any and

all liability that may be based on any of the documents and information that may have been

furnished to any member of the AG Group and all liability based on such documents or

information or errors therein or omissions therefrom. Accordingly, each member of the AG

Group acknowledges that none of the Trump Group Released Parties has made any

representation or warranty with respect to (i) any historical information, financial or otherwise,

including without limitation results of operations (or any component thereof), cash flows, or

financial condition (or any component thereof), of Trans-Resources and/or any of its subsidiaries,

(ii) any valuations or projections or estimates of future revenues, future results of operations (or

any component thereof), future cash flows or future financial condition (or any component

thereof) of Trans-Resources and/or any of its subsidiaries or the future business and operations of

Trans-Resources and/or any of its subsidiaries, (iii) any Claims any member of the AG Group

20

may have against any of the Trump Group Released Parties or (iv) any other information or

documents that may have been made available to any member of the AG Group or their

respective counsel, accountants or advisors with respect to any of the Trump Group Released

Parties any of their respective businesses, assets, liabilities or operations, except as expressly set

forth in this Agreement. In addition to the foregoing, each member of the AG Group

acknowledges that his, her or its entry into this Agreement and the transactions contemplated

hereby is based solely on his, her or its respective assessment and valuation of all Claims that he,

she or it may have against any of the Trump Group Released Parties and the likelihood of

success of such Claims in a court of competent jurisdiction. Each member of the AG Group

acknowledges that the consideration to be received by the AG Group pursuant to this Agreement

constitutes full and fair consideration for the release of all Claims contemplated hereunder.

(e)      Each member of the Trump Group represents that he, she or it is knowledgeable,

sophisticated and experienced in business, financial and other matters relevant to his, her or its

entry into this Agreement and the transactions contemplated hereby, and has engaged advisors,

experienced in the matters contemplated by this Agreement. Each member of the Trump Group

has undertaken such investigation and has been provided with and has evaluated such documents

and information as he, she or it has deemed necessary to enable him, her or it to make an

informed decision with respect to the execution, delivery and performance of this Agreement and

the transactions contemplated hereby. Each member of the Trump Group is consummating the

transactions contemplated hereby without reliance upon any express or implied representations

or warranties of any nature, whether in writing, orally or otherwise, made by or on behalf of or

imputed to any of the AG Group Released Parties, except as expressly set forth in this

21

Agreement, and no member of the Trump Group shall make any Claim with respect

thereto. Each member of the Trump Group acknowledges that he, she or it is taking full

responsibility for making his, her or its own evaluation of the adequacy and accuracy of all

information that may have been furnished to him, her or it, and that no member of the Trump

Group shall have any Claim against any of the AG Group Released Parties with respect thereto,

including for Claims relating to the accuracy or completeness of the information that may have

been furnished to him her or it. Each member of the Trump Group acknowledges and

understands that each member of the AG Group Released Parties expressly disclaims any and all

liability that may be based on any of the documents and information that may have been

furnished to any member of the Trump Group and all liability based on such documents or

information or errors therein or omissions therefrom. Accordingly, each member of the Trump

Group acknowledges that none of the AG Group Released Parties has made any representation or

warranty with respect to (i) any historical information, financial or otherwise, including without

limitation results of operations (or any component thereof), cash flows, or financial condition (or

any component thereof), of Trans-Resources and/or any of its subsidiaries, (ii) any valuations or

projections or estimates of future revenues, future results of operations (or any component

thereof), future cash flows or future financial condition (or any component thereof) of Trans-

Resources and/or any of its subsidiaries or the future business and operations of Trans-Resources

and/or any of its subsidiaries, (iii) any claims any member of the Trump Group may have against

any of the AG Group Released Parties or (iv) any other information or documents that may have

been made available to any member of the Trump Group or their respective counsel, accountants

or advisors with respect to any of the AG Group Released Parties any of their respective

22

businesses, assets, liabilities or operations, except as expressly set forth in this Agreement. In

addition to the foregoing, each member of the Trump Group acknowledges that his, her or its

entry into this Agreement and the transactions contemplated hereby is based solely on his, her or

its respective assessment and valuation of all Claims that he, she or it may have against any of

the AG Group Released Parties and the likelihood of success of such Claims in a court of

competent jurisdiction. Each member of the Trump Group acknowledges that the consideration

to be received by the Trump Group pursuant to this Agreement constitutes full and fair

consideration for the release of all claims contemplated hereunder.

