# EXHIBIT F

*To Be Argued By*:
JUDITH BACHMAN

New York County Clerk's Index No. 651089/10

# 𝔑𝔢𝔴 𝔜𝔬𝔯𝔨 𝔖𝔲𝔭𝔯𝔢𝔪𝔢 ℭ𝔬𝔲𝔯𝔱

## APPELLATE DIVISION—FIRST DEPARTMENT

◆◆◆

ARIE GENGER and ORLY GENGER, in her individual capacity
and on behalf of THE ORLY GENGER 1993 TRUST,

*Plaintiffs-Respondents,*

—against—

SAGI GENGER, TPR INVESTMENT ASSOCIATES, INC., THE SAGI GENGER 1993 TRUST, ROCHELLE FANG, individually and as trustee of THE SAGI GENGER 1993 TRUST, GLENCLOVA INVESTMENT COMPANY, TR INVESTORS, LLC, NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, JULES TRUMP, EDDIE TRUMP and MARK HIRSCH,

*Defendants-Respondents,*

DALIA GENGER,

*Defendant-Appellant.*

*(Caption continued on inside cover)*

## BRIEF FOR DEFENDANT-APPELLANT

JUDITH BACHMAN
LAW OFFICES OF JUDITH BACHMAN
254 S. Main Street, Suite 306
New City, New York 10956
(845) 639-3210
jlbesq_99@yahoo.com

*Attorneys for Dalia Genger*

REPRODUCED ON RECYCLED PAPER

SAGI GENGER, individually and as assignee of
THE SAGI GENGER 1993 TRUST, and TPR INVESTMENT ASSOCIATES, INC.,

*Cross-Claimants, Counterclaimants, and Third-Party Claimants-Respondents,*

—against—

ARIE GENGER, ORLY GENGER, GLENCLOVA INVESTMENT COMPANY, TR INVESTORS, LLC, NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, JULES TRUMP, EDDIE TRUMP, MARK HIRSCH, TRANS-RESOURCES, INC., WILLIAM DOWD, and THE ORLY GENGER 1993 TRUST,

*Cross-Claim, Counterclaim and/or Third-Party Defendants-Respondents.*

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ................................................ ii

QUESTION PRESENTED .................................................. 1

STATEMENT OF FACTS AND NATURE OF CASE ................... 1

ARGUMENT ............................................................... 4

    IT WAS ERROR FOR AN IAS COURT WITH INCOMPLETE
    INFORMATION AND NO BASIS TO DISMISS LIVE CLAIMS
    WITH PREJUDICE WHICH DISMISSAL CONTRADICTED
    A PRIOR ORDER AND A PENDING MOTION.................... 4

CONCLUSION............................................................ 7

# TABLE OF AUTHORITIES

PAGE(S)

**Cases**

James v. Bernhard,
   106 A.D.3d 435, 965 N.Y.S.2d 56 (1st Dep't 2013) ................   3

Kaiser v. J & S Realty, Inc.,
   173 A.D.2d 920 (3d Dep't 1991)......................................   5

People v. Evans,
   94 N.Y.2d 499 (2000)...................................................   6

People v. Putziger,
   22 A.D.2d 821 (2d Dep't 1964) .......................................   5

Samuels v. Consol. Edison Co. of N.Y.,
   96 A.D.3d 685 (1st Dep't 2012)......................................   5

## QUESTION PRESENTED

1. When an IAS Court has incomplete information and no basis, may it issue
   an Order dismissing live claims with prejudice based on a one-paragraph
   letter which contradicts a prior order of the IAS Court as well as a pending
   motion? The IAS Court answered yes.

## STATEMENT OF FACTS AND NATURE OF CASE

In 2010, plaintiff Arie Genger and his daughter, co-plaintiff Orly Genger
("Orly") (collectively, "Plaintiffs"), commenced this action against, among other
defendants, those collectively known as the "Trump Group". (R. 134). Orly
brought her claims in this action both in her individual capacity and on behalf of
the Orly Genger 1993 Trust ("Orly Trust") (collectively, the "Orly Individual and
Orly Trust Claims"). (R. 134). Dalia Genger ("Dalia") is the trustee of the Orly
Trust. (R. 134). In 2013, the action was assigned to Justice Barbara Jaffe of the
Supreme Court, New York County (the "IAS Court").

On January 2, 2013, the IAS Court dismissed some, but not all, of the Orly
Individual and Orly Trust Claims against the Trump Group. The IAS Court found
that certain of those claims stated a viable cause of action, including ones for
aiding and abetting breach of fiduciary duty and unjust enrichment (collectively,
the "Remaining Claims"). That partial dismissal was set forth in an Amended
Decision and Order of the IAS Court ("January Order"). (R. 10).

1

The Trump Group filed a notice of appeal from the January Order but never perfected that appeal. Instead, in June 2013, the Trump Group entered into a settlement with Plaintiffs ("Settlement"). (R. 288). Plaintiffs refused to share the terms of the Settlement with Dalia or anyone else. (R. 288). Instead, they filed a proposed Second Amended Stipulation of Discontinuance with Prejudice in which each of the settling parties initialed and scratched out (from a prior Stipulation) the words "on behalf of" before the words "the Orly Genger 1993 Trust" and replaced them with the words "as beneficiary of" – thereby making clear that the parties were only discontinuing the claims that Orly had brought against the Trump Group individually and as a trust beneficiary, but not any of the claims she had brought on behalf of the Orly Trust. The IAS Court "so-ordered" the Stipulation. (R. 288).

Consistent with the Second Amended Stipulation of Discontinuance, for the next year, in multiple submissions, Orly's attorneys represented to the IAS Court that her Settlement with the Trump Group "only dismisses Orly's individual claims against the Trump Group, but does not resolve or dismiss any claims of the Orly Trust against the Trump Group". (R. 61). Orly's attorneys further represented that the Settlement (which they still declined to share) left Dalia Genger, as Trustee of the Orly Trust, free to "pick up the cudgel if she so [chose]" to prosecute the Remaining Claims. Id. (emphasis added). The Trump Group did not notify the Court that they took issue with Orly's characterizations.

2

With that representation, and following certain other rulings from the IAS Court which further crystallized the issue, in August 2014, Dalia moved, in part, to be substituted for Orly on behalf of the Orly Trust ("Substitution Motion") against the Trump Group to "pick up the cudgel" and use that cudgel to prosecute some or all of the Remaining Claims on behalf of the Orly Trust.  (R.  52).[1]

Plaintiffs thereafter sought multiple extensions of their time to respond to the Substitution Motion, the last of which Dalia's objected but the IAS Court granted over that objection.  Before they had even submitted any oppositions to the Substitution Motion, Plaintiffs' submitted a one paragraph letter requesting that the IAS Court enter a proposed order of dismissal and severance: (1) dismissing all of Plaintiffs' claims (necessarily including the never-dismissed Remaining Claims) and (2) severing the cross-claims, counterclaims and third-party claims of another party (the "Letter").  (R.  48).

Upon receipt of the Letter, Dalia's counsel objected to the entry of the proposed order of dismissal and severance because of Dalia's pending Substitution Motion which sought, <u>inter alia</u>, to prosecute the Remaining Claims.  (R. 51). Without any meaningful, let alone complete, information in the form of papers, motion, hearing, or argument, however, the IAS Court entered the Order of

---

[1]     Such substitution is appropriate, and indeed necessary, when a derivative plaintiff, like Orly Genger, is no longer an appropriate representative plaintiff. <u>James v. Bernhard</u>, 106 A.D.3d 435, 965 N.Y.S.2d 56 (1st Dep't 2013).

3

dismissal and severance dated November 3, 2014 and entered November 25, 2014 (Jaffe, J.) (the "Order") that purportedly dismissed the Remaining Claims. That Order contradicted the IAS Court's own January Order leaving the Remaining Claims and ignored the pending Substitution Motion seeking, inter alia, to prosecute the Remaining Claims (R. 10).

Appellant, Dalia Genger , Trustee of the Orly Trust, now appeals that Order because it purportedly dismisses the Remaining Claims in contravention of the January Order and the Substitution Motion.

After entry of the Order and filing to the Notice of Appeal of it, the parties completed briefing on the Substitution Motion.  (R. 144 - 545).  The Appellees cited the Order as justification for the denial of the Substitution Motion claiming that the IAS Court had dismissed the Remaining Claims.  (R. 290).  After argument, the IAS Court held the Substitution Motion in abeyance until the Surrogate's Court determined whether Dalia should remain as trustee.  (R. 579).

## ARGUMENT

IT WAS ERROR FOR AN IAS COURT
WITH INCOMPLETE INFORMATION AND NO BASIS
TO DISMISS LIVE CLAIMS WITH PREJUDICE
WHICH DISMISSAL CONTRADICTED A PRIOR ORDER
AND A PENDING MOTION

When an order, such as the one at bar, is issued without complete information provided in the form of papers, motion, hearing or argument, it should

4

be reversed.  E.g., Samuels v. Consol. Edison Co. of N.Y., 96 A.D.3d 685 (1st

Dep't 2012).  Without the submission of complete information in support of an

application, a court cannot grant an order.  Kaiser v. J & S Realty, Inc., 173

A.D.2d 920 (3d Dep't 1991); People v. Putziger, 22 A.D.2d 821 (2d Dep't 1964).

Thus for instance in Kaiser v. J & S Realty, Inc., 173 A.D.2d 920 (3d Dep't

1991), the Third Department reversed an order issued on an oral motion because

the movant had failed to present affidavits or other competent evidence in support

of its factual assertions.  The court reasoned:

> Here, it appears that defendant made no
> evidentiary showing. In any event, the record on appeal,
> stipulated to by defendant, contains no affidavits, sworn
> testimony or other competent evidence in support of
> defendant's motion to vacate the default judgment. As
> such, Supreme Court's determination may not be
> sustained.

Likewise in People v. Putziger, 22 A.D.2d 821 (2d Dep't 1964), the Second

Department held that "it was error for the trial court to enter an order without a

hearing and without a judicial determination on the issues of fact and law raised by

the petition and return."

Here too, the Order must be reversed because "it was error for the [IAS

Court] to enter an [O]rder without a hearing and without a judicial determination

on the issues of fact and law raised . . . ."

5

The IAS Court entered the Order in response to the one-paragraph Letter.

Plaintiffs submitted no papers, motion, affidavits, sworn testimony or other

competent evidence justifying the request for the Order purportedly dismissing the

Remaining Claims, nor were any of the other parties afforded the opportunity to

oppose entry of the Order through their own submissions.

Among other things, the IAS Court had no information, papers, motion or

hearing on the interplay between the requested Order and the January Order. Nor

did the IAS Court have any information, papers, motion or hearing on the interplay

between the requested Order and the Substitution Motion. In fact, the Substitution

Motion had not been fully briefed, heard or decided, at the time the Order was

entered. The IAS Court had woefully incomplete information before it – merely a

one-paragraph Letter and nothing else – when it entered the Order.

Even assuming arguendo that the Court did have complete information about

the Order, it was error to enter the Order dismissing the Remaining Claims. There

was no basis to dismiss the Remaining Claims. That purported dismissal was in

direct contravention of the January Order which determined the Remaining Claims

to be viable, which ruling remained the law of the case. See, People v. Evans, 94

N.Y.2d 499, 503 (2000) (holding that law of the case doctrine "expresses the

practice of courts generally to refuse to reopen what has been decided") (quoting

Messenger v. Anderson, 225 U.S. 436, 444 (1912)).  Additionally, the Order was

6

issued notwithstanding the pendency of the Substitution Motion which sought to

prosecute the Remaining Claims.

## CONCLUSION

Because the IAS Court had incomplete information and no basis to issue the

Order, the Order must be reversed.

Dated:  November 6, 2015
       New City, New York

_____/s/_____
Judith Lisa Bachman, Esq.
Attorney for Appellant, Dalia Genger
254 South Main Street, Suite 306
New City, New York 10956
845-639-3210

## PRINTING SPECIFICATION STATEMENT

This computer generated brief was prepared using a proportionally spaced typeface.

Name of typeface: Times New Roman

Point size: 14 Points

Line spacing: Double

The total number of words in the brief, inclusive of point headings and footnotes and exclusive of pages containing the table of contents, table of authorities, proof of service, printing specification statement, or any authorized addendum is 1,472.

FILED: NEW YORK COUNTY CLERK 12/15/2014 04:35 PM
NYSCEF DOC. NO. 1156

INDEX NO. 651089/2010
RECEIVED NYSCEF: 12/15/2014

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------x
ARIE GENGER and ORLY GENGER, in her                    :
individual capacity and on behalf of
THE ORLY GENGER 1993 TRUST,                            :          Index No. 651089/2010
                                                                 (Jaffe, B. JSC)
                                                       :
                  Plaintiffs,
                                                       :

                  -against-                            :

SAGI GENGER, TPR INVESTMENT                            :
ASSOCIATES, INC., DALIA GENGER, THE
SAGI GENGER 1993 TRUST, ROCHELLE                       :
FANG, individually and as trustee of THE SAGI
GENGER 1993 TRUST, GLENCLOVA                           :
INVESTMENT COMPANY, TR INVESTORS,
LLC, NEW TR EQUITY I, LLC, NEW TR                      :
EQUITY II, LLC, JULES TRUMP, EDDIE
TRUMP AND MARK HIRSCH,                                 :

                  Defendants.                          :
-------------------------------------------------------------x
SAGI GENGER, individually and as assignee of          :          PREARGUMENT STATEMENT
THE SAGI GENGER 1993 TRUST, and TPR
INVESTMENT ASSOCIATES, INC.                            :

         Cross-Claimants, Counterclaimants, and       :
         Third-Party Claimants,
                                                       :
                  -against-
                                                       :
ARIE GENGER, ORLY GENGER,                              :
GLENCLOVA INVESTMENT COMPANY,
TR INVESTORS, LLC, NEW TR EQUITY I, LLC,               :
NEW TR EQUITY II, LLC, JULES TRUMP,
EDDIE TRUMP, MARK HIRSCH,                              :
TRANS-RESOURCES, INC., WILLIAM
DOWD, and THE ORLY GENGER 1993 TRUST,                  :

         Cross-Claim, Counterclaim and/or             :
         Third-Party Defendants.
-------------------------------------------------------------x

1.  TITLE OF ACTION:            As set forth in caption.

2.  FULL NAMES OF             The original parties are as set forth in the
    ORIGINAL PARTIES AND     caption above.
    ANY CHANGE IN PARTIES

3.  NAME OF COUNSEL FOR      Judith Bachman, Esq.
    DEFENDANT- APPELLANT    254 S. Main Street, Suite 306
    DALIA GENGER            New City, New York 10956
                            845-639-3210

4.  NAME OF COUNSEL FOR
    PLAINTIFF-RESPONDENTS

                            Yoav M. Griver, Esq.
                            Bryan D. Leinbach, Esq.
                            ZEICHNER ELLMAN & KRAUSE LLP
                            575 Lexington Avenue
                            New York, New York 10022
                            212-223-0400
                            Attorneys for Orly Genger

                            William Wachtel, Esq.
                            Elliot Silverman, Esq.
                            WACHTEL MASYR & MISSRY LLP
                            One Dag Hammarskjold Plaza
                            885 Second Avenue
                            New York, New York 10017
                            212-909-9595
                            Attorneys for Orly Genger

                            Lauren J. Wachtler, Esq.
                            Paul D. Montclare, Esq.
                            MITCHELL SILBERBERG & KNUPP LLP
                            12 East 49th Street
                            New York, New York 10017
                            212-509-3900
                            Attorney for Arie Genger

5.  NAME OF COUNSEL FOR
    DEFENDANT-RESPONDENTS

                            John Dellaportas
                            Morgan, Lewis & Bockius LLP
                            101 Park Avenue
                            New York, NY 10178-0060

212-309-6690
Attorneys for Defendants Sagi Genger,
The Sagi Genger 1993 Trust, and
TPR Investment Associates, Inc

Douglas Herrmann
William P. Frank
John Boyle
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Attorneys for Defendants Glenclova
Investment Co., TR Investors, LLC, New
TR Equity I, LLC, New TR Equity II, LLC,
Jules Trump, Eddie Trump, Mark Hirsch
and Trans-Resources, Inc.

Brian T. Stapleton
GOLDBERG SEGALLA
11 Martine Avenue, Suite 1700
White Plains, New York 10606
(914) 79805470
Attorneys for Third-Party Defendant William Dowd

Ira Tokayer, Esq.
The Chrysler Building
405 Lexington Avenue, 7th Floor
New York 10174
(212) 695-5250
Attorney for Rochelle Fang

6. COURT AND COUNTY
   FROM WHICH APPEAL
   IS TAKEN

SUPREME COURT, NEW YORK COUNTY
(Barbara Jaffe, J.S.C.)

7. THE NATURE AND OBJECT
   OF THE CAUSE OF ACTION:

By her pending motion Dalia Genger, as trustee,
sought an order substituting her as plaintiff on Orly
Genger's Trump Group claims and for an order

pursuant to CPLR 2701 directing that the Trump
Group settlement fund be paid into Court.

The Plaintiffs sought an order dismissing certain
claims including those for which Dalia Genger
sought to be substituted while the motion for
substitution was pending

Dalia Genger objected to the issuance of the order
while the substitution motion was still pending

8. RESULT REACHED IN
THE COURT BELOW:

The IAS Court issued the order requested by
Plaintiffs' dismissing certain claims including those
for which Dalia Genger sought to be substituted
while the motion for substitution was pending

9. GROUNDS FOR
SEEKING REVERSAL:

The Court erred in issuing the order requested by
Plaintiffs' dismissing certain claims including those
for which Dalia Genger sought to be substituted
while the motion for substitution was pending

10. RELATED ACTIONS:

Orly Genger et al. v. Dalia Genger et al.,
Index No. 109749/2009.  Pending

Orly Genger v. Sagi Genger, Index No.
100697/2008.  Pending

In the Matter of the Application of Orly Genger, as
a person interested, for the removal of Dalia
Genger, as Trustee of the Orly Genger Trust, File
No. 0017/2008 N.Y. Surr. Ct. (Anderson, N.
Surrogate. Pending.

Dalia Genger, et al. v. TR Investors LLC, C.A. No.
6906-CS Del. Chan. Ct., Stayed

11. OTHER APPEALS:                None pending by Dalia Genger.

**ATTORNEY'S CERTIFICATION**

The undersigned hereby certifies that, to the best of the undersigned's knowledge, information

and belief, formed after a reasonable inquiry under the circumstances, the Presentation of the

within PRE-ARGUMENT STATEMENT or the contentions contained herein is/are not frivolous

as defined in 22 NYCRR § 130-1.1

Dated:  December 15, 2014
        New City, New York

                                    _____/s/_____
                                    Judith Lisa Bachman, Esq.
                                    Attorney for Dalia Genger
                                    254 South Main Street, Suite 306
                                    New City, New York 10956
                                    845-639-3210

# EXHIBIT G

## SETTLEMENT AGREEMENT AND RELEASE

This settlement agreement and release (this "Agreement") is entered into as of June 16, 2013, by and between Arie Genger and Orly Genger (in her individual capacity and in her capacity as beneficiary of the Orly Genger 1993 Trust), Arnold Broser, David Broser, (in their individual capacity and on behalf of all entities managed, owned or controlled in any way by Arnold Broser or David Broser and which are in any way related to the subject matter hereof ("Broser Entities" and collectively with Arie Genger and Orly Genger in all capacities referenced above, the "AG Group"), and TR Investors, LLC ("TR Investors"), Glenclova Investment Co. ("Glenclova"), New TR Equity I, LLC ("New TR I"), New TR Equity II, LLC ("New TR II" and, together with TR Investors, Glenclova and New TR I, the "Trump Entities"), Trans-Resources, LLC (the successor to Trans-Resources, Inc. and together with its predecessor entities referred to herein as, "Trans-Resources"), Jules Trump, Eddie Trump and Mark Hirsch (collectively, with the Trump Entities and Trans-Resources, the "Trump Group"). The members of the AG Group and the Trump Group are each referred to herein individually as a "Party" and together as the "Parties".

WHEREAS, in March 2001, TR Investors, Glenclova, Trans-Resources and TPR Investment Associates, Inc. ("TPR") entered into a stockholders agreement with respect the common stock of Trans-Resources (the "Stockholders Agreement");

1

**WHEREAS**, since August 2008, Arie Genger, Orly Genger, the Trump Group and others have been engaged in various litigations (described below) concerning the ownership and control of Trans-Resources; and

**WHEREAS**, the Parties wish to resolve all issues, disputes and disagreements between them, including but not limited to the issue of ownership of all Trans-Resources shares;

**NOW, THEREFORE**, in consideration of the promises and representations contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1.  **Recitals.**    The above recitals are incorporated into and made a part of this Agreement and are binding on all Parties hereto.

2.  **Initial Consideration from the Trump Group.**    Upon dismissal with prejudice of the claims, counterclaims, cross-claims, third-party claims, issues and matters as provided in Paragraph 4 below, the Trump Group shall promptly:

(a)    release all claims they may have to the (i) $7,428,994.00 plus interest held by Skadden, Arps, Slate, Meagher & Flom LLP as escrow agent (the "Skadden Escrow") and (ii) $10,314,005.00 plus interest held by with Pedowitz & Meister as escrow agent (the "P&M Escrow");

(b)    pay to Wachtel, Masyr & Missry, LLP as attorneys for the AG Group ("Wachtel") an amount in cash equal to $35,000,000.00 minus (i) the amount held in the Skadden Escrow, and (ii) the amount held in the P&M Escrow.

2

3.    **Further Consideration from the Trump Group.**  Trans-Resources on behalf of the Trump Group shall pay: (i) $7,500,000 to Wachtel on the third  anniversary of the Effective Date (defined below), and (ii) $7,500,000 to Wachtel 364 days following the third anniversary of the Effective Date The payments provided under this paragraph shall be (a) subject to the terms and conditions herein and (b) evidenced by two (2) promissory notes that are substantially in the form attached as Exhibit A hereto (the "Notes").  Notwithstanding anything else herein, the maturity of the two $7,500,000 Notes shall be delayed beyond their due date until the earlier (the "Extended Maturity Date") of  (A) such time as all pending claims, cross-claims and counter-claims brought by any of TPR, Sagi Genger, the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust (other than the Orly Trust Action (as defined below)), D&K Limited Partnership, D&K GP LLC, Rochelle Fang, and/or David Parnes (collectively, the "Sagi Group") against any member of the Trump Group have been dismissed with prejudice and the statute of limitations shall have run with respect to any other potential claims of the Sagi Group that might be the subject of the Indemnification provided for by Paragraph 5 below or (B) such time as each member of the Sagi Group shall have provided the Trump Group with a release of the Trump Group Released Parties (as defined below) and covenant not to sue in form and substance that is the same as the AG release and covenant not to sue contained in Paragraph 6(a) below (the "Sagi Group Release").

Subject to the foregoing, the Notes shall become immediately due and payable upon the occurrence of any transaction or series of transactions which shall result in the Trump Group owning or controlling neither (i) a majority of the voting stock of Trans-Resources or its successors or each of its two principal subsidiaries, Haifa Chemicals, Ltd. and Na-Churs Plant

3

Food Company or their successors, nor (ii) directly or indirectly, a majority of the assets currently owned by Trans-Resources and its subsidiaries; provided, however, that in such event, at the request of the Trump Group, the amounts then payable on the Notes shall be placed in escrow for the duration of their original term or until the Extended Maturity Date (if applicable) under the provisions of an escrow agreement on reasonable terms to be negotiated at such time in good faith between Trans-Resources, the payee and an escrow agent selected by their mutual consent, which shall provide for their release to the Trump Group in payment of Indemnification Amounts, AG Group Release Amounts and Discovery Costs (as such terms are defined below), if any, and payment to the payee of such amounts after reduction for Indemnification Amounts, AG Group Release Amounts and Discovery Costs, if any, upon their original maturity date or the Extended Maturity Date (if applicable).  If Trans-Resources is unable to pay the Notes as and when they mature, the Trump Group will be obligated to make payment thereon in an amount equal to the lesser of (x) the outstanding amounts not paid by the obligor thereunder and (y) any amount by which cash payments received by members of the Trump Group (other than Trans-Resources) from Trans-Resources and its subsidiaries since the Effective Date (whether in the form of dividends, distributions, compensation or otherwise) exceeds reasonable compensation for services rendered plus payments for goods, services and assets provided by such persons in amounts that would have been paid for such goods, services and assets in arms' length transactions with unaffiliated third parties; provided, however, that in neither case shall the Trump Group be obligated to pay any amount that exceeds the outstanding amounts not paid by Trans-Resources on the Notes (subject to any Indemnification Amounts, AG Group Release Amounts or Discovery Costs).

4

4.    **Dismissal of Claims with Prejudice**.  Within two (2) business days of the

Effective Date (defined below), the AG Group and the Trump Group shall take all actions

necessary or desirable to:  (i) effect the dismissal with prejudice of all claims, counterclaims,

cross-claims, third-party claims, issues and matters between them, and to vacate all court orders

which restrain, enjoin or in any way limit actions by any members of the Trump Group, in each

pending action in which members of the AG Group and the Trump Group are parties (whether or

not service of process with respect thereto has been effected), including, without limitation, each

of the following pending actions (collectively, the "Litigation"):  *Genger v. TR Investors, LLC*,

No. 168, 2013 (Del.); *TR Investors, LLC v. Genger*, C.A. No. 6697-CS (Del. Ch.); *Trans-*

*Resources, Inc. v. Genger*, C.A. No. 4391-CS (Del. Ch.) (with respect to Arie Genger only); *TR*

*Investors, LLC, et al. v. Genger*, C.A. No. 3994-CS (Del. Ch.); *Glenclova Investment Co. v.*

*Trans-Resources, Inc., at al.*, No. 08 Civ. 7140 (JFK) (S.D.N.Y.); *Arie Genger and Orly Genger*

*v. Sagi Genger, et al.*, Index No. 651089/2010 (N.Y. Supr.); and (ii) have the New York State

Supreme Court enter a definitive non-appealable order declaring that members of the Trump

Group own all right, title and interest (beneficially, of record and otherwise) to the shares of

Trans-Resources purportedly transferred by TPR in October 2004 to Arie Genger (the ("Arie

Shares") and to the Orly Genger 1993 Trust (the "Orly Trust Shares"),  with the understanding

and agreement that should the request for the entry of such an order with respect to the "Orly

Trust Shares" be denied or not entered in a reasonably timely fashion,  then the AG Group and

the Trump Group shall take all action necessary or desirable to have the New York State

Supreme Court vacate all court orders which restrain, enjoin or in any way limit actions by the

5

parties to the pending action captioned *Dalia Genger, as Trustee of the Orly Genger 1993 Trust*

*v. TR Investors, LLC, et al.,* C.A. No. 6906-CS (Del. Ch.) (the "Orly Trust Action"), to prosecute,

defend, compromise, settle and otherwise deal with all claims, counterclaims, cross-claims, third-

party claims, issues and matters asserted therein; provided, however, that nothing in this

Agreement is intended to require or permit the dismissal of any claims, counterclaims, cross-

claims, third-party claims, issues and matters, (i) in *Trans-Resources, Inc. v. Genger*, C.A. No.

4391-CS (Del. Ch.) (the "Breach of Fiduciary Duty Case"), as between the Trump Group and

Avi Pelossof and/or William Dowd (subject to the exchange of general releases between the

members of the Trump Group and William Dowd as contemplated below) and (b) against TPR,

the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust, D&K Limited Partnership, D&K GP

LLC, Sagi Genger or Dalia Genger. Any member of the AG Group including, without

limitation, Orly Genger, who is called to testify in the Litigation or the Orly Trust Action, agrees

to testify that he, she (in her individual capacity, ~~on behalf of the Orly Genger 1993 Trust,~~ and as

beneficiary of the Orly Genger 1993 Trust) or it has waived all claims he, she (in her individual

capacity, ~~on behalf of the Orly Genger 1993 Trust,~~ and as beneficiary of the Orly Genger 1993

Trust) or it had or may have to ownership (record, beneficial or otherwise) of any shares of

Trans-Resources and that he, she (in her individual capacity, ~~on behalf of the Orly Genger 1993~~

~~Trust,~~ and as beneficiary of the Orly Genger 1993 Trust) or it is opposed to the Orly Genger

1993 Trust seeking any remedy of any kind against any member of the Trump Group.

Notwithstanding the foregoing, upon receipt by the Trump Group of a general release in form

and substance reasonably satisfactory to it, the Trump Group shall provide the same general

6

release to William Dowd and cause the dismissal of the Breach of Fiduciary Duty Case as
between the Trump Group and him.

        5.    **Indemnification.**

        (a)    Upon closing of this Agreement, each of the members of the AG
Group with the exception of Arnold Broser and David Broser and the Broser Entities, jointly
and severally, agrees to indemnify and hold harmless (i) each of the members of the Trump
Group, and their respective past and present affiliates and direct and indirect subsidiaries, and (ii)
each of the past and present agents, representatives, officers, directors, advisors, employees,
general partners, limited partners, shareholders, members, predecessors, successors, heirs,
executors, administrators and assigns of each person and entity referenced in clause (i), from all
reasonable costs, expenses, attorneys' fees of counsel selected by the Trump Group (it being
agreed that the Trump Group will cooperate with the AG Group in all reasonable respects to
cause the amount of such costs, expenses and its attorneys' fees to be minimized), settlements
and/or judgments (whether direct or related to joint and several liability) (the "Indemnification
Amounts") incurred as a result of, in connection with, or relating in any way to any (x) claims,
counterclaims, cross-claims or third-party claims raised or that could have been raised in the
Litigation, and (y) claims that are pending, have been brought, or that may in the future be
brought by or on behalf of any of TPR, the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust
(other than those claims currently pending in the Orly Trust Action), D&K Limited Partnership,
D&K GP LLC, Sagi Genger, David Parnes or Dalia Genger, regardless of whether they were or
could have been raised in the Litigation or the Orly Trust Action, relating in any way, whether
directly or indirectly, to (A) the Shareholders Agreement entered into by Trans-Resources

shareholders and Trans-Resources on March 30, 2001, (B) the transfer of interests in TPR or the

purported transfer of shares of Trans-Resources by TPR in October 2004, (C) any activities or

developments relating to or conducted by Trans-Resources or any of its direct or indirect

subsidiaries that occurred prior to September 26, 2008, (D) the acquisition by the Trump Group

of all interests (record, beneficial or otherwise) of the so called "Arie Shares", "Orly Trust

Shares" and the shares of Trans-Resources purportedly transferred by TPR in October 2004 to

the Sagi Genger 1993 Trust (the "Sagi Trust Shares") (including, without limitation, the

negotiations for the ownership or acquisition of such shares), (E) the control of Trans-Resources

or any of its direct or indirect subsidiaries by the Trump Group through its acquisition of the

aforementioned shares, (F) records and documents (including but not limited to electronic files)

in the possession, custody or control of Trans-Resources or any of its direct or indirect

subsidiaries, (G) misrepresentations made or improper acts conducted prior to September 26,

2008 by any officer or director of Trans-Resources, (H) this Agreement, (I) the business or

operations of Trans-Resources or any of its direct or indirect subsidiaries conducted prior to

September 26, 2008 arising from or in any way related to the conduct of any member of the AG

Group, Avi Pelossof or William Dowd, or (J) the conduct of any other individual to the extent

Arie Genger is aware, or should have been aware, thereof. Notwithstanding the foregoing, the

indemnity provided for above shall not apply to any claims which may be brought subsequent to

the Effective Date (and which are entirely unrelated to any claim brought prior to such date) by

any of Sagi Genger, the Sagi Genger 1993 Trust or TPR and which arise solely out of actions

taken or not taken by members of the Trump Group which actions or inactions no member of the

AG Group was aware of or should have been aware of; provided, however, that such claim was

8

not encouraged or solicited by any member of the AG Group and no member thereof cooperates

in asserting, instituting or prosecuting such claim. Notwithstanding anything herein to the

contrary, the undertaking of William Wachtel hereunder shall not exceed under any circumstance

an amount greater than $5,000,000.

　　　　　(b)　　The Trump Group may request payment or reimbursement of the

Indemnification Amounts at any time by providing a written statement or copy of an underlying

invoice or expense documentation to any member of the AG Group at the addresses set forth in

Paragraph 16 below, and the AG Group shall pay such indemnified expenses in full and in cash

within five (5) business days of the date such request is made.  The supporting documentation

submitted with any payment or reimbursement request hereunder may be redacted as necessary

to preserve attorney-client privilege, attorney work product, or confidential information the

Trump Group may, in its reasonable determination, need to protect.  The Trump Group will

provide the AG Group with reasonable notice prior to making any motion or taking any appeal

with respect to, or in, any past, present or future action or claim for which the Trump Group is

seeking indemnification, and such notice will be accompanied by a non-binding estimate of the

legal fees and costs associated with such motion or appeal. The Trump Group authorizes the AG

Group and their respective counsel to discuss directly with the Trump Group's appointed counsel

the amount and scope of any invoice for which the Trump Group is seeking indemnification.

The AG Group in its sole discretion may settle any indemnified claim so long as there is no

monetary contribution to be paid by the Trump Group, and the Trump Group is released, in form

and substance reasonably satisfactory to it, from any liability relating to any such indemnified

9

claim. The Trump Group shall not enter into any settlement of any indemnified claim, or discussions with respect thereto, without the express written consent of the AG Group.

(c)     With respect to each Indemnification Amount, until such time as it has been paid over to the Trump Group, the members of the AG Group shall remain jointly and severally liable for such Indemnification Amount and, the Trump Group may at its option pursue all legal remedies available to it and/or withhold an amount equal to such unreimbursed Indemnification Amount from any payments by Trans-Resources to be made pursuant to the Notes.

6.     **Releases**.