13.    **Attorneys' Fees.** The Parties agree to be responsible for their own attorneys' fees and

costs incurred in connection with this Agreement and negotiations related to and preparation of

this Agreement and not to seek from each other reimbursement of any such costs, expenses or

attorneys' fees.

14.    **Governing Law.**

This Agreement, and all disputes arising under this Agreement or related thereto, shall be

governed by, construed and interpreted in accordance with the laws of the State of Delaware,

applicable to instruments made, delivered and performed entirely in such state, without regard to

the choice of law provisions thereof.

15.    **Arbitration.** UNLESS THIS AGREEMENT SPECIFICALLY PROVIDES FOR

ANOTHER TYPE OF DISPUTE RESOLUTION WITH RESPECT TO A PARTICULAR

KIND OF DISPUTE, ANY AND ALL CONTROVERSIES AND CLAIMS ARISING OUT OF

OR RELATING TO THIS AGREEMENT, OR THE BREACH, TERMINATION OR

VALIDITY THEREOF, SHALL BE EXCLUSIVELY SETTLED BY FINAL AND BINDING

23

ARBITRATION IN ACCORDANCE WITH THE PROCEDURES SET FORTH IN THIS
SECTION.

(a)     The arbitration shall be conducted in accordance with the Commercial
Arbitration Rules of the American Arbitration Association ("AAA") then in effect (the "Rules"),
except as set forth herein.  Any member of the Trump Group on behalf of the Trump Group, on
the one hand, and any member of the AG Group on behalf of the AG Group, on the other hand,
may demand arbitration by giving the other written notice to such effect in accordance with the
Rules.

(b)     The arbitration will be held before one neutral arbitrator.  Within thirty (30)
days after the other Party's receipt of the demand for arbitration, the Party seeking arbitration
will invite the other Party to join it in approaching the following list of individuals about serving
as arbitrator and will approach such individuals with such other Party (if its invitation is accepted)
or without such other Party (if its invitation is rejected or not responded to within five (5)
business days): The Honorable William B. Chandler III, David A. Jenkins, Esq., Stephen E.
Jenkins, Esq., Robert J. Katzenstein, Esq., and Andre G. Bouchard, Esq.  If only one such
individual is available and willing, he shall serve as the arbitrator.  If more than one such
individual is available and willing, the Parties will mutually determine which of those so
available and willing will serve as the arbitrator.  If the Parties are unable to agree, the arbitrator
will be selected by the AAA from the foregoing list in accordance with the listing, striking and
ranking procedure in the Rules, with each Party being given a limited number of strikes, except
for cause.  If none of the foregoing individuals is available, the arbitrator will be selected by the
AAA in accordance with the listing, striking and ranking procedure in the Rules, with each Party

24

being given a limited number of strikes, except for cause. Any arbitrator appointed by the AAA shall be a retired judge that presided over a state or federal court located in Delaware or a practicing attorney licensed in Delaware with no less than fifteen years of experience with large commercial cases. Any such arbitration proceedings shall be and remain confidential. The place of arbitration shall be in Manhattan, New York or elsewhere if otherwise agreed to.

(c)     Discovery will be limited to the request for and production of documents, directly related to the issues in dispute, limited depositions of limited duration, and interrogatories. Interrogatories will be allowed only as follows: a Party may request the other Party to identify by name, last known address and telephone number (i) all persons having knowledge of facts relevant to the dispute and a brief description of that person's knowledge, and (ii) any experts who may be called as an expert witness, the subject matter about which the expert is expected to testify, the mental impressions and opinions held by the expert and the facts known by the expert. All issues concerning discovery upon which the parties cannot agree will be submitted to the arbitrator for determination.

(d)     Each of the Parties agrees that it will use commercially reasonable efforts to join (and will allow the other party to join) any third party that the Parties have agreed is indispensable to the arbitration. If any such third party does not agree to be joined, the arbitration will proceed nonetheless.