(a)     **The AG Group Release.** Effective on the Effective Date, each of the members of the AG Group, for itself, himself or herself, and in all capacities, and on behalf of its (and its respective affiliates' and direct and indirect subsidiaries'), his or her respective agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and affiliates, and each of their respective predecessors, successors, heirs, executors, administrators and assigns, and any other persons or entities acting in concert with any of them including, without limitation, any member of the Sagi Group which he, she or it shall at any time directly or indirectly control or be deemed authorized to act on behalf of (individually, an "AG Group Releasing Party" and collectively, the "AG Group Releasing Parties"): (i) fully, finally, irrevocably and unconditionally waives, releases and discharges each of the members of the Trump Group and its (and its respective past and present affiliates' and direct and indirect subsidiaries'), his or her respective past and present agents

10

(including Skadden, Arps, Slate, Meagher & Flom LLP in any capacity, including as Escrow

Agent for the Skadden Escrow or for any escrow in which it held, holds, or may hold, any

dividends or distributions from Trans-Resources), representatives, officers, directors, advisors,

employees, general partners, limited partners, shareholders, members, subsidiaries and affiliates,

and each of their respective predecessors, successors, heirs, executors, administrators and assigns

(collectively, the "Trump Group Released Parties"), from any and all claims, counterclaims,

demands, proceedings, actions, causes of action, orders, obligations, damages, debts, costs,

expenses and other liabilities whatsoever and however arising, whether known or unknown, past,

present or future, suspected or unsuspected, contingent or actual, both at law and in equity,

including without limitation, claims for fraud or fraud in the inducement (collectively, "Claims"),

which such AG Group Releasing Party now has, has ever had or may hereafter claim to have

against any Trump Group Released Party or its, his or her assets, liabilities or operations from

the beginning of the world through the Effective Date (individually, an "AG Group Released

Claim" and collectively, the "AG Group Released Claims"); and (ii) agrees not to assert, institute

or prosecute, or encourage, solicit or cooperate with any other person or entity in asserting,

instituting or prosecuting, any proceeding against any of the Trump Group Released Parties in

any jurisdiction (domestic or foreign, including, without limitation, the State of Israel) with

respect to any AG Group Released Claim or any other Claim relating in any way, directly or

indirectly, to Trans-Resources or any of its direct or indirect subsidiaries, the ownership or

acquisition of Trans-Resources shares (including any dividends or distributions relating thereto

or any escrow in which such dividends or distributions may currently be or in the past have been

held), the Litigation, the Orly Trust Action, control of Trans-Resources or any of its direct or

11

indirect subsidiaries, the business or operations of Trans-Resources or any of its direct or indirect subsidiaries, or arising out of this Agreement including, without limitation, the negotiation and execution of this Agreement or the AG Group Releases provided hereunder; provided, however, that this AG Group Release shall not apply to any Claims (x) seeking equitable relief to enforce the terms of this Agreement or claims seeking payment of the Notes or any indemnification payments required to be paid hereunder, (y) relating solely to events that transpired in their entirety subsequent to the Effective Date and that could not, under any circumstances, have possibly been pursued prior to the Effective Date whether or not then known, and (z) between any of the AG Group Releasing Parties and TPR, and/or any other member of the Sagi Group.

If an AG Releasing Party brings an AG Group Released Claim or other Claim in violation of the immediately preceding paragraph, the AG Group, jointly and severally, agrees to indemnify the Trump Group for any and all settlements, judgments, costs and fees, including legal fees and disbursements of counsel chosen by the Trump Group, incurred in working on, preparing for or defending such claim ("AG Group Release Amounts"). With respect to each AG Group Release Amount, until such time as such AG Group Release Amount has been paid over to the Trump Group, the members of the AG Group shall remain jointly and severally liable for such AG Group Release Amount, and the Trump Group may at its option pursue all legal remedies available to it and/or withhold an amount equal to such unreimbursed AG Group Release Amount from any payments to be made by Trans-Resources pursuant to the Notes. For purposes of the removal of all doubt, it is the parties' intention that no claims shall be brought or pursued by any member of the AG Group against any member of the Trump Group for any

12

reason whatsoever (other than claims permitted under clause (x), (y) and (z) of the immediately
preceding paragraph).

        (b)    **The Trump Group Release.** Effective on the Effective Date, each
of the members of the Trump Group, for itself or himself, and in all capacities, and on behalf of
its (and its respective affiliates' and direct and indirect subsidiaries'), or his respective agents,
representatives, officers, directors, advisors, employees, general partners, limited partners,
shareholders, members, subsidiaries and affiliates, and each of their respective predecessors,
successors, heirs, executors, administrators and assigns, and any other persons or entities acting
in concert with any of them (individually, a "Trump Group Releasing Party" and collectively, the
"Trump Group Releasing Parties"): (i) fully, finally, irrevocably and unconditionally waives,
releases and discharges each of the members of the AG Group and its (and its respective past and
present affiliates' and direct and indirect subsidiaries'), his or her respective past and present
agents, representatives, officers, directors, advisors, employees, general partners, limited partners,
shareholders, members, subsidiaries and affiliates, and each of their respective predecessors,
successors, heirs, executors, administrators and assigns (collectively, the "AG Group Released
Parties"), from any and all claims, counterclaims, demands, proceedings, actions, causes of
action, orders, obligations, damages, debts, costs, expenses and other liabilities whatsoever and
however arising, whether known or unknown, past, present or future, suspected or unsuspected,
contingent or actual, both at law and in equity including, without limitation, claims for fraud or
fraud in inducement, ("Claims"), which such Trump Group Releasing Party now has, has ever
had or may hereafter claim to have against any AG Group Released Party or its, his or her assets,
liabilities or operations from the beginning of the world through the Effective Date (individually,

13

a "Trump Group Released Claim" and collectively, the "Trump Group Released Claims"); and (ii) agrees not to assert, institute or prosecute, or encourage, solicit or cooperate with any other person or entity in asserting, instituting or prosecuting, any proceeding against any member of the AG Group Released Parties with respect to any Trump Group Released Claim or any other Claim relating in any way, directly or indirectly, to Trans-Resources or any of its direct or indirect subsidiaries, the ownership or acquisition of Trans-Resources shares, control of Trans-Resources or any of its direct or indirect subsidiaries, the business or operations of Trans-Resources or any of its direct or indirect subsidiaries, or the negotiation and execution of this Agreement or the Trump Group Releases provided hereunder; provided, however, that this Trump Group Release shall not apply to any Claims (x) seeking equitable relief to enforce the terms of this Agreement or claims seeking payment of any indemnification payments required to be paid hereunder, (y) relating solely to events that transpired in their entirety subsequent to the Effective Date and that could not, under any circumstances, have possibly been pursued prior to the Effective Date whether or not then known, and (z) between any of the Trump Group Releasing Parties and Avi Pelossof, William Dowd (unless and until the exchange of mutual general releases between the Trump Group and William Dowd referred to above) and/or TPR.

If a Trump Group Releasing Party brings a Trump Group Released Claim or other Claim in violation of the immediately preceding paragraph, the Trump Group, jointly and severally, agrees to indemnify the AG Group for any and all settlements, judgments, costs and fees, including legal fees and disbursements of counsel chosen by the AG Group, incurred in working on, preparing for or defending such claim ("Trump Group Release Amounts"). With respect to each Trump Group Release Amount, until such time as such Trump Group Release Amount has

14

been paid over to the AG Group, the members of the Trump Group shall remain jointly and

severally liable for such Trump Group Release Amount, and the AG Group may at its option

pursue all legal remedies available to it. For purposes of the removal of all doubt, it is the parties

intention that no claims shall be brought or pursued by any member of the Trump Group against

any member of the AG Group for any reason whatsoever (other than claims permitted under

clause (x), (y) and (z) of the immediately preceding paragraph).

      7.    **Discovery Obligations**.      Effective on the Effective Date (defined

below), to the extent that a member of the AG Group or the Orly Genger 1993 Trust seeks

discovery or testimony from any member of the Trump Group, or if any member of the Trump

Group is subpoenaed by any party to an action in which any member of the AG Group or the

Orly Genger 1993 Trust is a party, each of the members of the AG Group, jointly and severally,

agrees that to the extent indemnities of the Trump Group provided for elsewhere in this

Agreement do not apply, they shall indemnify the Trump Group for any and all costs and fees,

including reasonable legal fees and disbursements of counsel to be chosen by the Trump Group

(it being understood that for the purposes of this Discovery Obligation indemnity only, the

indemnification for legal fees shall be limited to $750 per hour of legal services), incurred in

working on, preparing for or defending such claim, it being agreed that the Trump Group will

cooperate with the AG Group in all reasonable respects to cause the amount of such costs and

fees, including its attorneys' fees and disbursements to be minimized ("Discovery Costs"). With

respect to each Discovery Cost, until such time as such Discovery Cost has been paid over to the

Trump Group, the members of the AG Group shall remain jointly and severally liable for such

Discovery Cost, and the Trump Group may at its option pursue all legal remedies available to it

and/or withhold an amount equal to such unreimbursed Discovery Cost from any payments to be made by Trans-Resources pursuant to the Notes.

8.    **Cooperation.**

(a)    Each member of the AG Group shall take all actions necessary or desirable, as promptly as practicable and as may be requested by the Trump Group from time to time including, without limitation, testifying in the Orly Trust Action, to (i) effectuate the release of the AG Group Released Claims and to prevent or preclude any other person or entity from asserting, instituting or prosecuting, or encouraging, soliciting or cooperating with any other person or entity in asserting, instituting or prosecuting, any proceeding or claims against any of the Trump Group Released Parties with respect to any AG Group Released Claim or any other Claim relating in any way, directly or indirectly, to Trans-Resources or any of its direct or indirect subsidiaries, the ownership or acquisition of Trans-Resources shares, the control of Trans-Resources or any of its direct or indirect subsidiaries, records and documents (including but not limited to electronic files) in the possession, custody or control of Trans-Resources or any of its direct or indirect subsidiaries or the business or operations of Trans-Resources or any of its direct or indirect subsidiaries brought by any party without regard to whether such party is a signatory hereto and (ii) cause the Orly Genger 1993 Trust to release any and all claims against the Trump Group Released Parties, including, without limitation, any claims pending in the Orly Trust Action.

(b)    As a condition to any settlement that any member of the AG Group shall enter into with any member of the Sagi Group, the AG Group parties to such settlement shall cause each Sagi Group party to such settlement to (i) dismiss with prejudice all pending claims, cross-claims and counter claims against any of the Trump Group Released Parties (as defined below)

16

and to provide the Sagi Group Release, and (ii) if the Orly Genger 1993 Trust is a party to such

settlement, cause it to agree in writing to become an AG Group member for purposes of

providing the indemnity contained in Paragraph 5. Likewise, as a condition to any agreement by

the AG Group to a replacement trustee for the Orly Genger 1993 Trust, the AG Group shall use

its best efforts to cause such trustee to agree in writing on behalf of the Orly Genger 1993 Trust

that it shall be a member of the AG Group for purposes of providing the indemnity contained in

Paragraph 5.

(c)   Each member of the AG Group covenants that for so long as the indemnity

contained in Paragraph 5 remains in effect, he, she or it shall not contribute or deposit any

amounts, or permit to be contributed or deposited any amounts (including, without limitation,

any payments made under Paragraphs 2 and 3), to or with the Orly Genger 1993 Trust or to any

other trust or entity that any of them directly or indirectly controls or is or was established at

their direction, or that is or was established or exists for any of their direct or indirect benefit,

unless such trust or entity has agreed in writing to being a member of the AG Group for purposes

of providing the indemnity contained in Paragraph 5. The foregoing shall not restrict members

of the AG Group from investing in or with such entities provided that that such investment may

be liquidated, without restriction, by such member of the AG Group from time to time as may be

necessary to comply with the terms of the indemnity contained in Paragraph 5.

(d)   The AG Group covenants that, subject to any confidentiality orders of any court

or other restrictions imposed by law (i) with respect to any court filing made or received by it

concerning the Orly Genger 1993 Trust, it shall contemporaneously provide a copy thereof to the

Trump Group, and (ii) contemporaneously with its becoming aware of any changes or

17

contemplated material changes to the Orly Genger 1993 Trust including, without limitation, the resignation of its trustee and/or the appointment of a replacement trustee, it shall provide written notice thereof to the Trump Group.

9. **Confidentiality.** The Parties and their counsel shall not disclose the terms of this Agreement, except if, upon written advice of counsel, it is required to do so by law. Notwithstanding the foregoing, disclosure may be made by the Parties: (i) to their respective accountants, financial advisors or attorneys (collectively, "Advisors") as required to obtain tax or legal advice, it being agreed that each Party shall apprise its Advisors of the obligation to maintain such confidentiality and that each Party shall be accountable for any breach of this provision by its respective Advisors, and (ii) notwithstanding anything to the contrary in this Agreement, the Parties may disclose the terms of this Agreement if necessary in any action to enforce this Agreement or as may be required to respond to a valid subpoena, court order or other legal process. Each Party agrees that he, she or it will promptly give notice of any attempt to compel disclosure of the terms of this Agreement to each of the other Parties, at least five (5) days before compliance is required.

10.     **Third Party Beneficiaries.** This Agreement shall have no third party beneficiaries except for those persons and entities that are not Parties hereto but are covered by the releases set forth in Paragraph 6 above, who may enforce those releases.

11.     **Binding Effect**

This Agreement shall be binding upon and inure to the benefit of each of the Parties hereto and (where applicable) their respective current and former agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and

18

affiliates, and each of their respective predecessors, successors, heirs, executors, administrators and assigns.

12.    **Representations and Warranties.**

(a)    Each Party represents that it, he or she is authorized to enter into this Agreement and to grant the rights granted by it, him or her in this Agreement. Each Party further represents that, to the extent any non-party consents are required for the performance of any of its, his or her obligations under this Agreement (including, without limitation, with any entity controlled by any Party, including any of its partners or equity holders), it, he or she has obtained such consents.

(b)    Each Party has the benefit of the advice of counsel chosen and employed by it, him or her concerning this Agreement.

(c)    Each Party is the sole owner and holder of the Claims it is releasing under this Agreement, and represents that none of the Claims released herein have been assigned, pledged, encumbered, or otherwise transferred in whole or in part, to any other person or entity.

(d)    Each member of the AG Group represents that he, she or it is knowledgeable, sophisticated and experienced in business, financial and other matters relevant to his, her or its entry into this Agreement and the transactions contemplated hereby, and has engaged advisors, experienced in the matters contemplated by this Agreement. Each member of the AG Group has undertaken such investigation and has been provided with and has evaluated such documents and information as he, she or it has deemed necessary to enable him, her or it to make an informed decision with respect to the execution, delivery and performance of this Agreement and the transactions contemplated hereby. Each member of the AG Group is

19

consummating the transactions contemplated hereby without reliance upon any express or

implied representations or warranties of any nature, whether in writing, orally or otherwise, made

by or on behalf of or imputed to any of the Trump Group Released Parties, except as expressly

set forth in this Agreement, and no member of the AG Group shall make any Claim with respect

thereto. Each member of the AG Group acknowledges that he, she or it is taking full

responsibility for making his, her or its own evaluation of the adequacy and accuracy of all

documents or information that may have been furnished to him, her or it, and that no member of

the AG Group shall have any Claim against any of the Trump Group Released Parties with

respect thereto, including for Claims relating to the accuracy or completeness of the information

that may have been furnished to him her or it. Each member of the AG Group acknowledges and

understands that each member of the Trump Group Released Parties expressly disclaims any and

all liability that may be based on any of the documents and information that may have been

furnished to any member of the AG Group and all liability based on such documents or

information or errors therein or omissions therefrom. Accordingly, each member of the AG

Group acknowledges that none of the Trump Group Released Parties has made any

representation or warranty with respect to (i) any historical information, financial or otherwise,

including without limitation results of operations (or any component thereof), cash flows, or

financial condition (or any component thereof), of Trans-Resources and/or any of its subsidiaries,

(ii) any valuations or projections or estimates of future revenues, future results of operations (or

any component thereof), future cash flows or future financial condition (or any component

thereof) of Trans-Resources and/or any of its subsidiaries or the future business and operations of

Trans-Resources and/or any of its subsidiaries, (iii) any Claims any member of the AG Group

20

may have against any of the Trump Group Released Parties or (iv) any other information or

documents that may have been made available to any member of the AG Group or their

respective counsel, accountants or advisors with respect to any of the Trump Group Released

Parties any of their respective businesses, assets, liabilities or operations, except as expressly set

forth in this Agreement. In addition to the foregoing, each member of the AG Group

acknowledges that his, her or its entry into this Agreement and the transactions contemplated

hereby is based solely on his, her or its respective assessment and valuation of all Claims that he,

she or it may have against any of the Trump Group Released Parties and the likelihood of

success of such Claims in a court of competent jurisdiction. Each member of the AG Group

acknowledges that the consideration to be received by the AG Group pursuant to this Agreement

constitutes full and fair consideration for the release of all Claims contemplated hereunder.

(e)      Each member of the Trump Group represents that he, she or it is knowledgeable,

sophisticated and experienced in business, financial and other matters relevant to his, her or its

entry into this Agreement and the transactions contemplated hereby, and has engaged advisors,

experienced in the matters contemplated by this Agreement. Each member of the Trump Group

has undertaken such investigation and has been provided with and has evaluated such documents

and information as he, she or it has deemed necessary to enable him, her or it to make an

informed decision with respect to the execution, delivery and performance of this Agreement and

the transactions contemplated hereby. Each member of the Trump Group is consummating the

transactions contemplated hereby without reliance upon any express or implied representations

or warranties of any nature, whether in writing, orally or otherwise, made by or on behalf of or

imputed to any of the AG Group Released Parties, except as expressly set forth in this

Agreement, and no member of the Trump Group shall make any Claim with respect

thereto. Each member of the Trump Group acknowledges that he, she or it is taking full

responsibility for making his, her or its own evaluation of the adequacy and accuracy of all

information that may have been furnished to him, her or it, and that no member of the Trump

Group shall have any Claim against any of the AG Group Released Parties with respect thereto,

including for Claims relating to the accuracy or completeness of the information that may have

been furnished to him her or it. Each member of the Trump Group acknowledges and

understands that each member of the AG Group Released Parties expressly disclaims any and all

liability that may be based on any of the documents and information that may have been

furnished to any member of the Trump Group and all liability based on such documents or

information or errors therein or omissions therefrom. Accordingly, each member of the Trump

Group acknowledges that none of the AG Group Released Parties has made any representation or

warranty with respect to (i) any historical information, financial or otherwise, including without

limitation results of operations (or any component thereof), cash flows, or financial condition (or

any component thereof), of Trans-Resources and/or any of its subsidiaries, (ii) any valuations or

projections or estimates of future revenues, future results of operations (or any component

thereof), future cash flows or future financial condition (or any component thereof) of Trans-

Resources and/or any of its subsidiaries or the future business and operations of Trans-Resources

and/or any of its subsidiaries, (iii) any claims any member of the Trump Group may have against

any of the AG Group Released Parties or (iv) any other information or documents that may have

been made available to any member of the Trump Group or their respective counsel, accountants

or advisors with respect to any of the AG Group Released Parties any of their respective

22

businesses, assets, liabilities or operations, except as expressly set forth in this Agreement. In

addition to the foregoing, each member of the Trump Group acknowledges that his, her or its

entry into this Agreement and the transactions contemplated hereby is based solely on his, her or

its respective assessment and valuation of all Claims that he, she or it may have against any of

the AG Group Released Parties and the likelihood of success of such Claims in a court of

competent jurisdiction. Each member of the Trump Group acknowledges that the consideration

to be received by the Trump Group pursuant to this Agreement constitutes full and fair

consideration for the release of all claims contemplated hereunder.

13.    **Attorneys' Fees.** The Parties agree to be responsible for their own attorneys' fees and

costs incurred in connection with this Agreement and negotiations related to and preparation of

this Agreement and not to seek from each other reimbursement of any such costs, expenses or

attorneys' fees.

14.    **Governing Law.**

This Agreement, and all disputes arising under this Agreement or related thereto, shall be

governed by, construed and interpreted in accordance with the laws of the State of Delaware,

applicable to instruments made, delivered and performed entirely in such state, without regard to

the choice of law provisions thereof.

15.    **Arbitration.** UNLESS THIS AGREEMENT SPECIFICALLY PROVIDES FOR

ANOTHER TYPE OF DISPUTE RESOLUTION WITH RESPECT TO A PARTICULAR

KIND OF DISPUTE, ANY AND ALL CONTROVERSIES AND CLAIMS ARISING OUT OF

OR RELATING TO THIS AGREEMENT, OR THE BREACH, TERMINATION OR

VALIDITY THEREOF, SHALL BE EXCLUSIVELY SETTLED BY FINAL AND BINDING

23

ARBITRATION IN ACCORDANCE WITH THE PROCEDURES SET FORTH IN THIS
SECTION.

    (a)    The arbitration shall be conducted in accordance with the Commercial
Arbitration Rules of the American Arbitration Association ("AAA") then in effect (the "Rules"),
except as set forth herein.  Any member of the Trump Group on behalf of the Trump Group, on
the one hand, and any member of the AG Group on behalf of the AG Group, on the other hand,
may demand arbitration by giving the other written notice to such effect in accordance with the
Rules.

    (b)    The arbitration will be held before one neutral arbitrator.  Within thirty (30)
days after the other Party's receipt of the demand for arbitration, the Party seeking arbitration
will invite the other Party to join it in approaching the following list of individuals about serving
as arbitrator and will approach such individuals with such other Party (if its invitation is accepted)
or without such other Party (if its invitation is rejected or not responded to within five (5)
business days): The Honorable William B. Chandler III, David A. Jenkins, Esq., Stephen E.
Jenkins, Esq., Robert J. Katzenstein, Esq., and Andre G. Bouchard, Esq.  If only one such
individual is available and willing, he shall serve as the arbitrator.  If more than one such
individual is available and willing, the Parties will mutually determine which of those so
available and willing will serve as the arbitrator.  If the Parties are unable to agree, the arbitrator
will be selected by the AAA from the foregoing list in accordance with the listing, striking and
ranking procedure in the Rules, with each Party being given a limited number of strikes, except
for cause.  If none of the foregoing individuals is available, the arbitrator will be selected by the
AAA in accordance with the listing, striking and ranking procedure in the Rules, with each Party

being given a limited number of strikes, except for cause. Any arbitrator appointed by the AAA shall be a retired judge that presided over a state or federal court located in Delaware or a practicing attorney licensed in Delaware with no less than fifteen years of experience with large commercial cases. Any such arbitration proceedings shall be and remain confidential. The place of arbitration shall be in Manhattan, New York or elsewhere if otherwise agreed to.

(c)     Discovery will be limited to the request for and production of documents, directly related to the issues in dispute, limited depositions of limited duration, and interrogatories. Interrogatories will be allowed only as follows: a Party may request the other Party to identify by name, last known address and telephone number (i) all persons having knowledge of facts relevant to the dispute and a brief description of that person's knowledge, and (ii) any experts who may be called as an expert witness, the subject matter about which the expert is expected to testify, the mental impressions and opinions held by the expert and the facts known by the expert. All issues concerning discovery upon which the parties cannot agree will be submitted to the arbitrator for determination.

(d)     Each of the Parties agrees that it will use commercially reasonable efforts to join (and will allow the other party to join) any third party that the Parties have agreed is indispensable to the arbitration. If any such third party does not agree to be joined, the arbitration will proceed nonetheless.

(e)     The arbitrators are not empowered to award damages not permitted by the terms of this Agreement and if so permitted, then not in excess of compensatory damages, except with respect to indemnification obligations for punitive damages as provided hereunder, and

25

each Party irrevocably waives the right to recover punitive, exemplary or multiple damages with respect to any dispute other than with respect to indemnification obligations for such punitive damages as provided hereunder. The decision of, and award rendered by, the arbitrator will be final and binding on the Parties, will be in writing and will include the findings of fact and conclusions of law upon which it is based, if any.

(f)     The Parties specifically acknowledge that this Agreement evidences a transaction involving, affecting, affected by, and a part of, interstate commerce and that this agreement to arbitrate is governed by and enforceable under the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq.

(g)     Except to the extent that any of the indemnification provisions contained herein shall be applicable (i) the Parties shall each be responsible for their own costs and expenses (including legal fees and disbursements) incurred in any arbitration, and (ii) the AG Group on the one hand and the Trump Group on the other shall each be responsible for 50% of the fees and disbursements of the arbitrator and of any costs and expenses payable to the AAA.

(h)     With respect to the enforcement, modification or vacating of any arbitration award (it being reconfirmed hereby that the arbitration award shall itself be final and binding on the Parties), the Parties submit to the exclusive jurisdiction of one or the other of (i) the United Stated District Court of the Southern District of New York sitting in the Borough of Manhattan in the City of New York and (ii) the Commercial Division of the New York State Supreme Court sitting in the Borough of Manhattan in the City of New York.

16.     **Notice.** If any Party is required to give notice to any other Party under this Agreement, such notice shall be in writing and shall be deemed to have been duly given upon receipt of hand delivery, one business day following its being sent to the recipient via Federal Express or another

26

nationally recognized over-night courier, or by e-mail with confirmation of receipt to the

following individuals or to such other address or person as such Parties may from time to time

specify by written notice given in the manner provided above:

**If to the Trump Group:**

Mark S. Hirsch, Esq.

The Trump Group

41 Madison Avenue, Suite 4101

New York, NY 10010

Phone: (212) 838-1000

E-mail: mhirsch@trumpgroup.com

**With Copy to:**

Thomas J. Allingham II, Esq.

Anthony W. Clark, Esq.

Douglas D. Herrmann, Esq.

Skadden, Arps, Slate, Meagher & Flom LLP

One Rodney Square

P.O. Box 636

Wilmington, DE 19899

Phone: (302) 651-3000

E-mail: thomas.allingham@skadden.com

27

E-mail: anthony.clark@skadden.com

E-mail: douglas.herrmann@skadden.com

**If to Arie Genger:**

Arie Genger

104 West 40th Street, 19th Floor

New York, NY 10018

E-mail: wachtel@wmllp.com

**With Copy to:**

Stephen P. Lamb, Esq.

Paul Weiss

500 Delaware Avenue, Suite 200

Wilmington, DE 19889

**If to Orly Genger:**

Orly Genger

104 West 40th Street, 19th Floor

New York, NY 10018

E-mail: wachtel@wmllp.com

**With Copy to:**

28

William Wachtel

Wachtel Masyr & Missry LLP

885 second ave.

New York, NY 10017

[]

**If to Arnold Broser or David Broser:**

David Broser

104 West 40th, 19th FloorNew York, NY 10018

E-mail:  wachtel@wmll.com

**With Copy to:**

William Wachtel

Wachtel Masyr & Missry LLP

885 second ave.
New York, NY 10017

29

17.    **Entire Agreement.**  This Agreement contains the entire agreement between the Parties concerning the subject matter hereof. Neither this Agreement nor any of its terms or provisions shall be binding on any Party until all the Parties hereto have signed. The Parties agree that all drafts of this Agreement are strictly confidential and shall supplement and complement any protection, which may attach to the exchange of confidential information in settlement discussions, whether by common law or statute including, but not limited to, Federal Rule of Evidence 408 and comparable state laws. Any and all prior discussions and agreements between the Parties concerning the subject matter of this Agreement are merged into this Agreement when signed. This Agreement may not be modified or amended, nor any of its provisions waived, except by an instrument in writing signed by all Parties. No Party has made any warranty or representation to the other Parties that is not set forth expressly herein. In entering into this Agreement, no Party has relied on any statement or representation made by or on behalf of any other Party, by or on behalf of any affiliate of such other Party, or by counsel for such other Party that is not set forth expressly in this Agreement.

18.    **No Drafting Presumption.**  This Agreement shall be interpreted or construed without any presumption that the provisions hereof should be strictly construed against the drafter, it being agreed that the Parties and their respective counsel and other agents have fully and equally participated in the preparation, negotiation, review and approval of all provisions of this Agreement.

19.    **No Admissions.**  The Parties have executed this Agreement for the sole purpose of settling and disposing of all Claims between them, and it is expressly understood and agreed that no Party hereto admits any wrongdoing on its, his or her part by executing this Agreement.

30

20.     **Binding Effect.** It is the intention of the parties to extinguish all AG Group Released Claims and all Trump Group Released Claims and, consistent with such intention, each of the Parties hereby waives any and all rights, to the extent permitted by law, to assert that the Release provided by it in Paragraph 6 hereunder is unenforceable as to any claim whatsoever and for any reason including, without limitation, any and all rights under section 1542 of the California Civil Code, if applicable, or any other applicable similar law or principle of common law, which may have the effect of limiting the Releases herein. Section 1542 of the California Civil Code provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

21.     **Headings.** The section headings contained in this Agreement are for reference purposes only and shall not in any way effect or control the meaning or interpretation of this Agreement.

22.     **Execution in Counterparts and by PDF e-mail.** This Agreement may be executed in multiple counterparts and by fax or PDF e-mail, each of which, when so executed and delivered, shall be an original, but such counterparts shall together constitute one and the same instrument and agreement.

23.     **Effective Date.** This Agreement shall be effective immediately upon execution and delivery by all Parties hereto (the "Effective Date").

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed as follows:

**TR Investors, LLC**

By: _____

Print: _____

Title: _____

Date: _____

**Arie Genger**

Date: 6/15/13

**Glenclova Investment Co.**

By: _____

Print: _____

Title: _____

Date: _____

**Orly Genger (in her individual capacity and in her capacity as beneficiary of the Orly Genger 1993 Trust)**

Date: 6/15/13

32

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly

executed as follows:

**TR Investors, LLC**                          **Arie Genger**

By: _____          _____

Print: MARK J. HIRSCH                    Date: _____

Title: Executive VP/General Counsel

Date: June 16, 2013

**Glenclova Investment Co.**                **Orly Genger (in her individual capacity and**

**in her capacity as beneficiary of the**

By: _____          **Orly Genger 1993 Trust)**

Print: MARK S. HIRICH

Title: Executive VP/General Counsel        _____

Date: June 16, 2013                       Date: _____

32

**New TR Equity I, LLC**

By: _____

Print: _____

Title: _____

Date: _____

**Arnold Broser**

Date: ___ 6/11/13 ___

**New TR Equity II, LLC**

By: _____

Print: _____

Title: _____

Date: _____

**David Broser**

Date: ___ 6/16/13 ___

33

**New TR Equity I, LLC**                    **Arnold Broser**

By: _Mark S. Hirsch_____    _____

Print: _MARK S. HIRSCH_____    Date: _____

Title: _Executive VP/General Counsel_

Date: _June 16, 2013_____


**New TR Equity II, LLC**                   **David Broser**

By: _Mark S. Hirsch_____    _____

Print: _MARK S. HIRSCH_____    Date: _____

Title: _Executive VP/General Counsel_

Date: _June 16, 2013_____

33

**Trans-Resources, LLC**

By: _Mark S. Hirsch_

Print: _MARK S. HIRSCH_

Title: _Executive VP/General Counsel_

Date: _June 16, 2013_

34

**Jules Trump**

Date: ___6 / 16 / 2013___

**Eddie Trump**

_____

Date: _____

**Mark Hirsch**

_____

Date: _____

**Jules Trump**

_____

Date: _____

**Eddie Trump**

_____

Date: June 16, 2013

**Mark Hirsch**

_____

Date: _____

35

**Jules Trump**

_____

Date: _____

**Eddie Trump**

_____

Date: _____

**Mark Hirsch**

_____

Date: June 16, 2013

EXHIBIT A

*6/16/13*
*Draft - Confidential*

## [FORM OF SUBORDINATED NOTE]

**THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE SOLD OR TRANSFERRED WITHOUT COMPLIANCE WITH THE REGISTRATION OR QUALIFICATION PROVISIONS OF APPLICABLE FEDERAL AND STATE SECURITIES LAWS OR APPLICABLE EXEMPTIONS THEREFROM.**

### TRANS-RESOURCES

### <u>SUBORDINATED NOTE</u>

$7,500,000.00                                          June __, 2013

**FOR VALUE RECEIVED**, Trans-Resources, LLC a Delaware entity (the successor to Trans-Resources, Inc. and referred to herein as the "<u>Maker</u>"), hereby promises to pay to the order of [_____] (the "<u>Payee</u>"), the principal sum of Seven Million, Five-Hundred Thousand Dollars ($7,500,000.00) pursuant to the terms and conditions of and at the times provided in the Settlement Agreement (as defined below).

1.    <u>Notes</u>. This Subordinated Note (this "<u>Note</u>") is issued pursuant to, and is subject to the terms and conditions of, the Settlement Agreement and Release, dated as of June __, 2013 by and among the AG Group and the Trump Group, as amended, restated, supplemented or otherwise modified from time to time (the "<u>Settlement Agreement</u>"). Terms used herein and not otherwise defined herein shall have the respective meanings ascribed thereto in the Settlement Agreement.

2.    <u>No Interest</u>. This Note will not accrue interest, pursuant to the terms of the Settlement Agreement.