(e)     The arbitrators are not empowered to award damages not permitted by the terms of this Agreement and if so permitted, then not in excess of compensatory damages, except with respect to indemnification obligations for punitive damages as provided hereunder, and

25

each Party irrevocably waives the right to recover punitive, exemplary or multiple damages with respect to any dispute other than with respect to indemnification obligations for such punitive damages as provided hereunder. The decision of, and award rendered by, the arbitrator will be final and binding on the Parties, will be in writing and will include the findings of fact and conclusions of law upon which it is based, if any.

(f)    The Parties specifically acknowledge that this Agreement evidences a transaction involving, affecting, affected by, and a part of, interstate commerce and that this agreement to arbitrate is governed by and enforceable under the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq.

(g)    Except to the extent that any of the indemnification provisions contained herein shall be applicable (i) the Parties shall each be responsible for their own costs and expenses (including legal fees and disbursements) incurred in any arbitration, and (ii) the AG Group on the one hand and the Trump Group on the other shall each be responsible for 50% of the fees and disbursements of the arbitrator and of any costs and expenses payable to the AAA.

(h)    With respect to the enforcement, modification or vacating of any arbitration award (it being reconfirmed hereby that the arbitration award shall itself be final and binding on the Parties), the Parties submit to the exclusive jurisdiction of one or the other of (i) the United Stated District Court of the Southern District of New York sitting in the Borough of Manhattan in the City of New York and (ii) the Commercial Division of the New York State Supreme Court sitting in the Borough of Manhattan in the City of New York.

16.    **Notice.** If any Party is required to give notice to any other Party under this Agreement, such notice shall be in writing and shall be deemed to have been duly given upon receipt of hand delivery, one business day following its being sent to the recipient via Federal Express or another

26

nationally recognized over-night courier, or by e-mail with confirmation of receipt to the

following individuals or to such other address or person as such Parties may from time to time

specify by written notice given in the manner provided above:

**If to the Trump Group:**

Mark S. Hirsch, Esq.

The Trump Group

41 Madison Avenue, Suite 4101

New York, NY 10010

Phone: (212) 838-1000

E-mail: mhirsch@trumpgroup.com

**With Copy to:**

Thomas J. Allingham II, Esq.

Anthony W. Clark, Esq.

Douglas D. Herrmann, Esq.

Skadden, Arps, Slate, Meagher & Flom LLP

One Rodney Square

P.O. Box 636

Wilmington, DE 19899

Phone: (302) 651-3000

E-mail: thomas.allingham@skadden.com

27

E-mail:  anthony.clark@skadden.com

E-mail:  douglas.herrmann@skadden.com

**If to Arie Genger:**

Arie Genger

104 West 40th Street, 19th Floor

New York, NY 10018

E-mail:  wachtel@wmllp.com

**With Copy to:**

Stephen P. Lamb, Esq.

Paul Weiss

500 Delaware Avenue, Suite 200

Wilmington, DE 19889

**If to Orly Genger:**

Orly Genger

104 West 40th Street, 19th Floor

New York, NY 10018


E-mail: wachtel@wmllp.com

**With Copy to:**

28

William Wachtel

Wachtel Masyr & Missry LLP

885 second ave.

New York, NY 10017

[]

**If to Arnold Broser or David Broser:**

David Broser

104 West 40th, 19th FloorNew York, NY 10018

E-mail: wachtel@wmll.com

**With Copy to:**

William Wachtel

Wachtel Masyr & Missry LLP

885 second ave.
New York, NY 10017

29

17.  **Entire Agreement.** This Agreement contains the entire agreement between the Parties concerning the subject matter hereof. Neither this Agreement nor any of its terms or provisions shall be binding on any Party until all the Parties hereto have signed. The Parties agree that all drafts of this Agreement are strictly confidential and shall supplement and complement any protection, which may attach to the exchange of confidential information in settlement discussions, whether by common law or statute including, but not limited to, Federal Rule of Evidence 408 and comparable state laws. Any and all prior discussions and agreements between the Parties concerning the subject matter of this Agreement are merged into this Agreement when signed. This Agreement may not be modified or amended, nor any of its provisions waived, except by an instrument in writing signed by all Parties. No Party has made any warranty or representation to the other Parties that is not set forth expressly herein. In entering into this Agreement, no Party has relied on any statement or representation made by or on behalf of any other Party, by or on behalf of any affiliate of such other Party, or by counsel for such other Party that is not set forth expressly in this Agreement.