3.    <u>Maturity</u>. Subject to the terms and conditions of the Settlement Agreement and this Paragraph 3, this Note shall mature and be redeemed or satisfied in full by the Maker in one installment, which shall be paid by the Maker no later than the ___ anniversary of the Effective Date (the "<u>Maturity Date</u>"). Notwithstanding the foregoing, the Maturity Date shall automatically be extended until the earlier (the "<u>Extended Maturity Date</u>") of (i) such time as all pending claims, cross-claims and counter-claims brought by any of TPR, Sagi Genger, the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust (other than the Orly Trust Action), D&K Limited Partnership, D&K GP LLC, Rochelle Fang, and/or David Parnes (collectively, the "<u>Sagi Group</u>") against any member of the Trump Group have been dismissed with prejudice and the statute of limitations shall have run with respect to any other potential claims of the Sagi Group that might be the subject of the indemnification obligations provided for by Paragraph 5 of the Settlement Agreement and (ii) such time as each member of the Sagi Group shall have provided the Trump Group with a release of the Trump Group Released Parties and covenant not to sue in form and substance that is the same as the AG Group Release and covenant not to sue contained in Paragraph 6(a) of the Settlement Agreement. Subject to the foregoing, this Note shall become immediately due and payable upon the occurrence of any transaction or series of transactions which shall result in the Trump Group owning or controlling neither (i) a majority of the voting stock of Trans-Resources or its successors or each of its two principal subsidiaries, Haifa

Chemicals, Ltd. and Na-Churs Plant Food Company or their successors, nor (ii) directly or indirectly, a majority of the assets currently owned by Trans-Resources and its subsidiaries; provided, however, that in such event, at the request of the Trump Group, the amounts then payable on this Note shall be placed in escrow until the Maturity Date or until the Extended Maturity Date (if applicable) under the provisions of an escrow agreement on reasonable terms to be negotiated at such time in good faith between the Maker, the Payee and an escrow agent selected by mutual consent of the Maker and the Payee (such consent, not to be unreasonably withheld, conditioned or delayed), which shall provide for the release of funds from such escrow to the Maker in satisfaction of any and all Indemnification Amounts, AG Group Release Amounts and Discovery Costs owing to Maker, if any, and payment to the Payee of any amounts remaining in escrow after payment to Maker of all Indemnification Amounts, AG Group Release Amounts and Discovery Costs, if any, upon the Maturity Date hereunder or the Extended Maturity Date (if applicable).

4.    Optional Prepayments.  The Maker may voluntarily prepay this Note prior to the Maturity Date, in whole or in part, at any time, without premium or penalty.

5.    Adjustment.  In accordance with the terms of the Settlement Agreement, in the event that at any time Indemnification Amounts, Discovery Costs, AG Group Release Amounts, or other amounts due and payable by the AG Group to the Trump Group pursuant to the Settlement Agreement (the "Costs") have not been paid to the Trump Group in accordance with the terms of the Settlement Agreement, the Maker may, upon written notice to the Payee, set off and apply as a credit against the amount due under this Note any and all due, unpaid and outstanding Costs.  The rights and remedies described herein are in addition to any other rights and remedies the Parties may have under the Settlement Agreement or other applicable law.

6.    Subordination.  Pursuant to the terms of the Settlement Agreement, this Note is unsecured and shall be fully subordinated to any obligation of Trans-Resources, including, but not limited to, outstanding credit facilities, bonds, loans, tax obligations and payables.

7.    Enforcement.  The Maker hereby agrees to pay on demand all reasonable costs and expenses, including without limitation attorneys' fees and costs of collection, incurred or paid by the Payee in enforcing this Note in accordance with the Settlement Agreement.

8.    Amendments.  No failure or delay on the part of the Maker or the Payee in exercising any right, power, privilege or remedy shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power, privilege or remedy preclude any other or further exercise thereof or the exercise of any other right, power, privilege or remedy.  This Note may not be amended and the provisions hereof may not be waived, except in accordance with the terms of the Settlement Agreement.

9.    Lost Notes, etc.  If this Note is mutilated, destroyed, lost or stolen, upon receipt of evidence satisfactory to the Maker of such loss, theft, destruction or mutilation of this Note and, if requested in the case of any such loss, theft or destruction, upon delivery of an indemnity agreement reasonably satisfactory to the Maker, or, in the case of any such mutilation, upon surrender and cancellation of this Note, the Maker shall issue a new Note of like tenor and amount, in lieu of this Note.

- 2 -

10.   <u>ASSIGNMENT</u>.  THIS NOTE, INCLUDING THE RESPECTIVE RIGHTS AND OBLIGATIONS OF THE MAKER AND THE PAYEE PURSUANT THIS NOTE, MAY NOT BE ASSIGNED, TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF BY EITHER THE MAKER OR THE PAYEE WITHOUT THE PRIOR WRITTEN CONSENT OF THE OTHER WHICH CONSENT MAY BE WITHHELD IN SUCH PARTY'S SOLE DISCRETION.

11.   <u>Binding Effect</u>.  The provisions of this Note shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns permitted hereby.

*[signature page follows]*

Error! Unknown document property name.

**IN WITNESS WHEREOF**, the Maker has caused this Subordinated Note to be duly executed under seal on the date set forth above by a duly authorized representative of the Maker.

TRANS-RESOURCES, LLC

By:_____
     Name:
     Title:

4

# EXHIBIT H

| | |
|---|---|
| **From:** | Michael P. Bowen |
| **Sent:** | Tuesday, April 17, 2018 11:22 PM |
| **To:** | 'Judith Bachman' |
| **Cc:** | Boyle, John; Dellaportas, John; Andrew R. Kurland; Mark Freyberg; flashlf@aol.com; Mitchell D. Goldberg; Herrmann, Douglas D.; Eric D. Herschmann |
| **Subject:** | RE: [Ext] Re: Surrogate's Court matters |

Judith – I received in the mail today a copy of your amended petition.  As I previously told you, we are not authorized to accept service on behalf of Orly Genger.  As you undoubtedly must know, this mailing is not proper service.


Michael P. Bowen
Kasowitz Benson Torres LLP
1633 Broadway
New York, New York 10019
Tel.  (212) 506-1903
Fax. (212) 500-3403
MBowen@kasowitz.com

**SURROGATE'S COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

In the Matter of the Petition of Dalia Genger, as Trustee
of the Orly Genger 1993 Trust, Created by Trust Agreement
Dated December 13, 1993 between ARIE GENGER, as
Grantor, and LAWRENCE M. SMALL and SASH A.
SPENCER, as Trustees, to Turnover Property to the Orly
Genger 1993 Trust.

FILE NO.    2008-0017/E

Hon. Nora S. Anderson

---

In the Matter of DALIA GENGER, trustee of the ORLY
GENGER 1993 TRUST,

      Petitioner,

      - against -

ORLY GENGER, ARIE GENGER, GLENCLOVA
INVESTMENT COMPANY, TR INVESTORS, LLC, NEW
TR EQUITY I, LLC, NEW TR EQUITY II, LLC, TRANS-
RESOURCES, INC., ARNOLD BROSER, DAVID
BROSER, JOHN DOES 1-20, and JANE DOES 1-20,

      Respondents.

**NOTICE OF MOTION**

---

      PLEASE TAKE NOTICE THAT upon the Memorandum of Law in Support of

the TR Entities' Motion to Dismiss the Amended Petition for Turnover of Trust Property and

Other Relief, the Affirmation of John Boyle in Support dated May 7, 2018 and all exhibits

attached thereto, the Affirmation of Mark S. Hirsch in Support dated May 7, 2018, and all prior

pleadings and proceedings heretofore, respondents Glenclova Investment Company, TR

Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC, and Trans-Resources, LLC

(collectively the "TR Entities") will move this court, sitting at 31 Chambers Street, New York,

New York 10007, on June 1, 2018, at 10:00 a.m., or as soon thereafter as counsel can be heard,

for an Order pursuant to CPLR 213, CPLR 214, CPLR 311, CPLR 311-a, CPLR 1001, CPLR

1003, CPLR 3016(b), CPLR 3211(a) (1), (3), (4), (5), (7), (8) and (10), and SCPA 203, SCPA

301, SCPA 306, SCPA 307, and SCPA 308 dismissing the Amended Petition as against the TR

Entities.

PLEASE TAKE NOTICE that pursuant to CPLR 2214(b), answering papers, if

any, and cross-motion, if any, must be served upon the undersigned at least seven (7) days before

the return date of this motion.

Dated: May 7, 2018
New York, NY

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

John Boyle
Four Times Square
New York, New York  10036
(212) 735-3000
john.boyle@skadden.com

*Attorneys for Respondents Glenclova
Investment Co., TR Investors, LLC, New TR
Equity I, LLC, New TR Equity II, LLC, and
Trans-Resources, LLC*

To:

JUDITH LISA BACHMAN, ESQ.
254 S. Main Street, Suite 306
New City, New York 10956
(845) 639-3210

*Attorney for Petitioner Dalia Genger*

KASOWITZ BENSON TORRES LLP
Michael Paul Bowen
1633 Broadway
New York, New York 10019
(212) 506-1700

*Attorneys for Respondent Orly Genger*

2

KELLEY DRYE & WARREN LLP
John Dellaportas
101 Park Avenue
New York, NY 10178
(212) 808-5000

*Attorneys for Sagi Genger, as Trustee of*
*the Sagi Genger 1993 Trust*

Mitchell D. Goldberg, Esq.
THE FREYBERG LAW GROUP
950 Third Avenue
32nd Floor
New York, NY 10022
(212) 983-1221

*Attorney for Respondents David Broser*
*and Arnold Broser*

Leon Friedman
685 Third Ave, 25th floor
New York, N.Y. 10017
(646) 825-4398

*Attorney for Respondent Arie Genger*

3

**SURROGATE'S COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

In the Matter of the Petition of Dalia Genger, as Trustee
of the Orly Genger 1993 Trust, Created by Trust Agreement
Dated December 13, 1993 between ARIE GENGER, as
Grantor, and LAWRENCE M. SMALL and SASH A.
SPENCER, as Trustees, to Turnover Property to the Orly
Genger 1993 Trust.

FILE NO.    2008-0017/E

Hon. Nora S. Anderson

---

In the Matter of DALIA GENGER, trustee of the ORLY
GENGER 1993 TRUST,

      Petitioner,

      - against -

ORLY GENGER, ARIE GENGER, GLENCLOVA
INVESTMENT COMPANY, TR INVESTORS, LLC, NEW
TR EQUITY I, LLC, NEW TR EQUITY II, LLC, TRANS-
RESOURCES, INC., ARNOLD BROSER, DAVID
BROSER, JOHN DOES 1-20, and JANE DOES 1-20,

      Respondents.

---

**MEMORANDUM OF LAW IN SUPPORT OF THE TR ENTITIES' MOTION TO DISMISS
THE AMENDED PETITION FOR TURNOVER OF TRUST PROPERTY AND OTHER
RELIEF FILED ON APRIL 13, 2018 BY DALIA GENGER AS TRUSTEE OF THE ORLY
GENGER 1993 TRUST**

                SKADDEN, ARPS, SLATE,
                  MEAGHER & FLOM LLP

                John Boyle
                Four Times Square
                New York, New York  10036-6522
                (212) 735-3000

                *Attorneys for Glenclova Investment Co.,*
                *TR Investors, LLC, New TR Equity I, LLC, New*
                *TR Equity II, LLC, and Trans-Resources, LLC*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ...................................................................................... 1

RELEVANT FACTUAL BACKGROUND ...................................................................... 4

ARGUMENT .................................................................................................................. 9

I.     STANDARD OF REVIEW ................................................................... 9

II.    THE COURT LACKS JURISDICTION OVER THE TR ENTITIES
       BECAUSE DALIA FAILED TO PROPERLY SERVE THEM .......................... 10

       A.     Neither the Original Petition Nor the Amended Petition Were
              Served as Required Under the CPLR and SCPA ......................................... 10

       B.     Dismissal Is Also Required Because Dalia Failed to Properly Join
              or Obtain Jurisdiction Over Trans-Resources, LLC ................................... 14

III.   DISMISSAL OF THE AMENDED PETITION IS REQUIRED AND
       THE TURNOVER CLAIM AGAINST THE TR ENTITIES IS NOW
       TIME-BARRED BECAUSE PROCESS WAS NOT SERVED WITHIN
       THE TIME PERIOD REQUIRED BY THE SCPA ............................................. 15

IV.    DALIA'S TURNOVER CAUSE OF ACTION CANNOT STAND ..................... 17

V.     DALIA'S "INJUNCTION" CLAIM IS NOT AN APPROPRIATE CAUSE
       OF ACTION .......................................................................................................... 18

VI.    RES JUDICATA AND COLLATERAL ESTOPPEL BAR DALIA'S
       CLAIMS ................................................................................................................ 20

VII.   SHOULD THE COURT NOT DISMISS THE AMENDED PETITION
       FOR ANY OF THE ABOVE REASONS IT SHOULD BE STAYED OR
       DISMISSED .......................................................................................................... 24

CONCLUSION .............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Basile v. Wiggs,*
98 A.D.3d 640, 950 N.Y.S.2d 148 (2d Dep't 2012)............................................9

*Biondi v. Beekman Hill House Apartment Corp.,*
257 A.D.2d 76, 692 N.Y.S.2d 304 (1st Dep't 1999), *aff'd*, 94 N.Y.2d 659 (2000) ...........9

*Bronxville Knolls, Inc. v. Webster Town Center,*
221 A.D.2d 248, 634 N.Y.S.2d 62 (1st Dep't 1995)............................................10

*Ciafone v. Queens Center for Rehabilitation & Residential Healthcare,*
126 A.D.3d 662, 5 N.Y.S.3d 462 (2d Dep't 2015)............................................12

*D'Amour v. Ohrenstein & Brown, LLP,*
17 Misc. 3d 1130(A), 2007 N.Y. Slip Op. 52207(U) (Sup. Ct. N.Y. Cty. Aug. 13,
2007) ........................................................................................19

*Dewey v. Hillcrest General Hospital,*
201 A.D.2d 609, 607 N.Y.S.2d 967 (2d Dep't 1994)...................................12, 13

*Estate of Jervis v. Teachers Insurance & Annuity Ass'n,*
279 A.D.2d 367, 720 N.Y.S.2d 21 (1st Dep't 2001)............................................17

*Faberge International Inc. v. Di Pino,*
109 A.D.2d 235, 491 N.Y.S.2d 345 (1st Dep't 1985)............................................20

*Fifty CPW Tenants Corp. v. Epstein,*
16 A.D.3d 292, 792 N.Y.S.2d 58 (1st Dep't 2005) ............................................20

*Genger v. Genger,*
144 A.D.3d 581, 2016 N.Y. Slip Op. 07987, 41 N.Y.S.3d 414 (1st Dep't 2016)..........9, 23

*Genger v. Genger,*
38 Misc. 3d 1213(A), 2013 WL 221485 (Sup. Ct. N.Y. County Jan. 3, 2013), *aff'd
as modified*, 121 A.D.3d 270, 990 N.Y.S.2d 498 (1st Dep't 2014)....................................5

*Genger v. Genger,*
76 F. Supp. 3d 488 (S.D.N.Y. 2015), *aff'd*, 663 F. App'x 44 (2d Cir. 2016)......................3

*Genger v. Genger,*
No. 651089/2010, 2015 N.Y. Slip Op. 30008(U) (Sup. Ct. N.Y. County Jan. 7,
2015) (Trial Order), *aff'd*, 135 A.D.3d 454, 22 N.Y.S.3d 433 (1st Dep't 2016)................4

ii

*Genger v. TR Investors, LLC*,
   C.A. No. 6906-CS (Del. Ch. Ct.) .......................................................................................7

*Greenway Medical Supply Corp. v. American Transit Insurance Co.*,
   58 Misc. 3d 147(A) (N.Y. App. Term. 2018) ...................................................................21

*Gropper v. 200 Fifth Owner LLC*,
   151 A.D.3d 635, 58 N.Y.S.2d 42 (1st Dep't 2017) ....................................................20, 23

*Held v. Macy's Inc.*,
   25 Misc. 3d 1219(A), 2009 N.Y. Slip Op. 52189(U) (Sup. Ct. Westchester Cty.
   Oct. 19, 2009) ............................................................................................................18, 19

*In re Estate of Hunter*,
   4 N.Y.3d 260, 794 N.Y.S.2d 286 (2005) ..................................................................20, 23

*In re Genger*,
   No. 2008-0017, 2014 WL 5364557 (Surr. Ct. N.Y. Cty. July 24, 2014)....................13, 14

*In re Perelman*,
   123 A.D.2d 436, 999 N.Y.S.2d 2 (1st Dep't 2014)..........................................................16

*In re Thomas*,
   28 Misc. 3d 300, 901 N.Y.S.2d 493 (Surr. Ct. Broome Cty. 2010)..................................15

*Insurance Co. of State of Pennsylvania v. HSBC Bank USA*,
   10 N.Y.3d 32, 852 N.Y.S.2d 812 (2008) .........................................................................21

*Kaleidakolor, Inc. v. Edward N. Hoffman Advert. Corp.*,
   No. 25577/91, 1995 WL 17961040 (Sup. Ct. N.Y. Cty. May 8, 1995)............................13

*Landau, P.C. v. LaRossa, Mitchell & Ross*,
   11 N.Y.3d 8, 862 N.Y.S.2d 316 (2008) ...........................................................................20

*McDonald v. Ames Supply Co.*,
   22 N.Y.2d 111, 291 N.Y.S.2d 328 (1968) ........................................................................13

*New Greenwich Litigation Tr., LLC v. Citco Fund Services (Europe) B.V.*,
   145 A.D.3d 16, 41 N.Y.S.3d 1 (1st Dep't 2016)..........................................................10, 17

*O'Brien v. City of Syracuse*,
   54 N.Y.2d 353, 445 N.Y.S.2d 687 (1981) ........................................................................20

*Poindexter v. EMI Record Group Inc.*,
   No. 11 Civ. 559, 2012 WL 1027639 (S.D.N.Y. Mar. 27, 2012) ......................................10

*Ross v. Lan Chile Airlines*,
   14 A.D.3d 602, 789 N.Y.S.2d 77 (2d Dep't 2005)............................................................12

*Schuykill Fuel Corp. v. B. & C. Nieberg Realty Corp.,*
   250 N.Y. 304 (1929) .................................................................................................21

*SportsChannel American Assocs. v. National Hockey League,*
   186 A.D.2d 417, 589 N.Y.S.2d 2 (1st Dep't 1992) ...............................................20

*Stuyvesant Fuel Service Corp. v. 99-105 3rd Ave. Realty LLC,*
   192 Misc. 2d 104, 745 N.Y.S.2d 680 (N.Y. Civ. Ct. 2002) .................................12

*Syncora Guarantee Inc. v. J.P. Morgan Securities LLC,*
   110 A.D.3d 87, 970 N.Y.S.2d 526 (1st Dep't 2013) .............................................24

*TR Investors, LLC v. Genger,*
   No. 3994-VCS, 2010 WL 2901704 (Del. Ch. July 23, 2010), *aff'd*, 26 A.3d 180
   (Del. 2011) ...............................................................................................................3

*Waterscape Resort, L.L.C. v. 70 W. 45th St. Holding LLC,*
   No. 652124/2014, 2015 WL 4400219 (Sup. Ct. N.Y. Cty. July 17, 2015) .........19

*Whitney v. Whitney,*
   57 N.Y.2d 731, 454 N.Y.S.2d 977 (1982) ...........................................................24

*Zanett Lombardier, Ltd. v. Maslow,*
   29 A.D.3d 495, 815 N.Y.S.2d 547 (1st Dep't 2006) .............................................9

*Zodkevitch v. Feibush,*
   49 A.D.3d 424, 854 N.Y.S.2d 373 (1st Dep't 2008) ...........................................19

## STATUTES AND RULES

CPLR 213........................................................................................................10, 16

CPLR 214.............................................................................................................10

CPLR 311..........................................................................................................2, 11

CPLR 311-a ..................................................................................................2, 11, 12

CPLR 320(c) .....................................................................................................1, 11

CPLR 1001(a) .......................................................................................................15

CPLR 1003........................................................................................................1, 15

CPLR 2201.............................................................................................................24

CPLR 3012.............................................................................................................14

CPLR 3211(a)(1) ....................................................................................................9

CPLR 3211(a)(4) ......................................................................................................................24

CPLR 3211(a)(5) ...............................................................................................................10, 20

CPLR 3211(a)(7) .......................................................................................................................9

CPLR 3211(a)(8) .................................................................................................................1, 11

CPLR 3211(a)(10) ...................................................................................................................15

CPLR 6301.................................................................................................................................19

SCPA 203..............................................................................................................................2, 10

SCPA 301....................................................................................................................................2

SCPA 307.........................................................................................................................2, 11, 14

SCPA 312...................................................................................................................................14

## OTHER AUTHORITIES

N.Y. C.P.L.R. 3012(a) cmt. C3012:6.........................................................................................13

N.Y. Surr. Ct. Proc. Act § 301 cmt. 2017 ................................................................................15

Respondents Glenclova Investment Co., TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC, and Trans-Resources LLC[1] (collectively the "TR Entities") respectfully submit this memorandum of law in support of their Motion to Dismiss the Amended Petition for Turnover of Trust Property and Other Relief filed on April 13, 2018, by Dalia Genger ("Dalia") as Trustee of the Orly Genger 1993 Trust (the "Amended Petition"), as against the TR Entities, pursuant to CPLR 213, CPLR 214, CPLR 311, CPLR 311-a, CPLR 1001, CPLR 1003, CPLR 3016(b), CPLR 3211(a)(1), (3), (4), (5), (7), (8) and (10), and SCPA 203, SCPA 301, SCPA 306, SCPA 307, SCPA 308, and SCPA 312.[2]

## PRELIMINARY STATEMENT

On April 13, 2018, without permission of the Court or any of the Respondents, Dalia filed her Amended Petition.[3] The passage of time has not enhanced Dalia's meritless allegations – quite to the contrary, her belated filing is as flawed as the original Petition[4] it purports to supplant. Although Dalia's Amended Petition retracts almost every substantive cause

---

[1]   As initially pointed out in the TR Entities' motion to dismiss the original Petition for turnover, there is no existing corporation known as Trans-Resources, Inc. It was converted into Trans-Resources, LLC in June 2013, and is a limited liability company created under the laws of Delaware, and has its principal offices in Florida. (*See* Affidavit of Mark S. Hirsch in Support of Motion to Dismiss the Amended Petition ¶ 5, cited herein as "Hirsch Aff."). The original citations issued in this proceeding did not identify Trans-Resources, LLC as a petitioner, no citation whatsoever has been served on Trans-Resources, LLC, and no supplemental citation identifying Trans-Resources, LLC has been issued or served. (Hirsch Aff. ¶¶ 5, 6, 8). As explained herein, Dalia's failure to properly join Trans-Resources, LLC – a necessary party to this proceeding – further justifies dismissal of the Amended Petition. *See* CPLR 1003.

[2]   Because the TR Entities are objecting to jurisdiction under CPLR 3211(a)(8), their limited appearance by way of this motion (and their motion to dismiss the original Petition) is not a waiver of service or a waiver of any challenge to jurisdiction, and is not a formal appearance for any purposes other than to object to jurisdiction. *See* CPLR 320(c).

[3]   A copy of the Amended Petition without exhibits is attached as Exhibit A to the Affirmation of John Boyle filed in Support of the TR Entities' Motion to Dismiss the Amended Petition submitted herewith. Copies of other documents relied upon in the Amended Petition and other documents that the Court may consider are similarly attached as exhibits to the Boyle Affirmation. The exhibits to the Boyle Affirmation are cited herein as "Boyle Aff., Ex. __."

[4]   Boyle Aff., Ex. M.

of action she previously alleged against the TR Entities in her original Petition, the Amended

Petition's new allegations are subject to dismissal for the same myriad reasons initially asserted

by the TR Entities in their motion to dismiss the original Petition plus some. *First*, the Court

lacks jurisdiction over the TR Entities because neither the original Petition nor the Amended

Petition has been properly served. *See* CPLR 311; CPLR 311-a; *see also* SCPA 203; SCPA 307.

*Second*, the three-year statute of limitations applicable to Dalia's only substantive claim against

the TR Entities (i.e., "turnover") has long-ago expired and has not been tolled because Dalia

failed to serve process on any of the TR Entities within 120 days after the filing of the original

Petition. *See* SCPA 301(a). *Third*, the Amended Petition fails to state a claim as to the

"turnover" and so-called "injunction" causes of action because, among other reasons, Dalia has

not (and cannot) sufficiently allege the necessary elements of these claims, Dalia has admitted

and the documentary evidence establishes that the TR Entities have not received and are not

holding any money from, or due, the Orly Genger 1993 Trust, and, as a matter of law, an

injunction is a remedy and not a cause of action. And *finally*, the claims in the Amended Petition

must be dismissed under principles of res judicata because, as admitted in the Amended Petition,

Dalia, as trustee of the Orly Genger 1993 Trust, stipulated to a dismissal with prejudice of all

claims against the TR Entities concerning ownership of any Trans-Resources shares, which had

also been finally resolved by the Settlement Agreement, and Dalia could have (and, if she ever

intended to, should have) asserted but failed to assert the claims that underlie her Amended

Petition in any one of several prior proceedings.

      Before turning to the allegations (and the insufficiency thereof) in the Amended

Petition, the sage reflections of New York Supreme Court Justice Cooper, who recently presided

over a Genger family dispute, are noteworthy. In that proceeding, Justice Cooper detailed what

2

has been called the "Genger family's litigation saga." Citing his own Westlaw search he

observed that:

> the Genger's lawsuits against each other have resulted in almost 40 reported
> decisions from the New York State Supreme Court and the Federal District Court
> for the Southern District of New York. Of the state court decisions, at least 10
> have been from the Appellate Division, First Department. There has also been
> extensive litigation in the Delaware state courts, as well as counties; unpublished
> decisions and orders from trial judges in the matrimonial and IAS parts of this
> court.

*Genger v. Genger*, No. 302436/2002, Decision and Order at 2 (Sup. Ct. N.Y. Cty. June 3, 2016)

(A copy of Justice Cooper's decision is attached as Ex. B to the Boyle Aff.). Justice Cooper

further noted that the "bitter and seemingly endless battle" pits the mother Dalia and the son Sagi

against the father Arie and the daughter Orly, and that the family has "employed a small army of

lawyers to fight over the pieces of the family pie and, it seems, to make each other's lives as

miserable as possible." (Boyle Aff., Ex. B at 3 (quoting *Genger v. Genger*, 76 F. Supp. 3d 488,

491 (S.D.N.Y. 2015), *aff'd*, 663 F. App'x 44 (2d Cir. 2016))). In this regard, Justice Cooper

rightly commented that the Genger cases seem to be more about "a dysfunctional family where

each member is intent on inflicting as much pain as possible on his or her ex-spouse, parent,

child or sibling," than about the merits of any claim. (Boyle Aff., Ex. B at 3-4).

            To the extent that the Genger family feud continues (as in this proceeding) to

improperly and without any merit haul innocent third parties, such as the TR Entities, into their

litigation blitz, this practice must come to an end. As Chief Justice Strine of the Delaware

Supreme Court (then-Vice-Chancellor of the Delaware Chancery Court) found: "the Genger

family's internecine feud . . . is not the [TR Entities'] problem . . . ." *TR Investors, LLC v.

Genger*, C.A. No. 3994-VCS, 2010 WL 2901704, at *18 (Del. Ch. July 23, 2010), *aff'd*, 26 A.3d

180 (Del. 2011). As described below, the claims asserted against the TR Entities in the

Amended Petition are without any merit and/or were settled or dismissed by the voluntary

3

actions of Dalia (as trustee of the Trust) and Orly (individually and in her capacity under the

Trust) many years ago.  As Justice Jaffe has noted, the "economic consequence" arising out of

the transfers of the Trans-Resources shares that underlie the claims alleged in this Amended

Petition are the result "of the bitter feud among the members of the Genger family, which should

not be borne by [the TR Entities] . . . ." *Genger v. Genger*, No. 651089/2010, 2015 N.Y. Slip

Op. 30008(U), at *12 (Sup. Ct. N.Y. Cty. Jan. 7, 2015) (Trial Order), *aff'd*, 135 A.D.3d 454, 22

N.Y.S.3d 433 (1st Dep't 2016).  Justice Jaffe further noted that the court should not extend any

equity to "needlessly prolong this litigation, especially where the [TR Entities] . . . [are]

essentially an outside bystander caught up in the contentious family feud." *Id.* at *14.  These

pointed admonitions should be heeded and, insofar as the Amended Petition attempts to again

drag the TR Entities back into the Genger family's courtroom combat, the Amended Petition

should be dismissed.

## **RELEVANT FACTUAL BACKGROUND**

This proceeding is purportedly brought on behalf of the Orly Genger 1993 Trust

(the "Trust") by Dalia Genger (Orly's mother) as trustee.  Dalia filed her original Petition on June

14, 2016.  She attempted to commence this proceeding despite that, at least since June 22, 2009,

Orly has sought in this Court to remove Dalia as trustee.  On June 21, 2017, this Court denied

Dalia's motion to dismiss Orly's petition to have her removed, noting that Orly's allegations

"raise significant issues about whether Dalia's efforts as trustee have been calculated to benefit

herself and others at the expense of the Orly Trust in violation of her fiduciary duty and whether

she poses an ongoing threat to the assets of the Orly Trust." *In re Orly Genger*, No. 2008-

0017/B, Decision at 12, dated June 21, 2017 (a copy is attached as Ex. C to the Boyle Aff.).

4

On February 6, 2018, the TR Entities and the other Respondents moved to dismiss the original Petition. Dalia opposed those motions and on February 27, 2018 the parties were before the Court in connection with the motions to dismiss, which were *sub judice* before the Court. Subsequently, on April 13, 2018, Dalia filed the Amended Petition, which, among other infirmities, continues to improperly name Trans-Resources, Inc. as a Respondent. Despite the fact that one of the grounds for the TR Entities' motion to dismiss the original Petition was the lack of personal jurisdiction because Dalia never properly served the required citations, Dalia did not endeavor to properly serve the Amended Petition or any citations or supplemental citations on any of the TR Entities. Rather, without any basis for doing so, Dalia merely mailed the Amended Petition (without any citations) to the TR Entities' counsel. (*See* Boyle Aff ¶ 3; Hirsch Aff. ¶ 8).

Since at least 2010, the TR Entities have been subjected to several litigations with the Genger family over who is or was the legal and beneficial owner of certain shares of Trans-Resources, Inc., a holding company for fertilizer and specialty chemicals business. Ultimately, following several trips to, and dispositive rulings and orders entered by, the Delaware Chancery Court, the Delaware Supreme Court, the New York Supreme Court, the Appellate Division, First Department, and the United States District Court for the Southern District of New York, and stipulations, settlements, and voluntary dismissals entered into with and/or by various persons, it has been conclusively determined that the TR Entities are the sole and only lawful and beneficial owners of all Trans-Resources shares. Discussed below are some of the proceedings, rulings, and other resolutions that are relevant to the original Petition and the Amended Petition.

The New York Action

In July 2010, Arie Genger and others, including his daughter Orly, commenced an action against the TR Entities and others. *See Genger v. Genger*, 38 Misc. 3d 1213(A), 2013 WL

5

221485, at *3 (Sup. Ct. N.Y. Cty. Jan. 3, 2013), *aff'd as modified*, 121 A.D.3d 270, 990 N.Y.S.2d 498 (1st Dep't 2014). In that action, Orly, acting individually and on behalf of the Trust, asserted a variety of causes of action against the TR Entities, Dalia (Orly's mother who was the putative trustee of the Trust), and others. *See id.* at *1. The TR Entities, Dalia, and others not relevant here moved to dismiss the complaint. In a Decision and Order dated January 3, 2013, the court granted Dalia's motion to dismiss in all respects, and granted in part and denied in part the TR Entities' motion to dismiss. *See id.* at *20-21. On July 1, 2013, the court "so ordered" and entered a Stipulation of Discontinuance with Prejudice that, among other things, dismissed all claims against the TR Entities brought by Orly, both individually and as beneficiary of the Trust (the "NY Dismissal with Prejudice"). (Boyle Aff., Ex. D).

Prior to entry of that order, on June 16, 2013, the AG Group, consisting of Arie Genger, Arnold and David Broser, and Orly (individually and as beneficiary of the Trust), and the TR Entities entered into a settlement agreement (the "Settlement Agreement") that settled all claims between and among the TR Entities and the AG Group. (*See* Boyle Aff., Ex. E; *see also* Ex. A [Amended Petition] at ¶¶ 14-16). It was in reliance upon the prior determination of the court that Orly, as beneficiary, was authorized to act on behalf of the Trust, that the TR Entities, Orly (both individually and as beneficiary of the Trust), and the other parties entered into the Settlement Agreement and into the NY Dismissal with Prejudice. Indeed, the NY Dismissal with Prejudice was "so ordered" by the court and expressly notes that Orly was acting "individually and as beneficiary of" the Trust. (Boyle Aff., Ex. E at 1). Most important, Dalia acknowledges that, pursuant to court rulings, Orly had legal standing to represent the Trust. (*See* Boyle Aff., Ex. A [Amended Petition] at ¶¶ 9-11).

6

The Settlement Agreement between the TR Entities and the AG Group provided that the AG group was to receive up to $35 million over time, less amounts already held in escrow and subject to certain setoffs and adjustments (the "Settlement Proceeds"), in return for a full release of claims against the TR Entities, including a general release by Orly, both as an individual and as beneficiary of the Trust, and a declaration that the TR Entities own "all right, title and interest (beneficially, of record, and otherwise)" to all of the Trans-Resources shares. (*See* Boyle Aff., Ex. E at ¶¶ 2-4).

The Delaware Action

On October 4, 2011, Dalia, as trustee of the Trust, filed an action in the Delaware Court of Chancery against the TR Entities and others seeking a determination as to the beneficial ownership of the so-called Orly Trust Shares – i.e., the Trans-Resources shares that, although sold to the TR Entities, the Trust continued to claim to beneficially own. *See Genger v. TR Investors, LLC*, C.A. No. 6906-CS (Del. Ch. Ct. Oct. 4, 2011). On August 30, 2013, after the NY Dismissal with Prejudice was entered, Dalia, as trustee of the Trust, agreed to entry of a Stipulation and Proposed Order of Dismissal (the "Delaware Dismissal"), which ordered that the TR Entities were indeed both the record and beneficial owners of the Trans-Resources shares. (*See* Boyle Aff., Ex. F at ¶ 2 ("[The TR Entities] owns, for all purposes, all right, title and interest (beneficially, of record and otherwise) to all authorized and issued shares of Trans-Resources")). The Delaware Dismissal also dismissed with prejudice all of Dalia's claims against the TR Entities. (*See* Boyle Aff., Ex. F at ¶ 4 ("The claims brought on behalf of the Orly Genger 1993 Trust by the Trustee of the Orly Trust against the [TR Entities] are dismissed with prejudice . . . .")). Before agreeing to dismiss all of the Trust's claims with prejudice, however, Dalia made clear to the Delaware court that she was aware of the Settlement Agreement, and that the TR Entities were willing to produce it to her (should the court direct them to do so) to pursue

7

claims. (*See* Boyle Aff., Ex. G). Rather than pursue those claims, however, Dalia decided to stipulate to the Delaware Dismissal (based upon Orly's wishes) and to dismiss her claims with prejudice without even reviewing the Settlement Agreement.