18.  **No Drafting Presumption.** This Agreement shall be interpreted or construed without any presumption that the provisions hereof should be strictly construed against the drafter, it being agreed that the Parties and their respective counsel and other agents have fully and equally participated in the preparation, negotiation, review and approval of all provisions of this Agreement.

19.  **No Admissions.** The Parties have executed this Agreement for the sole purpose of settling and disposing of all Claims between them, and it is expressly understood and agreed that no Party hereto admits any wrongdoing on its, his or her part by executing this Agreement.

30

20.   **Binding Effect.** It is the intention of the parties to extinguish all AG Group Released Claims and all Trump Group Released Claims and, consistent with such intention, each of the Parties hereby waives any and all rights, to the extent permitted by law, to assert that the Release provided by it in Paragraph 6 hereunder is unenforceable as to any claim whatsoever and for any reason including, without limitation, any and all rights under section 1542 of the California Civil Code, if applicable, or any other applicable similar law or principle of common law, which may have the effect of limiting the Releases herein. Section 1542 of the California Civil Code provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

21.   **Headings.** The section headings contained in this Agreement are for reference purposes only and shall not in any way effect or control the meaning or interpretation of this Agreement.

22.   **Execution in Counterparts and by PDF e-mail.** This Agreement may be executed in multiple counterparts and by fax or PDF e-mail, each of which, when so executed and delivered, shall be an original, but such counterparts shall together constitute one and the same instrument and agreement.

23.   **Effective Date.** This Agreement shall be effective immediately upon execution and delivery by all Parties hereto (the "Effective Date").

31

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as follows:

TR Investors, LLC                        Arie Genger

By: _____

Print: _____           Date: ___6/15/13___

Title: _____

Date: _____

Glenclova Investment Co.                 Orly Genger (in her individual capacity and

                                         in her capacity as beneficiary of the

By: _____     Orly Genger 1993 Trust)

Print: _____

Title: _____             Date: ___6/15/13___

Date: _____

32

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed as follows:

**TR Investors, LLC**                                    **Arie Genger**

By: _Mark S. Hirsch_                    _____

Print: _MARK J. HIRSCH_                Date: _____

Title: _Executive VP/General Counsel_

Date: _June 16, 2013_


**Glenclova Investment Co.**                    **Orly Genger (in her individual capacity and**
                                                               **in her capacity as beneficiary of the**
By: _Mark S. Hirsch_                     **Orly Genger 1993 Trust)**

Print: _MARK S. HIRSCH_

                                                               _____
Title: _Executive VP/General Counsel_

                                                               Date: _____
Date: _June 16, 2013_

32

**New TR Equity I, LLC**                    **Arnold Broser**

By: _____

Print: _____        Date: _____ 6/16/13 _____

Title: _____

Date: _____


**New TR Equity II, LLC**                   **David Broser**

By: _____

Print: _____        Date: _____ 6/16/13 _____

Title: _____

Date: _____

33

**New TR Equity I, LLC**                    **Arnold Broser**

By: _Mark S. Hirsch_                         _____

Print: _MARK S. Hirsch_              Date: _____

Title: _Executive VP / General Counsel_

Date: _June 16, 2013_


**New TR Equity II, LLC**                   **David Broser**

By: _Mark S. Hirsch_                         _____

Print: _MARK S. Hirsch_              Date: _____

Title: _Executive VP / General Counsel_

Date: _June 16, 2013_

33

**Trans-Resources, LLC**


By: _Mark S Hirsch_


Print: _MARK S. HIRSCH_


Title: _Executive VP/General Counsel_


Date: _June 16, 2013_

34

**Jules Trump**

Date: 6/16/2013

**Eddie Trump**

Date: _____

**Mark Hirsch**

Date: _____

**Jules Trump**

_____

Date: _____

**Eddie Trump**

_____

Date: June 16, 2013

**Mark Hirsch**

_____

Date: _____

35