And so, through both actions – the New York Action and the Delaware Action – the Trust had two opportunities to bring any and all claims that it might possibly assert against the TR Entities. Nevertheless, the Trust – through both its primary beneficiary (Orly in the New York Action) and its trustee (Dalia in the Delaware Action) – dismissed all claims with prejudice rather than litigate.

Dalia's Efforts to Step into Orly's Shoes

Approximately one year after she stipulated to the Delaware Dismissal, and having previously opted to seek dismissal of the New York claims rather than remain involved in any capacity in that action, Dalia, as trustee to the Trust, made an about face and moved to substitute in the New York Action for the purpose of asserting claims on behalf of the Trust against the TR Entities and others. That motion was held in abeyance pending the outcome, in this Court, of Orly's petition to remove Dalia as trustee. (*See* Boyle Aff., Ex. A at ¶ 26). While Dalia's motion was pending, the parties in the New York Action then sought to have the court enter a second order reflecting complete dismissal with prejudice of claims brought by Orly, which it did on November 25, 2014. (*See* Boyle Aff., Ex. H). Dalia, as trustee of the Trust, never raised any objection to the entry of that dismissal with prejudice, notwithstanding her pending motion to substitute in that action for Orly.

Despite failing to raise any objection to the court's entry of that order, Dalia later appealed the dismissal and specifically argued that she should be permitted to pursue the Trust's claims that the Settlement Proceeds paid (or to be paid) under the Settlement Agreement belonged to the Trust. The First Department denied her appeal and instead held that, because

8

Dalia failed to object to the dismissal in the first place (which are the very same claims she

belatedly asserts in her Amended Petition), she was foreclosed from raising the issues she tried to

raise below – i.e., that the Trust is entitled to the Settlement Proceeds.  Specifically the First

Department ruled that:

> Defendant Dalia Genger, as Trustee for the Orly Genger 1993 Trust (Orly Trust),
> failed to articulate any objection to the court's entry of the November 25, 2014
> order dismissing plaintiff Orly Trust's breach of fiduciary duty and unjust
> enrichment claims against certain defendants, and her claim is not properly before
> this Court . . . .  In any case, that order did not dismiss any claims; rather, it
> recognized that all claims had previously been dismissed or discontinued by prior
> court orders, dismissed the complaint, and severed other viable third party claims,
> cross claims, and counterclaims unrelated to the Orly Trust.

*Genger v. Genger*, 144 A.D.3d 581, 2016 N.Y. Slip Op. 07987, at *1, 41 N.Y.S.3d 414, 414-15

(1st Dep't 2016).

## ARGUMENT

## I.    STANDARD OF REVIEW

When a motion to dismiss is asserted under CPLR 3211(a)(1), the court is not

required to accept factual allegations that are contradicted by documentary evidence or legal

conclusions that are unsupported in the face of undisputed facts.[5]  *See Zanett Lombardier, Ltd. v.

Maslow*, 29 A.D.3d 495, 495, 815 N.Y.S.2d 547, 548 (1st Dep't 2006).  For example, dismissal

pursuant to CPLR 3211(a)(1) is warranted where the documentary evidence definitively disposes

---

[5]    In reaching its determination on a motion to dismiss, a court may consider facts that are indisputable and a court
may also "consider evidentiary material submitted by a [movant] in support of a motion to dismiss a complaint
pursuant to CPLR 3211(a)(7)."  *Basile v. Wiggs*, 98 A.D.3d 640, 641, 950 N.Y.S.2d 148, 149 (2d Dep't 2012).
Where a movant indisputably demonstrates through evidentiary material that an allegation was not a fact at all,
a motion to dismiss may be properly granted.  *Id.*  And where allegations consist of bare legal conclusions and
inherently incredible factual claims or claims contradicted by documentary evidence, they are not presumed to
be true.  *See Biondi v. Beekman Hill House Apartment Corp.*, 257 A.D.2d 76, 81, 692 N.Y.S.2d 304, 308 (1st
Dep't 1999) (where court considers extrinsic evidence on a CPLR 3211 motion the allegations of the complaint
are not deemed true and the motion should be granted where the essential facts have been negated by the
evidentiary matter), *aff'd*, 94 N.Y.2d 659, 709 N.Y.S.2d 861 (2000).

9

of plaintiff's claim. *See Bronxville Knolls, Inc. v. Webster Town Ctr. P'ship*, 221 A.D.2d 248, 248, 634 N.Y.S.2d 62, 63 (1st Dep't 1995). In addition, a plaintiff's allegations made in its original pleading may be deemed informal judicial admissions that constitute "documentary evidence" within the meaning of CPLR 3211(a)(1). *See New Greenwich Litig. Tr., LLC v. Citco Fund Servs. (Europe) B.V.*, 145 A.D.3d 16, 25, 41 N.Y.S.3d 1, 8-9 (1st Dep't 2016). Where allegations in the original pleading contradict allegations in the amended pleading, dismissal is justified. *See id.*; *cf. Poindexter v. EMI Record Grp. Inc.*, No. 11 Civ. 559, 2012 WL 1027639, at *2 (S.D.N.Y. Mar. 27, 2012) (dismissing claim noting that "[e]ven though the Amended Complaint is the operative pleading, the Court may still credit admissions in the original complaint and attached exhibits"). And, finally, CPLR 3211(a)(5) provides for dismissal where the cause of action may not be maintained because of collateral estoppel, res judicata, or statute of limitations.

Regardless, the Court need not even address the substantive CPLR 3211 arguments since, as established below, the Court lacks jurisdiction over the TR Entities. *See* CPLR 3211(a)(8); CPLR 213; CPLR 214; SCPA 203.

## II.    THE COURT LACKS JURISDICTION OVER THE TR ENTITIES BECAUSE DALIA FAILED TO PROPERLY SERVE THEM

### A.    Neither the Original Petition Nor the Amended Petition Were Served as Required Under the CPLR and SCPA

Dismissal of the Amended Petition is warranted because Dalia has not served the original or Amended Petition or any necessary citations on any of the TR Entities. Although Dalia first attempted service on January 5, 2018 – some 570 days after she filed the original Petition – Dalia's belated effort was indisputably ineffective and lacked diligence. On that date, Dalia had citations delivered to the offices of Creative World Management, Inc. ("CWM") at 400 Park Avenue, New York, NY. (Hirsch Aff. ¶ 6). Delivery merely consisted of the process server

10

leaving citations with an administrative assistant. (Hirsch Aff. ¶ 7). The citations were not

personally delivered to any member, officer, or authorized agent of any of the TR Entities. (*See*

Hirsch Aff. ¶¶ 5-8). Under the CPLR, such service, even if it had been timely made (which it

was not), was improper and does not confer jurisdiction over any of the TR Entities.[6]

       Notably, Dalia's filing of the Amended Petition only exacerbates her service

failures. Following the filing of the Amended Petition on April 13, 2018, Dalia attempted

service of the Amended Petition only by mailing it to the TR Entities' outside counsel. (*See*

Boyle Aff. ¶ 3). No other method of service of the Amended Petition was attempted. (*See*

Hirsch Aff. ¶ 8). Because the initial service of the original Petition was ineffective and because

the TR Entities had moved for dismissal of the original Petition for lack of personal jurisdiction,

among other bases, service of the Amended Petition in this manner was insufficient. *See In re*

*Genger*, No. 2008-0017, 2014 WL 5364557, at *2-3 (Surr. Ct. N.Y. Cty. July 24, 2014)

(Anderson, J.) (Trial Order) (citing CPLR 3012(a) and holding in related *Genger* proceeding to

remove Dalia as Trustee that amended pleading asserting new or additional claims must be

served upon all parties that have not appeared in the same manner as required for service of a

summons). Here, as noted above, none of the TR Entities has appeared in this action[7] or waived

service of process. (*See* Boyle Aff., ¶ 3; Hirsch Aff. ¶ 8). These several failings, as discussed in

more detail below, warrant dismissal of the Amended Petition under CPLR 3211(a)(8).

       *First*, none of the TR Entities maintains an office at CWM, or anywhere else in

New York State. (Hirsch Aff. ¶ 3). And, *second*, four of the five TR Entities are limited liability

---

[6]    Under SCPA 307(5), service of process upon a corporation or a limited liability company is governed by CPLR 311 and CPLR 311-a.

[7]    As previously noted (*see supra* note 2), the TR Entities' service of this motion to dismiss and its prior motion to dismiss the original Petition are not appearances within the meaning of SCPA 401 and do not confer jurisdiction. *See* CPLR 320(c).

companies.[8] Service on a limited liability company (an "LLC") is only effective if personally

delivered to a member, manager, or other agent authorized to receive process. *See* CPLR 311-a.

The administrative assistant with whom service was left has none of those roles, is not an

employee of any of the TR Entities, and does not even work in an office maintained by the TR

Entities. (Hirsch Aff. ¶¶ 6-7). Attempted service of these citations by delivery to an

administrative assistant in these circumstances is improper. *See, e.g., Ciafone v. Queens Ctr. for

Rehab. & Residential Healthcare*, 126 A.D.3d 662, 663-64, 5 N.Y.S.3d 462, 464 (2d Dep't 2015)

(dismissing action against LLC holding that delivery of process to someone other than person

authorized under CPLR 311-a is insufficient); *Stuyvesant Fuel Serv. Corp. v. 99-105 3rd Ave.

Realty LLC*, 192 Misc. 2d 104, 106, 745 N.Y.S.2d 680, 681 (Civ. Ct. Bronx Cty. 2002)

(dismissing claims against LLC because service on receptionist was improper); *see also Dewey

v. Hillcrest Gen. Hosp.*, 201 A.D.2d 609, 609-10, 607 N.Y.S.2d 967, 968 (2d Dep't 1994)

(because process was neither delivered to defendant's place of business nor to one of its

employees, service was improper).[9]

      *Third*, service was also ineffective as to Glenclova Investment Co., a Cayman

Islands company, and the only non-LLC among the TR Entities. Again the CPLR provides the

rule: service upon a corporation is effective only if it is personally served upon an officer,

director, managing agent, or some other agent authorized to receive service. *See* CPLR 311. As

noted above, the administrative assistant with whom such service was left has no such role, is not

---

[8]    TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC, and Trans Resources, LLC are all limited liability companies. (Hirsch Aff. ¶ 4).

[9]    Moreover, although the Amended Petition and the original citation purport to identify Trans-Resources, Inc. as a Respondent, Trans-Resources, Inc. was not a party to the Settlement Agreement at issue. (*See* Boyle Aff., Ex. E). Rather, the proper party is Trans-Resources, LLC, a Delaware limited liability company. (Hirsch Aff. ¶ 5). Dalia's failure to properly name and serve Trans-Resources, LLC provides an additional ground for dismissal. *See Ross v. Lan Chile Airlines*, 14 A.D.3d 602, 603-04, 789 N.Y.S.2d 77, 79 (2d Dep't 2005) (holding that misnaming of the entity as an "Inc." rather than an "LLC" was "in fact no naming at all").

a Glenclova employee, and was not even working in an office maintained by Glenclova. (*See* Hirsch Aff. ¶¶ 6-7). As a consequence, service upon her was improper. *See McDonald v. Ames Supply Co.*, 22 N.Y.2d 111, 114-16, 291 N.Y.S.2d 328, 331-32 (1968) (delivery to building receptionist who was not corporation's employee insufficient under CPLR 311 even though receptionist later re-delivered process to proper person); *Dewey*, 201 A.D.2d at 609-10, 607 N.Y.S.2d at 968 (delivery of process to executive secretary, even where secretary agreed to accept service on behalf of defendant, was ineffective under CPLR 311 where secretary was not employee of defendant and had never been authorized to accept service on behalf of defendant); *Kaleidakolor, Inc. v. Edward N. Hoffman Advert. Corp.*, No. 25577/91, 1995 WL 17961040, at *1 (Sup. Ct. N.Y. Cty. May 8, 1995) (service invalid on employee at office where employee was not authorized to accept service, was not employed by defendant, and office was not office of defendant).

And, *finally*, and as noted above, Dalia's subsequent attempted service of the Amended Petition on the TR Entities' attorney is also insufficient. Because Dalia never properly served the citation for the original Petition on any of the TR Entities, and because the TR Entities have never appeared in the proceeding, service by mail on the TR Entities' attorney does not confer jurisdiction over the TR Entities. *See In re Genger*, 2014 WL 5364557, at *3 & n.3 (holding that where party has not yet appeared the mailing of an amended pleading will not confer jurisdiction as service of process is required); *see also* N.Y. C.P.L.R. 3012(a) cmt. C3012:6 (comment by Patrick M. Connors) (noting that if a plaintiff wants to amend a pleading before the defendant has been served, the plaintiff "must personally serve a copy of both the original complaint that was filed to commence the action, plus the amended complaint, on [the defendant] under one of the CPLR 308 methods").

13

B.    Dismissal Is Also Required Because Dalia Failed to Properly
Join or Obtain Jurisdiction Over Trans-Resources, LLC

Despite the fact that the Amended Petition attempts (albeit ineffectively) to add

Trans-Resources, LLC as a Respondent and to add new claims, Dalia has failed to follow the

procedures of this Court in naming and serving an additional party. Pursuant to SCPA 312, the

addition of a party to a proceeding requires the issuance of a supplemental citation naming that

new party. Further, SCPA 307 requires service of that supplemental citation.[10] Dalia has done

neither. (*See* Hirsch Aff. ¶ 8). Perhaps even more problematic, Dalia does not identify Trans-

Resources, LLC as a Respondent in the caption of the Amended Petition but instead still refers to

Trans-Resources, Inc. as a Respondent. Dalia only tangentially refers to Trans Resources, LLC

as a Respondent in paragraph 88 of the Amended Petition, where she lists Trans-Resources, LLC

as having an interest in the proceeding as a "Respondent" while continuing to misidentify Trans-

Resources, LLC's address. (*See* Boyle Aff., Ex. A at ¶ 88(a); *see also* Hirsch Aff. ¶ 5). At

minimum, Dalia's failure to properly add Trans-Resources, LLC as a Respondent, coupled with

her complete failure to obtain and serve a supplemental citation on Trans-Resources, LLC

requires dismissal of the claims against Trans-Resources, LLC under CPLR 3211(a)(8).

Further, the indisputable documentary evidence establishes that Trans-Resources,

LLC is the only TR Entity that is a signatory to certain promissory notes (the "Notes"). (*See*

Hirsch Aff. ¶ 9; Boyle Aff., Ex. E [Settlement Agreement] at Exhibit A), and only Trans-

Resources, LLC is identified as the "Maker" of those Notes. (*See id.*). Thus, Dalia's "turnover"

and "injunction" causes of action against the other TR Entities – which rely solely upon an

alleged obligation to make the "Remaining Payments" under those Notes – must also be

---

[10]    Similarly, CPLR 3012(a) requires that "[a] subsequent pleading asserting new or additional claims for relief
shall be served upon a party who has not appeared in the manner provided for service of a summons."

14

dismissed because it is incontrovertible that none of the other TR Entities has any direct

obligations under the Notes.

For these same reasons, Trans-Resources, LLC is a necessary party to this

proceeding as complete relief under the causes of action asserted in the Amended Petition would

be unavailable without its joinder. *See* CPLR 1001(a). Therefore, Dalia's failure to properly join

Trans-Resources, LLC as a Respondent also warrants dismissal under CPLR 1003 and CPLR

3211(a)(10).

## III.   DISMISSAL OF THE AMENDED PETITION IS REQUIRED AND THE TURNOVER CLAIM AGAINST THE TR ENTITIES IS NOW TIME-BARRED BECAUSE PROCESS WAS NOT SERVED WITHIN THE TIME PERIOD REQUIRED BY THE SCPA

For a petition to be timely commenced to toll any statute of limitation, the citation

must be served on the respondent within 120 days after the date on which the petition was filed.

SCPA 301(a). Dalia filed her original Petition on June 14, 2016. As discussed above, no service

was attempted within the statutory 120-day period and no proper service has been made on any

of the TR Entities despite the lapse of more than 570 days from the date of initial filing.[11]

The practical effect of Dalia's lack of diligence in serving process for the original

Petition and her failure to properly serve the TR Entities (for both the original Petition and the

Amended Petition) is that her claim of "turnover" is now time-barred. Because a turnover claim

seeks the return of property, it is akin to a conversion claim and is subject to a three-year

limitations period. *See* CPLR 213; *see also In re Thomas*, 28 Misc. 3d 300, 305, 901 N.Y.S.2d

493, 497 (Surr. Ct. Broome Cty. 2010), *aff'd* 78 A.D.3d 1304, 910 N.Y.S.2d 252 (3d Dep't

---

[11]   Dalia's failure to do so required dismissal of the original Petition. *See* N.Y. Surr. Ct. Proc. Act § 301 cmt. 2017 (comment by Deborah S. Kearns) ("If the proceeding is commenced and the citation is served such that the requisite notice is not given, jurisdiction will not be obtained. . . . Where the statute of limitations period has run, a new proceeding must be commenced under SCPA 301 (b)").

2010). As a consequence, because Dalia's claims accrued, at the latest, on the date of the
Settlement Agreement – i.e., on June 16, 2013, more than three years ago – these claims are
time-barred.

In addition, as a matter of equity, Dalia's failure to even attempt service within the
120-day period, coupled with her extensive over 570-day delay in attempting service, her failure
to have properly served any of the TR Entities, her failure to properly join and obtain and serve a
supplemental citation on Trans-Resources, LLC, and her failure to effectively serve the
Amended Petition militates *against* granting her any right to file a new petition. *Cf. Estate of
Jervis v. Teachers Ins. & Annuity Ass'n*, 279 A.D.2d 367, 368, 720 N.Y.S.2d 21, 22 (1st Dep't
2001) (holding that plaintiff's failure to serve process by deadline and her "unacceptably
protracted delay measured from the expiration of the 120-day period" to even attempt service,
did not establish either "good cause" or "interest of justice" to extend time for service or to allow
plaintiff to avoid the bar of the statute of limitation).

Indeed, despite having been forewarned about her service and jurisdictional
failures by the TR Entities' initial motion to dismiss, Dalia continues to press her own version of
procedure in the hope that this Court will extend some equity and give her relief from these
statutory and due process requirements. As outlined in the preliminary statement above (*see
supra* at 2-4), the courts of New York have already put the Genger army of litigants on notice
that the their days of abusing the judicial system are over and that the courts will not assist them
in needlessly prolonging their endless litigations. This Court should not countenance Dalia's
efforts to plead for this Court's equitable discretion in order to save Dalia (a serial litigant in this
and other courts) from her intentional procedural and substantive shortcomings.

16

## IV. DALIA'S TURNOVER CAUSE OF ACTION CANNOT STAND

To state a turnover claim, a plaintiff must allege and establish that the defendant

received or retained property or money belonging to the plaintiff. *See, e.g., In re Perelman*, 123

A.D.2d 436, 436, 999 N.Y.S.2d 2 (1st Dep't 2014). Dalia's "turnover" cause of action must be

dismissed because Dalia has not alleged (and cannot) that the TR Entities ever received or

retained any specific property or money purportedly belonging to the Trust. *See id.* In fact, in

her allegations for the "turnover" claim in the original Petition Dalia admits that none of the TR

Entities received or its in their possession any of the "Settlement Proceeds"[12] that she was (and

is) claiming. (*See* Boyle Aff., Ex. M, at ¶¶ 72, 73).

Apparently recognizing that she had pleaded away her only substantive cause of

action, Dalia has edited that factual allegation from her Amended Petition. (*Compare* Boyle

Aff., Ex. M ¶¶ 72, 73 *with* Boyle Aff., Ex. A ¶¶ 72, 73, 74). Dalia's last minute scratch-out does

not save this claim. Dalia's allegations in her original Petition may be deemed informal judicial

admissions that constitute "documentary evidence" within the meaning of CPLR 3211(a)(1). *See*

*New Greenwich Litig. Tr.*, 145 A.D.3d at 25, 41 N.Y.S.3d at 8-9. These unvarnished and

verified factual allegations (asserted under the very same cause of action in the original Petition)

flatly contradict any claim that the TR Entities have received or have in their possession any of

the Settlement Proceeds, which include any of the so-called "Remaining Payments."

Insofar as the allegations of the Amended Petition regarding the "Remaining

Payment" are concerned, the documentary evidence further establishes that none of the TR

Entities is in possession of any property of the Trust in relation to any remaining obligations

---

[12]  In both the original Petition and the Amended Petition, Dalia defines "Settlement Proceeds" to include all of the
up to $32.3 million payable under the Settlement Agreement, including the $17.3 million that has already been
paid and the remaining $15 million in "Remaining Payments" potentially due under the Notes. (*See e.g.*, Boyle
Aff., Ex. M at ¶ 21 & Ex. A at ¶ 21).

17

under the Settlement Agreement. As set forth in the Settlement Agreement, the remaining

obligations due under the Settlement Agreement are governed by certain promissory notes (the

"Notes") substantially in the form that was included as Exhibit A to the Settlement Agreement

(*see* Boyle Aff., Ex. E at Exhibit A). As provided for in the Settlement Agreement, however, the

Notes are not yet mature and therefore none of the obligations under the Notes are presently due.

(*See* Boyle Aff., Ex. E at ¶ 3; Hirsch Aff. ¶¶ 9-10). Thus, there is no current obligation to either

fund or make any payment to any person in connection with the Settlement Agreement.

Moreover, should the Notes become mature and due, it is only Trans-Resources, LLC, which, as

explained above, has not been joined as a Respondent, who, as "Maker" of the Notes and the

only signatory to the Notes, is responsible for any direct obligation to make payments under the

Notes. Additionally, under the Settlement Agreement and the Notes, there is no obligation by

Trans-Resources, LLC (or any of the other TR Entities) to make direct payments to Orly Genger

or the Trust. (Hirsch Aff. ¶ 10). Further, Dalia has not alleged (nor could she) any facts that

establish that the TR Entities have any knowledge as to how any of the Settlement Proceeds will

be distributed or apportioned (if at all) by the AG Group's attorneys. These facts, established by

both the indisputable documentary evidence and by Dalia's own informal judicial admissions,

foreclose her "turnover" claim.

## V.   DALIA'S "INJUNCTION" CLAIM IS NOT AN APPROPRIATE CAUSE OF ACTION

      Under New York law an injunction is a remedy, not a cause of action. Injunction

as a remedy may only be sustained when the substantive cause of action that may give rise to an

injunction has also been sustained. *See Held v. Macy's, Inc.*, 25 Misc. 3d 1219(A), 2009 N.Y.

Slip Op. 52189(U), at *16 (Sup. Ct. Westchester Cty. Oct. 19, 2009). Because, as discussed

above, Dalia's "turnover" cause of action must be dismissed, so too must her request for injunctive relief. *See id.*

Moreover, a party seeking the drastic remedy of a preliminary or permanent injunction must sufficiently plead, among other things, that it will suffer irreparable harm absent the injunction. *See D'Amour v. Ohrenstein & Brown, LLP*, 17 Misc. 3d 1130(A), 2007 N.Y. Slip Op. 52207(U), at *14-15 (Sup. Ct. N.Y. Cty. Aug. 13, 2007) (granting motion to dismiss claim for preliminary and permanent injunction where "plaintiffs have failed to allege the sort of irreparable injury which is prerequisite to the granting of an injunction"). Dalia has not done so. Indeed, the Amended Petition contains no factual allegations to support either a preliminary or permanent injunction.[13] Nor could it since Dalia is merely seeking a portion of the Settlement Proceeds, i.e., a sum of money, from the TR Entities – a demand that indisputably forecloses any right to injunctive relief. *See id.* (finding dismissal of injunction appropriate where plaintiff failed to allege facts indicating that it could not be fully compensated by monetary damages); *Zodkevitch v. Feibush*, 49 A.D.3d 424, 425, 854 N.Y.S.2d 373, 374 (1st Dep't 2008) (holding plaintiffs not entitled to preliminary injunction directing defendant to place funds allegedly misappropriated into escrow account because plaintiffs failed to establish they would suffer irreparable injury unless injunction was granted and failed to demonstrate that award of money damages would not adequately compensate them).

In addition, Dalia's failure to seek an injunction in her original Petition filed in 2016, coupled with her absurd nearly five-year delay in seeking injunctive relief since she

---

[13]    The Amended Petition contains no sufficient allegations of a likelihood of ultimate success on the merits, or that the Trust will suffer irreparable harm unless the injunction is granted, or that the balancing of equities lies in favor of the Trust, all of which are required when seeking a preliminary injunction. *See* CPLR 6301; *see also e.g., Faberge Int'l Inc. v. Di Pino*, 109 A.D.2d 235, 240, 491 N.Y.S.2d 345, 349 (1st Dep't 1985) (holding absence of such allegations required dismissal of request for injunction).

19

became aware of the Settlement Agreement, further negates any entitlement to an injunction as it belies any sense of urgency. *See Waterscape Resort, L.L.C. v. 70 W. 45th St. Holding LLC*, No. 652124/2014, 2015 WL 4400219, at *2 (Sup. Ct. N.Y. Cty. July 17, 2015) (noting that delay in seeking injunction may also negate irreparable harm because failure to act earlier undercuts the urgency that normally attends request for a preliminary injunction) (citations omitted); *see also SportsChannel Am. Assocs. v. Nat'l Hockey League*, 186 A.D.2d 417, 418, 589 N.Y.S.2d 2, 3-4 (1st Dep't 1992) (affirming court's consideration of plaintiff's several months' delay in seeking injunction as grounds for denying the injunction).

## VI.    RES JUDICATA AND COLLATERAL ESTOPPEL BAR DALIA'S CLAIMS

All of Dalia's claims against the TR Entities are subject to dismissal under the principles of res judicata. *See* CPLR 3211(a)(5) Under New York law, any stipulated discontinuance with prejudice[14] in a prior action bars re-litigation of not only those claims but of all other claims arising out of the same transaction that could have been asserted in a prior proceeding, even if they are now based on different theories or seeking different remedies. *See O'Brien v. City of Syracuse*, 54 N.Y.2d 353, 357-58, 445 N.Y.S.2d 687, 689 (1981); *Fifty CPW Tenants Corp. v. Epstein*, 16 A.D.3d 292, 293, 792 N.Y.S.2d 58, 59 (1st Dep't 2005); *see also Landau, P.C. v. LaRossa, Mitchell & Ross*, 11 N.Y.3d 8, 12-13, 862 N.Y.S.2d 316, 319 (2008) ("[O]nce a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy.") (citation omitted); *In re Estate of Hunter*, 4 N.Y.3d 260, 269, 794 N.Y.S.2d 286, 291 (2005) (noting doctrine applies "not only to claims actually litigated but also to claims

---

[14]   A stipulation of discontinuance with prejudice in an action in another forum has the same res judicata preclusive effect as a judgment on the merits. *See Gropper v. 200 Fifth Owner LLC*, 151 A.D.3d 635, 635, 58 N.Y.S.3d 42, 42-43 (1st Dep't 2017).

20

that could have been raised in the prior litigation"). Thus, "a claim will be barred by the prior

adjudication of a different claim arising out of the same 'factual grouping' even if the claims

involve 'materially different elements of proof' and even if the claims 'would call for different

measures of liability or different kinds of relief.'" *Fifty CPW Tenants Corp.*, 16 A.D.3d at 293

(citations omitted).

Moreover, "[t]he doctrine of res judicata, or claim preclusion, is designed to

'relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by

preventing inconsistent decisions, encourage reliance on adjudication.'" *Ins. Co. of State of Pa.*

*v. HSBC Bank USA*, 10 N.Y.3d 32, 38, 852 N.Y.S.2d 812, 815-16 (2008) (citation omitted). One

of the tests for determining what constitutes the same cause of action has been expressed as

whether a different judgment in the second action would impair or destroy any rights or interests

established in the prior actions. *See Schuykill Fuel Corp. v. B. & C. Nieberg Realty Corp.*, 250

N.Y. 304, 306-07 (1929); *see also Greenway Med. Supply Corp. v. Am. Transit Ins. Co.*, 58

Misc. 3d 147(A), 2018 N.Y. Slip Op. 50039(U) (2d Dep't App. Term 2018) (affirming res

judicata dismissal where "any judgment in favor of plaintiff in the present action would destroy

or impair rights or interests established by the judgment in the [prior action]" (citing *Schuylkill*

*Fuel Corp.*, 250 N.Y. at 306-07)) (unpublished table decision).

Indeed, to allow serial litigants, such as Dalia, to continue to press (and re-press)

similar claims already adjudicated against them in various courts would make a mockery of our

judicial system, which relies on the consistency and finality of judicial decisions. Dalia's

approach here would allow a losing party in a long and expensive litigation instigated by it (as

Dalia did with regard to litigation in Delaware) to conjure up a slightly different theory (even

though that theory could well have been brought as part of the already completed litigation),

21

relying on the very same facts and seeking the same relief dressed in different clothing as the claims already litigated. To countenance such abuse would cause the courts (state courts in Delaware and federal and state courts in New York) and the opposing parties, such as the TR Entities, to re-litigate anew a dispute that has already been resolved at much expense, both in terms of time and resources.

Here, the fundamental gravamen of the Amended Petition concerns the beneficial ownership of Trans-Resources and any concomitant right to monetize that ownership interest, whatever it may have been. But, as described above, the issues of beneficial ownership of all the Trans-Resources shares were finally and fully resolved with Orly, both in her individual capacity and in her capacity as beneficiary of the Trust, on June 16, 2013. And then, on August 30, 2013, in the Delaware Dismissal, Dalia in her role as trustee to the Trust and with full knowledge of the Settlement Agreement and after voluntarily foregoing an opportunity to review the Settlement Agreement (*see* Boyle Aff., Ex. G), also finally and fully resolved all issues related to the ownership of all the Trans-Resources shares in the Delaware Action. (Boyle Aff., Ex. F). To the extent that Dalia now attempts to enforce the Trust's rights or entitlements as a beneficial owner of the Trans-Resources shares by, among other things, seeking to monetize that interest by taking possession of the Settlement Proceeds, the Delaware Dismissal (with Dalia's consent) bars any such relief.

In fact, Dalia has notably represented to the Supreme Court (in support of a motion on which she prevailed) that the Delaware Action was designed to provide a "**full adjudication**" of issues relating to the Trust's right to all the Trans-Resources shares that underlie the Settlement Agreement. (*See* Boyle Aff., Ex. J at 12-13 ("Further, it is important to note that an action is pending in the Delaware Chancery Court to declare that the Orly Trust is

22

the beneficial ownership [stet.] of the TRI, allowing for a full adjudication of beneficial

ownership of the TRI shares. *Dalia Genger v. TR Investors, LLC et. al.* (Del. Ch. 6906-CS. filed

Oct. 4, 2011)") (emphasis added)).

As there is no dispute that, in the Delaware Action, Dalia stipulated to a dismissal

with prejudice of all claims relating to the ownership of the Trans-Resources shares at a time

when she was aware of the Settlement Agreement, and, as such, could have raised any claims

relating to that settlement (including those purportedly brought here) in the Delaware Action, she

is now precluded from raising them in this proceeding. *See Gropper v. 200 Fifth Owner LLC*,

151 A.D.3d 635, 636, 58 N.Y.S.3d 42, 42-43 (1st Dep't 2017); *see also In re Hunter*, 4 N.Y.3d at

270-71, 794 N.Y.S.2d at 292 (confirming res judicata bars claims that were discernible from

document filed in prior proceedings).

A separate basis for res judicata as to the Trust arises out of the First Department's

decision in *Genger v. Genger*, 144 A.D.3d 581, 2016 N.Y. Slip Op. 07987, 41 N.Y.S.3d 414 (1st

Dep't 2016). In that decision, the First Department expressly rejected Dalia's attempt to assert

the same claim she is making in this Amended Petition: that the Settlement Proceeds belong to

the Trust. (*See* Boyle Aff., Ex. L at 1 (requesting order directing the Settlement Proceeds be paid

into court because "some or all of the settlement proceeds" belong to the Trust)). The First

Department rejected Dalia's attempt by concluding that "all [Orly Trust] claims had previously

been dismissed or discontinued by prior court orders." *Genger*, 144 A.D.3d 581, 2016 N.Y. Slip

Op. 07987, at *1, 41 N.Y.S.3d at 415. Because, as the First Department correctly noted, those

claims were previously "dismissed or discontinued," res judicata precludes their assertion here.

## VII. SHOULD THE COURT NOT DISMISS THE AMENDED PETITION FOR ANY OF THE ABOVE REASONS IT SHOULD BE STAYED OR DISMISSED

It is undisputed that Dalia's standing to assert these claims derives from her status

as trustee. At least since June 2009, however, a proceeding brought by Orly to remove Dalia as

trustee has been pending in this Court. In fact, on June 21, 2017, this Court denied Dalia's

motion to dismiss that proceeding, noting that Orly's allegations "raise significant issues about

whether Dalia's efforts as trustee have been calculated to benefit herself and others at the expense

of the Orly Trust in violation of her fiduciary duty and whether she poses an ongoing threat to

the assets of the Orly Trust." *In re Orly Genger*, No. 2008-0017/B, Decision at 12 (Boyle Aff.,

Ex. C). Thus, should this proceeding not be dismissed, it should be stayed pending resolution of

the threshold issue of whether Dalia is a proper trustee of the Trust. *See* CPLR 2201.

Moreover, Dalia, in a cross-petition she filed and served many months ago (that

bears no relation to the TR Entities), asserted identical claims of breach of fiduciary duty and

turnover solely against Orly concerning the Settlement Proceeds and on these very same facts.

(*See* Boyle Aff., Ex. K). A motion to dismiss that cross-petition filed by Orly (and joined by the

guardian *ad litem*) is currently *sub judice* before this Court. The existence of that proceeding

provides yet another reason for this Court to exercise its discretion to dismiss or stay any

proceedings on this Amended Petition.[15]

---

[15] The existence of the already pending action also provides a basis for dismissal under CPLR 3211(a)(4), which allows a party to move for judgment dismissing one or more causes of action asserted against it on the ground that "there is another action pending between the same parties for the same cause of action in a court of any state or the United States; the court need not dismiss upon this ground but may make such order as justice requires." CPLR 3211(a)(4). The subject of the two actions need not be identical to invoke CPLR 3211(a)(4); rather, "[t]he critical element is that both suits arise out of the same subject matter or series of alleged wrongs." *Syncora Guarantee Inc. v. J.P. Morgan Sec. LLC*, 110 A.D.3d 87, 96, 970 N.Y.S.2d 526, 533 (1st Dep't 2013) (alteration in original) (citation omitted). CPLR 3211(a)(4) "vests a court with broad discretion in considering whether to dismiss an action." *Whitney v. Whitney*, 57 N.Y.2d 731, 732, 454 N.Y.S.2d 977, 977 (1982).

## **CONCLUSION**

For the foregoing reasons, the TR Entities respectfully request that this Court dismiss the

Amended Petition and all claims therein as against the TR Entities, and grant the TR Entities

such other relief as may be just and proper.

Dated:  New York, New York
        May 7, 2018

Respectfully submitted,

SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP

_____
John Boyle
Four Times Square
New York, New York 10036-6522
(212) 735-3000
john.boyle@skadden.com

*Attorneys for Glenclova Investment Co.,*
*TR Investors, LLC, New TR Equity I, LLC,*
*New TR Equity II, LLC, and Trans-Resources,*
*LLC*

25

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK        )
                         : ss.:
COUNTY OF NEW YORK   )

Julie M. Thaxton, being duly sworn, deposes and says:

1. I am not a party to the action, am over 18 years of age and am employed by

Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, NY 10036.

2. On May 7, 2018 I served a true copy of the

- ***Notice of Motion,***
- ***Affirmation of John Boyle in Support of the TR Entities' Motion to Dismiss the Amended Petition for Turnover of Trust Property and Other Relief*** *with the exhibits annexed thereto,*
- ***Affirmation of Mark S. Hirsch in Support of the TR Entities' Motion to Dismiss the Amended Petition for Turnover*** *and*
- ***Memorandum of Law in Support of the TR Entities' Motion to Dismiss the Amended Petition for Turnover of the Trust Property and Other Relief Filed on April 13, 2018 by Dalia Genger as Trustee of the Orly Genger 1993 Trust***

by Federal Express, overnight delivery upon:

Judith Lisa Bachman, Esq.
254 S. Main Street, Suite 306
New City, New York 10956

Kasowitz Benson Torres LLP
Michael Paul Bowen
1633 Broadway
New York, NY 10019

Kelley Drye & Warren LLP
John Dellaportas
101 Park Avenue
New York, NY 10178

Mitchell D. Goldberg, Esq.
The Freyberg Law Group
950 Third Avenue
32nd Floor
New York, NY 10022

Leon Friedman
685 Third Avenue, 25th Floor
New York, NY 10017

Julie M. Thaxton

Sworn to before me this
7th day of May 2018.

Brian E. Keating
Notary Public, State of New York
No. 01KE5009535
Qualified in Westchester County
Certificate Filed in New York County
Commission Expires March 15, 2019

**SURROGATE'S COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

| | |
|---|---|
| In the Matter of the Petition of Dalia Genger, as Trustee of the Orly Genger 1993 Trust, Created by Trust Agreement Dated December 13, 1993 between ARIE GENGER, as Grantor, and LAWRENCE M. SMALL and SASH A. SPENCER, as Trustees, to Turnover Property to the Orly Genger 1993 Trust. | FILE NO.    2008-0017/E<br><br>Hon. Nora S. Anderson |

In the Matter of DALIA GENGER, trustee of the ORLY GENGER 1993 TRUST,

    Petitioner,

     - against -

ORLY GENGER, ARIE GENGER, GLENCLOVA INVESTMENT COMPANY, TR INVESTORS, LLC, NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, TRANS-RESOURCES, INC., ARNOLD BROSER, DAVID BROSER, JOHN DOES 1-20, and JANE DOES 1-20,

    Respondents.

**AFFIRMATION**
**OF JOHN BOYLE**
**IN SUPPORT OF THE TR**
**ENTITIES' MOTION TO**
**DISMISS THE**
**AMENDED PETITION**
**FOR TURNOVER OF**
**TRUST PROPERTY AND**
**OTHER RELIEF**

---

       John Boyle, an attorney duly admitted to practice before the courts of the State of New York, hereby affirms, under CPLR 2106, the following under penalty of perjury:

       1.    I am an attorney admitted to practice before the courts of the State of New York and counsel at Skadden, Arps, Slate, Meagher & Flom, LLP, attorneys for Respondents Glenclova Investment Company, TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC, Trans-Resources, LLC, in the above-captioned proceeding.

       2.    I submit this Affirmation in support of the TR Entities' Motion to Dismiss the Amended Petition for Turnover of Trust Property and Other Relief. I am familiar with the

facts and circumstances of this proceeding by virtue of my personal involvement in it and a

review of the case files, and the information provided herein is true and correct to the best of my

knowledge, information, and belief.

        3.      On April 17, 2018, I received via FedEx overnight service a single copy of

the Amended Petition. The FedEx envelope indicated that the package was shipped on April 16,

2018 from a location identified as 169 South Main Street, New City, NY, to be delivered to me

at my office address. No citations accompanied the Amended Petition and, to date, no citations

or supplemental citations issued in connection with the original Petition or the Amended Petition

have been served on me as attorney for the TR Entities. Counsel for the Petitioner did not

contact me to ask if I would accept service of the Amended Petition on behalf of the TR Entities

and I have never agreed to accept such service nor have I waived proper service of the original

Petition or the Amended Petition under the CPLR and the SCPA.

        4.      Attached as **Exhibit A** is a true and correct copy of the Amended Petition

for Turnover and Other Relief filed in this proceeding on April 13, 2018, by Dalia Genger as

trustee of the Orly Genger 1993 Trust.

        5.      Attached as **Exhibit B** is a true and correct copy of the Decision of Justice

Cooper, dated June 3, 2016 in *Genger v. Genger*, Index No. 302436/2002 (Sup. Ct. N.Y. Cty).

        6.      Attached as **Exhibit C** is a true and correct copy of this Court's June 21,

2017 decision in *In re Orly Genger*, File No. 2008-0017 (Surr. Ct. N.Y. Cty), denying Dalia

Genger's motion to dismiss Orly Genger's application to remove Dalia Genger as trustee of the

Orly Genger 1993 Trust.

7.      Attached as **Exhibit D** is a true and correct copy of the Second Amended Stipulation of Discontinuance (the "NY Dismissal with Prejudice") [Dkt. #487], dated July 1, 2013, in *Genger v. Genger*, 651089/2010 (Sup. Ct. N.Y. County).

8.      Attached as **Exhibit E** is a true and correct copy of the Settlement Agreement dated June 16, 2013.

9.      Attached as **Exhibit F** is a true and correct copy of the Stipulation and Proposed Order of Dismissal (the "Delaware Dismissal"), entered August 30, 2013 in *Genger v. TR Investors, LLC*, C.A. No. 6906-CS (Del. Ch. Ct).

10.     Attached as **Exhibit G** is a true and correct copy of a letter, dated August 9, 2013, from Jeremy Anderson, as attorney for Dalia Genger as trustee of the Orly Genger 1993 Trust, to Chancellor Strine in *Genger v. TR Investors, LLC*, C.A. No. 6906-CS (Del. Ch. Ct).

11.     Attached as **Exhibit H** is a true and correct copy of the Order to Sever [Dkt. # 1153], entered November 25, 2014, in Genger v. Genger, Index No. 651089/2010 (Sup. Ct. N.Y. County).

12.     Attached as **Exhibit I** is a true and correct copy of the Orly Genger 1993 Trust Agreement.

13.     Attached as **Exhibit J** is a true and correct copy of the Memorandum of Law of Dalia Genger [Dkt. #216], filed March 6, 2012, in support of Dalia Genger's motion to dismiss the complaint in *Genger v. Genger*, Index No. 651089/2010 (Sup. Ct. N.Y. County).

14.     Attached as **Exhibit K** is a true and correct copy of the Amended Answer and Cross-Petition of Dalia Genger, filed August 22, 2017, in *In re Orly Genger*, File No. 2008-0017 (Surr. Ct. N.Y. County).

3

15.     Attached as **Exhibit L** is a true and correct copy of the Notice of Motion

[Dkt. #1099], filed on August 11, 2014, by Dalia Genger in *Genger v. Genger*, Index No.

651089/2010 (Sup. Ct. N.Y. County).

16.     Attached as **Exhibit M** is a true and correct copy of the Petition for

Turnover and Other Relief filed in this proceeding on June 14, 2016, by Dalia Genger as trustee

of the Orly Genger 1993 Trust.

Dated: New York, NY                                    By: _____
        May 7, 2018                                            John Boyle

4

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------------X
In the Matter of the Petition of Dalia Genger, as Trustee of
the Orly Genger 1993 Trust, Created by Trust Agreement
Dated December 13, 1993 between ARIE GENGER,
as Grantor, and LAWRENCE M. SMALL and
SASH A. SPENCER, as Trustees, to Turnover Property
o the Orly Genger 1993 Trust.

------------------------------------------------------------------x

New York County Surrogate's Court
MISCELLANEOUS DEPT.

APR 1 3 2018

FILED

Clerk_____

       DALIA GENGER,
       Trustee of the Orly Genger 1993 Trust,

          Petitioner,                       Index No. 2008-0017/E
              -against-

ORLY GENGER, ARIE GENGER, GLENCLOVA
INVESTMENT COMPANY, TR INVESTORS, LLC   **AMENDED PETITION**
NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC,  **FOR TURNOVER OF**
TRANS-RESOURCES, INC.                    **TRUST PROPERTY**
ARNOLD BROSER,                          **AND OTHER RELIEF**
DAVID BROSER, JOHN DOES. 1-20, and
JANE DOES 1-20,

       Respondents,
------------------------------------------------------------------------X

TO THE SURROGATE'S COURT, COUNTY OF NEW YORK:

    It is respectfully alleged:

### The Parties

    1.     Petitioner, Dalia Genger, resides and is domiciled at 200 E. 65th Street, in the City

of New York, County of New York and State of New York.

    2.     Petitioner is the Trustee of the Orly Genger 1993 Trust (the "Orly Trust").

    3.     Respondent Orly Genger ("Orly") is the only non-contingent beneficiary of the

Orly Trust (in addition to her daughter Lily). The remaining respondents ("Respondents") are

interested parties who wrongfully aided and abetted Orly in the misappropriation of Orly Trust

-1-

assets.

## Jurisdiction and Venue

4.      This Court has subject matter jurisdiction pursuant to the Surrogate's Court Procedure Act, inter alia, SCPA 103(50), SCPA 207(1), and SCPA 209(6).

5.      Venue in this County is proper pursuant to, inter alia, SCPA 207(1).

## The Orly Trust

6.      On or around December 13, 1993, Arie Genger ("Arie") settled the Orly Trust pursuant to a written Trust Agreement executed by Arie, as Grantor, the two prior Trustees, Lawrence M. Small and Sash A. Spencer (the "Trust Agreement"). (Ex. 1.)

7.      Pursuant to Article ELEVENTH, Section C of the Trust Agreement, all trust funds are to be held in the name of the Orly Trust, and no Orly Trust assets are to be used for the benefit of Orly's creditors (the "Trust Agreement Obligations").

8.      The Respondents were aware of the Trust Agreement Obligations.

## Orly Trust Derivative Litigation

9.      In July 2010, Orly instituted a derivative action the Supreme Court, New York County entitled Arie Genger, et al. v. Sagi Genger, et al., Index No. 651089/2010, by which she brought claims "on behalf of the Orly Trust as the beneficiary of the Orly Trust" (the "Orly Trust Derivative Litigation"). The Complaint sought to assert claims for the Orly Trust's ownership in shares of stock in a company called Trans-Resources, LLC as successor to Trans-Resources, Inc. ("TRI"). Orly later amended her pleading to assert claims against, inter alia, the purchasers of those TRI shares, Respondents Glenclova Investment Company, TR Investors, LLC , New TR Equity I, LLC, and New TR Equity II, and TRI (collectively, the "Trump Group Entities"). (Ex. 2.)

-2-

10.     On January 2, 2013, in the Orly Trust Derivative Litigation, Justice Jaffe of the Supreme Court, New York County adopted Orly's position that she "has legal standing to represent the Orly Trust" and "may act on behalf of the Orly Trust unless and until the Surrogate's Court rules otherwise in an appropriate action there." (Ex. 3.)

11.     Earlier on in the same Orly Trust Derivative Litigation, Orly moved to restrain Petitioner from pursuing what Orly characterized as a "duplicative" action as Trustee of the Orly Trust before the Delaware Chancery Court, by which Petitioner was seeking a declaration of obtain ownership of the same TRI shares. According to Orly: "In the instant action ..., I seek, among other things, the return of those [same] TRI Shares to the Orly Trust." Also according to Orly, Petitioner's "contention that the Orly Trust is not a party to this action ... is meritless. Orly is prosecuting this action on behalf of the Orly Trust." The Supreme Court, New York County, agreed, restraining Petitioner from pursuing the action in the Delaware Chancery Court by which the Orly Trust had sought the TRI shares. (Ex. 4.)

12.     As a derivative plaintiff for the Orly Trust, having prevented the 'duplicative litigation' brought by Petitioner herself on behalf of the Orly Trust, Orly became the de facto trustee of the Orly Trust and owed fiduciary duties to the Orly Trust.

13.     Respondents knew that Orly owed fiduciary duties to the Orly Trust.

### Discontinuance With Prejudice of
### The Orly Trust Claims

14.     In June 2013, Orly disclosed that she had "entered into a confidential settlement agreement to resolve all issues among the stipulating parties," which included the Trump Group Entities. However, the settlement terms were left undisclosed. Petitioner sought production of the settlement agreement, but Orly refused to produce it, claiming the document was too "confidential." When it was proposed that the document be produced under "Attorney's Eye's

Only" limitation, Orly refused that proposal as well. Instead, Orly submitted the Settlement Agreement to Justice Jaffe, unsolicited, for in camera inspection.

15.     By letter dated June 28, 2013, counsel to the Trump Group Entities wrote to the Court on behalf of all settling parties "including ... Orly Genger" confirming that: "A material term of the agreement among the settling parties was the dismissal of *all* claims presently pending against one another, in whatever capacity they were brought. [If the settlement stipulation was drafted so as to] have the effect of *not* dismissing Orly Genger's derivative claims against the Trump Group [Entities], contrary to the agreement of the settling parties. Excluding such claims from the claims that are to be dismissed is not what the Trump Group [Entities] bargained and paid for in the settlement . . ." (Ex. 5, emphases in original.)

16.     Neither Orly nor any of the other settling parties disagreed with counsel's statements regarding the scope of the settlement. Accordingly, on July 1, 2013, Justice Jaffe signed the requested Stipulation and Order of Discontinuance with Prejudice. (Ex. 6.)

## The Trump Group Entities Settlement Agreement

17.     Months later, as part of a parallel proceeding, the United States District Court directed Orly to produce her settlement agreement with the Trump Group Entities (the "Trump Group Entities Settlement Agreement"). (Ex. 7.) The document revealed that Orly had settled her claims against the Trump Group Entities both "in her individual capacity and in her capacity as beneficiary of the Orly Genger 1993 Trust" – the latter being the very capacity by which this Court permitted Orly to assert derivative claims. According to its signatories, the purpose of the agreement was "to resolve all issues, disputes and disagreements between [Orly and the other Settling Parties], including but not limited to the issue of ownership of all [TRI] shares," most significantly those TRI shares claimed by the Orly Trust.

-4-

18.    In exchange, the Trump Group Entities agreed to pay $32.3 million to the so-called "AG Group," consisting of Orly, her father Arie, and Respondents Arnold and David Broser (collectively, "the Brosers"). Upon information and belief, the Brosers are creditors of Orly personally, to whom Orly owes many millions of dollars. The payments were broken up into: (a) an immediate payment of $17.3 million and (b) two follow-up payments of $7.5 million. According to the federal court, which reviewed the document, "Orly monetized her beneficial interest in the Orly Trust['s] [TRI] shares for $32.3 million ...." (Ex. 8.)

19.    The Trump Group Entities have since reaffirmed that the federal court construed the Trump Group Entities Settlement Agreement correctly:

> "[Any suggestion] that the confidential settlement agreement *might* only dis-miss Orly's individual claims against the Trump Group [Entities], but not resolve the Orly Trust's claims against the Trump Group [Entities] and the TPR Group . . . is counterfactual. This Court has already held that certain of Orly's claims in this action, including the remaining claims, are derivative in nature, and may be maintained by Orly on behalf of the Orly Genger 1993 Trust. ... In settling the claims among them, the Trump Group [Entities], Trans-Resources, Orly and Arie agreed to the dismissal of all claims presently pending against one another. This agreement is memorialized in the Second Amended Stipulation of Discontinuance.

20.    Evidencing this intent, in Section 6(a) of the Trump Group Entities Settlement Agreement, Orly settled and released all of her claims in the Trump Group Entities Settlement in both her derivative and individual capacities. (Ex. 7, p. 10: Orly releasing the Trumps "in all capacities.") In Section 8(a) thereof, Orly further agreed to "cause" the Orly Trust to do the same, which she later did, advising the Delaware Chancery Court that she favored dismissal of Petitioner's action on behalf of the Orly Trust. The case was dismissed.

## The Settlement Proceeds

21.    Under applicable law, the proceeds of a settlement obtained in a derivative lawsuit belong to the direct plaintiff (in this case, the Orly Trust), not the derivative plaintiff (in

-5-

this case, Orly personally).  Nonetheless, to date, none of the aforementioned $32.3 million (the "Settlement Proceeds") has been remitted to the Orly Trust, nor have any of the settling parties indicated an intention to do so in the future.

22.      At a hearing before Justice Jaffe on March 25, 2015, counsel to the Trump Group Entities confirmed that $17.3 million of the Settlement Proceeds has already been paid, but that $15 million remains to be paid ("Remaining Payment").  (Ex. 9, pp. 10-11.)

23.      In a recent brief, Orly has alleged that, to date, she has not personally received any of the Settlement Proceeds.  If true, this means $17.3 million of the Settlement Proceeds has been paid to other members of the "AG Group," i.e., the Brosers and Arie (the "Initial Payment").  Orly has not disclosed the intended recipients of the remaining $15 million.

24.      Consistent with her fiduciary duty to the Orly Trust and the express terms of the Trust Agreement Obligations, Orly was required to ensure that the Trump Group Entities Settlement proceeds were paid to the Orly Trust.  Orly failed to comply with these duties and obligations.  Respondents Arie Genger, Arnold Broser, and David Broser were aware of, and aided and abetted, Orly's breaches of her fiduciary duty to the Orly Trust and the express terms of the Trust Agreement Obligations.

25.      In addition to the named Respondents Arie Genger, Arnold Broser, and David Broser, Orly was further aided and abetted in her breaches of her fiduciary duty to the Orly Trust and the express terms of the Trust Agreement Obligations was aided and abetted by other attorneys, advisors and other professionals who were aware of her duties and obligations and profited from the breach thereof.  Petitioner reserves her right to amend her Petition to add these John Does and Jane Does as additional Respondents, as further facts become available through discovery and otherwise.

-6-

**Petitioner's Substitution Motion**

26.     In order to protect the rights of the Orly Trust, Petitioner moved in the Supreme

Court, New York County, for an order permitting it to substitute for Orly as plaintiff in the Orly

Trust Derivative Litigation and compelling the settling parties to deposit the Settlement Proceeds

into Court. Orly vigorously opposed the Petitioner's motion, on the ground, inter alia, that she is

seeking to remove the Petitioner as Trustee of the Orly Trust.  By Interim Order dated May 7,

2015, Justice Jaffe neither granted nor denied the motion, but rather held it in abeyance pending

this Court's determination of Orly's removal petition. (Ex. 10.)

27.     At the March 25, 2015 hearing on Petitioner's motion, Justice Jaffe suggested it

might already be too late to deposit the Initial Payment into Court, as the $17.3 million

apparently has already been paid out to non-parties. (Ex. 9, p. 28: "it sounds like that ship has

sailed").   Accordingly, Petitioner brings this Petition seeking, inter alia, monetary damages for

misappropriation of Orly Trust assets.  To the extent such Settlement Proceeds are recoverable,

Petitioner seeks turnover of those funds for the Orly Trust.

### Count I: Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary Duty Against Respondents Orly Genger, Arie Genger, Arnold Broser, and David Broser

28.     The allegations contained in paragraphs 1 through 27 hereinbefore are realleged

as if fully set forth herein.

29.     Because the Orly Trust Derivative Litigation was brought on behalf of the Orly

Trust, the Settlement Proceeds therefrom belong to the Orly Trust.

30.     Orly owed a fiduciary duty to the Orly Trust.

31.     Consistent with her fiduciary duty to the Orly Trust, Orly was required to ensure

that the Settlement Proceeds were paid to the Orly Trust.

32.     Orly did not so do.  Instead, she entered into the Trump Group Entities Settlement

Agreement, which provided for the Settlement Proceeds to be paid to parties other than the Orly

Trust, and she authorized payment of the Settlement Proceeds to such other parties.

33.    Orly's actions constitute a breach of fiduciary duty.

34.    Respondents Arie Genger, Arnold Broser, and David Broser were aware of Orly's

fiduciary duty to the Orly Trust.

35.    Respondents Arie Genger, Arnold Broser, and David Broser knowingly induced

and/or participated in Orly's breach of her fiduciary duty to the Orly Trust by, inter alia, taking

the Settlement Proceeds which belong to the Orly Trust, by drafting and entering into the Trump

Group Entities Settlement Agreement which failed to direct payment of the Settlement Proceeds

to the Orly Trust, by advising and inducing Orly to enter into the Trump Group Entities

Settlement Agreement which failed to direct payment of the Settlement Proceeds to the Orly

Trust, and/or by directing and authorizing payment of the Settlement Proceeds to parties other

than the Orly Trust.

36.    In doing so, Respondents Arie Genger, Arnold Broser, and David Broser aided

and abetted Orly's breach of fiduciary duty.

37.    The Orly Trust has been injured by Orly's breach of fiduciary duty and the

remaining Respondents' Arie Genger, Arnold Broser, and David Broser  aiding and abetting of

Orly's breach of her fiduciary duty to the Orly Trust in the amount of $32.3 million, plus

statutory interest.

### Count II: Tortious Interference with Contract
### Against Respondents Orly Genger, Arie Genger, Arnold Broser, and David Broser

38.    The allegations contained in paragraphs 1 through 37 hereinbefore are realleged

as if fully set forth herein.

39.    The Trust Agreement is a valid contractual agreement by the Orly Trust.

-8-

40.     Pursuant to the Trust Agreement Obligations, all trust funds were to be held in the name of the Orly Trust, and no Orly Trust assets were to be used for the benefit of Orly's creditors.

41.     Because the Orly Trust Derivative Litigation was brought on behalf of the Orly Trust, the Settlement Proceeds therefrom belong to the Orly Trust.

42.     Respondents Orly Genger, Arie Genger, Arnold Broser, and David Broser were aware of the Trust Agreement Obligations.

43.     The Orly Trust, acting through its de facto trustee Orly in the Orly Trust Derivative Litigation, breached the Trust Agreement Obligations by causing the Settlement Trustees to not be held in the name of the Orly Trust, and to instead use the Settlement Proceeds for the benefit of Orly's creditors, including the Brosers.

44.     Respondents Orly Genger, Arie Genger, Arnold Broser, and David Broser caused the Orly Trust's breach of the Trust Agreement Obligations by, inter alia, taking the Settlement Proceeds which belong to the Orly Trust, by drafting and entering into the Trump Group Entities Settlement Agreement which failed to direct payment of the Settlement Proceeds to the Orly Trust, by advising and inducing Orly to enter into the Trump Group Entities Settlement Agreement which failed to direct payment of the Settlement Proceeds to the Orly Trust, and/or by directing and authorizing payment of the Settlement Proceeds to parties other than the Orly Trust.

45.     In doing so, Respondents Orly Genger, Arie Genger, Arnold Broser, and David Broser tortiously interfered with the Trust Agreement Obligations.

46.     Respondents' Orly Genger, Arie Genger, Arnold Broser, and David Broser interference with the Trust Agreement Obligations was both intentional and improper.

-9-

47.    The Orly Trust has been injured by Respondents' Orly Genger, Arie Genger, Arnold Broser, and David Broser tortious interference with contract in the amount of $32.3 million, plus statutory interest.

### Count III: Money Had and Received
### Against Respondents Orly Genger, Arie Genger, Arnold Broser, and David Broser

48.    The allegations contained in paragraphs 1 through 47 hereinbefore are realleged as if fully set forth herein.

49.    Pursuant to the Trust Agreement Obligations, all trust funds were to be held in the name of the Orly Trust, and no Orly Trust assets were to be used for the benefit of Orly's creditors.

50.    Because the Orly Trust Derivative Litigation was brought on behalf of the Orly Trust, the Settlement Proceeds therefrom belong to the Orly Trust.

51.    Orly was required to ensure that the Settlement Proceeds were paid to the Orly Trust.

52.    Respondents Orly Genger, Arie Genger, Arnold Broser, and David Broser knew that Orly was required to ensure that the Trump Group Entities Settlement proceeds were paid to the Orly Trust.

53.    However, pursuant to the terms of the Trump Group Entities Settlement Agreement, the Settlement Proceeds were and are to be paid by the Trump Group Entities to parties other than the Orly Trust.

54.    None of the Settlement Proceeds have been paid to the Orly Trust.

55.    Respondents Orly Genger, Arie Genger, Arnold Broser, and David Broser received the Settlement Proceeds instead of the Orly Trust.

56.    Respondents Orly Genger, Arie Genger, Arnold Broser, and David Broser

-10-

received a benefit from the Settlement Proceeds which belongs to the Orly Trust.

57.    Under principles of good conscience, Respondents Orly Genger, Arie Genger, Arnold Broser, and David Broser should not be allowed to retain the Settlement Proceeds which belong to the Orly Trust, but rather should be compelled to return all $32.3 million to the Orly Trust, plus statutory interest.

## Count IV: Unjust Enrichment
### Against Respondents Orly Genger, Arie Genger, Arnold Broser, and David Broser

58.    The allegations contained in paragraphs 1 through 57 hereinbefore are realleged as if fully set forth herein.

59.    Pursuant to the Trust Agreement Obligations, all trust funds were to be held in the name of the Orly Trust, and no Orly Trust assets were to be used for the benefit of Orly's creditors.

60.    Because the Orly Trust Derivative Litigation was brought on behalf of the Orly Trust, the Settlement Proceeds therefrom belong to the Orly Trust.

61.    Orly was required to ensure that the Settlement Proceeds were paid to the Orly Trust.

62.    Respondents Orly Genger, Arie Genger, Arnold Broser, and David Broser knew that Orly was required to ensure that the Settlement Proceeds were required to be paid to the Orly Trust.

63.    Respondents Orly Genger, Arie Genger, Arnold Broser, and David Broser received the Settlement Proceeds instead of the Orly Trust.

64.    Respondents Olry Genger, Arie Genger, Arnold Broser, and David Broser received a benefit from receiving the Settlement Proceeds which belong to the Orly Trust.

65.    The benefit Respondents Olry Genger, Arie Genger, Arnold Broser, and David

-11-

Broser received from payment of the Settlement Proceeds was at the expense of the Orly Trust.

66.    Under principles of equity and good conscience, Respondents Orly Genger, Arie Genger, Arnold Broser, and David Broser must make restitution to the Orly Trust in the amount of $32.3 million, plus statutory interest.

### Count V: Turnover
### Against All Respondents

67.    The allegations contained in paragraphs 1 through 66 hereinbefore are realleged as if fully set forth herein.

68.    Pursuant to the Trust Agreement Obligations, all trust funds were to be held in the name of the Orly Trust, and no Orly Trust assets were to be used for the benefit of Orly's creditors.

69.    Because the Orly Trust Derivative Litigation was brought on behalf of the Orly Trust, the Settlement Proceeds therefrom belong to the Orly Trust.

70.    Orly was required to ensure that the Settlement Proceeds were paid to the Orly Trust.

71.    Respondents knew that Orly was required to ensure that the Settlement Proceeds were required to be paid to the Orly Trust.

72.    Respondents Orly Genger, Arie Genger, Arnold Broser, and David Broser received the Settlement Proceeds instead of the Orly Trust.

73.    Respondents have in their possession the Settlement Proceeds which should be delivered to the Orly Trust.

74.    Respondents the Trump Group Entities have in their possession, custody or control the Remaining Payment which has yet to be paid and which should be delivered to the Orly Trust.

75.    Respondents have refused to turn over the Settlement Proceeds in their respective possession, custody or control to the Orly Trust or pay it into Court.

76.    Respondents should be compelled to turn over to the Orly Trust all Settlement Proceeds in their possession, custody or control.

### Count VI: Injunction
### Against the Trump Group Entities

77.    The allegations contained in paragraphs 1 through 76 hereinbefore are realleged as if fully set forth herein.

78.    Pursuant to the Trust Agreement Obligations, all trust funds were to be held in the name of the Orly Trust, and no Orly Trust assets were to be used for the benefit of Orly's creditors.

79.    Because the Orly Trust Derivative Litigation was brought on behalf of the Orly Trust, the Settlement Proceeds therefrom belong to the Orly Trust.

80.    Orly was required to ensure that the Settlement Proceeds were paid to the Orly Trust.

81.    Respondents knew that Orly was required to ensure that the Settlement Proceeds were required to be paid to the Orly Trust.

82.    Respondents the Trump Group Entities have in their possession, custody or control the Remaining Payment which has yet to be paid and which should be delivered to the Orly Trust.

83.    If Respondents the Trump Group Entities pay the Remaining Payment to any of the other Respondents or to any party other than the Orly Trust or otherwise expend, encumber, spend, transfer or release the Remaining Payment, the Orly Trust will be irreparably harmed.

84.    Accordingly, the Trump Group Entities must be preliminarily and permanently

-13-

enjoined from paying, expending, encumbering, spending, transferring or releasing the Remaining Payment to any of the other Respondents or to any party other than the Orly Trust, until further order of this Court.

**Count VII: Accounting**
**Against Respondent Orly**

85.     The allegations contained in paragraphs 1 through 84 hereinbefore are realleged as if fully set forth herein.

86.     Orly has never provided an accounting of the Settlement Proceeds, which are an asset of the Orly Trust.

87.     As a matter of law and equity, Orly should provide an accounting of the Settlement Proceeds.

**Interested Parties**

88.     The names and addresses of all persons, other than the Petitioner, interested in the obtaining a determination of the issues presented in this Petition, and all other persons interested in this proceeding who are required to be cited upon this application or concerning whom this Court is required to have information, are:

(a)     The following who are of full age and sound mind or are corporations or associations:

ORLY GENGER
210 Lavaca Street #1903
Austin, Texas 78701

Interest: Beneficiary and Respondent

ARIE GENGER
17001 Collins Avenue,
Sunny Isles Beach, Florida

Interest: Respondent

-14-

GLENCLOVA INVESTMENT COMPANY
41 Madison Ave,
New York, New York

Interest: Respondent

TR INVESTORS, LLC
41 Madison Ave,
New York, New York

Interest: Respondent

NEW TR EQUITY I, LLC
41 Madison Ave,
New York, New York

Interest: Respondent

NEW TR EQUITY II, LLC,
41 Madison Ave,
New York, New York

Interest: Respondent

TRANS-RESOURCES, LLC as successor to Trans-Resources, Inc.
41 Madison Ave,
New York, New York

Interest: Respondent

ARNOLD BROSER
5371 Fisher Island Drive,
Miami Beach, Florida

Interest: Respondent

DAVID BROSER
104 West 40th Street, 19th Floor
New York, New York

Interest: Respondent

SAGI GENGER 1993 TRUST
C/O John Dellaportas
Kelley Drye & Warren LLP
101 Park Avenue

-15-

New York, NY 10178

Interest: Contingent Remainderman


(b)    The following who are persons under disability:
       Infants: None
       Others under a disability: None
(c)    The following persons who are confined in prison: None
(d)    The following persons whose names or whereabouts are unknown: None

89.    There are no persons, corporations or associations other than those mentioned

who are interested in this proceeding.

90.    No previous application for this or similar relief has been made to this or any

other court except Motion Seq. 42 (for payment into Court) in the Orly Trust Derivative

Litigation, entitled Arie Genger, et al. v. Sagi Genger, et al., Index No. 651089/2010 in New

York Supreme Court, New York County.  Motion Seq. 42 was held in abeyance by the Supreme

Court pending a determination by this Court.

-16-

WHEREFORE, Petitioner requests the following relief::

a.      Against respondents Orly Genger, Arie Genger, Arnold Broser and David Broser, damages in the amount of $32.3 million, plus statutory interest;

b.      Against respondents Glencova Investment Co., TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC, Trans-Resources, LLC, as successor to Trans-Resources, Inc., turnover of the Remaining Payment;

c.      Against respondents Glencova Investment Co., TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC, Trans-Resources, LLC, as successor to Trans-Resources, Inc preliminarily and permanently enjoining them from paying, expending, encumbering, spending, transferring or releasing the Remaining Payment to any of the other Respondents or to any party other than the Orly Trust, until further order of this Court;

d.      imposition of a constructive trust on the Settlement Proceeds;

e.      an order directing the delivery of the Settlement Proceeds to her as Trustee;

f.      an accounting of the Settlement Proceeds; and

g.      such other relief as to the Court seems just and necessary.

Dated: New City, New York
        April 12, 2018

_Dalia Genger_
DALIA GENGER

-1-

## VERIFICATION

STATE OF NEW YORK

) ss.:

COUNTY OF NEW YORK

DALIA GENGER, the petitioner named in the foregoing Amended Verified

Petition, being duly sworn, deposes and says:

1. I am the Petitioner in this matter.

2. I have read the annexed Amended Verified Petition, know the contents thereof and the same are true to my knowledge, except those matters thereon which are stated to be alleged upon information and belief, and as to those matters I believe them to be true.

DALIA GENGER

Sworn to before me this
12 day of April, 2018

Notary Public

```
MONICA LYNN HOWARD
Notary Public - State of New York
NO. 01HO6348491
Qualified in Queens County
My Commission Expires Sep 26, 2020
```

-2-

# SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT: _COOPER_ _____

Justice

PART _51_

GENGER, DALIA

- v -

ARIE GENGER

INDEX NO. _302436/02_

MOTION DATE _____

MOTION SEQ. NO. _21_

MOTION CAL. NO. _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

| | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | _____ |
| Answering Affidavits — Exhibits _____ | _____ |
| Replying Affidavits _____ | _____ |

Cross-Motion:   ☐ Yes   ☒ No

Upon the foregoing papers, it is ordered that this motion

**MOTION IS DECIDED IN ACCORDANCE WITH ATTACHED MEMORANDUM DECISION.**

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):

Dated: JUN 03 2016 _____

MATTHEW F. COOPER J.S.C.
J.S.C.

Check one:   ☒ FINAL DISPOSITION   ☐ NON-FINAL DISPOSITION

Check if appropriate:   ☐ DO NOT POST   ☐ REFERENCE

☐ SUBMIT ORDER/ JUDG.   ☐ SETTLE ORDER/ JUDG.

## SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT: _____Cooper_____          PART _51_

_Justice_

Genger, D .

- v -

Genger, A

INDEX NO. _3 02436/02_

MOTION DATE _____

MOTION SEQ. NO. _22_

MOTION CAL. NO. _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

|  | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | |
| Answering Affidavits — Exhibits _____ | |
| Replying Affidavits _____ | |

**Cross-Motion:** ☐ Yes   ☒ No

Upon the foregoing papers, it is ordered that this motion

is decided in accordance with the memorandum decision
in connection with motion sequence 21

JUN 03 2016

Dated: _____

MATTHEW F. COOPER _J.S.C._
J.S.C.

Check one:   ☒ **FINAL DISPOSITION**   ☐ **NON-FINAL DISPOSITION**

Check if appropriate:   ☐ **DO NOT POST**   ☐ **REFERENCE**

☐ **SUBMIT ORDER/ JUDG.**   ☐ **SETTLE ORDER/ JUDG.**

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):

## SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT:  _COOPER_  PART _51_
                    _Justice_

GENGER, DALIA

INDEX NO. _302436/02_

MOTION DATE _____

- v -

MOTION SEQ. NO. _23_

ARIE GENGER

MOTION CAL. NO. _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

| | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | |
| Answering Affidavits — Exhibits _____ | |
| Replying Affidavits _____ | |

**Cross-Motion:** ☐ Yes  ☒ No

Upon the foregoing papers, it is ordered that this motion

is decided in accordance with the memorandum decision
in connection with motion sequence 21

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE
FOR THE FOLLOWING REASON(S):

Dated: **JUN 0 3 2016** _____

MATTHEW F. COOPER
J.S.C.          _J.S.C._

Check one:  ☒ **FINAL DISPOSITION**   ☐ **NON-FINAL DISPOSITION**

Check if appropriate:   ☐ **DO NOT POST**        ☐ **REFERENCE**

☐ **SUBMIT ORDER/ JUDG.**        ☐ **SETTLE ORDER/ JUDG.**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:  PART 51
---------------------------------------------------------X
DALIA GENGER,

                Plaintiff,

                        Index No. 302436/2002
                        Motion Sequence Nos. 21, 22 and 23

        -against-

                        **DECISION AND ORDER**

ARIE GENGER,

                Defendant.

---------------------------------------------------------X
**For the Plaintiff**        **For the Defendant**
Judith Lisa Bachman, Esq.     Robert Z. Dobrish, Esq.
100 Park Avenue, 16ᵗʰ Floor    Dobrish Michaels Gross LLP
New York, NY 10017       757 Third Avenue
(212) 210-9272          New York, NY 10017
                   (212) 532-4000

Papers and exhibits considered in review of defendant's Orders to Show Cause:

    Motion Sequence No. 21
        Defendant's Order to Show Cause..............................................................1
        Plaintiff's Opposition...............................................................................2
        Defendant's Reply Affirmation................................................................3

    Motion Sequence No. 22
        Defendant's Order to Show Cause..............................................................1
        Plaintiff's Opposition...............................................................................2
        Defendant's Reply Affirmation................................................................3

    Motion Sequence No. 23
        Defendant's Order to Show Cause..............................................................1
        Plaintiff's Opposition...............................................................................2
        Defendant's Reply Affirmation................................................................3

**Matthew F. Cooper, J.:**

    Divorced more than a decade ago, the parties, along with their two grown children, have

been relentlessly litigating against one another ever since.  The case is now before me on a series

of post-judgment matrimonial motions brought by the ex-husband, Arie Genger ("Arie"), against

the ex-wife, Dalia Genger ("Dalia").

    The issue in all three motions is which ex-spouse owns a stock purchase agreement (the

"S.P.A.") that was used by Arie to sell shares of a company he owned to the parties' son, Sagi

Genger ("Sagi"). The S.P.A. is also the subject of a lawsuit between Arie and Sagi in which Arie

seeks to collect payment from his son on the instrument.

Arie contends that the S.P.A. is his separate property. Dalia asserts that the S.P.A. is a

non-liquid marital asset and, pursuant to the terms of a Stipulation of Settlement (the

"Stipulation"), which was signed by the parties on October 26, 2004, and was incorporated into

the judgment of divorce dated January 14, 2005, is subject to distribution by way of a coin toss.

As a result of having unilaterally conducted the coin toss on January 5, 2015, Dalia further

contends that the S.P.A. now belongs to her. In each of the motions, Arie seeks a finding that the

coin toss was invalid and that the instrument belongs to him.

*Background*

What is notable about the motions is not so much the S.P.A., it being of little value

relative to the parties' overall wealth. Rather, it is that the motions are just one more installment

in what has been described as the "Genger family's litigation saga" (*Genger v Genger*, 76 F Supp

3d 488, 491 [SDNY 2015]), with the parties and their two children continually suing one another

personally and through their various family-held businesses. A Westlaw search reveals that the

Genger's lawsuits against each other have resulted in almost 40 reported decisions from the New

York State Supreme Court and the Federal District Court for the Southern District of New York.

Of the state court decisions, at least 10 have been from the Appellate Division, First Department.

There has also been extensive litigation in the Delaware state courts, as well as countless

unpublished decisions and orders from trial judges in the matrimonial and IAS parts of this court.

As other judges have lamented, the "bitter and seemingly endless battle" (*Glencova*

*Investment Co. v Trans-Resources, Inc.*, 874 F Supp 2d 292, 295 [SDNY 2012]) between the

family members, which pits Dalia and Sagi against Arie and the couple's daughter, Orly Genger,

2

("Orly"), results, in large part, from the divorce itself.  In one of the Genger family cases that was

before her, Federal Judge Katherine B. Forrest stated

> "As Tolstoy famously wrote, 'Happy families are all alike; every
> unhappy family is unhappy in its own way.' (Leo Tolstoy, *Anna
> Karenina* 1 [Constance Garnett trans., 1978]). In the case of the
> wealthy Genger family, that unhappiness has taken the form of a
> seemingly never-ending series of lawsuits stemming from the
> divorce of Arie Genger and Dalia Genger, the family patriarch and
> matriarch, respectively. Together, Arie, Dalia, their son Sagi, and
> their daughter Orly have employed a small army of lawyers to fight
> over the pieces of the family pie and, it seems, to make each other's
> lives as miserable as possible"

(*Genger*, 76 F Supp 3d at 491).

In a decision rendered in February of this year after a 27-day trial in one of the many

lawsuits that Orly and Sagi have brought against each other in New York County Supreme Court,

Justice Barbara Jaffe wrote:

> "The parties are siblings; their family has been mired in litigation in
> several jurisdictions for many years, all inspired by the contentious
> divorce of the parties' parents. This action reflects the parents'
> enmity which has malignantly spread to their children".

(*Orly Genger v Sagi Genger*, Sup Ct, NY County, February 10, 2016, Jaffe, J., index No.

100697/08)

Despite having more money than they could ever hope to spend, the Genger's

interminable battle over who gets what has resulted in the two family camps having no

relationship with the other; the only contact the siblings have with each other and each parent has

with the child with whom he or she is not aligned is when they are in a courtroom litigating.

Perhaps the saddest manifestation is that Arie has never seen his grandchildren.  One gets the

sense that this may indeed be a case where it really is not about the money: it is about a

dysfunctional family where each member is intent on inflicting as much pain as possible on his or her ex-spouse, parent, child or sibling.

The Gengers have the right, of course, to make each other as miserable as they want. The problem is that the method they have chosen adversely impacts the court system and the people it serves. Litigation like the type the Genger family members have engaged in over the last decade – litigation that knows no bounds and is brought to inflict punishment on former loved-ones as much as it is to resolve actual claims – demands a disproportionate share of already limited judicial resources. The result is that litigants who lack the resources to command a "small army of lawyers," but often have claims equally or more pressing than the Genger's, find themselves receiving less time and attention from the courts than their cases deserve.

*Statement of Facts*

According to Justice Jaffe's trial decision, quoted above, much of the blame for making the Gengers a family whose *raison d'etre* is to sue one another rests with Arie and Dalia's decision to have Sagi take an active role in arriving at the terms of the divorce Stipulation. To make matters worse, the Stipulation provided that Sagi was to be appointed attorney-in-fact so that he could allocate non-liquid marital assets to his mother and father in order to effectuate an equal distribution of those assets. Predictably, this proved highly problematic, with Arie, joined by Orly, charging that Sagi was making allocations solely to benefit Dalia, and in turn, Sagi himself.

The S.P.A. is but one tiny sliver of the family's financial pie. Dated March 8, 2004, it requires Sagi to make payments each year to Arie in exchange for Arie having transferred to him 100 shares of common stock of AG Real Estate GP, Inc., a company used by Arie in connection with the family's Canadian real estate investments.

4

Notably, the value of the S.P.A. is only worth the amount that Arie will obtain by suing his son on the instrument, there being no indication that Sagi will ever pay voluntarily. At oral argument, both sides conceded that the very most Arie could hope to realize is $300,000. Moreover, if things proceed the way they have, it will presumably be years, along with hundreds of thousands of dollars in additional legal fees, before he gets a penny. On the other hand, if Dalia was granted ownership of the S.P.A., it can safely be assumed that she would waive enforcement of the instrument against Sagi, thereby relieving the child with whom she is aligned from having to make the required payments.

The "coin toss" provision, which is found in Article II of the Stipulation ("Distribution of Assets"), states that if the parties have not sold or divided a non-liquid marital asset by the second anniversary of the Stipulation, and are then unable to reach an agreement as to its disposition within 45 days of the anniversary date, a coin toss will be held to determine the value of the asset and which party owns it. The Stipulation sets out the procedure for the coin toss with the same type of detail one would expect from the rules governing the coin toss at the National Football League's Super Bowl.

The second anniversary of the Stipulation was October 26, 2006, a date that passed without the S.P.A. being sold or divided. Similarly, no agreement was reached as to the disposition of the S.P.A. by December 10, 2006, that being the 45th day following the two-year anniversary date. Despite the absence of a sale, division, or agreement as to the disposition of the instrument by either of the trigger dates, there was no demand by either party for a coin toss. In fact, the purported coin toss did not take place until more than nine years later when, on January 5, 2015, Dalia unilaterally conducted the event without her ex-husband's participation. As a result of having done so, she now claims ownership of the asset.

5

Dalia's decision to move forward with the coin toss after so many years was not the result of whim or happenstance. Instead, it was precipitated by the Appellate Division rendering a decision on December 4, 2014, in *Genger v Genger*, 123 AD3d 445 (1st Dept 2014), one of a multitude of Genger appeals before it. This appeal, which pitted Arie against Sagi and Dalia, stemmed from a decision by Justice Cynthia Kern, another Supreme Court judge who has handled Genger cases. Although she found that Arie owned the S.P.A., she denied summary judgment to him in his effort to collect against Sagi on the instrument and on three promissory notes. The Appellate Division reversed the denial of summary judgment and remanded the matter to Justice Kern for "a calculation of the amount of damages owed to Arie under the stock purchase agreement," as well as a "calculation of the simple interest owed to him in accordance with the terms of [the] notes...and the stock purchase agreement" (*Genger* at 447-448).

While Arie construed the Appellate Division's decision as a clear acknowledgment that he owned the S.P.A., Dalia apparently viewed certain language used in the decision as reason for her to demand the coin toss. On December 22, 2014, two weeks after the decision, one of Dalia's matrimonial attorneys, Judith Bachman, Esq., sent notice to one of Arie's attorneys, Edward Klimerman, Esq., notifying him that the long-delayed event would take place on January 5, 2015. Despite being advised by a letter from Arie's matrimonial attorney, Robert Z. Dobrish, Esq., that Arie objected to the coin toss and would not participate, Dalia proceeded with the toss on January 5 without Arie being present. Although the Stipulation specifies that "the coin will be tossed in the air by Orly Genger, or in her absence by a person mutually acceptable to the Husband and the Wife," neither Orly nor a "mutually acceptable" person tossed the coin on January 5, 2015. Instead, it was done by one of Sagi's lawyers, John Dellaportas, Esq., of Morgan, Lewis & Bockius, LLP, who was presumably properly attired for the task in a head referee's striped jersey and white cap.

6

As one would imagine, these events gave rise to another round of frenzied motion practice. Arie brought the series of motions that are the subject of this decision, and he moved before Justice Kern, pursuant to the Appellate Division's decision remanding the case to her, for judgment against Sagi on the S.P.A. Dalia, in turn, cross-moved for summary judgment declaring her to be the instrument's rightful owner.

Naturally, I would have preferred if Justice Kern had decided the coin toss issue, thereby subjecting her decision, rather than mine, to the inevitable appeal. She, however, in a decision dated February 26, 2015, ruled that "the determination of whether the coin toss was valid should be made by the Honorable Matthew Cooper in the matrimonial part" (*Genger v Genger*, Sup Ct, NY County, Kern J., index No. 104249/07). In making the referral, she reasoned that this was ultimately a decision to be made within the context of the post-divorce proceeding, especially in that the ex-husband had already moved before me to set aside the coin toss as invalid. In the end, the coin toss issue, like just about everything in world of the Gengers, goes back to the divorce itself. Thus, it is appropriate for the issue to be decided in a matrimonial part.

### *Legal Analysis*

In support of their quest for ownership of the S.P.A., both sides look to this stand-alone, single-sentence paragraph, from the Appellate Division's December 2014 decision:

> "To the extent the notes and stock purchase agreement were considered 'non-liquid assets,' subject to a 'coin toss' procedure set forth in the divorce settlement, Arie owns the instruments and the debts are owed to him"

(*Genger*, 123 AD3d at 446).

More precisely, each side looks to one or the other of the two clauses comprising the sentence. Dalia points to the sentence's dependent clause, consisting of these words: "To the extent the notes and stock purchase agreement were considered 'non-liquid assets,' subject to a

7

'coin toss' procedure set forth in the divorce settlement." According to Dalia, by including this language in the sentence, the Appellate Division authorized her to proceed with the coin toss, which resulted in her obtaining ownership of the S.P.A. Arie, on the other hand, focuses on the independent clause, which consists of these words: "Arie owns the instruments and the debts are owed to him." According to Arie, this was a definitive declaration by the Appellate Division that he owns the S.P.A.

The problem with each side's textual analysis is that it disregards the need to look at the sentence as a whole rather than just the individual clauses of which it is composed. While the dependent clause refers to the coin toss procedure, it is not a statement by the Appellate Division that the S.P.A. is an asset subject to the procedure. It serves only to introduce and modify the independent clause that follows it; grammatically, it cannot stand on its own as a declaration of anything. Likewise, the statement contained in the independent clause that Arie owns the instruments is not absolute; it is subject to the provisions of the words preceding it.

Because of the wording of the dependent clause, it is impossible to reconcile the two clauses in a way that would result in the sentence as a whole making any sense, particularly when viewed in the context of what the Stipulation states. If one substitutes the common meaning for the prepositional phrase "to the extent that," the sentence would read like this: "[Inasmuch as] the notes and stock purchase agreement were considered 'non-liquid assets,' subject to a 'coin toss' procedure set forth in the divorce settlement, Arie owns the instruments and the debts are owed to him." And because it is necessary to give full force and effect as to each word in the sentence's two clauses, the conclusion to be drawn is that if the S.P.A. is subject to the coin toss procedure, it is Arie's property. This, of course, is in total conflict with the Stipulation. Under the very clear terms of the Stipulation, the complete opposite is true: If the S.P.A. is an asset that is subject to a

8

general partner, AG Real Estate GP, Inc., a corporation owned by Arie. It was the stock in AG Real Estate GP, Inc. that Arie then sold to Sagi through the S.P.A.

Inasmuch as the S.P.A. consists of shares of the general partner in AG Real Estate Partners, L.P., the partnership at the center of the Canadian real estate investments, it constitutes property that comes within the scope of the arbitrator's dismissal of Dalia's "AG Properties claim." The dismissal is based on the arbitrator's express finding that "Dalia never had any real or equitable marital interest in the Canadian venture." Thus, the arbitration decision must be seen as conclusively determining that the S.P.A. was not marital property to which Dalia had an equitable claim.

The fact that Dalia took no action for so many years with regard to the S.P.A. demonstrates that she too regarded the arbitrator's decision to be a binding determination that she had no claim to the instrument. It was only after Arie sued Sagi on the S.P.A. and the Appellate Division rendered its decision, with its confusing sentence referencing the coin toss, that Dalia was suddenly motivated – after close to a decade of inactivity – to demand and then proceed with the coin toss. The effort, however, was to no avail. Whatever happened when Dalia's attorney flipped a coin into the air on January 5, 2015, was of no force and effect. This is because the S.P.A. was not, and is not, properly the subject of such a procedure. Although it is a non-liquid asset, the record establishes that it is not a marital asset; instead, the S.P.A. is Arie's separate property and thus not susceptible to division between the parties by coin toss or other means.

### Conclusion

The Genger story is compelling in its own way, as is any story of a family in turmoil. Much like watching a televison series about a rich and powerful, but ultimately tragic, family, we marvel at how people can have so much materially, and yet be so incredibly unhappy that they

10

dedicate their lives to suing their own sons, daughters, mothers, fathers, brothers and sisters. But as with most stories like this, there comes a time when it becomes simply tiresome, a time when we have seen far too much of the characters, their constant self-absorption and sense of entitlement, and their incessant troubling behavior.

The same way that a series about an unhappy family must ultimately come to an end, the time for the Gengers continuing to occupy center stage in the New York court system must also end. Recently, our new Chief Judge, Janet DiFiore, unveiled an initiative to curb what she described as "troublesome" inefficiencies in court operations. In an address to the court system's administrative judges, she stated that she wanted to "make certain that we are putting our resources to our highest and best uses" (New York Law Journal, March 31, 2016 at 1, col 3). It seems obvious that continuing to give the Gengers the exorbitant amount of court time that they demand is not putting our resources to their "highest and best uses."

With the dispute over the S.P.A. having been decided, it is this judge's hope that the parties and their children might take a step back and reflect on how destructive this path of constant litigation is, not only to them, but to the courts and the other litigants who truly need our services. If they are unable to do so, it may be incumbent on judges and court administrators to devise a method to curb what is becoming perilously close to an abuse of the judicial system.

In light of the foregoing, defendant's three motions are granted to the extent they seek to have him declared the owner of the S.P.A. and the coin toss declared invalid.

This constitutes the decision and order of the court.


Dated: June 3, 2016                    Enter: _____

**MATTHEW F. COOPER**
**J.S.C.**


11

SURROGATE'S COURT : NEW YORK COUNTY
----------------------------------------X
In the Matter of the Application of
Orly Genger to Remove Dalia Genger
as Trustee of the The Orly
Genger 1993 Trust Established on
December 13, 1993, by

        ARIE GENGER,

            Grantor.
----------------------------------------X



New York County Surrogate's Court

Date: June 21, 2017

File No. 2008-0017

A N D E R S O N,  S .

    This is a proceeding by Orly Genger, the primary

beneficiary of an irrevocable inter vivos trust established in

1993 by her father, Arie Genger, seeking removal of her mother,

Dalia Genger, as trustee and the appointment of a successor

trustee.   Pending are two motions to dismiss Orly's third

amended petition, one by Dalia and the other by the trustee of

the contingent remainder beneficiary, a trust Arie Genger

established for the benefit of Orly's brother Sagi (the "Sagi

Trust").   For the reasons stated below, the motions are denied.

    The trust at issue (the "Orly Trust") provides for

discretionary income and principal distributions to Orly for

life, with remainder to her descendants, or, if none, to the

Sagi Trust.   The original trustees and a series of successors

served until January 2008, at which time Dalia was designated

trustee. By this time, Dalia and Arie had concluded a bitter

divorce. Orly, who believed her mother "would not protect her

interests ... because of [her] animosity towards Arie, and her

collusion with Sagi" immediately commenced a proceeding in this

court, challenging the validity of her mother's appointment. In
the alternative, she sought the appointment of a "special
trustee" to investigate alleged "wrongful dealings concerning
the assets and income of the trust."   In deference to Orly's
position, Dalia refrained from acting as trustee during the
pendency of the application. However, on December 31, 2008, the
court held that Dalia's appointment was valid under the terms
of the trust and that Orly had set forth no grounds that would
warrant the appointment of a "special trustee." The application
was thus denied "without prejudice to renewal if future
circumstances warrant[ed] such relief" (*Matter of Genger*, NYLJ,
Jan. 9, 2009, at 34, col 2 [Sur Ct, NY County 2009]).
Thereafter, Dalia began acting as trustee.

Seven months later, Orly commenced the instant proceeding
to remove her mother as trustee and to appoint a successor
trustee. Orly also sought to restrain Dalia, during the
pendency of the proceeding, from selling or otherwise
encumbering the Orly Trust's 19.43% interest in Trans-
Resources, Inc. ("TRI"), an allegedly valuable agricultural and
industrial chemical manufacturing company founded by Arie.
After a hearing, the court memorialized an agreement between
the parties in an order dated July 1, 2009, which directed that
Dalia give 10-days' notice of any offer to purchase the shares
and of any attempt by Dalia or anyone acting on her behalf to
sell or otherwise encumber those shares (the "July 1 2009

2

Order").[1]

After Orly amended the petition for a third time to allege additional conduct as a basis for removal, Dalia moved to dismiss for failure to state a claim and for failure to join a necessary party, the Sagi Trust (CPLR 3211[a][7],[10]). The court directed joinder of the Sagi Trust and held the balance of Dalia's motion in abeyance pending the completion of jurisdiction (*see Matter of Genger*, NYLJ 1202666658274 [Sur Ct, NY County 2014]). After Orly served the trustee of the Sagi Trust (the "Sagi Trustee"), he moved to dismiss for lack of personal jurisdiction (CPLR 3211[a][8]), claiming that service of process upon him by registered mail in Israel where he resides was insufficient under the Hague Convention. The court granted the motion (see *Matter of Genger,* NYLJ 1202723666996 [Sur Ct, NY County 2015).

After the trustee was served process in accordance with the Hague Convention, Dalia renewed her motion to dismiss the removal petition and the Sagi Trustee moved to dismiss as well. Both movants seek dismissal on the ground that the petition fails to state a claim (CPLR 3211[a][7]). In addition, the Sagi Trustee argues that the petition should be dismissed because

---

[1]    The July 1, 2009 Order was subsequently reaffirmed by the court on August 18, 2009 and then supplemented by a stipulation dated September 8, 2010, which provided that, in addition, Dalia would give notice of any intention to vote the Orly Trust's TRI shares for any purpose.

3

Orly purportedly 1) attempted to commit a fraud against the court by making a false statement in her petition concerning her proposed successor trustee and 2) is "exploiting" this proceeding to delay Dalia's efforts to recover on behalf of the Orly Trust funds that Orly allegedly has received on the trust's behalf in settlement of various litigations in other courts, but has kept for her personal use. Orly and the guardian ad litem for Orly's unborn issue oppose the motions.

Before turning to the merits of these motions, the court notes that Dalia did not attach to her motion papers a copy of the third amended petition.  This is a technical defect which could be viewed as a basis to deny Dalia's motion (*see e.g. Alizio v Perpignano*, 225 AD2d 723 [2d Dept 1996]). This court has noted previously that "filing a motion which requires the court to search its records to obtain a pleading upon which the motion is based is not an advisable litigation practice" (*Matter of Terian*, NYLJ 1202646597731, at *3 [Sur Ct, NY County 2014], *citing Sheedy* v Pataki, 236 AD2d 92 [2d Dept 1997]; Loeb *v Tanenbaum*, 124 AD2d 941 [3d Dept 1986]). However, in this instance, the court will consider the motion, since the pleading was annexed properly to the Sagi Trustee's related motion to dismiss and is therefore easily accessible for review.

Since both movants seek dismissal pursuant to CPLR 3211(a)(7), we address first whether the allegations in the

4

amended petition state sufficient grounds for removal under SCPA § 711. On a motion to dismiss for failure to state a claim, the court must "'accept the facts as alleged in the [pleading] as true, accord [petitioner] the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory'" (*Braddock v Braddock*, 60 AD3d 84, 86 [1st Dept 2009], *quoting Leon v Martinez*, 84 NY2d 83, 87-88 [1994]). Respondent on the motion may submit affidavits, but they "will almost never warrant dismissal under CPLR 3211 unless they 'establish conclusively that [petitioner] has no [claim or] cause of action'" (*Matter of Lawrence*, 11 NY3d 588, 595 [2008], *quoting Rovello v Orofino Realty Co.*, 40 NY2d 633, 635-636 [1976]; *see also Basis Yield Alpha Fund v Goldman Sachs Group, Inc.*, 115 AD3d 128 [1st Dept 2014]). The issue of "[w]hether a [petitioner] can ultimately establish [his or her] allegations is not part of the calculus in determining a motion to dismiss" (*EBC I, Inc. v Goldman, Sachs & Co.*, 5 NY3d 11, 19 [2005]).

Petitioner seeks removal under subsections 2, 3, 7, 8 of SCPA § 711. SCPA § 711(2) provides that a fiduciary's letters may be revoked,

> "[w]here by reason of his having wasted or improperly applied the assets of the estate, ... or otherwise improvidently managed or injured the property committed to his charge, ... or by reason of other misconduct in the execution of his office or dishonesty, drunkenness, improvidence or want of understanding, he is unfit for the execution of his office."

5

Subsections 711(3) and (7) provide a further ground for removal where a fiduciary has "wilfully refused or without good cause neglected to obey any lawful direction of the court contained in any decree or order or any provision of law relating to discharge of his duty" or "has removed property of the estate without the state without prior approval of the court." Finally, 711(8) provides for removal where a fiduciary "does not possess the qualifications required of a fiduciary by reason of substance abuse, dishonesty, improvidence, want of understanding, or ... is otherwise unfit for the execution of the office."

Here, the conduct alleged (and assumed to be true) in Orly's 31-page pleading details a course of conduct by Dalia after December 31, 2008 (the date the court determined her appointment was proper) that, if true, could be a basis for removal under the above subdivisions of SCPA § 711. Orly alleges in great detail numerous actions by Dalia that have contributed to and/or resulted in the depletion of assets of the Orly Trust or otherwise disadvantaged the Orly Trust in violation of her fiduciary duty. She offers a substantial motive for such conduct as well: a desire to punish Orly, who has maintained a relationship with her father following the divorce, and to benefit Sagi with whom Dalia maintains a close relationship.

Orly alleges that the Orly Trust and the Sagi Trust were

6

established by Arie in 1993 as an estate planning vehicle for Arie and Dalia to pass some of their substantial wealth to their children. Initially, each trust was funded with a $600,000 gift from Arie and each child's 48% interest in D & K LP ("D & K"), a family owned limited partnership which was named for "Dalia and the Kids." Dalia was general partner and owned the remaining 4% of D & K.

At about the same time that the trusts were funded, D & K purchased 240 shares (a 49% interest) in TPR Investment Associates, Inc. ("TPR"), a closely held family corporation, for $10,200,000. The shares were purchased in part with $600,000 from each trust and $50,000 from Dalia. The balance ($8,950,000) was satisfied with a recourse promissory note (the D & K Note") payable over ten years. The D & K Note was secured by a pledge of the 240 TPR shares owned by D & K. Each trust and Dalia assumed liability on the note in proportion to its/her interest in D & K. Thus, at the conclusion of the transaction, each trust had assumed liability for 48% of the D & K Note, but also through D & K obtained an indirect interest in 23.52% of TPR.  Dalia, for her part, had assumed liability for 4% of the D & K Note and obtained an indirect interest in 1.96% of TPR.

At this time, Arie owned the remaining 51% of TPR. TPR also had a majority interest in TRI. D & K initially used dividends from TRI (distributed by TPR) to pay the D & K Note.

7

However, in 1999, TRI stopped paying dividends and so D & K stopped making payments on the note. No effort was made to enforce the D & K Note, however.  According to Orly, everyone involved understood that the D & K Note and the pledge of TPR shares as security were part of an estate plan that would be defeated if the note were enforced by TPR.

In October 2004, when Arie and Dalia divorced, Dalia received as part of the divorce settlement Arie's 51% interest in TPR. In addition, the parties caused TPR's 52.85% interest in TRI to be divided among Arie (13.99%), the Orly Trust (19.43%) and the Sagi Trust (19.43%). The Orly Trust and the Sagi Trust also granted Arie an irrevocable lifetime voting proxy over their TRI shares. As a result, Arie and the trusts in combination had a controlling interest in TRI and TPR no longer had an interest in TRI.

According to Orly, as divorce loomed, Dalia as the general partner of D & K took steps to give Sagi control over the management of D & K. To that end, she and Sagi formed D & K GP LLC ("D & K GP). Dalia then exchanged her general partnership interest in D & K and $1.00 for a 99% membership interest in D & K GP. Sagi purchased a 1% interest in D & K GP for $1.00 and, pursuant to D & K's Limited Liability Agreement, Sagi obtained the power to select a manager of D & K GP, who would be responsible for managing D & K's assets.  Sagi then selected himself to manage D & K GP. Orly claims that the creation of D

8

& K GP shielded Dalia and Sagi from any personal liability
stemming from their interests in D & K, including personal
liability relating to the D & K Note. In addition, Dalia, as
the majority shareholder of TPR, facilitated Sagi's becoming a
board member of TPR (along with Dalia) and its Chief Executive
Officer. Later (but prior to her becoming trustee) Dalia, in
exchange for $5 million, divested herself of her interest in
TPR, leaving Sagi squarely in control of TPR and its interest
in the D & K Note, while at the same time controlling D & K
through D & K GP.

Orly further alleges that, once in control of TPR and D &
K, Sagi (with the assistance of Dalia) embarked on a scheme to
benefit himself and Dalia at the expense of Arie and Orly,
which involved trying to strip the Orly Trust of its indirect
interest in TPR and direct interest in TRI. The scheme was
first aided by Dalia's insistence as part of the divorce
settlement that the original trustees of the Orly Trust and the
Sagi Trust be replaced by friends or relatives of Sagi, who
would act at her and Sagi's behest. Then, in 2008, one such
trustee of the Orly Trust, Sagi's sister-in-law Lea Fang,
resigned and appointed Dalia against the wishes of Orly.
According to Orly, Dalia in her role as trustee then became an
"active and willing participant in Sagi's scheme."

Among the many specific acts as trustee that Orly asserts
were part of the scheme and are grounds for removal is Dalia's

9

execution of an agreement as trustee with D & K GP (by Sagi) and TPR (by Sagi) on February 9, 2009, entitled, "Meeting of Partners of D & K LP" (the "Agreement"). The Agreement, alleged to have been signed by Dalia for no consideration, explicitly "clarified" the authority of D & K GP (as per an earlier agreement executed by Lea Fang, the prior trustee of the Orly Trust) to encumber the Orly Trust's TRI shares for the benefit of D & K in connection with the D & K Note. The Agreement also provided that Sagi and Dalia would be indemnified for any claim in connection with the Agreement. According to Orly, the purpose of the Agreement was to give TPR, which was controlled by Sagi, the ability to deplete the Orly Trust of its assets.

Orly also alleges that Dalia failed to stop TPR from foreclosing on the D & K Note (which she asserts was never intended to be enforced) and from selling at auction on February 27, 2009, D & K's 240 shares of TPR which secured the D & K Note. TPR then purchased the shares for $2.2 million in what Orly alleges was a "bogus sale" because the value of TPR shares was significantly higher. The result was that D & K's obligation on the note was reduced far less than it should have been while D & K's interest in TPR was in effect forfeited to TPR. This, in turn, not only rendered the Orly Trust's interest in D & K worthless, since D &K no longer owned TPR shares, but also left the Orly Trust liable for its proportionate share of the deficiency (about $4.5 million) and exposed it to the

10

possibility that TPR would seek to foreclose on the Orly Trust's TRI shares to satisfy the D & K Note as the Agreement would allow.

Orly alleges that, despite numerous requests for information about Dalia's administration of the Orly Trust, she was not informed by Dalia of the foreclosure and the sale of D & K's TPR shares even though, by this time, there was no issue that Dalia was acting as trustee and was aware that TPR was enforcing the D & K Note. According to Orly, when she finally learned of the foreclosure - after it had been concluded - she commenced the instant proceeding to remove Dalia and obtained the July 1 2009 Order. However, Dalia repeatedly violated the July 1 2009 Order by executing on behalf of the Orly Trust a series of agreements in 2011 and 2012 that negatively impacted the trust and its interest in TRI.[2]

One such agreement was a settlement with TPR that Dalia executed as trustee in October 2011. Pursuant to such agreement, the Orly Trust transferred its interest in D & K to TPR and disclaimed any interest it might have in TPR directly or indirectly (through D & K). TPR, for its part, cancelled the Orly Trust's share of the deficiency as guarantor of the D & K Note (about $4.5 million) and the Orly Trust executed a

---

[2]    During the course of this proceeding, Orly, on behalf of the Orly Trust, commenced lawsuits in New York County Supreme Court relating to the Orly Trust's TRI shares and D & K's interest in TPR. Orly alleges that by executing these agreements in 2011 and 2012 Dalia also violated restraints issued in those actions as well.

falsification of documents by defendants."

Equally unavailing is the Sagi Trustee's argument that dismissal is warranted because "Orly is exploiting this proceeding to delay a determination on [Dalia's] application for the return of $32.3 million that Orly monetized and retained from claims she brought on behalf of the Orly Trust [in Supreme Court, New York County]." Again, there is a sharp factual dispute concerning the accuracy of the Sagi Trustee's allegation. Moreover, this issue bears no relationship to the issue before the court on this motion, namely whether Orly's third amended petition states a claim for Dalia's removal. Significantly, the Sagi Trustee cites no authority to support dismissal under these circumstances (even assuming arguendo they are true), and the court is aware of none.

Moreover, the Sagi Trustee's expressed concern as to delays in this proceeding is difficult to reconcile with his decision to defer a determination of the merits of this proceeding by moving to dismiss the petition based upon the waivable and ultimately curable defense of personal jurisdiction. As noted above, this tactical maneuver not only required a decision from the court, but then Orly's service of process upon the Sagi Trustee under the Hague Convention. The Sagi Trustee then appeared (as he could have done at the

14

outset) and the instant motions were filed.

Based upon the foregoing analysis, the motions to dismiss
are denied. This decision constitutes the order of the court.


Dated: June 2| , 2017

_____

S U R R O G A T E

15

FILED: NEW YORK COUNTY CLERK 07/01/2013
NYSCEF DOC. NO. 487

INDEX NO. 651089/2010

RECEIVED NYSCEF: 07/01/2013

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

ARIE GENGER and ORLY GENGER, in her individual
capacity and on behalf of the ORLY GENGER 1993
TRUST,

        Plaintiffs,

        - against -

SAGI GENGER, TPR INVESTMENT ASSOCIATES,
INC., DALIA GENGER, THE SAGI GENGER 1993
TRUST, ROCHELLE FANG, individually and as Trustee
of the SAGI GENGER 1993 TRUST, GLENCLOVA
INVESTMENT CO., TR INVESTORS, LLC, NEW TR
EQUITY I, LLC, NEW TR EQUITY II, LLC, JULES
TRUMP, EDDIE TRUMP, MARK HIRSCH, and
TRANS-RESOURCES, INC.,

        Defendants.

SAGI GENGER, individually and as assignee of THE
SAGI GENGER 1993 TRUST, and TPR INVESTMENT
ASSOCIATES, INC.,

        Cross-Claimants, Counterclaimants, and Third-
        Party Claimants,

        - against -

ARIE GENGER, ORLY GENGER, GLENCLOVA
INVESTMENT COMPANY, TR INVESTORS, LLC,
NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC,
JULES TRUMP, EDDIE TRUMP, MARK HIRSCH,
TRANS-RESOURCES, INC., and WILLIAM DOWD,

        Cross-Claim, Counterclaim and/or Third-Party
        Defendants.

INDEX NO. 651089/2010

[SECOND] AMENDED STIPULATION OF
DISCONTINUANCE WITH
PREJUDICE

Hon. Barbara Jaffe

Part 12

5385242.1/43419-00001

GLENCLOVA INVESTMENT CO., TR INVESTORS,
LLC, NEW TR EQUITY I, LLC, NEW TR EQUITY II,
LLC, JULES TRUMP, EDDIE TRUMP, MARK
HIRSCH, and TRANS-RESOURCES, INC.,

      Counterclaimants, Cross-Claimants, and Third-
      Party Plaintiffs,

      - against –

ARIE GENGER, ORLY GENGER, SAGI GENGER,
TPR INVESTMENT ASSOCIATES, INC., THE SAGI
GENGER 1993 TRUST, WILLIAM DOWD, ARNOLD
BROSER, DAVID BROSER, and ONE OR MORE
ENTITIES DIRECTED, OWNED OR CONTROLLED
BY ARNOLD BROSER AND/OR DAVID BROSER,

      Counterclaim, Cross-Claim, and/or Third-Party
      Defendants.

WHEREAS no party hereto is an infant or an incompetent as to whom a committee has been appointed;

WHEREAS the parties hereto have entered into a confidential agreement finally resolving the disputes between them as it relates to the subject matter of this action;

IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned counsel for



Plaintiffs/Counterclaim Defendants Arie Genger and Orly Genger ("Orly"), in her individual capacity _(as beneficiary of)_ and ~~on behalf of~~ the Orly Genger 1993 Trust, and Third-Party Defendants Arnold Broser, David Broser

and One or More Entities Directed, Owned or Controlled by Arnold Broser and/or David Broser

(collectively, the "AG Group"), and Defendants/Counterclaimants/Third-Party Plaintiffs Glenclova

Investment Co., TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC, Jules Trump,

Eddie Trump, Mark Hirsch, and Trans-Resources, Inc. (collectively, the "Trump Group"), that:

1

1.      All claims, counterclaims and third-party claims of the AG Group in this action against the Trump Group are discontinued with prejudice and without costs;

2.      All claims, counterclaims and third-party claims of the Trump Group in this action against the AG Group are discontinued with prejudice and without costs;

3.      Any and all orders, including, without limitation, the Order to Show Cause dated August 8, 2011 (Mot. Seq. 5), the Order to Show Cause for Temporary Restraining Order and Preliminary Injunction dated August 11, 2011 (Mot. Seq. 4), the Order to Show Cause and Temporary Restraining Order dated November 9, 2011 (Mot. Seq. 13) (the "November 9, 2011 OSC") and the Decision and Order dated December 28, 2011 entered in this action which restrain, enjoin or in any way limit actions by any members of the Trump Group shall be, and are hereby, vacated and dissolved. Except as specifically provided in paragraph 4 of this Stipulation, nothing in this Stipulation is intended to vacate or dissolve any order entered in this action restraining, enjoining or in any way limiting acts by Sagi Genger, TPR Investment Associates, Inc., Dalia Genger, individually and/or as Trustee of the Orly Genger 1993 Trust, William Dowd, the Sagi Genger 1993 Trust, or Rochelle Fang, individually and/or as Trustee of the Sagi Genger 1993 Trust.

4.      Orly's applications that resulted in the Order to Show Cause and Temporary Restraining Order entered October 26, 2011 (the "October 26, 2011 OSC") (Mot. Seq. 012) and the November 9, 2011 OSC are hereby withdrawn. The parties hereto stipulate and agree that any and all orders, restraints, injunctions or other limiting actions in the October 26, 2011 OSC and the November 9, 2011, which restrain, enjoin or in any way limit actions by any party, individual or entity from proceeding in the matter entitled *Dalia Genger, as Trustee of the Orly Genger 1993 Trust v. TR Investors LLC et al.*, C.A. No. 6906-CS ( Del. Ch) shall be, and are hereby, vacated and dissolved.

2

5389781.1/43419-00001

5.       Nothing in this Stipulation is intended to dismiss, discontinue or release any claim asserted in this action as against Sagi Genger, TPR Investment Associates, Inc., Dalia Genger, individually and/or as Trustee of the Orly Genger 1993 Trust, William Dowd, the Sagi Genger 1993 Trust, or Rochelle Fang, individually and/or as Trustee of the Sagi Genger 1993 Trust.

[INTENTIONALLY BLANK]

5389781.1/43419-00001

IT IS FURTHER STIPULATED AND AGREED that this Stipulation may be executed by facsimile and in counterparts that together shall constitute one and the same Stipulation.

DATED: New York, New York
June 21, 2013

MITCHELL SILBERBERG & KNUPP LLP

By: _____

Paul D. Montclare
pdm@msk.com
12 East 49th Street, 30th Floor
New York, New York 10017-1028
Telephone: (212) 509-3900
Facsimile: (212) 509-7239

*Attorneys for Plaintiff Arie Genger*

FELDMAN GALE P. A.
&
LAWRENCE, WORDEN, RAINIS, & BARD
P.C.

By: _____

Michael P. Hogan
Jeffrey D. Feldman
Ashley G. Kessler
mhogan@feldmangale.com
1700 Market Street, Suite 3010
Philadelphia, Pennsylvania 19103
(305) 358-5001
&
Russell T. McHugh
rmchugh@lwrlawyer.com
225 Broad Hollow Road, Suite 105E
Melville, New York 11747
(631) 694-0033

*Attorneys for Third-Party Defendant
Arnold Broser*

SKADDEN, ARPS, SLATE MEAGHER &
FLOM LLP

By: _____

William P. Frank
Thomas J. Allingham II
John Boyle
William.Frank@skadden.com
Thomas.Allingham@skadden.com
John.Boyle@skadden.com
Four Times Square
New York, New York 10036
(212) 735-3000

*Attorneys for Third Party Glenclova
Investment Company, TR Investors, LLC,
New TR Equity I, LLC, New TR Equity II,
LLC, Jules Trump, Eddie Trump, Mark
Hirsch And Trans-Resources, Inc.
(Collectively, The "Trump Group")*

4

5389781.1/43419-00001

IT IS FURTHER STIPULATED AND AGREED that this Stipulation may be executed by facsimile and in counterparts that together shall constitute one and the same Stipulation.

DATED:  New York, New York
          June 20, 2013

MITCHELL SILBERBERG & KNUPP LLP

By: _____

    Paul D. Montclare
    pdm@msk.com
    12 East 49th Street, 30th Floor
    New York, New York 10017-1028
    Telephone: (212) 509-3900
    Facsimile: (212) 509-7239

    *Attorneys for Plaintiff Arie Genger*

FELDMAN GALE P. A.
&
LAWRENCE, WORDEN, RAINIS, & BARD P.C.

SKADDEN, ARPS, SLATE MEAGHER & FLOM LLP

By: _____

By: _____

    Michael P. Hogan
    Jeffrey D. Feldman
    Ashley G. Kessler
    mhogan@feldmangale.com
    1700 Market Street, Suite 3010
    Philadelphia, Pennsylvania 19103
    (305) 358-5001
    &
    Russell T. McHugh
    rmchugh@lwrlawyer.com
    225 Broad Hollow Road, Suite 105E
    Melville, New York 11747
    (631) 694-0033

    William P. Frank
    Thomas J. Allingham II
    John Boyle
    William.Frank@skadden.com
    Thomas.Allingham@skadden.com
    John.Boyle@skadden.com
    Four Times Square
    New York, New York 10036
    (212) 735-3000

    *Attorneys for Third-Party Defendant Arnold Broser*

    *Attorneys for Third Party Glenclova Investment Company, TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC, Jules Trump, Eddie Trump, Mark Hirsch And Trans-Resources, Inc. (Collectively, The "Trump Group")*

5389781.1/43419-00001

3

ZEICHNER, ELLMAN & KRAUSE LLP                THE FREYBERG LAW GROUP

By: _____                  By: _____
    Yoav M. Griver                               Mark L. Freyberg
    Brian D. Leinbach                            Mitchell Goldberg
    YGriver@zeklaw.com                           mfreyberg@freyberglaw.com
    BLeinbach@zeklaw.com                         mitchell@oglaw.net
    575 Lexington Avenue                         950 Third Avenue, 32nd Floor
    New York, New York 10022                     New York, New York 10022
    (212) 223-0400                               (212) 754-9200

*Attorneys for Plaintiff Orly Genger, in her*   *Attorneys for Third Party Defendant*
*individual capacity and ~~on behalf of~~ the Orly*   *David Broser*
*Genger 1993 Trust*

as beneficiary of

So-Ordered: _____

        Hon. Barbara Jaffe

5389781.1/43419-00001                            5

ZEICHNER, ELLMAN & KRAUSE LLP          THE FREYBERG LAW GROUP

By: _____          By: _____
    Yoav M. Griver                         Mark L. Freyberg
    Brian D. Leinbach                      Mitchell Goldberg
    YGriver@zeklaw.com                     mfreyberg@freyberglaw.com
    BLeinbach@zeklaw.com                   mitchell@oglaw.net
    575 Lexington Avenue                   950 Third Avenue, 32nd Floor
    New York, New York 10022               New York, New York 10022
    (212) 223-0400                         (212) 754-9200

*Attorneys for Plaintiff Orly Genger, in her*          *Attorneys for Third Party Defendant*
*individual capacity and on behalf of the Orly*        *David Broser*
*Genger 1993 Trust*


So-Ordered: _____

      Hon. Barbara Jaffe

BARBARA JAFFE
J.S.C.

5389781.1/43419-00001

## SETTLEMENT AGREEMENT AND RELEASE

This settlement agreement and release (this "Agreement") is entered into as of

June 16, 2013, by and between Arie Genger and Orly Genger (in her individual capacity and in

her capacity as beneficiary of the Orly Genger 1993 Trust), Arnold Broser, David Broser, (in

their individual capacity and on behalf of all entities managed, owned or controlled in any way

by Arnold Broser or David Broser and which are in any way related to the subject matter hereof

("Broser Entities" and collectively with Arie Genger and Orly Genger in all capacities referenced

above, the "AG Group"),  and TR Investors, LLC ("TR Investors"), Glenclova Investment Co.

("Glenclova"), New TR Equity I, LLC ("New TR I"), New TR Equity II, LLC ("New TR II" and,

together with TR Investors, Glenclova and New TR I, the "Trump Entities"), Trans-Resources,

LLC (the successor to Trans-Resources, Inc. and together with its predecessor entities referred to

herein as, "Trans-Resources"), Jules Trump, Eddie Trump and Mark Hirsch (collectively, with

the Trump Entities and Trans-Resources, the "Trump Group").  The members of the AG Group

and the Trump Group are each referred to herein individually as a "Party" and together as the

"Parties".

WHEREAS, in March 2001, TR Investors, Glenclova, Trans-Resources and TPR

Investment Associates, Inc. ("TPR") entered into a stockholders agreement with respect the

common stock of Trans-Resources (the "Stockholders Agreement");

1

WHEREAS, since August 2008, Arie Genger, Orly Genger, the Trump Group and others have been engaged in various litigations (described below) concerning the ownership and control of Trans-Resources; and

WHEREAS, the Parties wish to resolve all issues, disputes and disagreements between them, including but not limited to the issue of ownership of all Trans-Resources shares;

NOW, THEREFORE, in consideration of the promises and representations contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1.  **Recitals.**   The above recitals are incorporated into and made a part of this Agreement and are binding on all Parties hereto.

2.  **Initial Consideration from the Trump Group.**   Upon dismissal with prejudice of the claims, counterclaims, cross-claims, third-party claims, issues and matters as provided in Paragraph 4 below, the Trump Group shall promptly:

   (a)   release all claims they may have to the (i) $7,428,994.00 plus interest held by Skadden, Arps, Slate, Meagher & Flom LLP as escrow agent (the "Skadden Escrow") and (ii) $10,314,005.00 plus interest held by with Pedowitz & Meister as escrow agent (the "P&M Escrow");

   (b)   pay to Wachtel, Masyr & Missry, LLP as attorneys for the AG Group ("Wachtel") an amount in cash equal to $35,000,000.00 minus (i) the amount held in the Skadden Escrow, and (ii) the amount held in the P&M Escrow.

3.   **Further Consideration from the Trump Group.**   Trans-Resources on behalf of the Trump Group shall pay: (i) $7,500,000 to Wachtel on the third anniversary of the Effective Date (defined below), and (ii) $7,500,000 to Wachtel 364 days following the third anniversary of the Effective Date The payments provided under this paragraph shall be (a) subject to the terms and conditions herein and (b) evidenced by two (2) promissory notes that are substantially in the form attached as Exhibit A hereto (the "Notes"). Notwithstanding anything else herein, the maturity of the two $7,500,000 Notes shall be delayed beyond their due date until the earlier (the "Extended Maturity Date") of (A) such time as all pending claims, cross-claims and counter-claims brought by any of TPR, Sagi Genger, the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust (other than the Orly Trust Action (as defined below)), D&K Limited Partnership, D&K GP LLC, Rochelle Fang, and/or David Parnes (collectively, the "Sagi Group") against any member of the Trump Group have been dismissed with prejudice and the statute of limitations shall have run with respect to any other potential claims of the Sagi Group that might be the subject of the Indemnification provided for by Paragraph 5 below or (B) such time as each member of the Sagi Group shall have provided the Trump Group with a release of the Trump Group Released Parties (as defined below) and covenant not to sue in form and substance that is the same as the AG release and covenant not to sue contained in Paragraph 6(a) below (the "Sagi Group Release").

Subject to the foregoing, the Notes shall become immediately due and payable upon the occurrence of any transaction or series of transactions which shall result in the Trump Group owning or controlling neither (i) a majority of the voting stock of Trans-Resources or its successors or each of its two principal subsidiaries, Haifa Chemicals, Ltd. and Na-Churs Plant

Food Company or their successors, nor (ii) directly or indirectly, a majority of the assets currently owned by Trans-Resources and its subsidiaries; provided, however, that in such event, at the request of the Trump Group, the amounts then payable on the Notes shall be placed in escrow for the duration of their original term or until the Extended Maturity Date (if applicable) under the provisions of an escrow agreement on reasonable terms to be negotiated at such time in good faith between Trans-Resources, the payee and an escrow agent selected by their mutual consent, which shall provide for their release to the Trump Group in payment of Indemnification Amounts, AG Group Release Amounts and Discovery Costs (as such terms are defined below), if any, and payment to the payee of such amounts after reduction for Indemnification Amounts, AG Group Release Amounts and Discovery Costs, if any, upon their original maturity date or the Extended Maturity Date (if applicable).  If Trans-Resources is unable to pay the Notes as and when they mature, the Trump Group will be obligated to make payment thereon in an amount equal to the lesser of (x) the outstanding amounts not paid by the obligor thereunder and (y) any amount by which cash payments received by members of the Trump Group (other than Trans-Resources) from Trans-Resources and its subsidiaries since the Effective Date (whether in the form of dividends, distributions, compensation or otherwise) exceeds reasonable compensation for services rendered plus payments for goods, services and assets provided by such persons in amounts that would have been paid for such goods, services and assets in arms' length transactions with unaffiliated third parties; provided, however, that in neither case shall the Trump Group be obligated to pay any amount that exceeds the outstanding amounts not paid by Trans-Resources on the Notes (subject to any Indemnification Amounts, AG Group Release Amounts or Discovery Costs).

4

4.    **Dismissal of Claims with Prejudice**.  Within two (2) business days of the

Effective Date (defined below), the AG Group and the Trump Group shall take all actions

necessary or desirable to:  (i) effect the dismissal with prejudice of all claims, counterclaims,

cross-claims, third-party claims, issues and matters between them, and to vacate all court orders

which restrain, enjoin or in any way limit actions by any members of the Trump Group, in each

pending action in which members of the AG Group and the Trump Group are parties (whether or

not service of process with respect thereto has been effected), including, without limitation, each

of the following pending actions (collectively, the "Litigation"):  *Genger v. TR Investors, LLC,*

No. 168, 2013 (Del.); *TR Investors, LLC v. Genger*, C.A. No. 6697-CS (Del. Ch.); *Trans-*

*Resources, Inc. v. Genger*, C.A. No. 4391-CS (Del. Ch.) (with respect to Arie Genger only); *TR*

*Investors, LLC, et al. v. Genger*, C.A. No. 3994-CS (Del. Ch.); *Glenclova Investment Co. v.*

*Trans-Resources, Inc., at al.*, No. 08 Civ. 7140 (JFK) (S.D.N.Y.); *Arie Genger and Orly Genger*

*v. Sagi Genger, et al.*, Index No. 651089/2010 (N.Y. Supr.); and (ii) have the New York State

Supreme Court enter a definitive non-appealable order declaring that members of the Trump

Group own all right, title and interest (beneficially, of record and otherwise) to the shares of

Trans-Resources purportedly transferred by TPR in October 2004 to Arie Genger (the ("Arie

Shares") and to the Orly Genger 1993 Trust (the "Orly Trust Shares"),  with the understanding

and agreement that should the request for the entry of such an order with respect to the "Orly

Trust Shares" be denied or not entered in a reasonably timely fashion,  then the AG Group and

the Trump Group shall take all action necessary or desirable to have the New York State

Supreme Court vacate all court orders which restrain, enjoin or in any way limit actions by the

parties to the pending action captioned *Dalia Genger, as Trustee of the Orly Genger 1993 Trust
v. TR Investors, LLC, et al.*, C.A. No. 6906-CS (Del. Ch.) (the "Orly Trust Action"), to prosecute,
defend, compromise, settle and otherwise deal with all claims, counterclaims, cross-claims, third-
party claims, issues and matters asserted therein; provided, however, that nothing in this
Agreement is intended to require or permit the dismissal of any claims, counterclaims, cross-
claims, third-party claims, issues and matters, (i) in *Trans-Resources, Inc. v. Genger*, C.A. No.
4391-CS (Del. Ch.) (the "Breach of Fiduciary Duty Case"), as between the Trump Group and
Avi Pelossof and/or William Dowd (subject to the exchange of general releases between the
members of the Trump Group and William Dowd as contemplated below) and (b) against TPR,
the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust, D&K Limited Partnership, D&K GP
LLC, Sagi Genger or Dalia Genger.  Any member of the AG Group including, without
limitation, Orly Genger, who is called to testify in the Litigation or the Orly Trust Action, agrees
to testify that he, she (in her individual capacity, ~~on behalf of the Orly Genger 1993 Trust,~~ and as
beneficiary of the Orly Genger 1993 Trust) or it has waived all claims he, she (in her individual
capacity, ~~on behalf of the Orly Genger 1993 Trust,~~ and as beneficiary of the Orly Genger 1993
Trust) or it had or may have to ownership (record, beneficial or otherwise) of any shares of
Trans-Resources and that he, she (in her individual capacity, ~~on behalf of the Orly Genger 1993
Trust,~~ and as beneficiary of the Orly Genger 1993 Trust) or it is opposed to the Orly Genger
1993 Trust seeking any remedy of any kind against any member of the Trump Group.
Notwithstanding the foregoing, upon receipt by the Trump Group of a general release in form
and substance reasonably satisfactory to it, the Trump Group shall provide the same general

6

release to William Dowd and cause the dismissal of the Breach of Fiduciary Duty Case as between the Trump Group and him.

     5.    **Indemnification.**

        (a)    Upon closing of this Agreement, each of the members of the AG Group with the exception of Arnold Broser and David Broser and the Broser Entities, jointly and severally, agrees to indemnify and hold harmless (i) each of the members of the Trump Group, and their respective past and present affiliates and direct and indirect subsidiaries, and (ii) each of the past and present agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, predecessors, successors, heirs, executors, administrators and assigns of each person and entity referenced in clause (i), from all reasonable costs, expenses, attorneys' fees of counsel selected by the Trump Group (it being agreed that the Trump Group will cooperate with the AG Group in all reasonable respects to cause the amount of such costs, expenses and its attorneys' fees to be minimized), settlements and/or judgments (whether direct or related to joint and several liability) (the "Indemnification Amounts") incurred as a result of, in connection with, or relating in any way to any (x) claims, counterclaims, cross-claims or third-party claims raised or that could have been raised in the Litigation, and (y) claims that are pending, have been brought, or that may in the future be brought by or on behalf of any of TPR, the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust (other than those claims currently pending in the Orly Trust Action), D&K Limited Partnership, D&K GP LLC, Sagi Genger, David Parnes or Dalia Genger, regardless of whether they were or could have been raised in the Litigation or the Orly Trust Action, relating in any way, whether directly or indirectly, to (A) the Shareholders Agreement entered into by Trans-Resources

7

shareholders and Trans-Resources on March 30, 2001, (B) the transfer of interests in TPR or the

purported transfer of shares of Trans-Resources by TPR in October 2004, (C) any activities or

developments relating to or conducted by Trans-Resources or any of its direct or indirect

subsidiaries that occurred prior to September 26, 2008, (D) the acquisition by the Trump Group

of all interests (record, beneficial or otherwise) of the so called "Arie Shares", "Orly Trust

Shares" and the shares of Trans-Resources purportedly transferred by TPR in October 2004 to

the Sagi Genger 1993 Trust (the "Sagi Trust Shares") (including, without limitation, the

negotiations for the ownership or acquisition of such shares), (E) the control of Trans-Resources

or any of its direct or indirect subsidiaries by the Trump Group through its acquisition of the

aforementioned shares, (F) records and documents (including but not limited to electronic files)

in the possession, custody or control of Trans-Resources or any of its direct or indirect

subsidiaries, (G) misrepresentations made or improper acts conducted prior to September 26,

2008 by any officer or director of Trans-Resources, (H) this Agreement, (I) the business or

operations of Trans-Resources or any of its direct or indirect subsidiaries conducted prior to

September 26, 2008 arising from or in any way related to the conduct of any member of the AG

Group, Avi Pelossof or William Dowd, or (J) the conduct of any other individual to the extent

Arie Genger is aware, or should have been aware, thereof. Notwithstanding the foregoing, the

indemnity provided for above shall not apply to any claims which may be brought subsequent to

the Effective Date (and which are entirely unrelated to any claim brought prior to such date) by

any of Sagi Genger, the Sagi Genger 1993 Trust or TPR and which arise solely out of actions

taken or not taken by members of the Trump Group which actions or inactions no member of the

AG Group was aware of or should have been aware of; provided, however, that such claim was

8

not encouraged or solicited by any member of the AG Group and no member thereof cooperates in asserting, instituting or prosecuting such claim. Notwithstanding anything herein to the contrary, the undertaking of William Wachtel hereunder shall not exceed under any circumstance an amount greater than $5,000,000.

(b)    The Trump Group may request payment or reimbursement of the Indemnification Amounts at any time by providing a written statement or copy of an underlying invoice or expense documentation to any member of the AG Group at the addresses set forth in Paragraph 16 below, and the AG Group shall pay such indemnified expenses in full and in cash within five (5) business days of the date such request is made. The supporting documentation submitted with any payment or reimbursement request hereunder may be redacted as necessary to preserve attorney-client privilege, attorney work product, or confidential information the Trump Group may, in its reasonable determination, need to protect. The Trump Group will provide the AG Group with reasonable notice prior to making any motion or taking any appeal with respect to, or in, any past, present or future action or claim for which the Trump Group is seeking indemnification, and such notice will be accompanied by a non-binding estimate of the legal fees and costs associated with such motion or appeal. The Trump Group authorizes the AG Group and their respective counsel to discuss directly with the Trump Group's appointed counsel the amount and scope of any invoice for which the Trump Group is seeking indemnification. The AG Group in its sole discretion may settle any indemnified claim so long as there is no monetary contribution to be paid by the Trump Group, and the Trump Group is released, in form and substance reasonably satisfactory to it, from any liability relating to any such indemnified

9

claim. The Trump Group shall not enter into any settlement of any indemnified claim, or discussions with respect thereto, without the express written consent of the AG Group.

(c)  With respect to each Indemnification Amount, until such time as it has been paid over to the Trump Group, the members of the AG Group shall remain jointly and severally liable for such Indemnification Amount and, the Trump Group may at its option pursue all legal remedies available to it and/or withhold an amount equal to such unreimbursed Indemnification Amount from any payments by Trans-Resources to be made pursuant to the Notes.

6.  **Releases.**

(a)  **The AG Group Release.** Effective on the Effective Date, each of the members of the AG Group, for itself, himself or herself, and in all capacities, and on behalf of its (and its respective affiliates' and direct and indirect subsidiaries'), his or her respective agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and affiliates, and each of their respective predecessors, successors, heirs, executors, administrators and assigns, and any other persons or entities acting in concert with any of them including, without limitation, any member of the Sagi Group which he, she or it shall at any time directly or indirectly control or be deemed authorized to act on behalf of (individually, an "AG Group Releasing Party" and collectively, the "AG Group Releasing Parties"): (i) fully, finally, irrevocably and unconditionally waives, releases and discharges each of the members of the Trump Group and its (and its respective past and present affiliates' and direct and indirect subsidiaries'), his or her respective past and present agents

10

(including Skadden, Arps, Slate, Meagher & Flom LLP in any capacity, including as Escrow Agent for the Skadden Escrow or for any escrow in which it held, holds, or may hold, any dividends or distributions from Trans-Resources), representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and affiliates, and each of their respective predecessors, successors, heirs, executors, administrators and assigns (collectively, the "Trump Group Released Parties"), from any and all claims, counterclaims, demands, proceedings, actions, causes of action, orders, obligations, damages, debts, costs, expenses and other liabilities whatsoever and however arising, whether known or unknown, past, present or future, suspected or unsuspected, contingent or actual, both at law and in equity, including without limitation, claims for fraud or fraud in the inducement (collectively, "Claims"), which such AG Group Releasing Party now has, has ever had or may hereafter claim to have against any Trump Group Released Party or its, his or her assets, liabilities or operations from the beginning of the world through the Effective Date (individually, an "AG Group Released Claim" and collectively, the "AG Group Released Claims"); and (ii) agrees not to assert, institute or prosecute, or encourage, solicit or cooperate with any other person or entity in asserting, instituting or prosecuting, any proceeding against any of the Trump Group Released Parties in any jurisdiction (domestic or foreign, including, without limitation, the State of Israel) with respect to any AG Group Released Claim or any other Claim relating in any way, directly or indirectly, to Trans-Resources or any of its direct or indirect subsidiaries, the ownership or acquisition of Trans-Resources shares (including any dividends or distributions relating thereto or any escrow in which such dividends or distributions may currently be or in the past have been held), the Litigation, the Orly Trust Action, control of Trans-Resources or any of its direct or

11

indirect subsidiaries, the business or operations of Trans-Resources or any of its direct or indirect

subsidiaries, or arising out of this Agreement including, without limitation, the negotiation and

execution of this Agreement or the AG Group Releases provided hereunder; provided, however,

that this AG Group Release shall not apply to any Claims (x) seeking equitable relief to enforce

the terms of this Agreement or claims seeking payment of the Notes or any indemnification

payments required to be paid hereunder, (y) relating solely to events that transpired in their

entirety subsequent to the Effective Date and that could not, under any circumstances, have

possibly been pursued prior to the Effective Date whether or not then known, and (z) between

any of the AG Group Releasing Parties and TPR, and/or any other member of the Sagi Group.

If an AG Releasing Party brings an AG Group Released Claim or other Claim in

violation of the immediately preceding paragraph, the AG Group, jointly and severally, agrees to

indemnify the Trump Group for any and all settlements, judgments, costs and fees, including

legal fees and disbursements of counsel chosen by the Trump Group, incurred in working on,

preparing for or defending such claim ("AG Group Release Amounts").  With respect to each

AG Group Release Amount, until such time as such AG Group Release Amount has been paid

over to the Trump Group, the members of the AG Group shall remain jointly and severally liable

for such AG Group Release Amount, and the Trump Group may at its option pursue all legal

remedies available to it and/or withhold an amount equal to such unreimbursed AG Group

Release Amount from any payments to be made by Trans-Resources pursuant to the Notes.  For

purposes of the removal of all doubt, it is the parties' intention that no claims shall be brought or

pursued by any member of the AG Group against any member of the Trump Group for any

12

reason whatsoever (other than claims permitted under clause (x), (y) and (z) of the immediately

preceding paragraph).

(b)    **The Trump Group Release.** Effective on the Effective Date, each

of the members of the Trump Group, for itself or himself, and in all capacities, and on behalf of

its (and its respective affiliates' and direct and indirect subsidiaries'), or his respective agents,

representatives, officers, directors, advisors, employees, general partners, limited partners,

shareholders, members, subsidiaries and affiliates, and each of their respective predecessors,

successors, heirs, executors, administrators and assigns, and any other persons or entities acting

in concert with any of them (individually, a "Trump Group Releasing Party" and collectively, the

"Trump Group Releasing Parties"): (i) fully, finally, irrevocably and unconditionally waives,

releases and discharges each of the members of the AG Group and its (and its respective past and

present affiliates' and direct and indirect subsidiaries'), his or her respective past and present

agents, representatives, officers, directors, advisors, employees, general partners, limited partners,

shareholders, members, subsidiaries and affiliates, and each of their respective predecessors,

successors, heirs, executors, administrators and assigns (collectively, the "AG Group Released

Parties"), from any and all claims, counterclaims, demands, proceedings, actions, causes of

action, orders, obligations, damages, debts, costs, expenses and other liabilities whatsoever and

however arising, whether known or unknown, past, present or future, suspected or unsuspected,

contingent or actual, both at law and in equity including, without limitation, claims for fraud or

fraud in inducement, ("Claims"), which such Trump Group Releasing Party now has, has ever

had or may hereafter claim to have against any AG Group Released Party or its, his or her assets,

liabilities or operations from the beginning of the world through the Effective Date (individually,

13

a "Trump Group Released Claim" and collectively, the "Trump Group Released Claims"); and (ii)
agrees not to assert, institute or prosecute, or encourage, solicit or cooperate with any other
person or entity in asserting, instituting or prosecuting, any proceeding against any member of
the AG Group Released Parties with respect to any Trump Group Released Claim or any other
Claim relating in any way, directly or indirectly, to Trans-Resources or any of its direct or
indirect subsidiaries, the ownership or acquisition of Trans-Resources shares, control of Trans-
Resources or any of its direct or indirect subsidiaries, the business or operations of Trans-
Resources or any of its direct or indirect subsidiaries, or the negotiation and execution of this
Agreement or the Trump Group Releases provided hereunder; provided, however, that this
Trump Group Release shall not apply to any Claims (x) seeking equitable relief to enforce the
terms of this Agreement or claims seeking payment of any indemnification payments required to
be paid hereunder, (y) relating solely to events that transpired in their entirety subsequent to the
Effective Date and that could not, under any circumstances, have possibly been pursued prior to
the Effective Date whether or not then known, and (z) between any of the Trump Group
Releasing Parties and Avi Pelossof, William Dowd (unless and until the exchange of mutual
general releases between the Trump Group and William Dowd referred to above) and/or TPR.

If a Trump Group Releasing Party brings a Trump Group Released Claim or other Claim
in violation of the immediately preceding paragraph, the Trump Group, jointly and severally,
agrees to indemnify the AG Group for any and all settlements, judgments, costs and fees,
including legal fees and disbursements of counsel chosen by the AG Group, incurred in working
on, preparing for or defending such claim ("Trump Group Release Amounts"). With respect to
each Trump Group Release Amount, until such time as such Trump Group Release Amount has

14

been paid over to the AG Group, the members of the Trump Group shall remain jointly and

severally liable for such Trump Group Release Amount, and the AG Group may at its option

pursue all legal remedies available to it. For purposes of the removal of all doubt, it is the parties

intention that no claims shall be brought or pursued by any member of the Trump Group against

any member of the AG Group for any reason whatsoever (other than claims permitted under

clause (x), (y) and (z) of the immediately preceding paragraph).

      7.    **Discovery Obligations**.    Effective on the Effective Date (defined

below), to the extent that a member of the AG Group or the Orly Genger 1993 Trust seeks

discovery or testimony from any member of the Trump Group, or if any member of the Trump

Group is subpoenaed by any party to an action in which any member of the AG Group or the

Orly Genger 1993 Trust is a party, each of the members of the AG Group, jointly and severally,

agrees that to the extent indemnities of the Trump Group provided for elsewhere in this

Agreement do not apply, they shall indemnify the Trump Group for any and all costs and fees,

including reasonable legal fees and disbursements of counsel to be chosen by the Trump Group

(it being understood that for the purposes of this Discovery Obligation indemnity only, the

indemnification for legal fees shall be limited to $750 per hour of legal services), incurred in

working on, preparing for or defending such claim, it being agreed that the Trump Group will

cooperate with the AG Group in all reasonable respects to cause the amount of such costs and

fees, including its attorneys' fees and disbursements to be minimized ("Discovery Costs"). With

respect to each Discovery Cost, until such time as such Discovery Cost has been paid over to the

Trump Group, the members of the AG Group shall remain jointly and severally liable for such

Discovery Cost, and the Trump Group may at its option pursue all legal remedies available to it

and/or withhold an amount equal to such unreimbursed Discovery Cost from any payments to be made by Trans-Resources pursuant to the Notes.

### 8. Cooperation.

(a)    Each member of the AG Group shall take all actions necessary or desirable, as promptly as practicable and as may be requested by the Trump Group from time to time including, without limitation, testifying in the Orly Trust Action, to (i) effectuate the release of the AG Group Released Claims and to prevent or preclude any other person or entity from asserting, instituting or prosecuting, or encouraging, soliciting or cooperating with any other person or entity in asserting, instituting or prosecuting, any proceeding or claims against any of the Trump Group Released Parties with respect to any AG Group Released Claim or any other Claim relating in any way, directly or indirectly, to Trans-Resources or any of its direct or indirect subsidiaries, the ownership or acquisition of Trans-Resources shares, the control of Trans-Resources or any of its direct or indirect subsidiaries, records and documents (including but not limited to electronic files) in the possession, custody or control of Trans-Resources or any of its direct or indirect subsidiaries or the business or operations of Trans-Resources or any of its direct or indirect subsidiaries brought by any party without regard to whether such party is a signatory hereto and (ii) cause the Orly Genger 1993 Trust to release any and all claims against the Trump Group Released Parties, including, without limitation, any claims pending in the Orly Trust Action.

(b)    As a condition to any settlement that any member of the AG Group shall enter into with any member of the Sagi Group, the AG Group parties to such settlement shall cause each Sagi Group party to such settlement to (i) dismiss with prejudice all pending claims, cross-claims and counter claims against any of the Trump Group Released Parties (as defined below)

16

and to provide the Sagi Group Release, and (ii) if the Orly Genger 1993 Trust is a party to such settlement, cause it to agree in writing to become an AG Group member for purposes of providing the indemnity contained in Paragraph 5. Likewise, as a condition to any agreement by the AG Group to a replacement trustee for the Orly Genger 1993 Trust, the AG Group shall use its best efforts to cause such trustee to agree in writing on behalf of the Orly Genger 1993 Trust that it shall be a member of the AG Group for purposes of providing the indemnity contained in Paragraph 5.

(c)    Each member of the AG Group covenants that for so long as the indemnity contained in Paragraph 5 remains in effect, he, she or it shall not contribute or deposit any amounts, or permit to be contributed or deposited any amounts (including, without limitation, any payments made under Paragraphs 2 and 3), to or with the Orly Genger 1993 Trust or to any other trust or entity that any of them directly or indirectly controls or is or was established at their direction, or that is or was established or exists for any of their direct or indirect benefit, unless such trust or entity has agreed in writing to being a member of the AG Group for purposes of providing the indemnity contained in Paragraph 5. The foregoing shall not restrict members of the AG Group from investing in or with such entities provided that that such investment may be liquidated, without restriction, by such member of the AG Group from time to time as may be necessary to comply with the terms of the indemnity contained in Paragraph 5.

(d)    The AG Group covenants that, subject to any confidentiality orders of any court or other restrictions imposed by law (i) with respect to any court filing made or received by it concerning the Orly Genger 1993 Trust, it shall contemporaneously provide a copy thereof to the Trump Group, and (ii) contemporaneously with its becoming aware of any changes or

17

contemplated material changes to the Orly Genger 1993 Trust including, without limitation, the resignation of its trustee and/or the appointment of a replacement trustee, it shall provide written notice thereof to the Trump Group.

9. **Confidentiality.** The Parties and their counsel shall not disclose the terms of this Agreement, except if, upon written advice of counsel, it is required to do so by law. Notwithstanding the foregoing, disclosure may be made by the Parties: (i) to their respective accountants, financial advisors or attorneys (collectively, "Advisors") as required to obtain tax or legal advice, it being agreed that each Party shall apprise its Advisors of the obligation to maintain such confidentiality and that each Party shall be accountable for any breach of this provision by its respective Advisors, and (ii) notwithstanding anything to the contrary in this Agreement, the Parties may disclose the terms of this Agreement if necessary in any action to enforce this Agreement or as may be required to respond to a valid subpoena, court order or other legal process. Each Party agrees that he, she or it will promptly give notice of any attempt to compel disclosure of the terms of this Agreement to each of the other Parties, at least five (5) days before compliance is required.

10. **Third Party Beneficiaries.** This Agreement shall have no third party beneficiaries except for those persons and entities that are not Parties hereto but are covered by the releases set forth in Paragraph 6 above, who may enforce those releases.

11. **Binding Effect**

This Agreement shall be binding upon and inure to the benefit of each of the Parties hereto and (where applicable) their respective current and former agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and

18

affiliates, and each of their respective predecessors, successors, heirs, executors, administrators and assigns.

12.    **Representations and Warranties.**

(a)    Each Party represents that it, he or she is authorized to enter into this Agreement and to grant the rights granted by it, him or her in this Agreement. Each Party further represents that, to the extent any non-party consents are required for the performance of any of its, his or her obligations under this Agreement (including, without limitation, with any entity controlled by any Party, including any of its partners or equity holders), it, he or she has obtained such consents.

(b)    Each Party has the benefit of the advice of counsel chosen and employed by it, him or her concerning this Agreement.

(c)    Each Party is the sole owner and holder of the Claims it is releasing under this Agreement, and represents that none of the Claims released herein have been assigned, pledged, encumbered, or otherwise transferred in whole or in part, to any other person or entity.

(d)    Each member of the AG Group represents that he, she or it is knowledgeable, sophisticated and experienced in business, financial and other matters relevant to his, her or its entry into this Agreement and the transactions contemplated hereby, and has engaged advisors, experienced in the matters contemplated by this Agreement. Each member of the AG Group has undertaken such investigation and has been provided with and has evaluated such documents and information as he, she or it has deemed necessary to enable him, her or it to make an informed decision with respect to the execution, delivery and performance of this Agreement and the transactions contemplated hereby. Each member of the AG Group is

19

consummating the transactions contemplated hereby without reliance upon any express or

implied representations or warranties of any nature, whether in writing, orally or otherwise, made

by or on behalf of or imputed to any of the Trump Group Released Parties, except as expressly

set forth in this Agreement, and no member of the AG Group shall make any Claim with respect

thereto. Each member of the AG Group acknowledges that he, she or it is taking full

responsibility for making his, her or its own evaluation of the adequacy and accuracy of all

documents or information that may have been furnished to him, her or it, and that no member of

the AG Group shall have any Claim against any of the Trump Group Released Parties with

respect thereto, including for Claims relating to the accuracy or completeness of the information

that may have been furnished to him her or it. Each member of the AG Group acknowledges and

understands that each member of the Trump Group Released Parties expressly disclaims any and

all liability that may be based on any of the documents and information that may have been

furnished to any member of the AG Group and all liability based on such documents or

information or errors therein or omissions therefrom. Accordingly, each member of the AG

Group acknowledges that none of the Trump Group Released Parties has made any

representation or warranty with respect to (i) any historical information, financial or otherwise,

including without limitation results of operations (or any component thereof), cash flows, or

financial condition (or any component thereof), of Trans-Resources and/or any of its subsidiaries,

(ii) any valuations or projections or estimates of future revenues, future results of operations (or

any component thereof), future cash flows or future financial condition (or any component

thereof) of Trans-Resources and/or any of its subsidiaries or the future business and operations of

Trans-Resources and/or any of its subsidiaries, (iii) any Claims any member of the AG Group

20

may have against any of the Trump Group Released Parties or (iv) any other information or

documents that may have been made available to any member of the AG Group or their

respective counsel, accountants or advisors with respect to any of the Trump Group Released

Parties any of their respective businesses, assets, liabilities or operations, except as expressly set

forth in this Agreement. In addition to the foregoing, each member of the AG Group

acknowledges that his, her or its entry into this Agreement and the transactions contemplated

hereby is based solely on his, her or its respective assessment and valuation of all Claims that he,

she or it may have against any of the Trump Group Released Parties and the likelihood of

success of such Claims in a court of competent jurisdiction. Each member of the AG Group

acknowledges that the consideration to be received by the AG Group pursuant to this Agreement

constitutes full and fair consideration for the release of all Claims contemplated hereunder.

(e)       Each member of the Trump Group represents that he, she or it is knowledgeable,

sophisticated and experienced in business, financial and other matters relevant to his, her or its

entry into this Agreement and the transactions contemplated hereby, and has engaged advisors,

experienced in the matters contemplated by this Agreement. Each member of the Trump Group

has undertaken such investigation and has been provided with and has evaluated such documents

and information as he, she or it has deemed necessary to enable him, her or it to make an

informed decision with respect to the execution, delivery and performance of this Agreement and

the transactions contemplated hereby. Each member of the Trump Group is consummating the

transactions contemplated hereby without reliance upon any express or implied representations

or warranties of any nature, whether in writing, orally or otherwise, made by or on behalf of or

imputed to any of the AG Group Released Parties, except as expressly set forth in this

Agreement, and no member of the Trump Group shall make any Claim with respect

thereto. Each member of the Trump Group acknowledges that he, she or it is taking full

responsibility for making his, her or its own evaluation of the adequacy and accuracy of all

information that may have been furnished to him, her or it, and that no member of the Trump

Group shall have any Claim against any of the AG Group Released Parties with respect thereto,

including for Claims relating to the accuracy or completeness of the information that may have

been furnished to him her or it. Each member of the Trump Group acknowledges and

understands that each member of the AG Group Released Parties expressly disclaims any and all

liability that may be based on any of the documents and information that may have been

furnished to any member of the Trump Group and all liability based on such documents or

information or errors therein or omissions therefrom. Accordingly, each member of the Trump

Group acknowledges that none of the AG Group Released Parties has made any representation or

warranty with respect to (i) any historical information, financial or otherwise, including without

limitation results of operations (or any component thereof), cash flows, or financial condition (or

any component thereof), of Trans-Resources and/or any of its subsidiaries, (ii) any valuations or

projections or estimates of future revenues, future results of operations (or any component

thereof), future cash flows or future financial condition (or any component thereof) of Trans-

Resources and/or any of its subsidiaries or the future business and operations of Trans-Resources

and/or any of its subsidiaries, (iii) any claims any member of the Trump Group may have against

any of the AG Group Released Parties or (iv) any other information or documents that may have

been made available to any member of the Trump Group or their respective counsel, accountants

or advisors with respect to any of the AG Group Released Parties any of their respective

22

businesses, assets, liabilities or operations, except as expressly set forth in this Agreement. In

addition to the foregoing, each member of the Trump Group acknowledges that his, her or its

entry into this Agreement and the transactions contemplated hereby is based solely on his, her or

its respective assessment and valuation of all Claims that he, she or it may have against any of

the AG Group Released Parties and the likelihood of success of such Claims in a court of

competent jurisdiction. Each member of the Trump Group acknowledges that the consideration

to be received by the Trump Group pursuant to this Agreement constitutes full and fair

consideration for the release of all claims contemplated hereunder.

13.    **Attorneys' Fees.** The Parties agree to be responsible for their own attorneys' fees and

costs incurred in connection with this Agreement and negotiations related to and preparation of

this Agreement and not to seek from each other reimbursement of any such costs, expenses or

attorneys' fees.

14.    **Governing Law.**

This Agreement, and all disputes arising under this Agreement or related thereto, shall be

governed by, construed and interpreted in accordance with the laws of the State of Delaware,

applicable to instruments made, delivered and performed entirely in such state, without regard to

the choice of law provisions thereof.

15.    **Arbitration.** UNLESS THIS AGREEMENT SPECIFICALLY PROVIDES FOR

ANOTHER TYPE OF DISPUTE RESOLUTION WITH RESPECT TO A PARTICULAR

KIND OF DISPUTE, ANY AND ALL CONTROVERSIES AND CLAIMS ARISING OUT OF

OR RELATING TO THIS AGREEMENT, OR THE BREACH, TERMINATION OR

VALIDITY THEREOF, SHALL BE EXCLUSIVELY SETTLED BY FINAL AND BINDING

23

ARBITRATION IN ACCORDANCE WITH THE PROCEDURES SET FORTH IN THIS
SECTION.

(a)     The arbitration shall be conducted in accordance with the Commercial
Arbitration Rules of the American Arbitration Association ("AAA") then in effect (the "Rules"),
except as set forth herein.  Any member of the Trump Group on behalf of the Trump Group, on
the one hand, and any member of the AG Group on behalf of the AG Group, on the other hand,
may demand arbitration by giving the other written notice to such effect in accordance with the
Rules.

(b)     The arbitration will be held before one neutral arbitrator.  Within thirty (30)
days after the other Party's receipt of the demand for arbitration, the Party seeking arbitration
will invite the other Party to join it in approaching the following list of individuals about serving
as arbitrator and will approach such individuals with such other Party (if its invitation is accepted)
or without such other Party (if its invitation is rejected or not responded to within five (5)
business days): The Honorable William B. Chandler III, David A. Jenkins, Esq., Stephen E.
Jenkins, Esq., Robert J. Katzenstein, Esq., and Andre G. Bouchard, Esq.  If only one such
individual is available and willing, he shall serve as the arbitrator.  If more than one such
individual is available and willing, the Parties will mutually determine which of those so
available and willing will serve as the arbitrator.  If the Parties are unable to agree, the arbitrator
will be selected by the AAA from the foregoing list in accordance with the listing, striking and
ranking procedure in the Rules, with each Party being given a limited number of strikes, except
for cause.  If none of the foregoing individuals is available, the arbitrator will be selected by the
AAA in accordance with the listing, striking and ranking procedure in the Rules, with each Party

24

being given a limited number of strikes, except for cause. Any arbitrator appointed by the AAA shall be a retired judge that presided over a state or federal court located in Delaware or a practicing attorney licensed in Delaware with no less than fifteen years of experience with large commercial cases. Any such arbitration proceedings shall be and remain confidential. The place of arbitration shall be in Manhattan, New York or elsewhere if otherwise agreed to.

(c)     Discovery will be limited to the request for and production of documents, directly related to the issues in dispute, limited depositions of limited duration, and interrogatories. Interrogatories will be allowed only as follows: a Party may request the other Party to identify by name, last known address and telephone number (i) all persons having knowledge of facts relevant to the dispute and a brief description of that person's knowledge, and (ii) any experts who may be called as an expert witness, the subject matter about which the expert is expected to testify, the mental impressions and opinions held by the expert and the facts known by the expert. All issues concerning discovery upon which the parties cannot agree will be submitted to the arbitrator for determination.

(d)     Each of the Parties agrees that it will use commercially reasonable efforts to join (and will allow the other party to join) any third party that the Parties have agreed is indispensable to the arbitration. If any such third party does not agree to be joined, the arbitration will proceed nonetheless.

(e)     The arbitrators are not empowered to award damages not permitted by the terms of this Agreement and if so permitted, then not in excess of compensatory damages, except with respect to indemnification obligations for punitive damages as provided hereunder, and

25

each Party irrevocably waives the right to recover punitive, exemplary or multiple damages with respect to any dispute other than with respect to indemnification obligations for such punitive damages as provided hereunder. The decision of, and award rendered by, the arbitrator will be final and binding on the Parties, will be in writing and will include the findings of fact and conclusions of law upon which it is based, if any.

(f)     The Parties specifically acknowledge that this Agreement evidences a transaction involving, affecting, affected by, and a part of, interstate commerce and that this agreement to arbitrate is governed by and enforceable under the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq.

(g)     Except to the extent that any of the indemnification provisions contained herein shall be applicable (i) the Parties shall each be responsible for their own costs and expenses (including legal fees and disbursements) incurred in any arbitration, and (ii) the AG Group on the one hand and the Trump Group on the other shall each be responsible for 50% of the fees and disbursements of the arbitrator and of any costs and expenses payable to the AAA.

(h)     With respect to the enforcement, modification or vacating of any arbitration award (it being reconfirmed hereby that the arbitration award shall itself be final and binding on the Parties), the Parties submit to the exclusive jurisdiction of one or the other of (i) the United Stated District Court of the Southern District of New York sitting in the Borough of Manhattan in the City of New York and (ii) the Commercial Division of the New York State Supreme Court sitting in the Borough of Manhattan in the City of New York.

16.     **Notice.** If any Party is required to give notice to any other Party under this Agreement, such notice shall be in writing and shall be deemed to have been duly given upon receipt of hand delivery, one business day following its being sent to the recipient via Federal Express or another

26

nationally recognized over-night courier, or by e-mail with confirmation of receipt to the

following individuals or to such other address or person as such Parties may from time to time

specify by written notice given in the manner provided above:

**If to the Trump Group:**

Mark S. Hirsch, Esq.

The Trump Group

41 Madison Avenue, Suite 4101

New York, NY 10010

Phone: (212) 838-1000

E-mail: mhirsch@trumpgroup.com

**With Copy to:**

Thomas J. Allingham II, Esq.

Anthony W. Clark, Esq.

Douglas D. Herrmann, Esq.

Skadden, Arps, Slate, Meagher & Flom LLP

One Rodney Square

P.O. Box 636

Wilmington, DE 19899

Phone: (302) 651-3000

E-mail: thomas.allingham@skadden.com

27

E-mail: anthony.clark@skadden.com

E-mail: douglas.herrmann@skadden.com

**If to Arie Genger:**

Arie Genger

104 West 40th Street, 19th Floor

New York, NY 10018

E-mail: wachtel@wmllp.com

**With Copy to:**

Stephen P. Lamb, Esq.

Paul Weiss

500 Delaware Avenue, Suite 200

Wilmington, DE 19889

**If to Orly Genger:**

Orly Genger

104 West 40th Street, 19th Floor

New York, NY 10018


E-mail: wachtel@wmllp.com

**With Copy to:**

28

William Wachtel

Wachtel Masyr & Missry LLP

885 second ave.

New York, NY 10017

[]

**If to Arnold Broser or David Broser:**

David Broser

104 West 40th, 19th FloorNew York, NY 10018

E-mail:  wachtel@wmll.com

**With Copy to:**

William Wachtel

Wachtel Masyr & Missry LLP

885 second ave.
New York, NY 10017

29

17.     **Entire Agreement.** This Agreement contains the entire agreement between the Parties concerning the subject matter hereof. Neither this Agreement nor any of its terms or provisions shall be binding on any Party until all the Parties hereto have signed. The Parties agree that all drafts of this Agreement are strictly confidential and shall supplement and complement any protection, which may attach to the exchange of confidential information in settlement discussions, whether by common law or statute including, but not limited to, Federal Rule of Evidence 408 and comparable state laws. Any and all prior discussions and agreements between the Parties concerning the subject matter of this Agreement are merged into this Agreement when signed. This Agreement may not be modified or amended, nor any of its provisions waived, except by an instrument in writing signed by all Parties. No Party has made any warranty or representation to the other Parties that is not set forth expressly herein. In entering into this Agreement, no Party has relied on any statement or representation made by or on behalf of any other Party, by or on behalf of any affiliate of such other Party, or by counsel for such other Party that is not set forth expressly in this Agreement.

18.     **No Drafting Presumption.** This Agreement shall be interpreted or construed without any presumption that the provisions hereof should be strictly construed against the drafter, it being agreed that the Parties and their respective counsel and other agents have fully and equally participated in the preparation, negotiation, review and approval of all provisions of this Agreement.

19.     **No Admissions.** The Parties have executed this Agreement for the sole purpose of settling and disposing of all Claims between them, and it is expressly understood and agreed that no Party hereto admits any wrongdoing on its, his or her part by executing this Agreement.

30

20.    **Binding Effect.** It is the intention of the parties to extinguish all AG Group Released Claims and all Trump Group Released Claims and, consistent with such intention, each of the Parties hereby waives any and all rights, to the extent permitted by law, to assert that the Release provided by it in Paragraph 6 hereunder is unenforceable as to any claim whatsoever and for any reason including, without limitation, any and all rights under section 1542 of the California Civil Code, if applicable, or any other applicable similar law or principle of common law, which may have the effect of limiting the Releases herein. Section 1542 of the California Civil Code provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

21.    **Headings.** The section headings contained in this Agreement are for reference purposes only and shall not in any way effect or control the meaning or interpretation of this Agreement.

22.    **Execution in Counterparts and by PDF e-mail.** This Agreement may be executed in multiple counterparts and by fax or PDF e-mail, each of which, when so executed and delivered, shall be an original, but such counterparts shall together constitute one and the same instrument and agreement.

23.    **Effective Date.** This Agreement shall be effective immediately upon execution and delivery by all Parties hereto (the "Effective Date").

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed as follows:

**TR Investors, LLC**                           Arie Genger

By: _____        _____

Print: _____          Date: ___6/15/13___

Title: _____

Date: _____


**Glenclova Investment Co.**                    **Orly Genger (in her individual capacity and**

                                                **in her capacity as beneficiary of the**

By: _____                     **Orly Genger 1993 Trust)**

Print: _____           _____

Title: _____           Date: ___6/15/13___

Date: _____

32

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed as follows:

**TR Investors, LLC**                    **Arie Genger**

By: _____          _____

Print: MARK J. HIRSCH                  Date: _____

Title: Executive VP/General Counsel

Date: June 16, 2013

**Glenclova Investment Co.**             **Orly Genger (in her individual capacity and
                                          in her capacity as beneficiary of the
                                          Orly Genger 1993 Trust)**

By: _____

Print: MARK S. HIRSCH                  _____

Title: Executive VP/General Counsel    Date: _____

Date: June 16, 2013

32

**New TR Equity I, LLC**

By: _____

Print: _____

Title: _____

Date: _____


**Arnold Broser**

_signature_

Date: _____ 6/16/13 _____


**New TR Equity II, LLC**

By: _____

Print: _____

Title: _____

Date: _____


**David Broser**

_signature_

Date: _____ 6/16/13 _____


33

**New TR Equity I, LLC**                    **Arnold Broser**

By: _Mark S. Hirsch_____          _____

Print: _MARK S. HIRSCH_____               Date: _____

Title: _Executive VP/General Counsel_

Date: _June 16, 2013_____


**New TR Equity II, LLC**                   **David Broser**

By: _Mark S. Hirsch_____          _____

Print: _MARK S. HIRSCH_____               Date: _____

Title: _Executive VP/General Counsel_

Date: _June 16, 2013_____

33

**Trans-Resources, LLC**

By: _Mark S. Hirsch_

Print: _MARK S. HIRSCH_

Title: _Executive VP/General/Counsel_

Date: _June 16, 2013_

**Jules Trump**

Date: _6 / 16 / 2013_

**Eddie Trump**

Date: _____

**Mark Hirsch**

Date: _____

**Jules Trump**

_____

Date: _____

**Eddie Trump**

_____

Date: June 16, 2013

**Mark Hirsch**

_____

Date: _____

**Jules Trump**

_____

Date: _____

**Eddie Trump**

_____

Date: _____

**Mark Hirsch**

_____

Date: _June 16, 2013_____

EXHIBIT A

6/16/13
*Draft - Confidential*

## [FORM OF SUBORDINATED NOTE]

**THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE SOLD OR TRANSFERRED WITHOUT COMPLIANCE WITH THE REGISTRATION OR QUALIFICATION PROVISIONS OF APPLICABLE FEDERAL AND STATE SECURITIES LAWS OR APPLICABLE EXEMPTIONS THEREFROM.**

TRANS-RESOURCES

## SUBORDINATED NOTE

$7,500,000.00                                          June __, 2013

   **FOR VALUE RECEIVED**, Trans-Resources, LLC a Delaware entity (the successor to Trans-Resources, Inc. and referred to herein as the "Maker"), hereby promises to pay to the order of [_____] (the "Payee"), the principal sum of Seven Million, Five-Hundred Thousand Dollars ($7,500,000.00) pursuant to the terms and conditions of and at the times provided in the Settlement Agreement (as defined below).

   1.   Notes. This Subordinated Note (this "Note") is issued pursuant to, and is subject to the terms and conditions of, the Settlement Agreement and Release, dated as of June __, 2013 by and among the AG Group and the Trump Group, as amended, restated, supplemented or otherwise modified from time to time (the "Settlement Agreement"). Terms used herein and not otherwise defined herein shall have the respective meanings ascribed thereto in the Settlement Agreement.

   2.   No Interest. This Note will not accrue interest, pursuant to the terms of the Settlement Agreement.

   3.   Maturity. Subject to the terms and conditions of the Settlement Agreement and this Paragraph 3, this Note shall mature and be redeemed or satisfied in full by the Maker in one installment, which shall be paid by the Maker no later than the ___ anniversary of the Effective Date (the "Maturity Date"). Notwithstanding the foregoing, the Maturity Date shall automatically be extended until the earlier (the "Extended Maturity Date") of (i) such time as all pending claims, cross-claims and counter-claims brought by any of TPR, Sagi Genger, the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust (other than the Orly Trust Action), D&K Limited Partnership, D&K GP LLC, Rochelle Fang, and/or David Parnes (collectively, the "Sagi Group") against any member of the Trump Group have been dismissed with prejudice and the statute of limitations shall have run with respect to any other potential claims of the Sagi Group that might be the subject of the indemnification obligations provided for by Paragraph 5 of the Settlement Agreement and (ii) such time as each member of the Sagi Group shall have provided the Trump Group with a release of the Trump Group Released Parties and covenant not to sue in form and substance that is the same as the AG Group Release and covenant not to sue contained in Paragraph 6(a) of the Settlement Agreement. Subject to the foregoing, this Note shall become immediately due and payable upon the occurrence of any transaction or series of transactions which shall result in the Trump Group owning or controlling neither (i) a majority of the voting stock of Trans-Resources or its successors or each of its two principal subsidiaries, Haifa

Chemicals, Ltd. and Na-Churs Plant Food Company or their successors, nor (ii) directly or indirectly, a majority of the assets currently owned by Trans-Resources and its subsidiaries; provided, however, that in such event, at the request of the Trump Group, the amounts then payable on this Note shall be placed in escrow until the Maturity Date or until the Extended Maturity Date (if applicable) under the provisions of an escrow agreement on reasonable terms to be negotiated at such time in good faith between the Maker, the Payee and an escrow agent selected by mutual consent of the Maker and the Payee (such consent, not to be unreasonably withheld, conditioned or delayed), which shall provide for the release of funds from such escrow to the Maker in satisfaction of any and all Indemnification Amounts, AG Group Release Amounts and Discovery Costs owing to Maker, if any, and payment to the Payee of any amounts remaining in escrow after payment to Maker of all Indemnification Amounts, AG Group Release Amounts and Discovery Costs, if any, upon the Maturity Date hereunder or the Extended Maturity Date (if applicable).

4.    Optional Prepayments. The Maker may voluntarily prepay this Note prior to the Maturity Date, in whole or in part, at any time, without premium or penalty.

5.    Adjustment. In accordance with the terms of the Settlement Agreement, in the event that at any time Indemnification Amounts, Discovery Costs, AG Group Release Amounts, or other amounts due and payable by the AG Group to the Trump Group pursuant to the Settlement Agreement (the "Costs") have not been paid to the Trump Group in accordance with the terms of the Settlement Agreement, the Maker may, upon written notice to the Payee, set off and apply as a credit against the amount due under this Note any and all due, unpaid and outstanding Costs. The rights and remedies described herein are in addition to any other rights and remedies the Parties may have under the Settlement Agreement or other applicable law.

6.    Subordination. Pursuant to the terms of the Settlement Agreement, this Note is unsecured and shall be fully subordinated to any obligation of Trans-Resources, including, but not limited to, outstanding credit facilities, bonds, loans, tax obligations and payables.

7.    Enforcement. The Maker hereby agrees to pay on demand all reasonable costs and expenses, including without limitation attorneys' fees and costs of collection, incurred or paid by the Payee in enforcing this Note in accordance with the Settlement Agreement.

8.    Amendments. No failure or delay on the part of the Maker or the Payee in exercising any right, power, privilege or remedy shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power, privilege or remedy preclude any other or further exercise thereof or the exercise of any other right, power, privilege or remedy. This Note may not be amended and the provisions hereof may not be waived, except in accordance with the terms of the Settlement Agreement.

9.    Lost Notes, etc. If this Note is mutilated, destroyed, lost or stolen, upon receipt of evidence satisfactory to the Maker of such loss, theft, destruction or mutilation of this Note and, if requested in the case of any such loss, theft or destruction, upon delivery of an indemnity agreement reasonably satisfactory to the Maker, or, in the case of any such mutilation, upon surrender and cancellation of this Note, the Maker shall issue a new Note of like tenor and amount, in lieu of this Note.

- 2 -

Error! Unknown document property name.

**IN WITNESS WHEREOF**, the Maker has caused this Subordinated Note to be duly executed under seal on the date set forth above by a duly authorized representative of the Maker.

TRANS-RESOURCES, LLC

By:_____
    Name:
    Title:

4







**GRANTED**

EFiled: Aug 30 2013 04:33PM EDT
Transaction ID 53977416
Case No. 6906-CS

## IN THE COURT OF CHANCERY FOR THE STATE OF DELAWARE

| | |
|---|---|
| DALIA GENGER, as Trustee of the Orly Genger 1993 Trust,<br><br>    Plaintiff,<br>    v.<br><br>TR INVESTORS, LLC, GLENCLOVA INVESTMENT CO., NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, TRANS-RESOURCES, INC., and TPR INVESTMENT ASSOCIATES, INC.<br><br>    Defendants.<br>─────────────────────<br>TR INVESTORS, LLC, GLENCLOVA INVESTMENT CO., NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, and TRANS-RESOURCES, INC.,<br><br>    Counterclaim and Crossclaim Plaintiffs,<br>    v.<br><br>DALIA GENGER, as Trustee of the Orly Genger 1993 Trust,<br><br>    Counterclaim Defendant,<br><br>    and<br><br>TPR INVESTMENT ASSOCIATES, INC.,<br><br>    Crossclaim Defendant<br>─────────────────────<br>TPR INVESTMENT ASSOCIATES, INC.,<br>    Counterclaim and Crossclaim Plaintiff, | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br><br>C.A. No. 6906-CS |

v.                                              :
                                                :
DALIA GENGER, as Trustee of the                 :
Orly Genger 1993 Trust,                         :
                                                :
     Counterclaim Defendant,         :
                                                :
  and                                        :
                                                :
TR INVESTORS, LLC, GLENCLOVA               :
INVESTMENT CO., NEW TR EQUITY I,           :
LLC, NEW TR EQUITY II, LLC, and            :
TRANS-RESOURCES, INC.,                     :
                                                :
     Crossclaim Defendant            :

---

## STIPULATION AND PROPOSED ORDER OF DISMISSAL

      Plaintiff/Counterclaim Defendant Dalia Genger, as Trustee of the Orly Genger 1993 Trust (the "Trustee of the Orly Trust"), Defendants/Counterclaim and Crossclaim Plaintiffs/Crossclaim Defendants TR Investors, LLC, Glenclova Investment Co., New TR Equity I, LLC, New TR Equity II, LLC and Trans-Resources, Inc. (collectively, the "Trump Group") and Defendant/Counterclaim and Crossclaim Plaintiff/Crossclaim Defendant TPR Investment Associates, Inc. ("TPR"), through the undersigned counsel, pursuant to Chancery Court Rules 41(a)(1)(ii) and 41(1)(c), hereby stipulate and agree as follows:

1. In the action styled *TR Investors, LLC, et al. v. Genger*, C.A. No. 3994-CS (the "3994 Action"), the Court found that (i) the transfers in October 2004 of Trans-Resources, Inc. ("Trans-Resources) stock out of TPR were in violation of the March 2001 Stockholders Agreement among Trans-Resources, TPR, TR Investors, LLC and Glenclova Investment Co., (ii) the transfers were void and the